**ANDERSON & KARRENBERG**
Thomas R. Karrenberg (3726)
Jon V. Harper (1378)
50 West Broadway, #700
Salt Lake City, UT  84101
Telephone:  (801) 534-1700
Facsimile:   (801) 364-7697
tkarrenberg@aklawfirm.com
jharper@aklawfirm.com

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
(215) 963-0600
         and
Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
(619) 230–0800

**Attorneys for Plaintiff**

_____

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT FREEDMAN, on behalf: of himself and all others similarly situated, | **COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (Proposed Class Action) |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | Civil No. 2:14-CV-00033 |
| NU SKIN ENTERPRISES INC., RITCH N. WOOD, AND M. TRUMAN HUNT, | Judge Paul M. Warner |
| Defendants. | |

Plaintiff, by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings

made by Nu Skin Enterprises Inc. ("Nu Skin" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Nu Skin; and (d) other public information regarding the Company.

### INTRODUCTION

1.      This is a federal securities class action brought on behalf of purchasers of Nu Skin's publicly traded common stock between July 10, 2013 and January 14, 2014 inclusive (the "Class Period").  The claims asserted herein are alleged against Nu Skin and certain of the Company's senior executives (collectively, "Defendants"), and arise under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Nu Skin is a direct selling company that purports to develop and distribute more than 200 premium-quality anti-aging personal care products and nutritional supplements under the Nu Skin and Pharmanex brands in 53 markets worldwide, including North Asia, Greater China, the south Asia/Pacific, the Americas and Europe, the Middle East, and Africa. The Company's global operations generated more than $2.17 billion in revenue during 2012.

3.      The Company has become very dependent on China for a very significant amount of its revenue and its growth.  Sales in Mainland China accounted for approximately one third of the Company's total revenue in the first nine months of 2013.

4.      Notably, while the Company issued numerous public statements discussing its positive results and increased guidance, especially in light of new product

2

introductions and increased sales in Greater China, it failed to disclose either its fraudulent sales practices and non-compliance with laws and regulations in China, or their potential impact on the Company.  Then, in January 2014, two Chinese agencies announced that they were probing the Company's marketing and business practices in China and that it was suspected the Company was operating an illegal pyramid scheme. These revelations had an immediate and material impact on the Company's stock price, causing shares of Nu Skin's stock to tumble over 44% in the two days of trading after these announcements.

## PARTIES

5.      Plaintiff, Robert Freedman, purchased shares of Nu Skin stock during the Class Period as set forth in the attached certification and was injured thereby.

6.      Defendant Nu Skin is a Delaware corporation with its principal executive offices located 75 West Center Street, Provo, Utah 84601.  Shares of Nu Skin trade on the New York Stock Exchange ("NYSE") under the ticker symbol "NUS" and, as of October 31, 2013, the Company had 59,482,398 shares of the stock outstanding.

7.      Defendant M. Truman Hunt ("Hunt") served as the President and Chief Executive Officer of Nu Skin at all times relevant to the Class Period.

8.      Defendant Ritch N. Wood ("Wood") served as the Chief Financial Officer of Nu Skin at all relevant times to the Class Period.

9.      Defendants Hunt and Wood are collectively referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

10.     The claims asserted herein on behalf of Plaintiff and the Class arise under

Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § § 78j(b) and 78t(a), and SEC

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction

over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and

Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange

Act and 28 U.S.C. § 1391(b).  Nu Skin maintains its executive offices in this District and

many of the acts and transactions giving rise to the violations of law complained of

herein, including dissemination to the public of materially false and misleading

information, occurred in and/or were issued from this District.

12.     In connection with the acts, conduct and other wrongs complained of

herein, defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including, but not limited to, the United States mails, and the

facilities of a national securities market.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and

Rule 23(b)(3) of the Federal Rules of Civil Procedures on behalf of all persons or entities

(the "Class") who purchased or acquired the common stock of Nu Skin during the Class

Period and who suffered damages as a result.

14.     Excluded from the Class are: (i) Defendants; (ii) members of the

immediate family of each of the Defendants; (iii) any person who was an executive

officer and/or director of Nu Skin during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15.     The members of the Class, purchasers of Nu Skin common stock, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher. Nu Skin has over 59 million shares of common stock outstanding, owned by hundreds or thousands of investors.

16.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

17.     Plaintiff will fairly and adequately protect the interest of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

18.     A class action is superior to the other methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

        a.     Whether Defendants violated the Exchange Act;

        b.     Whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        c.     Whether the market price of Nu Skin stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

        d.     Whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

        e.     With respect to Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the Individual Defendants are controlling persons of the Company; and

        f.     Whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

20.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

21.     The names and addresses of the record owners of Nu Skin shares purchased during the Class Period are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## BACKGROUND

22.     Nu Skin is a global direct selling company with operations in 53 markets worldwide.  The Company purports to develop and distribute premium quality anti-aging personal care products and nutritional supplements under its Nu Skin and Pharmanex brands.

23.     The Company primarily sells its products through direct marketing, though in China Nu Skin has said that it sells through physical stores as well as through direct sales where permitted.  The Company generally relies on independent salespeople called distributors.  According to an October 26, 2012 *CNN Money* article titled "Nu Skin and the Short Sellers," for a $25 sign-up fee, a distributor can buy at wholesale and pocket the markup on anything they sell.  The only chance for a distributor to earn a full-time income is to recruit other distributors and get a piece of their sales.  The Company's salespeople must sign up more sellers and so on to generate commissions on a portion of their sales.  Nu Skin's sales force is made up of over 40,000 people who sell the Company's products in at least 19 of China's 32 provinces and municipalities.

24.     In China, the market is particularly ripe for the Company's anti-aging products.  According to a January 17, 2014 *Bloomberg* article titled "Nu Skin China

7

Probe Derails CEO's Sevenfold Share Gain," the United Nations has forecast that the population of people aged 65 and older will increase in China by approximately 66 million from 2015 to 2025.

25.     Therefore, it is no surprise that Nu Skin's operations have expanded rapidly in Asia, and particularly in China.  The *Bloomberg* article also details that sales in China more than tripled in the three-month period ending Sept. 30, accounting for the bulk of the Company's total 76% revenue gain for the quarter.  According to defendant Hunt, mainland China alone accounted for 30% of Nu Skin's $2.16 billion in revenue during the first nine months of 2013.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

26.     The Class Period begins July 10, 2013, the first day of trading after the Company issued a press release announcing its preliminary financial results for the second quarter ended June 30, 2013.  The Company announced a significant increase to estimated revenue and earnings per share for the second quarter 2013.  The Company stated:  "[r]evenue is now estimated to be about $680 million, with estimated earnings per share of approximately $1.20."  Prior revenue guidance was $570 to $580 million, with earnings per share guidance of $0.99 to $0.95.  The release also announced that the Company was increasing its full-year 2013 revenue guidance by $320 million to $2.83 to $2.86 billion and that it expected 2013 earnings to be $4.85 to $5.00 per share.

27.     The Company's public statements highlighted Nu Skin's new products and growing business in China.  Specifically, Defendant Hunt stated: "Our second-

quarter results reflect the strong momentum of our business.  After a record 2012 that included impressive ageLOC product launches in the second quarter, we continue to generate healthy gains throughout our global business, ***particularly*** in ***the Greater China***, North Asia and Americas regions."   (Emphasis added).   Following Defendants' statements to the market on July 10, 2013, the price of the Company's stock increased by $12.71 per share, over 19%  from a closing price of $66.17 on July 9 to a closing price of $78.88 on July 10, 2013.

28.     The statements set forth in the paragraphs above were materially false and misleading for the following reasons:

(a) Defendants knew and failed to disclose that its sales and business practices in China were not in compliance with local law and regulation;

(b) Defendants knew and failed to discuss the negative impact that these practices would have on the Company; and

(c) Defendants knew that Nu Skin could not keep up its "strong momentum of [its] business" to "continue to generate healthy gains throughout [its] global business" without the sales generated in China, which were then contributing to approximately one third of the Company's overall revenue.

29.     The Company announced its actual second quarter results on August 1, 2013 and during an earnings conference call on the same day.  During the earnings conference call, defendant Hunt stated

we're really pleased with our results for the second quarter.  We generated record revenue of $683 million, which is an 18% increase in local currency, while increasing our earnings per share by 30% to $1.22. Given the strong growth we're seeing in our consumer base, which has continued

through the month of July and is reflected in our active account number, we're also increasing, again, today our guidance for the remainder of the year. We now expect revenue to increase by 35% for the year with earnings up over 40% year-over-year.

30.     Later, during that same conference call, defendant Hunt noted the impact of China on the Company's strong results. He specifically stated "Greater China's growth obviously continues to be strong. Sales in the second quarter in Mainland China were $198 million." Defendant Hunt further highlighted the continued business growth in China, noting "we're pleased that China recently approved 5 additional direct-selling licenses, which will become increasingly important as our business develops throughout China." He further stated:

> We continue to invest to sustain growth in this market and are committed to working to ensure our long-term success there. From what we're seeing, we believe that the market continues to have significant upside potential.

31.     Defendant Wood reiterated the positive results on the call noting that "… revenue growth driven by very strong increases in our consumer base, as well as our sales leaders, our growth in our distribution channel really is what gives us confidence and increasing confidence in our ability to deliver on our revenue and profit expectations ..." He further acknowledged that Nu Skin saw "great enthusiasm and demand for our new products. We believe that being conservative in forecasting, as the business accelerates, is important. And so we're particularly careful in forecasting the product launch sales and the growth that we're seeing in our China business."

32.     In discussing the Company's expansion in China, defendant Hunt further stated during the call:

> In Shanghai, we are building a Greater China headquarters, which is also quite large in scale and will enable us to have enough infrastructure to continue to grow there for some time. It includes manufacturing facilities, warehousing facilities, office facilities, as well as a recognition center for China sales leaders. It, too, will be a real showpiece and will attract a lot of our sales leaders from around the Greater China region...

33.     Defendant Wood also spoke during the August 1 conference call, referring, among other things, to the Company's "special incentive" to continue its growth in China, as follows:

> ...we have this incentive that we've talked about in our Greater China region that if the Greater China region achieves $1 billion, there's a special incentive that we put in place back in 2009 that would pay out. At this point in time, we're highly confident and obviously on the track we're on now we'll exceed that $1 billion target this year. So we're accruing to hit that number that pushed our selling expenses up just a little bit. We have more people in qualification, more people qualifying to hit sales incentive targets, kind of trip incentives and promotional incentives that we put in place, which has also pushed the incentive up just a little bit. The way we really calibrate that through is that the faster growth helps us to leverage our overhead as well. So the growth in selling expenses is offset in the overhead number, which allows us to continue to improve margins as we go forward.

34.     Defendant Hunt also acknowledged the Company's rapid growth in China during the call.  He stated that the Nu Skin "team is working their tails off not just at the management level but, really throughout the entire organization" and "[f]rom the infrastructure standpoint…we're fairly rapidly building out our store presence…"

35.     The statements set forth above about the Company's prospects and business in China from the second quarter 2013 earnings conference call were false and misleading because, as noted above:

(a)     Defendants knew and failed to disclose that its business practices in China did not comply with local laws and regulations;

11

(b)     Defendants knew and failed to disclose the impact of its non-compliance with Chinese laws and regulations; and

(c)     Defendants knew and failed to disclose that the Company's rapid growth and revenue increase could not continue without its China business.

36.     On October 22, 2013, the Company announced its results for the third quarter 2013 in a press release and on a call with investors and analysts.  The Company again highlighted its growing business and success in the Greater China region during the conference call, stating that the Company was "very pleased with [its] third quarter results. We posted record revenue of $928 million, an impressive 76% improvement over the prior year. And even more impressive when you consider that our largest revenue quarter prior to this was $683 million. Additionally, our earnings grew by 107%, reaching $1.80 per share."

37.      During that call, defendant Hunt stated that "a highlight for the third quarter was the very strong start we had with the global LTO of our new weight management system which we call ageLOC TR90.  Beginning in September, we made TR90 available in portions of Greater China and in the South Asia/Pacific regions, with sales totaling about $205 million."

38.     The Company also highlighted the importance of Greater China. Defendant Hunt specifically noted "[g]eographically, we were particularly pleased with the strong growth in the Greater China and South Asia/Pacific regions…. We remain optimistic about the potential of Mainland China, which continues to be a growing market for the direct selling industry as a whole. We're still a relatively small player in

the market and we think that the market's potential justifies the investment to continue to sustain growth in a market that one really cannot afford to ignore." Moreover, in addition to announcing the opening of its new Innovation Center and expanded headquarters in the United States, the Company further announced that it expected to complete its new Greater China regional headquarters and Innovation Park in Shanghai by the end of the year.

39.     On the earnings call, Defendant Hunt again mentioned the Company's incentive in Greater China:

> Some of you will remember that about 3 years ago, we put in place an incentive for Greater China to reach $1 billion in sales by the end of 2014, which is our 30th anniversary year. That objective, when we initiated it, it seemed quite aspirational at the time. But we will announce this week at our convention that Greater China actually achieved that sales objective for the year earlier in the month of October. So we're really pleased with what's happening there, and that achievement is a tribute to our management team and our sales leaders who are working really hard to execute in a high growth environment.

40.     Defendant Wood similarly touted the Company's success in China:

> …overall sales grew 76%, which included a 3% currency -- negative currency impact. Revenue in the quarter benefited from $205 million approximately of LTO sales, and which was approximately $15 million ahead of our estimate of $190 million. In the prior year quarter, we had about $50 million of LTO sales in Greater China and Southeast Asia. Our gross margin for the quarter was 84.9%. That was well ahead of our expectations and up about 140 basis points compared to the prior year, 83.5% rate. The lift in gross margin was primarily attributed to the LTO sales of TR90 products, which on a consolidated basis have very good gross margins in Asia, which is where the LTO took place.

41.     These statements were false and misleading because the Company knew that its business practices in China were not in compliance with Chinese law, that they operated as an illegal pyramid scheme, and that the Company's rapid growth and revenue

increase could not continue without its China business. As such, Nu Skin painted a materially misleading picture with regard to its prospects because so much of its revenue was based on its sales and success in China and Nu Skin's business there could not be sustained because it violated local law and regulations. Following Defendants' statements to the market on October 22, 2013, the price of the Company's stock increased by $8.61 per share, over 8% from a closing price of $102.43 on October 21 to a closing price of $111.04 on October 22, 2013.

42.     The Company's false and misleading statements, and failures to disclose important facts about its business model and practices in China, continued when the Company held an Investor Day conference on November 21, 2013 (the "Investor Day"). The conference materials stated expressly that "China represents a significant opportunity to expand our business" and "China continues to hold great promise." The materials also highlighted that the "personal care and beauty category continues to show healthy growth in China" and that one of the Company's two-year business cycle key growth initiatives was to drive growth through China LTO sales. The Company also detailed its plan to expand stores in China, with 36 stores planned for 2013-2014 and an additional 85 for 2015-2016.

43.     The Investor Day materials further represented that Nu Skin China "penetration has been growing consistently in the last few years and has been a key driver of the growth," and that the results of a Nielsen study had demonstrated that repeat purchasers had gained momentum in the last two years as Nu Skin China had become more efficient in converting trial purchasers into repeat purchasers.

14

44.     Defendant Wood noted at Investor Day that the 3 year CAGR for Greater China was 74% and 5 year was 46% and for Mainland China the 3 year CAGR was 122% and the 5 year was 74%.  He also noted that the 2014 project constant-currency revenue would increase 50-55%.

45.     The Company's statements at Investor Day were false and misleading because Defendants knew that the Company's operations in China were an illegal pyramid scheme in violation of Chinese law and, as such, the business operations and prospects were false and would tumble when the illegal practices came to light.  Thus, in its public statements, the Company falsely touted the success and growth of its China business while concealing that its operations there violated the laws.

## THE TRUTH SLOWLY BEGINS TO EMERGE

46.     On January 15, 2014, the Chinese newspaper *People's Daily* published a report asserting that Nu Skin's Chinese operations are in violation of the laws of the People's Republic of China and that such operations were suspected to be an illegal pyramid scheme.  The article further reported that the Company brainwashes its trainees and sells 104 products, 20 more than the Chinese government allows.  On January 16, 2014, China's State Administration for Industry and Commerce reported that it would investigate Nu Skin after the *People's Daily* report.

47.     According to a report in the *Wall Street Journal*, Nu Skin had sales of $667.4 million in Mainland China in the first nine months of last year, accounting for nearly a third of the Company's total sales.  In the Company's SEC filings, Nu Skin said it had 57,780 independent distributors, sales employees and other promoters in greater

China as of September 30, greater than three times the level of the previous year. The Company acknowledged in a statement on January 16, 2014 that "there will likely be a negative impact on China revenue" as it worked through the "evolving situation."

48.     On the news of the China investigations, the share price of Nu Skin common stock fell precipitously, down over $51 per share, or approximately 44%, over the two trading sessions after these reports surfaced. Specifically, shares of Nu Skin closed on January 15, 2014 at $115.23, down from $136.47 the previous day, an 18% drop, and the next day, shares of Nu Skin were down $30.43, or 26%, to $84.80, on a day of heavy trading.

49.     On January 17, 2014, a second Chinese agency, the Ministry of Commerce, said it would probe the Company. Shares of Nu Skin fell further to $79.57, or nearly 7%, on January 17, 2014.

## LOSS CAUSATION

50.  As alleged herein, during the Class Period, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. The materially false statements and omissions caused significant rises in the prices of Nu Skin common stock, propelling the price of the stock from less than $70 per share before the start of the Class Period to a high of approximately $140 per share by the end of the Class Period. This scheme artificially inflated the price of Nu Skin common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and material omissions were disclosed to the market starting on January 14, 2014, the price of Nu Skin common stock fell precipitously, as the prior

16

artificial inflation came out of the price over time.  As a result of their purchases of Nu Skin common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51. Nu Skin's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Nu Skin who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET AND MATERIAL OMISSIONS

53. Plaintiff asserts two bases for a presumption of reliance in this action. First, the material omissions are presumed to have inflated the market prices of Nu Skin common stock under the presumption stated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Second, at all relevant times, the market for Nu Skin

common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Among other factors, throughout the Class Period:

(a)     Nu Skin's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Nu Skin filed periodic public reports with the SEC;

(c)     Nu Skin regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.  Securities analysts and the business press followed and published research reports regarding Nu Skin that were publicly available to investors; and

(d)     The market price of Nu Skin common stock reacted promptly to the dissemination of new, material information regarding the Company;

54.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for Nu Skin securities was artificially inflated. Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" and *Affiliated Ute* theories apply.

55.    Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Nu Skin securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was fully disclosed.

56.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased Nu Skin common stock at the artificially inflated prices in the market.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(Against All Defendants)

57.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

58.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10-b(5) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

59.    Throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class

members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

60.     Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's stock; and (iii) cause Plaintiff and the other members of the Class to purchase Nu Skin's stock at inflated prices.

61.     By failing to inform the market of all material facts concerning the impact of its fraudulent business practices in China, and by making other false statements and material omissions, Defendants misled investors, causing artificial inflation in the prices of Nu Skin's publicly traded common stock throughout the Class Period and until the truth was fully disclosed.

62.     Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or making direct statements to the investing public on the conference calls detailed herein.

63.     During the Class Period, defendant Hunt, as President and CEO of Nu Skin, and defendant Wood, as CFO, were privy to non-public information concerning the Company.   Hunt, Wood and the Company knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

64.     As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased Nu Skin securities during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.  There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available about the prospects of the Company.

65.     Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

66.     In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for Nu Skin stock, Plaintiff and the other members of the Class purchased Nu Skin stock at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the stock at artificially inflated prices.

67.     The market price for Nu Skin stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

68.     Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Nu Skin stock at artificially inflated

prices and the subsequent decline in the price of those securities when the truth was disclosed.

69.     This claim was brought within two years after discovery of this fraud and within five years of the making of the statements and omissions alleged herein to be materially false and misleading.

70.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

71.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

72.     This Claim is brought pursuant to Section 20(a) of the Exchange Act against the Individual Defendants on behalf of Plaintiff and all members of the Class who purchased Nu Skin stock during the Class Period.

73.     As alleged herein, the Company is liable to Plaintiff and the members of the Class who purchased Nu Skin stock based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     Throughout the Class Period, the Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act, and as culpable participants in the Nu Skin fraud, as detailed herein.

75.     The Individual Defendants exercised control over Nu Skin during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, their direct involvement in its day-to-day operations, and the statements they made and authorized to be made to the public.

76.     Given their responsibilities for managing Nu Skin throughout the Class Period, the Individual Defendants regularly presented to the market as individuals who were responsible for the Company's day-to-day business and operations, as well as the Company's strategic direction.  The Individual Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods, updating investors about the status of the Company and assuring the market about the state of, and prospects for the Company.

77.     As a result of the false and misleading statements and omissions alleged herein, the market price of Nu Skin stock was artificially inflated during the Class Period.

78.     This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements and omissions alleged herein to be materially false and misleading.

79.     By virtue of the foregoing, the Individual Defendants are liable under Section 20(a) to Plaintiff and the Class, each of whom has been damaged as a result of Nu Skin underlying violations.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated:  January 21, 2014

**ANDERSON & KARRENBERG**

/s/ Jon V. Harper
Thomas R. Karrenberg
Jon V. Harper
50 West Broadway #700
Salt Lake City, UT  84101
(801) 534-1700

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
(215) 963-0600

24

Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
(619) 230–0800

*Attorneys for Plaintiff*