Jonathan Gardner
Mark S. Goldman
Christine M. Fox
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mgoldman@labaton.com
cfox@labaton.com

Heidi G. Goebel, 10343
CHRISTENSEN & JENSEN, P.C.
15 W South Temple
Salt Lake City, UT 84101
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
heidi.goebel@chrisjen.com

*Counsel for Lead Plaintiff State-Boston Retirement System
and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE NU SKIN ENTERPRISES, INC., SECURITIES LITIGATION | Master File No. 2:14-cv-00033-DB<br><br>PROPOSED CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| This Document Relates To:<br>ALL ACTIONS | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE .......................................................................... 7

III.    PARTIES ............................................................................................................ 7

IV.     CONTROL PERSON ALLEGATIONS.............................................................. 10

V.      SUBSTANTIVE ALLEGATIONS ..................................................................... 12

        A.      Nu Skin's Multi-Level Marketing Business ......................................... 12

        B.      Nu Skin Enters the Chinese Market in the Early 1990s....................... 14

        C.      The Individual Defendants Orchestrate the Rapid Expansion of Nu Skin's
                MLM Business in Mainland China to Make Up for Declining Growth in
                the U.S. and Japan ................................................................................. 16

        D.      Nu Skin's Violations of China's Regulations on Direct Selling and Anti-
                Pyramid Selling..................................................................................... 18

        E.      The Individual Defendants Knew the Laws in China and Knew Nu Skin's
                Direct Sellers Were Violating Those Laws ........................................... 30

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS .............................................................................................. 31

        A.      First Quarter 2011 Results .................................................................... 31

        B.      Second Quarter 2011 Results................................................................ 38

        C.      Third Quarter 2011 Results................................................................... 41

        D.      Fourth Quarter/Full Year 2011 Results................................................ 45

        E.      First Quarter 2012 Results .................................................................... 50

        F.      Second Quarter 2012 Results................................................................ 54

        G.      Citron Research Report, Company's Response, and Analyst Reports ................ 58

        H.      Company Announces Expanded Distribution in China ......................... 67

        I.      Third Quarter 2012 Results................................................................... 67

J.  Nu Skin's 2012 Annual Analyst and Investor Conference ................................... 72

K.  Fourth Quarter/Full Year 2012 Results ................................................................ 73

L.  Company's Announcement of $ 1 Billion Goal for China .................................... 76

M.  First Quarter 2013 Results ................................................................................... 77

N.  Second Quarter 2013 Revised Estimates and Results .......................................... 80

O.  Third Quarter 2013 Results .................................................................................. 84

P.  Nu Skin's 2013 Annual Investor Day .................................................................. 88

VII.  THE TRUTH IS REVEALED OVER THE COURSE OF ONE WEEK ....................... 90

VIII.  POST-CLASS PERIOD REVELATIONS ...................................................................... 94

IX.  ADDITIONAL SCIENTER ALLEGATIONS ............................................................... 101

A.  Growth in China Was Extremely Important to the Company's Success ............ 102

B.  The Individual Defendants' Insider Selling During the Class Period Was
Extremely Large and Inconsistent with their Prior Trading History ................. 103

C.  The Individual Defendants' Trades During the Class Period Made
Pursuant to 10b-5-1 Plans Are Not Insulated from Scrutiny ............................ 106

D.  In Addition to the Massive Proceeds from Insider Selling, the Individual
Defendants' Total Compensation from Nu Skin Also Increased
Dramatically During the Class Period Based on Defendants' Fraud .................. 108

X.  CLASS ACTION ALLEGATIONS ................................................................................ 110

XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
FRAUD ON THE MARKET DOCTRINE ..................................................................... 112

XII.  NO SAFE HARBOR ....................................................................................................... 114

XIII.  LOSS CAUSATION/ECONOMIC LOSS ...................................................................... 115

COUNT I Violation of Section 10(b) Of The Exchange Act And Rule 10b-5(b)
Promulgated Thereunder Brought Against All Defendants ............................................ 119

COUNT II Violation Of Section 20(a) Of The Exchange Act Brought Against the
Individual Defendants ................................................................................................ 122

PRAYER FOR RELIEF ......................................................................................................... 123

DEMAND FOR TRIAL BY JURY ....................................................................................... 124

Lead Plaintiff State-Boston Retirement System ("State-Boston" or "Lead Plaintiff"), and additional plaintiffs Michael J. DuDash, Liang Bing and Chen Ying Ying, and Jason Spring (together, "Plaintiffs"), by their undersigned attorneys, hereby bring this Consolidated Class Action Complaint ("Complaint") against Nu Skin Enterprises, Inc. ("Nu Skin" or the "Company"), M. Truman Hunt ("Hunt") and Ritch N. Wood ("Wood") (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which included interviews of former employees, independent distributors and sales promoters of Nu Skin and other persons with knowledge of the matters alleged herein,[1] review and analysis of publicly available information, including Securities and Exchange Commission ("SEC") filings by Nu Skin, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and certain affiliated persons who purchased or otherwise

---

[1]     Confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.). All CWs will be described in the masculine to protect their identities.

acquired Nu Skin securities including options between May 4, 2011 and January 17, 2014,

inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of

the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934

(the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Nu Skin is a global multi-level marketing company that distributes personal skin

care products and nutritional supplements in the Americas, Europe, and the Asia Pacific region.

Multi-level marketing ("MLM") is a marketing strategy often used by companies making sales

directly to consumers where the salespersons are compensated not only for products they sell,

but also for the sales of other salespersons whom they recruit.[2]

3.      Prior to the start of the Class Period, growth in Nu Skin's business in some of its

larger, more developed markets including Japan and the United States was on the decline.

4.      To offset the slowdown in growth in Nu Skin's major, more developed markets,

Defendants orchestrated a plan to substantially expand Nu Skin's presence in the People's

Republic of China ("PRC" or "Mainland China").  The decision to focus the Company's

resources on growing business in the PRC was made despite stringent regulations in China

prohibiting the very type of multi-level marketing and multi-level compensation employed by Nu

Skin in all of its other markets and despite the limited success Nu Skin had achieved in

penetrating the Chinese market as a result of those stringent regulations.

---

[2]      This recruited sales force is referred to as the salesperson's  "downline," and can provide
multiple levels of compensation. *See* Jon M. Taylor, MBA, Ph.D., *The Case against Multi-level
Marketing as an Unfair and Deceptive Practice*, Chapter 2: MLM Definitions And Legitimacy,
pages 1-3. Available at http://www.mlm-thetruth.com/research/case4and-against-mlm/

5.     In early 2011, Defendants took what was already a modest, but illegal multi-level marketing business model and multi-level compensation plan in Mainland China, and essentially put it on steroids, easing some of the restrictions they had put in place, rapidly recruiting new distributors who received inadequate, if any training, authorizing the rapid expansion of downlines, and permitting the direct sale of products outside Nu Skin's brick and mortar stores that were not licensed for direct selling.

6.     Defendants also encouraged Nu Skin's existing sales distributors around the world, including its Chinese-speaking distributors in Hong Kong, Taiwan, and Southeast Asia, to recruit sales promoters and distributors in Mainland China in much the same way they recruited distributors around the rest of the world. This included signing up sales distributors in Mainland China, paying them strictly on commission, and requiring the new recruits to sell specified minimum monthly sales levels of Nu Skin products while promising to reward them handsomely not only for selling Nu Skin products but also for recruiting additional new sales distributors from whom they could share their sales commissions. Defendants masterminded this massive expansion in China knowing that Nu Skin's form of multi-level compensation violated many of China's regulations on direct selling and prohibitions on pyramid schemes.

7.     During the Class Period, Defendants repeatedly and misleadingly misrepresented how Nu Skin was operating its business in the PRC in order to create the appearance that the Company's growth in Mainland China was achieved in compliance with China's laws and regulations.  Defendants told investors that Nu Skin developed a "hybrid" system of marketing the Company's products in the PRC, creating "teams" that marketed Nu Skin products and shared in commissions.

8.      In reality, Nu Skin was operating the very same MLM system in Mainland China that it was operating everywhere else.  Confidential witnesses, and internal documents used to train new employees confirm that Nu Skin was not complying with China's direct selling and anti-pyramid selling regulations. In fact, quite the opposite - Defendants were permitting the establishment of downlines in China in direct violation of China's rules prohibiting multi-level marketing. Moreover, Defendants knowingly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in a way that complied with Chinese law. The training that did exist was lax and inconsistent and not at all enforced – another violation of China's regulations on direct selling.

9.      Quarter after quarter, Defendants continuously touted astounding growth in Mainland China attributing it to enthusiasm for Nu Skin's anti-aging products and general business momentum all the while failing to acknowledge how that growth was really achieved in China – through multi-level marketing, vast networks of downlines, and poorly trained sales representatives who sold products not authorized for direct sales in Mainland China.

10.     Nu Skin sales materials shared with potential recruits in China in early 2013 detail Nu Skin's strategy to encourage its direct sellers and sales representatives in China to create at least six "generations" or layers of recruits underneath them to maximize their compensation. In these documents, Nu Skin calls the downlines of its sales representatives - sales "teams" - and calls its multi-level compensation "team rewards" or "team awards" – in an attempt to skirt the Chinese regulations prohibiting multi-level compensation and MLM.  However, there is a flat-out prohibition against multi-level compensation in China and Defendants knew their "team rewards" system and "payment by team" was in direct contravention of that prohibition.

11.    Nu Skin became increasingly dependent on Mainland China for a disproportionate share of its gross revenues and all of its growth.  In 2010, revenue from sales in Mainland China was $91.4 million or 6% of Nu Skin's overall revenue.  By the end of 2013, those numbers skyrocketed – to over $1 billion in revenue and 32% of the Company's revenue – a growth rate for Mainland China of 292% (year-over-year).

12.    As they were touting the Company's performance and prospects in Mainland China, the Individual Defendants unloaded huge amounts of Nu Skin stock for ***proceeds of more than $40 million, at a time when they knew that  the Company's stock price was inflated by the false statements they were making about the reasons for the Company's extraordinary growth in China***.

13.    Defendants' scheme began to unravel in August, 2012, when Citron Research, a short seller, published the results of its private investigation showing that Nu Skin's operations in Mainland China were being conducted no differently than they were in the rest of the world, through a multi-level marketing, pyramid scheme.  Nu Skin's stock dropped on the day this report was issued.  Defendants responded to the report almost immediately, denying Citron's claims and continuing to misrepresent the nature of Nu Skin's business in the PRC.  Defendants successfully convinced analysts and investors following the Company that Citron's report was not credible, and Nu Skin's stock rebounded in response while investors remained deceived.  For the next year and a half, Defendants continued to tout the Company's growth in the PRC, which, they claimed, was achieved while operating in compliance with Chinese law.

14.    Defendants' scheme completely fell apart on January 15, 2014 when a leading Chinese newspaper reported that Nu Skin was operating an illegal pyramid scheme in China, and

employing unlawful business practices in violation of PRC law. The next day, Nu Skin reported that its business practices were under investigation by Chinese authorities.

15.     The full truth was finally revealed on Tuesday, January 21, 2014 when Nu Skin filed a Report on Form 8-K releasing a letter to its customers in China (in English and Chinese / Mandarin) admitting to violations of Mainland China's regulations on direct selling.

16.     Between January 15, 2014 and January 21, 2014, Nu Skin's stock price **_plummeted over 43%_** - falling from a market close on January 14, 2014 of $136.47 per share to a market close on January 21, 2014 of $77.39 on unusually high volume during those four trading days.

17.     Ultimately, Nu Skin was fined by one branch of the Chinese government, forced to retrain its sales representatives in China and required to shutter certain "working studios" improperly used by the Company's sales representatives in China to recruit new distributors and direct sellers. **_Further, based upon information and belief, at least one investigation by Chinese authorities regarding Nu Skin's business is ongoing as of June 2014_**.

18.     Defendants' actions have negatively affected and continue to negatively affect Nu Skin's revenues and growth rate in Mainland China. During the Class Period, growth in Mainland China reached almost 300% year-over-year. Now the Company cannot even predict if and when its business in Mainland China, previously one of its largest markets, will recover.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

22.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

23.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

24.    On May 1, 2014, the Court appointed State-Boston to serve as Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. 104-67, 109 Stat. 737.

25.    Lead Plaintiff State-Boston is a defined-benefit governmental pension plan headquartered in Boston, Massachusetts.  It manages assets on behalf of beneficiaries associated with the City of Boston, including the Boston Redevelopment Authority, the Boston Housing Authority, the Boston Water and Sewer Commission, the Boston Public Health Commission.  As set forth in the previously filed Certification Pursuant to Federal Securities Laws dated March

24, 2014, State-Boston purchased the securities of Nu Skin at artificially inflated prices and has been damaged thereby. [Dkt. No. 26-1]

26.     Plaintiff Michael J. DuDash purchased the securities of Nu Skin at artificially inflated prices as set forth in the previously filed Certification Pursuant to Federal Securities Laws dated March 20, 2014 and has been damaged thereby. [Dkt. No. 22-1]

27.     Plaintiffs Liang Bing and his wife Chen Ying Ying purchased the securities of Nu Skin at artificially inflated prices as set forth in the previously filed Certifications Pursuant to Federal Securities Laws dated March 6, 2014 and March 24, 2014, respectively, and have been damaged thereby. [Dkt. No. 33-1].

28.     Plaintiff Jason Spring purchased the securities of Nu Skin at artificially inflated prices as set forth in the previously filed Certification Pursuant to Federal Securities Laws dated February 3, 2014 and has been damaged thereby. [Dkt. No. 25-2].

29.     Defendant Nu Skin is a Delaware corporation with principal executive offices located at 75 West Center Street, Provo, UT 84601. Nu Skin's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NUS." Nu Skin sells more than 200 products by way of its consumer and sales networks that include approximately one million people. Nu Skin representatives earn commissions from the products they and others in their network sell to friends, family and strangers.

30.     Defendant M. Truman Hunt ("Hunt") has served as Chief Executive Officer of Nu Skin since May 2003 and President of Nu Skin since January 2003. Hunt joined Nu Skin and served as its Vice President and General Counsel from May 1998 to January 2003 and as an Executive Vice President from January 2001 to January 2003. He served as Vice President of

Legal Affairs and Investor Relations from September 1996 to May 1998. He has been a Director of Nu Skin since 2003. During the Class Period, Hunt signed Nu Skin's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Nu Skin's internal control over financial reporting. In 2012 and 2013, Hunt received approximately $7.78 million and $9.69 million, respectively, in total compensation including stock awards. Hunt was a direct and substantial participant in the fraud.

31.     Defendant Ritch N. Wood ("Wood") has been the Chief Financial Officer of Nu Skin since November 2002 and serves as its Principal Accounting Officer and Vice President, having previously served as Vice President of Finance and Vice President of New Market Development for Nu Skin. Prior to Nu Skin, Wood worked for the accounting firm of Grant Thornton LLP as a Certified Public Accountant. During the Class Period, Wood signed all of Nu Skin's annual and quarterly reports and quarterly and annual SOX certifications stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Nu Skin's internal control over financial reporting.  In 2012 and 2013, Wood received approximately $2.27 million and $4.14 million, respectively, in total compensation including stock awards. Wood was a direct and substantial participant in the fraud.

32.     Defendants Hunt and Wood are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Nu Skin, are collectively referred to as the "Defendants."

**IV.    CONTROL PERSON ALLEGATIONS**

33.    Hunt and Wood, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

34.    During the Class Period, the Individual Defendants knew that revenues from Mainland China were increasing exponentially and were the primary driver of Nu Skin's growth. The Individual Defendants followed, tracked, and were aware of the pace at which the Company was signing up new distributors and direct sellers in China, the Company's fastest-growing geographic market. Indeed, the Company's selling expenses, which the Individual Defendants closely monitored, were increasing throughout the Class Period as more distributors and direct sellers from Mainland China qualified for promotional incentives based not only on their individual sales but on the sales of their network or downlines.

35.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are

responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

36.     The Individual Defendants because of their positions of control and authority as senior executive officers (and as Director for Hunt), had access to the adverse, undisclosed information about Nu Skin's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

37.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

38.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Nu Skin's securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding Nu Skin's compliance with direct selling regulations in Mainland China.  The scheme: (i) deceived the investing public regarding Nu Skin's operations

and business in China, and the true value of Nu Skin's securities; and (ii) caused Plaintiffs and other members of the Class to purchase Nu Skin's securities at artificially inflated prices, which fell as the truth concerning Nu Skin's violations of China's regulations against multi-level marketing ultimately became known.

39.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Nu Skin, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Nu Skin's Multi-Level Marketing Business

40.     Nu Skin is a global multi-level marketing company with operations in 52 markets worldwide. The Company develops and distributes anti-aging personal care products and nutritional supplements under its Nu Skin and Pharmanex brands, respectively. Throughout the Class Period personal care products made up 55% of Nu Skin's business, with nutritional supplements constituting approximately 45% of the business

41.     Nu Skin was founded in 1984 by Blake Roney, Sandie Tillotson, and Steven J. Lund. Since its founding, Nu Skin's products have been distributed exclusively through MLM. In reality, Nu Skin's business model operates as a classic pyramid scheme in which distributors focus their efforts on recruiting new distributors rather than on selling products.  Distributors must purchase minimum quotas of product in order to remain members of the distribution chain and reap commissions from the efforts of their "downline" distributors.  In the Nu Skin model, success comes from recruiting new, active distributors.

42.     According to the Company's filings with the SEC, "the sponsoring of new distributors creates multiple levels in a network marketing structure.  Individuals that a distributor sponsors are referred to as 'downline' or 'sponsored' distributors.  If downline distributors also sponsor new distributors, they create additional levels in the structure. . . ." Once an individual becomes an Executive Distributor in Nu Skin, they are able to collect commissions from other distributors they have recruited to sell Nu Skin products (distributors in their downlines).  This is called multi-level compensation.

43.     Nu Skin boasts that one of its competitive advantages is its global sales compensation plan.  Under its global compensation plan, "a distributor is paid consolidated monthly commissions in the distributor's home country, in local currency, for the distributor's own product sales and for product sales in that distributor's downline distributor network *across all geographic markets*."[3] In other words, an Executive Distributor in the United States may receive commissions on sales by sales promoters and direct sellers located outside the United States if those sales people are in the Executive Distributor's downlines.

44.     Because Nu Skin's global sales compensation plan is beneficial only for those Executive Distributors near the top of the pyramid structure, Nu Skin experiences a high level of distributor turnover.  For those distributors with few downlines, the monthly product minimum purchase often exceeds that distributor's sales commissions.[4]  Thus, in order to continue to grow

---

[3]     All emphasis has been added unless otherwise noted.

[4]     In 1991, Nu Skin International Inc. agreed to refund approximately $16 million to Nu Skin distributors as part of a settlement of a class action lawsuit filed in federal court in California accusing the Company of misleading sales practices.

its sales, the Company must constantly increase the number of its "active" distributors. In addition, as one geographic market reaches saturation, the Company must expand to other countries in order to continue signing-up new distributors.  Further, as lower-level distributors drop out, they must be replaced by new distributors in new markets.  If that does not happen, the whole scheme collapses and the ones most adversely affected are the Executive Distributors at the top of the pyramid.

45.     The MLM structure utilized in the rest of the world was not supposed to be employed in Mainland China, where strict rules and laws prohibiting it were in place.

**B.     Nu Skin Enters the Chinese Market in the Early 1990s**

46.     Nu Skin first entered Mainland China in the early 1990s and operated under the name Shanghai Harmony Daily-Use & Health Products, Co., Ltd ("Shanghai Harmony").[5] In the 1990s, MLM was allowed in China and Shanghai Harmony engaged in MLM sales of two dozen cosmetic and hygienic products in the Shanghai Municipality.

47.     In the late 1990s, riots broke out in China when several pyramid schemes collapsed and salespeople at the lowest rungs lost their savings after paying for products that were never delivered to them.

48.     In 1998, the Chinese government completely outlawed MLM and pyramid schemes (also called "Chuan Xiao").  In July 1998, Shanghai Harmony passed a Board Resolution stating that it would cease all MLM activities and shift toward retail sales conducted out of brick-and-mortar stores by internal sales employees.

---

[5]     In 2004, Shanghai Harmony changed its name to Nu Skin (China) Daily-Use & Health Products, Co., Ltd.

49.      From 2003 to 2005, Nu Skin China operated in Mainland China – selling products only through retail outlets in the provinces of Zhejiang, Jiangsu, Fujian and Guangdong and the Shanghai Municipality. In 2005, the Company opened Nu Skin's first retail store in Beijing.  No direct sales were made to consumers outside the Company-owned stores.

50.      Under pressure from the World Trade Organization, in November 2005, the Chinese government lifted a seven-year ban on direct-sales businesses. "Direct sales" are sales made outside a brick and mortar store, sometimes referred to as "door to door" sales.  The State Council promulgated: 1) the Regulation on Direct Selling Administration (Order of the State Council of the People's Republic of China No. 443)[6]; and 2) the Regulations on Prohibition of Pyramid Selling (Order of the State Council of the People's Republic of China No. 444).[7] While these regulations allowed companies to recruit sales representatives to engage in door-to-door or direct selling pursuant to strictly enforced licensing, training, disclosure and compensation rules (described below), MLM and multi-level compensation were still strictly prohibited.

51.      In July 2006, Nu Skin (China) Daily-Use & Health Products Co., Ltd f/k/a Shanghai Harmony, received approval from the Chinese Ministry of Commerce/Shanghai Municipal Foreign Investment Working Committee to commence direct selling activities in the Shanghai Municipality. In 2006, Nu Skin China also obtained approval to commence direct selling in the Beijing Municipality. Starting in 2007, Nu Skin was permitted to sell its products

---

[6]
http://english.mofcom.gov.cn/sys/print.shtml?/zt_yearboook/lanmua/200804/20080405503301.
A copy of the PRC's Regulations on Direct Selling Administration is attached hereto as Exhibit A.

[7]      http://www.asianlii.org/cn/legis/cen/laws/ropops432/. A copy of the PRC's Regulation on Prohibition of Pyramid Selling is attached as Exhibit B.

through both its retail stores and, for those products and sales representatives who were properly licensed, through direct selling in the Shanghai and Beijing Municipalities.

52.     Restrictions on direct selling and on creating an MLM marketing structure similar to that used in Nu Skin's other markets made it increasingly difficult for Nu Skin to expand its business in Mainland China prior to the Class Period. Even before the Class Period, Nu Skin was not entirely successful in abiding by these restrictions, which led to a number of regulatory investigations and the interruption of sales activities, and, in some cases, fines being paid to resolve those investigations.

53.     Because of the stringent regulations prohibiting MLM in China and the enforcement of those regulations by Chinese authorities, from 2007-2010, Mainland China represented only a small percentage of Nu Skin's overall sales. In fact, from 2008-2009, Nu Skin closed the majority of its retail stores in Mainland China and eliminated close to 1,000 retail sales positions.

**C.      The Individual Defendants Orchestrate the Rapid Expansion of Nu Skin's MLM Business in Mainland China to Make Up for Declining Growth in the U.S. and Japan**

54.      Prior to the start of the Class Period, growth in Nu Skin's business in Japan and the United States was on the decline. In Japan, previously one of Nu Skin's largest markets, Nu Skin was facing a host of problems including: (1) a slowdown in the direct selling industry generally; (2) a negative trend in Nu Skin's distributor growth specifically; (3) litigation over a Customs ruling; (4) a new management team; and (5) recent natural disasters.  In the U.S., Nu Skin also faced declining growth. Further, Defendants did not expect to launch any new products in the U.S. market until the beginning of 2012.

55.     Given the slowdown in distributor growth in the U.S. and Japan and facing pressure from Executive Distributors who were relying on growth in Nu Skin's active distributor base for the payment of downline commissions, Defendants embarked on a plan to substantially expand Nu Skin's presence in Mainland China, lured in large part by the size of its population (approximately 1.3 billion people in 2011) and Nu Skin's lack of market penetration.

56.     By the start of the Class Period, Nu Skin had procured direct selling licenses in ten provinces and three municipalities in Mainland China. In addition, the Company operated approximately 40 retail stores in the Beijing and Shanghai areas. However, Nu Skin's retail stores in China were not numerous enough and even those open did not have nearly the foot traffic the Company needed to substantially expand its business.

57.     Therefore, Defendants made the decision to not only attempt to obtain direct selling licenses in additional cities and provinces to create *the appearance* of a legitimate direct selling business, but, ***more importantly***, Defendants realized that they had to grow Nu Skin's business in Mainland China in the only way Defendants knew how – through the expansion of its successful MLM strategy, notwithstanding strict Chinese regulations prohibiting it.

58.     To that end, Defendants authorized existing Executive Distributors to sign-up a record number of sales promoters and direct sellers in Mainland China as part of their downlines. Newly recruited Chinese citizens were encouraged to become sales promoters and direct sellers with the promise of reaping millions of yuan in commissions and once in a lifetime trips and cruises, new cars and other benefits by creating and expanding downlines among family and friends in Mainland China.  Without the promise of earning commissions on downlines in Mainland China, there was no way Nu Skin could entice the number of distributors and sales

representatives it needed to penetrate the Chinese market and satisfy the demands of the Company's Executive Directors outside China.

59.     Defendants also actively encouraged Nu Skin's Executive Distributors in Taiwan, Hong Kong, and Southeast Asia to aggressively recruit new sales distributors and direct sellers in Mainland China. Notwithstanding China's rules against paying multi-level compensation, Defendants promised to not only allow multi-level compensation to its Executive Distributors hailing from outside of Mainland China but to all of the direct sellers recruited by those living in Mainland China.

60.     CW1 was an Independent Distributor at Nu Skin from September 2011 until December 2013 - based in San Francisco. CW1 confirmed that as new markets opened up in countries around the world, Nu Skin distributors wanted to get into those markets fast and grab the biggest share of new recruits and get the best leaders to build their downline organization quickly. During the Class Period, CW1 wanted to expand his downline into China and sat for a multiple-choice examination given by Nu Skin so that he could sponsor distributors in China. CW1 ultimately decided against expanding his downline into China but is personally aware of the fact that a few of his fellow independent distributors did expand their downlines into China. CW1 stated that distributors who had downlines in China had a special distributor ID number which indicated that the distributor was allowed to sponsor people in China.

D.     **Nu Skin's Violations of China's Regulations on Direct Selling and Anti-Pyramid Selling**

61.     The direct sales environment in China is well-regulated, while MLM is strictly prohibited.  The nature of the legal system in China gives regulatory agencies at both the local

and central levels of government the ability to enforce relevant laws regulating direct marketing and prohibiting pyramid schemes.

62.     China's direct selling and anti-pyramid selling regulations, enacted at the end of 2005, are extremely restrictive and contain various limitations, including but not limited to:

(a)     a complete prohibition on multi-level marketing[8];

(b)     restrictions on the ability to pay multi-level compensation[9];

(c)     restrictions on how compensation can be calculated for direct sellers[10];

(d)     requirements that all direct sellers pass selling examinations and obtain selling certificates[11];

---

[8]     *See* Article 7(3) of the PRC's Regulation on Prohibition of Pyramid Selling: "An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling so as to form a multi-level relationship, and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoters below." (Ex. B).

[9]     *Id.; See also* Article 7(1) of the PRC's Regulation on Prohibition of Pyramid Selling: "An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling, calculating and paying  remunerations (including material awards and other economic interests, the same below) to the recruiters on the basis of the number of persons a recruiter has directly or indirectly recruited in a rotating way." (Ex. B).

[10]     *See* Article 24 of the PRC's Regulations on Direct Selling Administration: "A direct selling company shall pay remuneration to its door-to-door salesmen at least on a monthly basis. The remunerations paid to any door-to-door salesman by a direct selling company ***shall be calculated on the basis of the income gained from selling products directly to consumers by the door-to-door salesman himself/herself, and the total remuneration (including commission, bonus, various awards and other economic benefits, and etc.) may not exceed 30% of the income gained from selling products directly to consumers by the door-to-door salesman himself/hersel***f." (Ex. A).

(e)    a prohibition on direct sellers selling product for which the direct selling company has not obtained government licenses and a requirement that direct selling only be conducted in the areas/cities specified in the provincial licenses[12];

(f)    a restriction on certain high-pressure sales tactics[13];

(g)    a restriction on minimum product purchase requirements[14];

---

*( . . . continued)*

[11]    *See* Article 18 of the PRC's Regulations on Direct Selling Administration: "A direct selling company shall be responsible for organizing the vocational training and examination of the door-to-door salesmen it recruits, and shall issue the certificates of door-to-door salesman to the door-to-door salesmen who have passed the examination. Anyone who fails to obtain the certificate of door-to-door salesman may not undertake direct selling activities. No direct selling company may charge the door-to-door salesman any fees for the vocational training and examination. No entity or individual outside a direct selling company is allowed to organize the vocational training of door-to-door salesmen in any name." (Ex. A).

[12]    *See* Article 16 of the PRC's Regulations on Direct Selling Administration: "A direct selling company and its branches shall conclude a sales contract with any door-to-door salesman it recruits, and shall ensure that its door-to-door salesmen carry out direct selling business only in the province, autonomous region, and municipality directly under the Central Government where one of its branches has established service location. Any person who fails to conclude a sales contract with a direct selling company or any of its branches may not carry out direct selling business by any way." (Ex. A).

[13]    *See* Article 5 of the PRC's Regulations on Direct Selling Administration: "When undertaking direct selling activities, no direct selling company or its door-to-door salesman may conduct any fraudulent or misleading acts and other ***drumbeating and sales promotion acts***." (Ex. A).

[14]    *See* Article 14 of the PRC's Regulations on Direct Selling Administration: "No direct selling company or any of its branches may promulgate any advertisements drumbeating the remunerations for its door-to-door salesmen, ***nor may it have the payment of fees or purchase of commodities as the conditions for becoming a door-to-door salesman thereof***." (Ex. A). *See also* Article 7(2) of the PRC's Regulation on Prohibition of Pyramid Selling: "An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling ***and asking the recruiters to pay fees explicitly or in any disguised form like purchasing***

*(continued . . . )*

(h)      a restriction on the type of person who can be recruited as a direct seller[15];

(i)       restrictions on who can conduct sales trainings for new direct selling recruits[16]; and

(j)      a requirement that a direct selling company be ultimately responsible for the activities of all of its direct selling representatives.[17]

---

*( . . . continued)*
***commodities for obtaining the qualification for participating in pyramid selling or recruiting others to participate in pyramid selling****.*” (Ex. B).

[15]    *See* Article 15 of the PRC's Regulations on Direct Selling Administration: “No direct selling company or any of its branches may recruit the following personnel as a door-to-door salesman: 1. person under the age of 18; 2. person without capacity or with limited capacity for civil conduct; 3. full-time school students; 4. teachers, medical personnel, public servants and soldiers in active service; 5. formal employees of the direct selling company; 6. overseas personnel; and 7. personnel as prohibited from taking part-time jobs by laws or administrative regulations.” (Ex. A).

[16]    *See* Article 19 of the PRC's Regulations on Direct Selling Administration: “The teaching staff who give vocational training to door-to-door salesmen shall be the formal employees of the direct selling company, and shall satisfy the following requirements: 1. Having worked in the companies for more than one year; 2. Having received graduate or post-graduate education and having the relevant professional knowledge of law and marketing; 3. Having no records of being punishment for deliberate crimes; and 4. Having no records of major illegal operation. A direct selling company shall issue the certificates of direct selling trainer to the teaching staff that satisfy the provisions of the preceding paragraph, and shall report the name list of the personnel who have obtained the certificate of direct selling trainer to the competent commerce department of the State Council for record. The said department shall promulgate on the government website the name list of the personnel who have obtained the certificate of direct selling trainer. No foreigner may undertake the vocational training of door-to-door salesmen.” (Ex. A).

[17]    *See* Article 27 of the PRC's Regulation on Direct Selling Administration: “A direct selling company shall bear the joint responsibility for the direct selling acts of any of its door-to-door salesmen, unless it can prove that the direct selling act of the door-to-door salesman has nothing to do with the company.” (Ex. A).

63.     The Individual Defendants knew from experience that Chinese government regulators would be scrutinizing closely the Company's activities and the activities of its employed sales representatives, contractual sales promoters and direct sellers, monitoring Nu Skin's compliance with applicable direct selling and anti-pyramid selling regulations.

64.     In order to give the appearance of compliance with these regulations, during the Class Period, Nu Skin represented that its business model in Mainland China was distinct from its MLM business model employed in the U.S. and abroad. According to the Company, its business model in China purportedly operated as follows:

> [W]e currently are unable to operate under our global direct selling business model in China as a result of regulatory restrictions on direct selling activities in this market. Consequently, we have developed a hybrid business model that utilizes retail stores with an employed sales force and contractual sales promoters to sell products through fixed locations, which we supplement with a direct sales opportunity in those locations where we have obtained a direct sales license. We continue to operate this hybrid model because we believe it provides us with more flexibility in the manner in which we can operate throughout China and compensate our contractual sales promoters and employed sales representatives given the restrictions in the direct selling regulations. We rely on our sales force to market and sell products at the various retail locations supported by only minimal advertising and traditional promotional efforts. Our sales force may also refer individuals to join our sales force as sales employees, contractual sales promoters or direct sellers. Our retail model in China is largely based upon our ability to attract customers to our retail stores through our sales force, to educate them about our products through frequent training meetings, and to obtain repeat purchases. We also continue to implement a direct sales opportunity that allows us to engage independent direct sellers who can sell products away from our retail stores.

Nu Skin's Annual Report on Form 10-K for the period ended December 31, 2011.

65.     Despite the clear prohibition against calculating and paying remunerations to its downlines in Mainland China on the basis of the number of persons those individuals recruited to Nu Skin, during the Class Period, Nu Skin paid its direct sellers and sales representatives in Mainland China on the basis not only of their own sales but also of the sales productivity of the sales people those direct sellers and sales representatives recruited.

66.     Confidential Witnesses confirm that during the Class Period, direct sellers, sales representatives, and distributors in Mainland China were promised and paid downline commissions based not only on their sales but on sales of those sales representatives below them who they recruited. Confidential Witnesses also confirm that the Company flouted other provisions of China's direct selling regulations.

67.     CW2, a Nu Skin Sales Manager[18] in Beijing from April 2013 until November 2013 confirmed that Nu Skin's sales representatives were not required by Nu Skin to obtain a

---

[18]     In Nu Skin China, the sales hierarchy (from most junior to most senior) is: 1) Qualification-level ("Q"); 2) Sales Representative ("SR"); 3) Sales Executive ("SE"); 4) Senior Sales Executive ("SSE"); 5) Sales Manager ("SM"); 6) Senior Sales Manager ("SSM"); 7) Sales Director ("SD"); and 8) National Sales Director ("NSD"). *See* "Overview of China" available at http://www.nuskin.com/library/NSE/pdf/China_Cert_Training_English-20110826.pdf. Qualification-level sales recruits were required to generate sales of 5,000 renminbi in a month to be considered an official Nu Skin sales person. Renminbi or RMB is the official currency of the PRC and the yuan is the basic unit of the renminbi. To rise in rank from Q to SR, a salesperson had to conclude 30,000 RMB in sales within six months. A bonus on such a sales performance could reach up to 10% of sales revenue. *Id.* As an SR, you had to maintain sales revenue of 10,000 RMB per month and an additional "automatic re-ordering" of at least 1,000 RMB to be eligible for a 20% bonus. *See* "The Most Updated Rules for Nu Skin Bonus" (attached with a certified English translation at Exhibit C). Moving up the ranks to Sales Manager (SM) involved recruiting and managing four SRs.  *Id.* Recruiting and managing 8 SRs would lead to the title Sales Director (SD), while recruiting and managing 12 SRs would result in the title of National Sales Director (NSD). *Id.*

license to engage in direct selling.[19] Moreover, Nu Skin sales representatives were not required to attend in-person training sessions in China and were allowed to "train" over email and WeChat – a mobile text and voice messaging communication service available in China. Even though CW2 engaged in direct selling outside Nu Skin's store in Beijing, to receive a commission payment he had to pass a record of his sales to a Nu Skin retail store and an employee in the store recorded CW2's sales in Nu Skin's computer system. CW2 was responsible for paying for his own copy of Nu Skin's product manual.  CW2 also confirmed that Nu Skin's compensation was similar to a pyramid, and everyone was expected to develop his/her own downline. Sales representatives could enjoy a percentage of the sales of his/her downline if they reached a certain level in the hierarchy.

68.    CW4, a Sales Representative from the Guangzhou province from August 2012 through August 2013 also echoed that Nu Skin's sales representatives had few requirements – one just had to be willing to join, pay a fee, and sign a contract with the Company. CW4 confirmed that Nu Skin sales representatives in China had downlines and that he was part of someone's downline.  Upstream leaders could earn 5% of their downlines' revenue as a commission and when a sales representative reached a certain level of sales, the representative was entitled to "base pay" in addition to commissions. CW4 also confirmed that training for sales representatives was conducted by someone in their upstream. Also, CW4 stated that the

---

[19]    CW3, a Sales Representative in the Tianjin province from April 2013 until November 2013, also confirmed that neither he nor any Nu Skin sales representatives he knew had a direct selling license. CW3 also did not attend sales training meetings although he attended some marketing meetings to learn about new Nu Skin products.

Company did not make it clear which products were licensed for sale by direct sellers and which could only be sold through the physical stores.

69.     CW5, a Sales Representative in Nanjing from August 2011 to February 2012, also confirmed the existence of downlines in China.  CW5 stated "you can say it is like a pyramid scheme." CW5 stated that as a salesman, one's income depended upon the sales revenue generated by the representatives and others on his team.  CW5 confirmed there were 7 or 8 sales people under him and his income depended on his team's performance. CW5 also recalled that sales training was led by those in the sales representatives' upstream.

70.     CW10, a Sales Representative in Shanghai from December 2013 through April 2014, also confirmed that as part of Nu Skin's sales team hierarchy, sales representatives had to develop their own downlines in order to earn the title of SR.  Sales representatives could enjoy a cut of their sales team's revenues if those in their downlines met minimum sales quotas. CW10 occasionally visited a Nu Skin "office" in Shanghai, shared by many Nu Skin sales teams, to receive training from other salespeople, but noted that those trainings were not compulsory. CW10 confirmed that sales representatives received very little in the way of basic pay - usually less than one tenth of what they could make on commission. CW10 also reiterated that while he signed a contract with Nu Skin, he did not get social security, medical insurance, or any other benefits that come with employment. In fact, CW10 said the Company did not make it clear what was the nature of sales representatives' employment status with Nu Skin.

71.     CW6, was an Analyst at Healthy Business Building Incentive, an outside consultant for Nu Skin in Shanghai.  From September 2013 to March 2014, it was CW6's job to evaluate Nu Skin's distributors' performance, based on their sales volume and the volume of

their "sales teams" (downlines), to determine which distributors qualified for incentive trips and other Nu Skin incentive rewards. CW6 confirmed that distributors in Mainland China receive a cut of their downlines' revenues as long as the distributors and their downlines meet minimum sales requirements. For example, if a downline earns RMB 10,000 a month, the upline gets 5% of that revenue.[20] If the downline earns RMB 20,000, the upline can get a 10% commission on that. Lower level distributors would not receive any base salaries: all of their income is in the form of commission and depends on how much they and their downlines sell. Only senior level distributors would receive a small base salary from Nu Skin China.[21]

72.     Nu Skin sales materials shared with potential recruits in China in early 2013 detail Nu Skin's strategy to encourage its direct sellers and sales representatives in China to create at least six "generations" or layers of recruits underneath them to maximize their compensation.[22] In these documents, Nu Skin calls the downlines of its sales representatives - sales "teams" - and calls its multi-level compensation "team rewards" or "team awards" – in an attempt to skirt the Chinese regulations against MLM and pyramid selling. However, there is a flat-out prohibition

---

[20]     CW6 confirmed that the term used by Nu Skin for "upline" or "upstream" is "sponsor" and that distributors and preferred customers are sometimes called "partners." It is the partners that comprise the downlines.

[21]     CW6 confirmed that distributors had to sign labor contracts with the Company. But Nu Skin did not pay social security or social insurance fees on the distributors' behalf. CW6 also confirmed that since the publication of the Citron Research Report (discussed at ¶ 141), Nu Skin has tweaked some technical aspects of its business (such as the threshold for becoming a distributor, the percentage cuts the distributors get from their downlines, etc.) but Nu Skin has not adjusted its business model wholesale.

[22]     *See* "(1) System Analysis of NU SKIN," attached with a certified English translation at Exhibit D; *See also* "The Most Updated Rules for Nu Skin Bonus" (Ex. C).

against multi-level compensation in China and Defendants' knew their "team rewards" system and "payment by team" was in direct contravention of that prohibition. The PRC's Regulations are clear that: "An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling so as to form a multi-level relationship, ***and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoters below***." *See* Article 7(3) of PRC's Regulation on Prohibition of Pyramid Selling (Ex. B). Direct sellers can only be compensated for sales made directly by them to consumers. *See* Article 24 of PRC's Regulations on Direct Selling Administration (Ex. A). There is a flat-out prohibition against multi-level compensation. There are no special exceptions in the laws for the sharing of "team rewards" by sales teams.

73.     Indeed, a pre-Class Period power-point presentation prepared by Nu Skin acknowledges the prohibition in China against compensation based on group or team sales volume.  It reads: "The compensation that direct selling companies pay to their distributors may only be calculated based on the personal sales directly made by the distributors to the consumers. The total amount of the compensation (including commission, bonus, various incentives and other economic benefits) should not exceed 30% of the personal sales directly made by the direct selling distributors, ***compensation should not be based on group volume***."[23]  The presentation also states:

---

[23]     "Mainland China Opportunity Training May 2007," available at www.pharmanexusa.com/library/NSE/ppt/china_training.ppt; Also at www.bigplanetusa.com/library/NSE/ppt/china_training.ppt.

> *Direct Sellers will not get paid in any form on the sales volume of other Direct Sellers and Sales Employees.* The sales volume of Direct Sellers must come from their combined sales made directly to Preferred Customers and Retail Customers based on the products that the company is approved to sell through direct selling.

*Id.*

74.     In order for distributors and direct sellers both in and outside of Mainland China to receive commissions from downlines established in Mainland China – Sales Support Teams and Distributor Support Teams at Nu Skin corporate had to manually input the names and relevant information for each sales team member into Nu Skin's computer systems.

75.     CW7, a former Sales Support Representative at Nu Skin from August 2011 to April 2012 and again from July 2012 to January 2013,[24] who assisted distributors in Nu Skin's call center in Provo, Utah, confirmed that other Sales Support Reps in his office handling Chinese accounts let him know that there were downlines being set up in China and that in 2012, Nu Skin "definitely had downlines" in China. The call center set up the downlines for distributors in Mainland China so that people could be signed up as downlines in China the same what that they could be signed up as downlines in the U.S. and Japan. CW7 also stated that most of the distributors in China were likely part of the downlines of distributors in the U.S.

76.     CW8, a former Marketing Specialist at Nu Skin from July 2012 to February 2014, who reported to Nu Skin's Vice President of Marketing and Vice President of Global Product Marketing, also confirmed that shortly after he began at Nu Skin in July 2012, the number of distributors based in China increased dramatically and that downlines were created for those

---

[24]     CW7 participated in an international internship from April 2012 – July 2012.

distributors. CW8's responsibilities included marketing new products to Nu Skin's customers and distributors.

77.     Nu Skin was able to monitor sales by all distributors and direct sellers in Mainland China through a linked computer system. According to CW9, a Nu Skin Independent Distributor from 2010 to the present, who reported to Michael Snow, a Nu Skin Sponsor of Blue Diamond Executives, Nu Skin's corporate office in Utah can "see every sale that is going on by every distributor" in China because the computer systems were the same. Even though based in the U.S., CW9 was familiar with Nu Skin's operations in China because in 2011 he took a trip to China in an attempt to recruit Nu Skin sales representatives for his downline. CW9 no longer actively recruits for Nu Skin, but at the height of his relationship with Nu Skin, CW9 had more than 250 people in his downline. CW9 also stated that all of the Chinese downlines reported into sales executives in the U.S.

78.     When direct sellers make sales in Mainland China, they can direct their customers to order from Nu Skin's website and input their personal and ordering information. Alternatively, sales representatives can take their customers to the retail stores to complete the sales transaction.  CW6 confirmed that when distributors have their customers place an order through Nu Skin's website, the Company can ship the product directly to the customer, the product can be shipped to a nearby Nu Skin store for pick up, or the order can be sent to the distributor who can deliver the product to the customer. CW5 recalled having his customers' products delivered to a retail store.  The store recorded his direct sales on the store's systems. CW5 confirmed that every sales person has a personal account and his "team's" account was linked to his personal account.

### E.   The Individual Defendants Knew the Laws in China and Knew Nu Skin's Direct Sellers Were Violating Those Laws

79.    High-level Nu Skin executives including the Individual Defendants participated in meetings with government regulatory representatives in China and understood the direct selling and anti-pyramid selling regulations and the fact that multi-level compensation was not allowed in any province or city in Mainland China.

80.    China's Ministry of Commerce website reports that on March 31, 2011, one month before the beginning of the Class Period, defendant Hunt met with Wang Chao, China's Vice-Minister of Ministry of Commerce**.** According to media reports, Wang cautioned Hunt about Nu Skin's "earnest performance of social responsibilities" and about the Chinese government's direct-selling regulations and prohibitions on pyramid-selling. At that meeting, Hunt and certain Nu Skin China representatives were informed of the rules on market access and industrial management. Chao also warned Nu Skin that the PRC would thoroughly implement the Administrative Regulations on Direct-Selling and the Regulations on Prohibiting Pyramid-selling to ensure the steady and orderly development of the direct-selling industry

81.    Moreover, the Individual Defendants frequently traveled to Mainland China for conventions and sales meetings and were acutely aware that their expansion plans for Mainland China were proceeding exactly as they planned.  For example, the Individual Defendants were in China for the following conventions:

(a)    From June 13, 2012 through June 15, 2012, NuSkin held its Regional Convention at the AsiaWorld-Expo in Hong Kong.  This was reported as the biggest conference ever held in Hong Kong with approximately 20,000 people in attendance, including Truman Hunt and Ritch Wood. Also in attendance were: 1) Andrew Fan, Regional President Nu Skin

China; and 2) Patrick Yeung, Nu Skin Regional Vice President, Leaderships cum President, Hong Kong & Macau, NU SKIN Greater China; and

(b)     From September 11, 2012 through September 13, 2012, Nu Skin hosted its Greater China Leadership Conference (also called the New School) at the Venetian Macau Hotel in Macau, China. The conference was attended by defendants Hunt and Wood, Andrew Fan, president of Nu Skin's Greater China region, and thousands of Nu Skin's sales representatives, employees and distributors from Mainland China.

82.     With Defendants' blessing (and agreement to pay multi-level compensation contrary to China's regulations), Nu Skin's sales promoters and direct sellers in Mainland China were engaged in the very type of MLM and multi-level compensation prohibited by China's laws.[25] *Indeed, this was how the Defendants set up the Nu Skin market in China and how it grew more than* __*292 percent*__ *in one year during the Class Period*.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   First Quarter 2011 Results

83.     The Class Period starts on May 4, 2011. On that date, Nu Skin issued a press release announcing its financial and operating results for the first quarter ended March 31, 2011. For the quarter, the Company reported revenue of $395.8 million, a 9 percent improvement over the prior year. Earnings per share for the quarter were $0.24. Excluding non-cash charges of $32.8 million associated with a Japan customs ruling, earnings per share were $0.56. In

---

[25]     In fact, even Nu Skin's slogan in China was an exaggeration designed to attract new recruits to the Nu Skin's multi-level marketing scheme: 用如新的产品能去新世界、不用就是不相信善的力量 – which translates to "Use Nu Skin Product can go to New World, Not Use is Not Believe in Force of Compassion."

commenting on the results, Hunt touted the Company's performance in Mainland China, stating in part:

> Our solid first-quarter performance was driven by growth in our distributor force, our dynamic product portfolio, strength in emerging markets, and a continued focus on profitability and shareholder value. . . . In fact, we had our largest revenue month in company history in March.
>
> The number of executive-level sales leaders is trending positively. We are also benefiting from a more balanced geographic footprint, driven primarily by strong growth in emerging markets, which is enabling us to be less dependent upon any given region. We are particularly pleased with the quarterly performance of Mainland China and South Asia/Pacific, which posted local-currency revenue gains of 47 and 30 percent, respectively. South Korea and Europe also posted solid gains during the quarter. Because of these positive trends, coupled with favorable foreign currency exchange rates and a strong projected product launch in the fourth quarter, we are increasing our annual guidance.

84.     Also on May 4, 2011, before the market closed, the Company hosted a conference call to discuss Nu Skin's financial results for the first quarter ended March 31, 2011. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business, Hunt took this opportunity to highlight the "encouraging trends" seen in "emerging markets," stating:

> So overall, our geographic footprint continues to broaden, and we're becoming less dependent on any given market and less dependent on any particular currency.
>
> [A]s we look forward to the remainder of 2011, we're really focused on 3 key issues. First, we're focused on distributor growth. In the first quarter of this year, we generated 9% growth in executive distributors and also saw our active distributors increase 4%. . . . As most of you know, distributor growth is critical to our success and is also a good barometer of the health of the business. So we're focused on keeping both our active count and executive count heading the right direction.

<u>The second factor that we're working with again, is the encouraging trends that we're seeing in the emerging markets.</u> In 2010, emerging markets represented about 22% of our overall business. In the first quarter, they represented 25% of the business. <u>And at the end of last year in our Investor Day presentation, we felt that emerging markets would represent a majority of our sales by the year 2020, but as we re-do our forecasts and consider the trends in those markets, we believe that these emerging markets could easily represent half of our business or more by 2015.</u>

Finally, our third area of focus is our continued effort to operate more efficiently.

85.     Commenting on the results, Wood echoed Hunt's statements about the importance of emerging markets in the Company's growth, making specific reference to growth in China, stating in part:

[W]e're especially happy that both our revenue and profitability were ahead of our expectations, and that's driven in part by our emerging market growth. We like the improving geographic diversity in our business. We like the progress in our margins. We like the alignment of management team around our corporate objectives to drive long term sustainable earnings growth, and the weakness in the dollar continues to provide a nice tailwind to our overall results.

*     *     *

<u>I would expect greater China and my model of around $300 million for this year.</u> So, continuing to become a more and more key player to our overall business.

86.     During the question and answer portion of the earnings conference call, Hunt was asked why the Company experienced the level of growth it did in China in the first quarter of 2011. Hunt attributed the growth to legitimate "good momentum" and standard sales incentives:

No, we didn't really launch anything meaningful in the quarter from a product perspective. The impact of the [direct selling] licenses is, frankly it's primarily psychological and image

- 33 -

enhancement. It's just helpful to have that seal of approval on your business as we go from province to province and start to extend the business more. The accelerated rate of growth there is obviously impressive and frankly, our guidance is still well below the bullishness of our management team on the ground there. One thing we did do in the quarter, for example, and I almost hesitate to say this because no one should be modeling this, but our management team talked us into taking a step that really is adding fuel to the fire. Our thirtieth corporate anniversary will be in the year 2014, and because our payout to our sales force in China has been slightly below our global averages, we actually put an incentive in place to pay out $30 million in conjunction with our thirtieth anniversary if sales leaders in the greater China region reach the $1 billion sales mark by the end of the year 2014. That's how bullish they are. And essentially our business there is just in good momentum right now.

87.    Mainland China's importance to Nu Skin was highlighted by Wood in these

comments, where he compared sales growth in China with lower results in Japan and the U.S:

We believe the impact of the Japan disasters will be in line with our guidance provided about a month ago. And we continue to see things develop and keep our eyes wide open on that, but would estimate that total impact to be around $25 million -- $10 million in Q2, $7 million in Q3, and $3 million in Q4. And we now model Japan's local currency revenue to decline approximately 8% for this year which again reflects that 5% negative impact from the disaster. And would also -- are modeling the US to be approximately flat this year compared to last year. We've taken that guidance down just a little bit.

So fortunately, the other markets have more than made up for that. And in fact from an overall guidance standpoint, we took Japan down by approximately $25 million, the US down by about $10 million. But then we took China up by $15 million, Southeast Asia up by $10 million, and currency benefits up by $20 million to $25 million compared against our initial guidance.

88.    On May 5, 2011, the Company filed a quarterly report for the period ended March

31, 2011 on Form 10-Q with the SEC, which was signed by Wood.  In addition, the Form 10-Q

contained SOX certifications signed by Hunt and Wood, stating that the financial information

contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The Company reported that for the quarter ended March 31, 2011, revenues from Mainland China were $31.1 million, an increase of 47% compared to the same period in 2010 (on a local currency basis).

89.     The 10-Q distinguished the way the Company supposedly operated in Mainland China from the manner in which it operated in the rest of the world:

> The Company operates in a single operating segment by selling products to a global network of independent distributors that operates in a seamless manner from market to market, except for its operations in Mainland China. <u>In Mainland China, the Company utilizes an employed sales force, contractual sales promoters and direct sellers to sell its products through fixed retail locations. Selling expenses are the Company's largest expense comprised of the commissions paid to its worldwide independent distributors as well as remuneration to its Mainland China sales employees, promoters and direct sellers paid on product sales.</u> The Company manages its business primarily by managing its global sales force. The Company does not use profitability reports on a regional or divisional basis for making business decisions.

> \*      \*      \*

> Our revenue for the three-month period ended March 31, 2011 increased 9% to $395.9 million compared to the same period in 2010, with foreign currency exchange rate fluctuations positively impacting revenue by 5%. <u>This increase in revenue reflects significant growth in emerging markets, with Mainland China and Southeast Asia growing 52% and 41%, respectively, compared to the prior year. Revenue growth was also driven by interest in our strong product portfolio, including our ageLOC products, along with sustained sales force growth</u>, with the number of active and executive distributors globally up 4% and 9%, respectively, compared to the prior-year period.

> \*      \*      \*

> On a local-currency basis, revenue in Mainland China increased 47% in the three-month period ended March 31, 2011, compared to

the same period in 2010. This continued growth is largely due to significant sales force growth, as reflected by a 30% increase in preferred customers and 56% increase in sales representatives, compared to the prior-year period.

90.    The 10-Q also addressed Nu Skin's shrinking U.S. market share:

Revenue in the United States for the three-month period ended March 31, 2011 decreased by 11% compared to the prior-year period. The year-over-year revenue comparison was impacted by a solid first quarter of 2010, which represented the formal launch of our ageLOC Transformation skincare system. However, our recent growth initiatives have had a lesser impact on active distributor growth in the United States than in many of our other markets. We currently expect continued softness in the United States in the second and third quarters of 2011, followed by growth in the fourth quarter in connection with our global convention in October. Active distributors in the United States decreased 3% and executive distributors decreased 6% in the first quarter of 2011 compared to the same prior-year period.

91.    On May 5, 2011, Nu Skin's stock price closed at $35.97 – up from a close on May 3, 2011 of $32.96 – a two day increase of approximately 9% on volume at least triple Nu Skin's daily average trading volume.

92.    The statements identified in ¶¶ 83-86, 88 (SOX certification only), 89 regarding Nu Skin's business growth in Mainland China were false and materially misleading because the following facts were known by Defendants but concealed from the investing public during the Class Period:

(a)    Defendants were utilizing MLM and multi-level compensation and permitting the creation of downlines to grow Nu Skin's business in Mainland China – all in contravention of China's strict rules prohibiting such practices;

(b)      Because Nu Skin grew in China through improper and illegal means and not simply through sales "momentum" or legitimate sales incentives or pursuant to increased, *licensed* direct sales, Nu Skin's growth levels in that market could not be sustained;

(c)      Defendants knowingly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in a way that would have taught new sales representatives and direct sellers how to comply with Chinese direct selling regulations.  Nu Skin did not require formal training as required by the Chinese regulations (see Articles 18 and 19 of PRC's Regulations on Direct Selling Administration (Ex. A). Further, Nu Skin's training for new distributors and direct sellers was sporadic and was not enforced;

(d)      Rather than utilizing a different business model in Mainland China compared to the ordinary business model that had been deployed in other geographic regions as Defendants represented in SEC filings, in truth, Nu Skin had replicated its MLM pyramid scheme model in the PRC, which it attempted to disguise with a lexicon that simply called its component features something else; and

(e)      The Company's disclosures about the risks of doing business in China were materially false and misleading when issued as the Defendants knew or were severely reckless in not knowing that the Company was not "at risk" of violating multiple direct selling and pyramid scheme  regulations throughout the Class Period, it was in fact violating those laws. Defendants knew that the Company's policies, coupled with strong Chinese enforcement of its laws prohibiting unlicensed direct selling and pyramid scheme compensation, meant that the

Company would eventually be caught, and  fined or sanctioned for its MLM,  multi-level

compensation scheme, and unlicensed direct selling in Mainland China.

**B.     Second Quarter 2011 Results**

93.     On August 2, 2011, Nu Skin issued a press release announcing its financial and

operating results for the second quarter ended June 30, 2011.  For the quarter, the Company

reported revenue of $424.4 million, a 9 percent improvement over the prior-year period.

Earnings per share for the quarter were $0.65, a 30 percent improvement over the prior year.

Commenting on the results, Hunt stated in part:

> We also continue to have high expectations for continued growth
> in emerging markets, particularly Mainland China and South Asia.
> These markets are becoming more meaningful to our global
> business, providing geographic diversity and long-term
> opportunity…Our operating margin improvements and strong cash
> generation reflect continued management focus on profitability.

94.     Also on August 2, 2011, before the market closed, the Company hosted a

conference call to discuss Nu Skin's financial results for the second quarter ended June 30, 2011.

Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business in

China, Hunt made the following statements:

> We continue to generate very solid growth in a majority of our
> markets, particularly in emerging markets. Mainland China, as you
> could tell from our release, had an outstanding quarter. . . . If we
> were to normalized [sic] the impact of convention sales from last
> year, mainland China continued to grow at a rate of about 50%,
> year-over-year, which was consistent with our first quarter growth
> rate.

95.     During the question and answer portion of the conference call, Wood responded

to a question concerning margins in China. Wood stated in part:

> [O]ur overall margin, operating margin, market to market, is fairly
> consistent now, particularly where we're gotten pretty good
> traction in a region. The difference in China is the fact that we do
> our own manufacturing there, so we can get a little bit more benefit
> on the gross margin line, which is offset, somewhat, by having a
> little bit more in-depth infrastructure as we have to have stores
> throughout the region. As we continue to grow, China will just
> become more and more profitable.

96.     During the question and answer portion of the call, Per Ostlund of Jefferies & Co.

inquired whether the growth in China was due to the larger population, an expansion of direct

selling  provincial licenses, or just "good old-fashioned business momentum." Again, Hunt

touted the growth of the Company's direct selling business, attributing it to legitimate business

reasons stating:

> Yes, I would say, Per, that 98% of it is good old-fashioned
> business momentum. And, we're just enjoying just really healthy
> growth. And in a direct selling business, when checks are going up,
> the story builds, the momentum builds; and that is what's
> happening in China.

97.     On August 3, 2011, Nu Skin's stock price closed at $40.69 up from a close on

August 1, 2011 of $37.35 – a two day price increase of almost 9% on heavy trading volume.

98.     On August 5, 2011, the Company filed a quarterly report for the period ended

June 30, 2011 on Form 10-Q with the SEC, which was signed by Wood.  In addition, the Form

10-Q contained SOX certifications signed by Hunt and Wood, stating that the financial

information contained in the Form 10-Q was accurate and that they disclosed any material

changes to the Company's internal control over financial reporting. The Company reported that

for the quarter ended June 30, 2011, revenues in Mainland China were $38.1 million or 8.97% of

Nu Skin's total revenues, an improvement of 77 percent from the second quarter of 2010 (on a

local currency basis).

- 39 -

99.     In the 10-Q, Defendants provided investors with a view of how Nu Skin was supposed to be structured in Mainland China, stating that the Company believed it to be in compliance with Chinese laws prohibiting pyramid schemes and unlicensed direct selling:

> The Company operates in a single operating segment by selling products to a global network of independent distributors that operates in a seamless manner from market to market, except for its operations in Mainland China.  In Mainland China, the Company utilizes an employed sales force, contractual sales promoters and direct sellers to sell its products through fixed retail locations.
>
> *       *       *
>
> Although management believes that the Company is in compliance, in all material respects, with the statutes, laws, rules and regulations of every jurisdiction in which it operates, no assurance can be given that the Company's compliance with applicable statutes, laws, rules and regulations will not be challenged by foreign authorities or that such challenges will not have a material adverse effect on the Company's financial position or results of operations or cash flows.

100.    In the first week of September 2011, Ritch Wood met with analysts from Jefferies & Co.  Based on that meeting, Per E. Ostlund, CFA,  from Jefferies issued a Research Report on Nu Skin with a "Buy" rating, The report stated in part:

> NUS remains relatively underindexed in emerging markets (~22% of sales) vis-a-vis direct selling peers. However, NUS's emerging markets business is on a strong trajectory, especially in China. . . . While the company's relatively high price points might be somewhat limiting in emerging markets today, management noted that a) distributors in these markets are very focused on the business opportunity versus simply product consumption and b) the high end nature of the brand is aspirational, while acknowledging that growing wealth in these countries is a potent tailwind over time.

101.    The statements identified in ¶¶ 93-96, 99 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 92. In addition, the SOX certification described in ¶ 98 also was false and materially misleading for the same reasons.

### C.    Third Quarter 2011 Results

102.    On October 25, 2011, Nu Skin issued a press release announcing its financial and operating results for the third quarter ended September 30, 2011.  For the quarter, the Company reported revenue of $428 million and earnings per share of $0.72, a 31 percent year-over-year improvement. The executive distributor count in Mainland China improved 39 percent, while the number of active distributors increased by 15 percent compared to the prior-year. Revenues in America continued to decline.  Selling expenses, as a percent of revenue, were 43.0 percent in the third quarter, a 70-basis-point increase, attributable to a higher number of distributors qualifying for promotional sales incentives.

103.    Also on October 25, 2011, before the market closed, the Company hosted a conference call to discuss its financial results for the third quarter ended September 30, 2011. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business in China, Hunt made the following statements indicating that growth in China was accomplished without violating any laws prohibiting pyramid schemes and unlicensed direct selling :

> In the third quarter, our executive distributor count increased 14%, and our active distributor count jumped 6%. We're just seeing more people join the business, especially in many of our emerging markets, in particular, mainland China, where our executive count increased 75%. And all throughout the south Asia region where we saw a 27% improvement.

> Seeing this type of growth in our distributer numbers speaks to the continued appetite for opportunity around the world and the ability we have to provide a compelling income opportunity for people.

*     *     *

> First, nearly 70% revenue growth in Mainland China is making China a much more relevant factor in our overall results. Our business there is obviously trending very strongly. . . . So we continue to believe that China is enjoying very healthy momentum and has a real likelihood to becoming our largest market within a fairly short period of time.

*     *     *

> [W]e, obviously, have caught a gear in Mainland China and the enthusiasm of our sales force is just through the roof. Our Management Team there has done a phenomenal job of earning the trust of the sales leaders and we'll have about 1,000 Mainland Chinese here this week for convention. And they are just -- they happen to be sitting on the biggest direct selling opportunity in the history of the world. There just aren't any other markets like it, with direct selling being as robust as it within the Chinese communities globally and they recognize that and our competitors are also doing well in China. We're not the only one who is enjoying good, robust growth. It just happens to be a phenomenal market in terms of size and scale.

104.    Commenting on the growth in revenue from China on the conference call, Wood

stated:

> We're also benefiting from growth in China where we have a slightly higher gross margin due to the vertical integration of our manufacturer operations in this key market….Our selling expenses for the quarter increased 43.0% up from 42.3% last year. This uptick in this expense reflects a higher than usual number of distributors who are qualifying for various incentive trip and promotions. And this is actually a good sign in our business as the sales force continues to develop and progress. The increase comes, primarily, from markets where we're seeing growth rates ahead of our expectations.

*     *     *

- 42 -

Well as you might expect, the weighting of the products by market bears some resemblance to the markets that are growing the fastest. So big ups in China, Korea, south Asia is reflective of the strength of the business there and they definitely showed up in the pre orders as well. So the allocation of that $100 million really skews to the markets that are growing the fastest.

105.    After the conference call with management, Bill Schmitz, Jr. of Deutsche Bank

issued a Research Report on Nu Skin in which he discussed Nu Skin's expansion in China:

Perhaps most interesting to the sustainable growth story is the recovery in China, where the company's premium offerings continue to resonate off a low base. Prestige cosmetics in China continue to expand at a solid pace and consumers there have been historically receptive to novel supplements and nutraceuticals, as evident in Amway's large Nutrilite sales in the market. . . .[T]he company's China business has recovered nicely after challenges with licenses, government intervention and a bloated hybrid retail/direct selling cost structure with significant penetration potential going forward and a management team highly incentivized to make it work. After troughing at $65 million of sales in 2008, we conservatively expect the company's China business to grow almost 60% this year to $143 million, with few signs of slowdown as new products gain traction.

106.    On October 26, 2011, Nu Skin's stock price closed at $48.19 up from a close on

October 24, 2011 of $45.99 or 4.8% over a two day period with very high trading volume on

October 25, 2011.

107.    On November 7, 2011, the Company filed a quarterly report for the period ended

September 30, 2011 on Form 10-Q with the SEC, which was signed by Wood, and reiterated the

Company's previously announced quarterly financial results and financial position.  In addition,

the Form 10-Q contained SOX certifications signed by Hunt and Wood, stating that the financial

information contained in the Form 10-Q was accurate and that they disclosed any material

changes to the Company's internal control over financial reporting. The Company reported that

for the quarter ended September 30, 2011, revenues in Mainland China were approximately

$42.1 million, an increase of 69 percent over the same quarter in 2010 and totaled approximately

9.8% of Nu Skin's total revenues.

108.    The 10-Q represented the following in relevant part concerning the Company's

operations in China:

> The Company operates in a single operating segment by selling products to a global network of independent distributors that operates in a seamless manner from market to market, except for its operations in Mainland China. In Mainland China, the Company utilizes an employed sales force, contractual sales promoters and direct sellers to sell its products through fixed retail locations. Selling expenses are the Company's largest expense comprised of the commissions and incentives paid to its worldwide independent distributors as well as remuneration to its Mainland China sales employees, promoters and direct sellers paid on product sales.
>
> *       *       *
>
> On a local-currency basis, revenue in Mainland China increased 69% and 65% in the three- and nine-month periods ended September 30, 2011, compared to the same periods in 2010. This continued growth is due to significant sales force growth, driven by strong interest in our product portfolio and sales force incentives, as reflected by a 42% increase in preferred customers and 75% increase in sales representatives, compared to the prior-year period.

109.    The statements identified in ¶¶ 103, 104, 108 regarding Nu Skin's business in

Mainland China were false and materially misleading for the reasons set forth in ¶ 92. In

addition, the SOX certification described in ¶ 107 also was false and materially misleading for

the same reasons.

**D.** **Fourth Quarter/Full Year 2011 Results**

110.    On November 16, 2011, Nu Skin issued a press release increasing its fourth

quarter 2011 and recently-issued 2012 financial guidance in advance of its Annual Investor Day

Meeting. The company increased its fourth quarter revenue guidance to $475 to $485 million,

and earnings per share by $0.02 to $0.68 to $0.72. The company also increased 2012 revenue

guidance to $1.80 to $1.83 billion with earnings per share of $2.82 to $2.92.

111.    Commenting on the results, Hunt stated:

> As we come to the conclusion of another record year, we continue
> to build momentum for the future. We are revolutionizing the fight
> against aging through our ageLOC product pipeline, innovating in
> our direct selling channel, <u>experiencing stellar growth in emerging
> marke</u>ts, and continuing to drive shareholder value through
> improved efficiencies and increasing cash flow.

112.    On February 2, 2012, Nu Skin issued a press release announcing its financial and

operating results for the fourth quarter and year ended December 31, 2011.  For the quarter, the

Company reported revenue of $495.3 million (a 23 percent improvement over the prior year) and

diluted EPS of $0.76.  For the year, the Company reported net income of $153 million, or $2.38

diluted EPS and revenue of $1.74 billion, as compared to net income of $136 million, or $2.11

diluted EPS and revenue of $1.5 billion for the same period a year ago. Revenue in Greater

China improved 66 percent to $110.6 million for the quarter ended December 31, 2011,

executive distributor count in the region increased 47 percent and the number of active

distributors improved 21 percent. The Company's selling expenses also increased due to a higher

number of distributors qualifying for promotional sales incentives.

113.    Regarding the Company's performance in China, Hunt was quoted in the press

release as follows:

In addition to the energy surrounding ageLOC, we are pleased with growth in the sales force, particularly in the Greater China and South Asia/Pacific regions, as well as in South Korea.

Additionally, as we announced in another release earlier this morning, based on our 2011 growth and strong balance sheet, we are raising our quarterly dividend by 25 percent.

*     *     *

<u>Emerging markets continue to generate strong results with particularly impressive growth in the Greater China and South Asia/Pacific regions. Our initiatives are driving solid growth in our distributor force as evidenced by healthy gains in both our active and executive distributor numbers, reflecting our compelling business opportunity and fueling our optimism for the future.</u> Overall, we are pleased with the continued positive direction of the business and we believe that we are on track to produce another record year in 2012.

Based, in part, on strong sales in China, Wood increased Nu Skin's annual revenue guidance to $1.81 billion to $1.84 billion.

114.    On February 2, 2012, after the release of the Company's financial results for the fourth quarter and year ended December 31, 2011 and before the market closed, the Company held a conference call with analysts. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business in China, Hunt stated in part:

Now, let's take a closer look at some of our geographies specifically. <u>No surprise that the markets that continue to enjoy the best traction are Greater China</u>, South Korea, and the South Asia Pacific region. There has not been a time in my experience with the Company, when we have enjoyed such strong momentum in so many different markets.

<u>In mainland China, we have performed very well and we remain excited about our opportunities there. We generated a 47% increase in executive leaders in the Greater China region during the fourth quarter, and China continues to have enormous upside.</u> This optimism is reflected in our $50 million investment in the state-of-

the-art corporate facility. just outside of Shanghai, but this $50 million investment, as we've indicated, is also offset by tax credits offered by the Shanghai Government. We broke ground on the China innovation center in December, and we see no signs of slowing in mainland China and fully expect that the market will become our single largest market in the not too distant future.

115.    In response to a question about revenue growth in Mainland China and Hong Kong, Wood stated in part:

I think the best thing do there is to look at the executive growth. In mainland China, held I think in the 75% range. So very, very strong numbers. The actual revenue booked in China, I think, showed 49% growth which was a deceleration from Q3. That's all because sales were booked in Hong Kong and not in mainland China.

116.    On February 3, 2012, Nu Skin's stock price closed at $52.76 – up from a close on February 1, 2012 of $50.60 – a two day price increase of 4 percent with heavy trading volume on February 2, 2012.

117.    On February 28, 2012, the Company filed an annual report on Form 10-K with the SEC for the period ended December 31, 2011, which was signed by, among others, Hunt and Wood, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

118.    The 10-K represented the following in relevant part concerning the Company's operations in China:

We operate through a direct selling model with independent distributors in all of our markets except Mainland China, referred to in this Annual Report on Form 10-K as China, where we operate through a hybrid model with a sales force of sales employees,

contractual sales promoters and a limited number of direct sellers. As of December 31, 2011, we had more than 850,000 active distributors.  More than 40,000 of our distributors were qualified sales leaders we refer to as "executive distributors."  Our executive distributors play a critical leadership role in the growth and development of our business.

*       *       *

Our sales employees and contractual sales promoters in China, which are included in references to "executive distributors" have a monthly volume commitment that is about 50% of the dollar amount of an executive-level distributor's monthly volume commitment under our global compensation plan.

*       *       *

Our retail model in China is largely based upon our ability to attract customers to our retail stores through our sales force, to educate them about our products through frequent training meetings, and to obtain repeat purchases. We also continue to implement a direct sales opportunity that allows us to engage independent direct sellers who can sell products away from our retail stores.

*       *       *

Through training meetings, distributor conventions, web-based messages, distributor focus groups, regular telephone conference calls, and other personal contacts with distributors, we seek to understand and satisfy the needs of our distributors.  We provide walk-in, telephonic, and web-based product fulfillment and tracking services that result in user-friendly, timely product distribution.  Several of our walk-in retail centers maintain meeting rooms, which our distributors may utilize for training and sponsoring activities.  Because of our efficient distribution system, we believe that most of our distributors do not maintain a significant inventory of our products.

*       *       *

*Rules Affecting Distributors.*  We regularly monitor regulations and have adopted distributor policies and procedures to assist our distributors in their efforts to comply with local laws.  Our distributor policies and procedures establish the rules that

distributors must follow in each market.  These distributor policies and procedures also help to maintain a level playing field for our distributors, so that some are not disadvantaged by the activities of others.   We require our distributors to present products and business opportunities ethically and professionally.   Distributors further agree that their presentations to customers must be consistent with, and limited to, the product claims and representations made in our literature.

\*        \*        \*

We systematically review reports of alleged distributor misbehavior.  If we determine one of our distributors has violated any of our policies or procedures, we may terminate the distributor's rights completely.  Alternatively, we may impose sanctions, such as warnings, probation, withdrawal or denial of an award, suspension of privileges of a distributorship, fines and/or withholding of commissions until specified conditions are satisfied, or other appropriate injunctive relief.

\*        \*        \*

We work diligently to train our sales force in China on how our China business model differs from our global business model.

\*        \*        \*

The Company operates in a single operating segment by selling products to a global network of independent distributors that operates in a seamless manner from market to market, except for its operations in Mainland China.  In Mainland China, the Company utilizes an employed sales force, contractual sales promoters and direct sellers to sell its products through fixed retail locations.

\*        \*        \*

Strong revenue and sales force growth in the Greater China region, including significant growth in China, was driven by continued interest in our business opportunity and our strong product portfolio, including our ageLOC products. The region was also positively impacted by successful sales initiatives and excitement surrounding the initial introduction of ageLOC R$^2$ and our ageLOC Galvanic Body Spa and related products in the fourth quarter of 2011.

- 49 -

119.    The statements identified in ¶¶ 111, 113-115, 118 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 92. In addition, the SOX certification described in ¶ 117 also was false and materially misleading for the same reasons.

### E.    First Quarter 2012 Results

120.    On April 26, 2012, Nu Skin issued a press release announcing its financial and operating results for the quarter ended March 31, 2012.  For the quarter, the Company reported net income of $47.8 million, or $0.74 diluted EPS and revenue of $462 million, as compared to net income of $15.3 million, or $0.24 diluted EPS and revenue of $395.8 million for the same period a year ago. First-quarter revenue in Greater China increased 35 percent to $92.6 million, compared to $68.6 million in the prior-year period. The executive distributor count in Greater China improved 31 percent, while the number of active distributors increased 25 percent compared to the prior year.

121.    Regarding the Company's performance in China, Hunt made the following statements:

> Emerging markets also performed well in the first quarter. The Greater China region posted a 35 percent year-over-year increase, and the South Asia/Pacific region continued to build momentum in anticipation of the launch of new ageLOC products in the second quarter.
>
> \*        \*        \*
>
> We expect strong results to continue throughout 2012 as we move forward with the roll out of our ageLOC product line. Our Greater China region will begin taking orders for ageLOC R2 and the ageLOC Body Galvanic Spa in the first week in May, and in June we will host approximately 20,000 distributors at our Greater China regional convention in Hong Kong. . . . We are tracking

ahead of our mid- and long-range goals as we continue innovating in our product categories and within our sales channel.

122.     On April 26, 2012, after the release of the Company's financial results for the first

quarter ended March 31, 2012 and before the market closed, the Company held a conference call

with analysts. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu

Skin's business in China, Hunt made the following statements:

> We also continue to grow at a very strong pace in our emerging markets. Mainland China in particular posted gains of more than 57% in Q1, and we project a very strong Q2 as we will begin to take orders for ageLOC R2 and Body Galvanic Spa next week, in advance of a larger Greater China regional distributer convention that will be held in June.

123.     Commenting on how the strong product launches in China were expected to fuel

increased projected earnings, Wood stated in part:

> In addition, we now expect earnings per share to be in the $2.92 to $3.00 per share range. That is an increase of $0.06 over the top end of our previous guidance. The guidance reflects an anticipated benefit from our new product launches in Greater China and Southeast Asia during the second quarter of approximately $55 million to $60 million, and that is up about $20 million to $25 million off where our previous guidance was.

In response to a question about where the growth in China was coming from, Hunt stated:

> The growth we are seeing in China, John, really is coming from the centers around Beijing, Shanghai and Guangzhou. And the growth we are seeing really isn't related to -- much at all to the expansion of new cities. This is just core growth in our 3 core areas, and it is, obviously, very encouraging because it is much less related to geographic expansion than it is just core growth in the business.

124.     On May 8, 2012, Defendants raised Nu Skin's revenue guidance for 2012 by $40

million and earnings per share guidance by $0.06 per share, bringing the Company's full year

guidance to $1.885 to 1.915 billion of revenue, and $2.98 to $3.06 in earnings per share based, in part, on expected increased sales of Nu Skin's new ageLOC products in Mainland China.

125.    Despite the upward guidance, the price of Nu Skin's stock declined in sympathy with other companies who employ the direct selling sales model.  On May 8, 2012, the date Nu Skin raised its revenue guidance for 2012, John Faucher of JP Morgan Chase issued a Research Alert on Nu Skin.[26]  In the Research Alert, Faucher explained that the decline was unrelated to Nu Skin's prospects, particularly in China:

> The stock was down as much as 15% last week (vs. -2% for the SPX) and is now down nearly -8% for the year (vs. +8.9% for the SPX), as it traded down in sympathy with Herbalife (HLF/Not covered), after Greenlight Capital's David Einhorn asked questions about Herbalife's direct-selling model on its quarterly conference call. . . .
>
> *          *          *
>
> We hosted several meetings with NUS last week, and the takeaways were generally positive. <u>The Greater China business continues to do well</u>, and management was confident about a turnaround in the US business. . . . There were also questions asked about the effectiveness of the company's scanner product, the guidance for down revenues in Q4, and China regulations.

126.    On May 8, 2012, Rommel Dionisio of Wedbush Securities also commented on the sell-off in shares Nu Skin stock, along with shares of other companies employing a direct sales model:

> We view recent selloff as an attractive buying opportunity. Given recent investor concerns about David Einhorn's questions on Herbalife's Q1 earnings call about their multi-level marketing platform, shares of NUS and other direct sellers also sold off

---

[26]    CFO Ritch Wood also met with Scott Van Winkle of Canaccord Genuity during the week of May 3, 2012 to answer questions about Nu Skin's direct selling business model. *See* May 3, 2012 Canaccord Genuity Report.

sharply on sympathetic concerns. <u>As we view Nu Skin's well established business model to be above reproach, we see last week's selloff as an attractive buying opportunity, particularly given such improving fundamentals.</u>

127.     On May 10, 2012, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended March 31, 2012, which was signed by Wood, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The Company reported that for the quarter ended March 31, 2012, revenues from Mainland China grew to $50.8 million (up 57% year-over-year) partially offsetting a decline in Japan.

128.     The 10-Q represented the following in relevant part concerning the Company's operations in China:

> <u>Strong revenue growth in the Greater China region was driven by significant sales force growth and continued interest in our strong product portfolio, including our ageLOC products.</u> In May, we received approximately $100 million dollars in orders of our ageLOC R2  and ageLOC Galvanic Body Spa  and related products, through a limited-time offer in connection with our Greater China regional convention in June. We currently anticipate that these orders will be filled and recorded as revenue in both the second and third quarters based on the timing of our fulfillment of the orders.
>
> *        *        *
>
> The Company operates in a single operating segment by selling products to a global network of independent distributors that operates in a seamless manner from market to market, except for its operations in Mainland China. <u>In Mainland China, the Company utilizes an employed sales force, contractual sales</u>

<u>promoters and direct sellers to sell its products through fixed retail
locations</u>.

129.    The statements identified in ¶¶ 121-123, 128 regarding Nu Skin's business in

Mainland China were false and materially misleading for the reasons set forth in ¶ 92. In

addition, the SOX certification described in ¶ 127 also was false and materially misleading for

the same reasons.

**F.    Second Quarter 2012 Results**

130.    On July 26, 2012, Nu Skin issued a press release announcing its financial and

operating results for the second quarter ended June 30, 2012.  For the quarter, the Company

reported net income of $60.4 million, or $0.94 diluted EPS and revenue of $593 million, as

compared to net income of $41.7 million, or $0.65 diluted EPS and revenue of $424.4 million for

the same period a year ago. Revenue in Greater China increased 152 percent to $199.7 million,

compared to $79.4 million in the prior-year period. Results included approximately $100 million

of product launch sales. The executive distributor and employee sales representative count in

Greater China improved 111 percent, while the number of actives increased 31 percent compared

to the prior year.

131.    Regarding the Company's performance in Greater China, Hunt made the

following statements:

> Once again, we are pleased to announce record quarterly results,
> highlighted by the most successful regional product launch in our
> history that boosted revenue by more than 150 percent in Greater
> China and 66 percent in South Asia.

> *       *       *

> <u>Emerging markets, particularly China and South Asia, will
> continue to drive healthy overall growth rates</u>.

132.     Based on the strong second quarter results, Wood announced that the

Company was, "significantly increasing our 2012 revenue and earnings guidance. We

project 2012 revenue to be in the $2.00 to $2.03 billion range with earnings per share of

$3.16 to $3.24."

133.     On July 26, 2012, after the release of the Company's financial results for the

second quarter ended June 30, 2012 and before the market closed, the Company held a

conference call with analysts. Participating on that call from Nu Skin were Hunt and Wood.

Regarding Nu Skin's results, Hunt stated in part:

> We generated revenue of $593 million in the quarter, which
> represents growth of 40%, exceeding guidance by more than $50
> million. I think you will agree with us that these results are
> reflective of very strong business momentum. It wasn't too long
> ago when we first generated revenue of $1 billion for a full year,
> and this year we have accomplished that just the first six months.
>
> Our earnings also came in well ahead of guidance with a record
> high quarterly EPS of $0.94, a very healthy 45% increase over last
> year.
>
> *       *       *
>
> I would point out how quickly emerging markets are becoming a
> larger component of our revenue mix. The greater China region
> obviously knocked the cover off the ball with 150% growth in the
> second quarter.

134.     In response to a question regarding growth in the sales representative team in

China, Wood stated in part:

> I would just highlight the growth in our sales representative base
> there, our employee sales force growth, very, very significant. We
> had the greater China convention, and there's just a lot of energy
> right now. As we kind of forecast out and look at our business, it's
> highly likely that China surpasses Korea next year as the second

<u>largest business in our world, and by 2015, could likely be the largest market in the Nu Skin world</u>.

In addressing a question regarding how much growth in sales to Mainland China were achieved at the sales convention in Hong Kong, Wood, stated: "<u>the growth rate in China would have been well in excess of 100%....Mainland growth rate would have been over 100% year-over-year</u>."

135.    In response to Nu Skin's projected goal of $1 billion in sales in the Greater China region by 2015, Hunt and Wood stated the following:

> <u>Truman Hunt</u>: [I]t truly is stunning, actually, to attend our greater China convention in Hong Kong a few weeks ago, and just witness the stream of Chinese leaders coming across the stage. <u>The market is enormous, the potential is enormous</u>. The people are hungry for opportunity. They work their tails off, and our management time is bullish. They believe that, that $1 billion goal is realistic. We've looked at it as perhaps more aspirational, but it's hard not to start becoming a believer when you see the numbers that they are putting up and when you see the people walking across the stage and realize that these are very, very capable folks. I would have liked to have had all of our analysts, frankly, sitting that's [sic] greater China convention, because you would have a hard time coming away without being believers in the region. Want to talk about the run rate, Ritch?

> <u>Ritch Wood</u>: When this goal was stated by our management team in China, and our greater China region, we were at about $270 million. That it was in 2010, 2011, $342 million, and this year we will be over $500 million in the region, and it's, frankly, right on track with the forecast that we were provided by them a few years back. <u>As much as $1 billion seems unrealistic to some of us, our management team over there has a high level of confidence that they're executing on plans, and, frankly, there is so much opportunity in these markets that it's not out of the realm of possibility that we deliver on that target.</u>

136.     In response to a question about the growth rate in executive distributors, Hunt

stated in part:

> On the executive count, we would expect, as Ritch just indicated,
> the growth in executives to mirror a little closer revenue growth,
> which we're projecting at 18%. So you will see a little contraction
> in the greater China number, we would think, but they're
> surprising us on the upside on an almost quarterly basis, so we'll
> just have to see how it plays out.

137.     On the news of Nu Skin's strong results for the second quarter ended June 30,

2012 including much better than expected growth in Mainland China, Nu Skin's stock price

jumped from $44.00 on July 25, 2012 to close at $50.99 on July 27, 2012 – **an increase of**

**almost 16% over two days** on volume at least triple Nu Skin's average daily trading volume.

138.     On August 6, 2012, after the market closed, the Company filed a quarterly report

for the period ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Wood, and

reiterated the Company's previously announced quarterly financial results and financial position.

In addition, the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood,

stating that the financial information contained in the Form 10-Q was accurate and that they

disclosed any material changes to the Company's internal control over financial reporting.

139.     The 10-Q represented the following in relevant part concerning the Company's

operations in China:

> The Company operates in a single operating segment by selling
> products to a global network of independent distributors that
> operates in a seamless manner from market to market, except for
> its operations in Mainland China. <u>In Mainland China, the
> Company utilizes an employed sales force, contractual sales
> promoters and direct sellers to sell its products through fixed retail
> locations.</u>

*        *        *

> Significant revenue growth in the Greater China region was driven by successful limited-time offers of our ageLOC R$^2$ and ageLOC Galvanic Body Spa  and related products in connection with our Greater China regional convention held in Hong Kong in June. These limited-time offers generated approximately $100 million in revenue during the second quarter. Our product innovation also continued to drive significant growth in our customer base and sales force in this region, including significant growth in our sales leaders.

140.    The statements identified in ¶¶ 131, 133-136, 139 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 92. In addition, the SOX certification described in ¶ 138 also was false and materially misleading for the same reasons.

### G.    Citron Research Report, Company's Response, and Analyst Reports

141.    On Tuesday August 7, 2012, Citron Research, an online stock commentary website run by a short seller, published an analyst report entitled, "The Two Faces of Nu Skin" ("August 7th Citron Report"). The August 7th Citron Report included new information about Nu Skin's operations in China and included seven transcripts of interviews conducted by undercover Citron researchers in Mainland China with Nu Skin retail store employees and/or sales promoters and independent distributors. Citron concluded that Nu Skin's operations in China are based on illegal multi-level marketing or pyramid selling schemes.  The report concluded the following in relevant part:

> By contrast, China prohibits multi-level marketing strictly and in [its] entirety. Pyramid schemes create victims by creating an endless chain of recruits who recruit new recruits into a wealth transfer scheme which cannot possibly be sustained. Therefore the vast majority of the participants lose their money. Often pyramid schemes are cloaked in the sale of an overpriced product, with new recruits being required to "invest in inventory" to gain or maintain certain levels of membership which most will be unable to achieve.

These abusive business models are understandably outlawed under Chinese law.

China does have a law which defines and permits only "direct selling.". . . [I]t is the opinion of Citron Research that Nu Skin is grossly violating the laws of the PRC, and their entire Chinese business operation could be in jeopardy of seizure and other substantial risks.

*　　　*　　　*

<u>Citron associates engaged some undercover "customers" who helped us expose the truth. While Nu Skin is a registered direct seller, we believe they violate laws regulating direct selling, as well as the prohibition on pyramid sales, specifically by supporting the creation of a multi-level pyramid compensation scheme, as well as requiring purchases in order to participate in sales commissions or salary.</u>

*　　　*　　　*

Nu Skin investors are exposed to the massive risk of its China operations coming to an abrupt halt due to violation of the PRC's and Hong Kong pyramid sales laws. The consequences would be devastating.  What would the Company be worth without its China operation?

142.     The interviews with and the documents created by the Nu Skin employees and independent distributors (published in the August 7th Citron Report) demonstrate how Nu Skin downlines worked in China.  This in-depth information had not been previously disclosed or known to the market.  Based on Citron's proprietary interviews and notes, the August 7th Citron Report was more than just an opinion piece based on publically available information. It was a partial disclosure of Nu Skin's violations of Chinese law which the Defendants attempted to discredit almost immediately, with enough force and intensity so as to overtake its truth and continue to deceive the market.

- 59 -

143. ***Upon release of the August 7th Citron Report, Nu Skin's stock declined $4.50 per share, or more than 9%***, to close at $44.36 per share on August 7, 2012.

144. However, ***after the market closed on August 7, 2012***, the Company responded by filing a Form 8-K disputing Citron's claims and reiterating the Company's alleged compliance with Chinese law.  The Form 8-K (Regulation FD Disclosure), signed by Wood, stated the following:

> <u>We are confident that our China operations are in compliance with applicable regulations as interpreted and enforced by the government of China</u>. Nu Skin has an eight-year history of doing business in China under these regulations, and the government has regularly reviewed our business activities. In the past year the government has issued Nu Skin new direct selling licenses in several cities and municipalities.
>
> China's regulatory framework is unique. Consequently, our business model in China is different than our global business model. Nu Skin utilizes retail stores with an employed sales force and contractual sales promoters, which we supplement with a direct sales opportunity in those locations where we have obtained a direct selling license. <u>Our compensation is similar to other direct selling companies operating in China. Our employed sales force is compensated based on a number of performance factors that are similar to any other sales organization in any industry: productivity, effectiveness of sales management and leadership, as well as compliance with local regulations and company policies</u>.
>
> We actively educate our sales force to follow all regulations and company policies and procedures. <u>Any member of our sales force not operating in accordance with local law or with our company policies is subject to discipline</u>.

145. On August 8, 2012, after the filing of Nu Skin's Report on Form 8-K denying the allegations in the August 7th Citron Report, Scott Van Winkle of Canaccord Genuity issued the only analyst report on Nu Skin that day. Van Winkle based his report on the Company's Report on Form 8-K and prior conversations with Nu Skin management including Defendants Wood

and Hunt. In his report, Van Winkle noted that Nu Skin's stock price had "correct[ed] on an

investment report questioning [Nu Skin's] China sales model. The report suggests Nu Skin's

compensation system is in violation of Chinese rules."  However, Van Winkle concluded:

> •Our thesis remains that Nu Skin is in the midst of a powerful
> product cycle, coupled with a concerted effort to improve margins
> that should drive above-average EPS growth.
>
> Investment highlights
>
> • Nu Skin utilizes an employed work force in China for the vast
> majority of its sales reps with a salary that is reset quarterly,
> commission rates dependent upon individual sales volume, and
> organizational volume driving salary rates.
>
> • While aggressive selling tactics by sales reps may be
> encountered, the compensation plan utilized is actively approved
> by the government and Nu continues to receive incremental direct
> selling licenses.
>
> Our price target reflects the superior growth anticipated over the
> next two years and current business momentum.

146.    On August 8, 2012, Nu Skin's stock price decreased an additional 5.4% on heavy

trading volume falling from $44.36 per share to close at $41.96 per share.

147.    A day later, on August 9, 2012, Andrew Left of Citron Research appeared on

CNBC's StreetSigns with Deutsche Bank's Bill Schmitz, Jr., an analyst who covers Nu Skin.

Left and Schmitz engaged in a debate concerning Nu Skin's business in China. According to a

media report on the presentation: [27]

---

[27]     The recorded CNBC Streetsigns debate is available at
http://www.streetinsider.com/Trader+Talk/UPDATE%3A+Traders+Eye+Nu+Skin+(NUS)+Ahead+of+BullBear+Debate+on+CNBC/7646698.html;
http://video.cnbc.com/gallery/?video=3000108202&play=1

Recently, respected short selling firm Citron Research wrote a bearish article on Nu Skin (NUS) that caused the stock to drop over 10% in a couple days. The basis for Citron's bear attack is that multi-level marketing (MLM) schemes are illegal in China, and since Nu Skin is operating an MLM there, then the company is at risk of losing all business in China and getting its assets seized (as a worst-case scenario).

On CNBC today, Andrew Left from Citron Research had a debate with NUS bull Bill Schmitz, senior research analyst at Deutsch Bank.[28]

There was lots of new, useful information to get out of this debate from Bill Schmitz. Andrew Left highlighted his article. The following are highlights from the debate.

Andrew Left: "If you look at my diagrams on my website, you can see reps drawing out pyramids when recruiting. If you look at info from a recent convention in Hong Kong, they most definitely run an MLM in China. They get paid for recruiting sellers down the pyramid, which constitutes an MLM scheme."

Schmitz: First off, the big recent revenue boom in China and the convention was for their new product which they marketed heavily. That recent revenue boom in China isn't sustainable.

Left: That new "great" product was refused admission this last spring here in the US per the FDA.

Schmitz: That's not true. The product hasn't been approved yet by the FDA. That is a factually incorrect statement.

Schmidt: And as far as the MLM structure in China, all the Nu Skin distributors who get commissions in China are salaried and get health care and benefits.

Left: Nu Skin has had regulatory problems all over, North Korea, Japan, etc.

---

[28]    The media report incorrectly spelled the Deutsche Bank's analyst's name. The correct spelling has been used here.

Schmitz: The executives of Nu Skin helped script the direct selling law in China. They sat down and helped write it. So they aren't going to get thrown out of China.

My analysis of the debate is that Andrew Left got worked pretty badly. He had no specific rebuttals to Bill Schmitz, but Mr. Schmitz had some for him. It is clear to me that Mr. Schmitz knows the company much more intimately than Mr. Left does. What I found most interesting, is that Mr. Schmitz said all Nu Skin commissioned distributors in China also get salaries, health care and benefits. Does that sound like a typical MLM, pyramid scheme distributor in the United States?

I invite all NUS bears to respond to this article and state their point of view. I am long NUS, but I always welcome contrary opinion. Also keep in mind that I read Citron's articles, and I still believe they are one of the best short sellers in the world.

148.    Nu Skin's stock price rebounded 6.24% on August 9, 2012 based, in part, on the CNBC segment and Schmitz's staunch defense of Nu Skin.

149.    On August 16, 2012, Citron Research published an update to its online report on Nu Skin.  In the update, Citron included a new, previously non-public report on a Nu Skin sales conference in Hefei, China on July 7, 2012 which an undercover Citron researcher attended in-person. The speaker at the conference, Chen Jiajun, a Nu Skin Executive Distributor, spoke with Nu Skin distributors and sales representatives, describing Nu Skin as composed of many pyramids and telling the audience how they could become rich if they took the initiative to develop downlines. Jiajun stated, "you are always at the top of your own pyramid while being at the bottom of someone else's pyramid." Jiajun reported he had 2,000 full-time downlines in China.  Jiajun also reported that in Nu Skin, every new distributor has 6 uplines who will help train the new distributors. He said, "they will help you because every one of your uplines will make 5% commission from your sales."

150.    On August 16, 2012, Wood presented at the Canaccord Genuity 32nd Annual

Growth Conference in Boston. At the conference, Wood stated that Nu Skin expected its

emerging markets to account for 40 percent of its projected 2015 revenue, "with tremendous

opportunity in Mainland China and Southeast Asia. Nu Skin has many years of experience

operating within China's regulatory framework and has made substantial investments in its

infrastructure, including four manufacturing plants, two R&D labs, 40 retail stores and 15

provincial and municipality licenses." Wood explained that in Mainland China, Nu Skin's direct

sellers and sales promoters received commissions of 10% - 30% on their direct sales to

customers and sales employees received a salary (which was 40% of the employee's total

compensation) and commissions of between 10 - 25% on sales to customer and on the

productivity of both the employee and his/her sales team. Further, Wood falsely represented that

in China, Nu Skin had no product purchase requirements.

151.    On August 20, 2012, following defendant Wood's presentation at the Canaccord

Genuity 32nd Annual Growth Conference in Boston, Scott Van Winkle of Canaccord Genuity

issued another Research Report on Nu Skin, stating in part and based on and repeating Wood's

remarks at the conference:

> Much has been alleged over the past week or so – Nu Skin
> operates a multi-level marketing scheme in China contrary to
> China rules, product claim improprieties, a phantom relationship
> with Stanford University and FDA non-compliance relating to the
> Galvanic spa facial unit. Our responses are such: Nu Skin has been
> operating in China under a government-approved compensation
> plan for several years. It maintains an employed sales force where
> salaries are paid for group success and an independent seller model
> where commissions are limited to direct sales. It has developed
> local operations (detailed below) similar to other direct sellers in
> the country, many of which have independent sellers receiving

<u>business licenses to receive compensation for training of other distributors on top of commissions</u>. . . .

*    *    *

We don't see any of the aforementioned issues, <u>excluding a change in government regulation in China</u>, as materially disruptive to Nu Skin's operations or reflective of the underlying healthy fundamentals.…

*    *    *

CONFERENCE TAKEAWAYS

• Nu Skin CFO Ritch Wood spent much of the presentation detailing Nu Skin's Chinese operations. In sum, Nu Skin has been operating in mainland China for roughly 10 years, first as a retailer then subsequently as a direct seller. <u>The company notes being fully regulatory compliant, and has safeguards in place similar to those in all of its other global markets</u>.

152. The statements identified in ¶¶ 144, 150 regarding Nu Skin's business in Mainland China were false and materially misleading because the following facts were known by Defendants but concealed from the investing public during the Class Period:

(a)   Defendants were utilizing MLM and multi-level compensation and permitting the creation of downlines to grow Nu Skin's business in Mainland China – all in contravention of China's strict rules against such practices;

(b)   Because Nu Skin grew in China through improper and illegal means and not simply through sales "momentum" or legitimate sales incentives or pursuant to increased, *licensed* direct sales, Nu Skin's growth levels in that market could not be sustained;

(c)   Defendants knowingly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in a way that would have taught new sales representatives and direct sellers how to comply with Chinese

- 65 -

direct selling regulations.  Nu Skin did not require formal training as required by the Chinese

regulations (see Articles 18 and 19 of PRC's Regulations on Direct Selling Administration (Ex.

A). Further, Nu Skin's training for new distributors and direct sellers was sporadic and was not

enforced;

    (d)  Rather than utilizing a different business model in Mainland China

compared to the ordinary business model that had been deployed in other geographic regions as

Defendants represented in SEC filings, in truth, Nu Skin had replicated its MLM pyramid

scheme model in the PRC, which it attempted to disguise with a lexicon that simply called its

component features something else;

    (e)  Defendants knew that the disclosures in the August 7th Citron Report

were accurate and/or at least justified an in-depth review of both the Company's sales and

training policies in Mainland China; and

    (f)  The Company's  disclosures about the risks of doing business in China

were materially false and misleading when issued as the Defendants knew or were severely

reckless in not knowing that the Company was not "at risk" of violating multiple direct selling

and pyramid scheme  regulations throughout the Class Period, it was in fact violating those laws.

Defendants knew that the Company's policies, coupled with strong Chinese enforcement of its

laws prohibiting unlicensed direct selling and pyramid scheme compensation, meant that the

Company would eventually be caught, and  fined or sanctioned for its MLM, multi-level

compensation scheme, and unlicensed direct selling in Mainland China.

**H.      Company Announces Expanded Distribution in China**

153.    On September 21, 2012, soon after the Greater China Leadership Conference in Macau, the Company issued a press release following up on its China expansion plans. In that press release the Company stated:

> In order to reach further into the unique China marketplace, Nu Skin also announced plans to expand its distribution with the addition of "independent marketers" to its existing multi-channel business model. These legally-registered independent business operators are widely used within the direct selling industry in China and would be authorized to operate sales businesses that provide a variety of products and services under the scope of their business licenses. Consequently, the business model of Nu Skin in China will include:
>
> > ▪Employed and contractual sales people who sell products from stores.
> >
> > ▪Direct sellers who sell products away from stores; and
> >
> > ▪Independent marketers who will sell products from their own place of business.
>
> "We believe that the expansion of our distribution alternatives in China will effectively supplement our current distribution channels in this unique marketplace, offering additional business and employment opportunities, improving people's livelihoods, and paving the way for our long-term, sustainable growth in this important market," concluded [Andrew] Fan [Nu Skin China's Regional President].

154.    The statements identified in ¶ 153 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152.

**I.      Third Quarter 2012 Results**

155.    On October 31, 2012, Nu Skin issued a press release announcing its financial and operating results for the third quarter ended September 30, 2012.  For the quarter, the Company

reported net income of $54.2 million, or $0.87 diluted EPS and revenue of $526.2 million, as compared to net income of $46.8 million, or $0.72 diluted EPS and revenue of $428.4 million for the same period a year ago. Third-quarter revenue in Greater China increased 64 percent to $136.6 million (including revenue from pre-orders in the prior quarter). The sales leader count in Mainland China improved 51 percent, while the number of actives increased by 38 percent compared to the prior-year.  The Company also reported that selling expenses, as a percent of revenue had increased based on accelerated sales growth in emerging markets, "due in part to successful product launches and a higher number of sales leaders qualifying for promotional incentives."

156.    On October 31, 2012, before Nu Skin's earnings conference call, Bill Schmitz, Jr, of Deutsche Bank issued a Research Note on Nu Skin maintaining a "Buy" rating on Nu Skin stating in part:

> With Company being unduly punished spurious and easily refuted allegations of wrongdoing in China, it has strong secular growth tailwinds, fueled by strong innovation pipeline, increased executive distributor growth and expansion into new geographies. Moreover, balance sheet is pristine and management has significant flexibility to redeploy excess cash to accelerate share repurchase, pay one or a series of special dividends or even take the company private if market doesn't start to reflect the strong financial and fundamental position of the company With recent pullback, valuation is considerably more compelling, and company continues to beat still-high expectations. Maintain Buy, $60 target.

157.    On the afternoon of October 31, 2012, after the release of the Company's financial results for the third quarter ended September 30, 2012 and before the market closed, the Company held a conference call with analysts. Participating on that call from Nu Skin were Hunt and Wood. Hunt addressed how the Company had been able to achieve such strong results:

As we have discussed in the past, there are three ways to grow our business. First, we recruit more salespeople and customers. Second, we retain more salespeople and customers. And third, we improve sales productivity. We've made significant progress on all three of these fronts over the past several years, and during 2012. In the third quarter we grew in every region, and our sales force became even more engaged and productive as a result of recent product launches.

*    *    *

<u>Greater China and South Asia obviously continue to post strong growth, coming off tremendous limited time offers in the second quarter</u>.

158.   Regarding Nu Skin's growth in China, Wood stated in part:

This morning, we raised our annual 2012 revenue guidance to $2.11 billion. That represents an expected growth rate of 21% in US dollars over the prior year, and includes a couple percent headwind from foreign currency. We are encouraged very much by the strong growth we continue to see. And when providing initial 2012 guidance, one of the challenges was our difficult fourth quarter revenue comparison.

*    *    *

<u>And we've mentioned this as it relates particularly to South Asia and Greater China, and as we've begun to -- as we continue to see very, very strong results in these two regions particularly, we've started to accrue against these achievements for these incentives that are out there</u>.

159.   In response to a question about the Company's response to the allegations in the

August 7th Citron Report about Nu Skin's business model in China, Hunt stated:

Yes, it's obviously been an interesting time for us, Bill, over the course of the last several months, as we've faced the scrutiny that we have from certain sources, including recently sources in other types of media. You know, it just seems like everybody has an agenda these days, and the short-sellers certainly have their agenda, and other media writers have their agenda, which seems to be more political than anything else. We're viewing this really as kind of a rite of passage, I suppose. You know, 20 years ago we

- 69 -

went through a high level of scrutiny from a regulatory perspective here in the US, with the FTC and several state Attorneys General, and came through that. We really faced similar scrutiny from the industry 10 years or so ago, and we emerged within the industry as a leader, and now we have the opportunity to face the scrutiny of the street, and hopefully come through this rite of passage successfully, too, which we intend to do.

You know, we're happy to answer the questions that we can, and our goal is to be as transparent as we can with anyone who's asking questions honestly and objectively. It's just that when questions are asked with an agenda, and people don't particularly care what the response is or what the truth is, it becomes a little bit harder to communicate the truth. But we're being as responsive as we can. <u>When – it's been interesting to us, as certain issues have been raised, to find that in China, in particular, our Management team has already been on top of those issues, and addressed those issues. So we think that our team there is doing a great job managing a high-growth environment, and I think with the passage of time, really, is what we need right now to demonstrate to the street that we have a viable and successful business there, and we can continue to grow the market</u>.

160.    Based on Defendants' representations about Nu Skin's business in China, among other things, Scott Van Winkle of Canaccord Genuity issued a Research Report on Nu Skin on October 31, 2012 after the Company's earnings conference call. The Report stated in part:

We continue to believe that Nu Skin is in the midst of a powerful product cycle that is driving momentum in distributor growth and sales productivity that will lead the company toward its $4/share of EPS target faster than most anticipate. While there will always be doubters of the direct selling model – and Nu Skin has its own challenges and seems to be a magnet for negative publicity of late – the company's long-term growth in most major markets (Japan the well known exception) is evidence of the sustainability of the sales model, and the attractiveness of the business model is clear in the financial results. We reiterate our BUY rating and recommend investors take advantage of an opportunity to buy NUS at a discount to historical average forward PE while business momentum is arguably at the highest level of the company's history.

161.    The Company's stock price increased substantially on the October 31, 2012 statements.  Nu Skin's stock price increased from a market close on October 26, 2011 of $41.94 to a close on November 1, 2012 at $48.95 – *a two day increase of 16.7 percent* on exceptionally high trading volume.[29]

162.    On November 2, 2012, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended September 30, 2012, which was signed by Wood, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The Company reported that for the quarter ended September 30, 2012, local-currency revenue in Mainland China improved 60 percent over the same quarter in 2011. Mainland China revenues reached $68.2 million or 13% of total revenues.

163.    The 10-Q also reported the following about Nu Skin's growth of its Chinese business:

> Significant growth in our revenue and our customer base and sales force in the Greater China region continued to be driven by strong interest in our innovative anti-aging product portfolio and business opportunity. Local-currency revenue for the three- and nine-month periods ended September 30, 2012 in Mainland China was up 60% and 55%, respectively. . . .Mainland China reported a 66% and 64% increase in the number of sales representatives and preferred customers, respectively, compared to the prior-year period.

---

[29]    The markets were closed on Monday October 29, 2012 and Tuesday October 30, 2012 due to Hurricane Sandy.

164.     The statements identified in ¶¶ 157-159, 163 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152. In addition, the SOX certification described in ¶ 162 also was false and materially misleading for the same reasons.

### J.     Nu Skin's 2012 Annual Analyst and Investor Conference

165.     On November 14, 2012: Nu Skin hosted its Annual Analyst and Investor Conference. The presentation is available on the Investor Relations page of the Nu Skin Enterprises website, at http://ir.nuskin.com. During the conference, Hunt made a presentation about Nu Skin's growing business in Mainland China. Hunt represented that Mainland China was Nu Skin's "fastest growing direct selling market" and that the Company was "Modeling 15-18% revenue growth in 2013." Further, Hunt stated that Nu Skin had a solid infrastructure and significant market potential in Mainland China.  With respect to compliance China's direct selling rules, Hunt maintained that Nu Skin's "Experienced management team" "understands local regulatory framework, works cooperatively with local regulators" and "[h]as a track record of regulatory compliance and successful operations."  Further, Hunt stated that Nu Skin intended to "increase number of direct selling licenses" in China, "Expand number of direct sellers," "Triple number of retail stores" and "Extend distribution channel by adding independent marketers." Hunt closed his presentation on Mainland China, by claiming, "We are confident in the LONG-TERM GROWTH POTENTIAL of Mainland China and believe we have the KNOWLEDGE and RESOURCES to capitalize on the opportunity."

166.     Hunt's statements in ¶ 165 about Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152.

**K.      Fourth Quarter/Full Year 2012 Results**

167.     On February 6, 2013, Nu Skin issued a press release announcing its financial and operating results for the fourth quarter and full year ended December 31, 2012.  For the quarter, the Company reported net income of $59.2 million, or $0.97 diluted EPS and revenue of $588.2 million, as compared to net income of $49.5 million or $0.76 diluted EPS and revenue of $495.3 million for the same period a year ago.  For the year, the Company reported net income of $221.6 million, or $3.52 diluted EPS and revenue of $2.17 billion, as compared to net income of $153.3 million, or $2.38 diluted EPS and revenue of $1.7 billion for the same period a year ago. In Greater China, fourth-quarter revenue increased 28 percent to $141.7 million, compared to $110.6 million in the prior-year period. The sales leader count in the region improved 57 percent, while the number of actives increased 51 percent compared to the prior-year. Selling expenses, as a percent of revenue, were 45.0 percent in the fourth quarter, representing a 170 basis-point increase.

168.     Commenting on the results, Hunt stated:

> We are pleased with our solid fourth-quarter results and believe 2013 will be another record year as we launch a new wave of compelling anti-aging products and project strong performances around the world. <u>Our growth in the fourth quarter was driven by particularly strong trends in several key markets including Japan, South Korea and Mainland China where we continue to see tremendous results from our latest ageLOC products.</u> We expect the upcoming launch of our ageLOC weight-management system to drive significant growth in the back-half of the year.
>
> *      *      *
>
> We expect 2013 will be another record year with healthy trends in all of our regions and a record launch of our new ageLOC weight management system, which we plan to introduce through a global limited time offer in the fall.

- 73 -

Wood raised expectations for Nu Skin for full year 2013, "based on the strength of our business and the growth of our global sales force." "We expect first-quarter 2013 revenue to be $500 to $510 million, and are increasing our annual revenue guidance to $2.30 to $2.35 billion."

169.    On the afternoon of February 6, 2013, after the release of the Company's financial results for the quarter and year ended December 31, 2012 and before the market closed, the Company held a conference call with analysts. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business in China, Hunt made the following statements:

> As noted in our press release this morning, we also remain optimistic about 2013 and have raised our guidance for the full year, which Ritch will talk more about in a minute. Suffice it to say that 2012 was a terrific year -- we ended with the strongest quarter in our 28-year history; our key metrics continue to be strong; and, overall, we are very bullish about our ability to sustain growth going forward.
>
> As you know, there has been a lot of noise about direct selling over the past year, and some of you may have wondered if that noise has had any impact on our results. I'm pleased to say that we continue to see strong trends around the world, and we have continued confidence in the model and our expectations for growth. The energy within our sales force surrounding our products and our business opportunity is at the highest level I have seen in the 10 years that I've been CEO of this incredible business. Together with our sales leaders, our management team is staying focused on growing the business.
>
> \*        \*        \*
>
> Greater China also posted very strong growth in the fourth quarter. We continue to believe that this region holds tremendous potential, and we are continuing to invest in our business there. . . . and a footprint of our business continues to expand at a rapid rate.
>
> \*        \*        \*

I think one of the things that sets us apart really throughout the whole Asia region is that we have very mature and very experienced management teams who have been with us for a long time. They are locally -- they are natives to the markets that they manage. Certainly the case in greater China, in North Asia, and Southeast Asia. They have been with us for a long time. They know who we are. They know what we are trying to do. They are aligned behind everything we've talked about this morning. And we enjoy very strong field leadership, great sales leaders who run our businesses very effectively. And it is just enabling us to really hit stride in a region that still has tremendous potential and lots of room for us to continue to grow.

When we look at our competitors' success in markets, such as mainland China and look at companies who are doing in the range of $4 billion to $5 billion a year in sales, and we compete head-to-head with them in other Asian environments such as Taiwan and Hong Kong, Singapore, other Chinese market, it's hard for us to not be enthusiastic about our potential in mainland China and in other Asian environments. We have been far more successful in Korea than many direct sellers have been. Japan is clearly a multilevel market. Single-level companies have not done well there, whereas multilevel marketing companies have done well. And all of those things add up to really give us tremendous confidence in the fact that these Asian markets are going to continue to grow.

170.    On that same call, Hunt commented on whether distributors had been scared off by the August 7th Citron Report:

> [W]e have been very encouraged by the lack of impact on our business results as a result of the market noise. I think our distributors are seeing through the intentions of short sellers, and they are just plowing ahead. In fact, as I indicated, I've never sensed in the 10 years that I've been CEO, as much energy and enthusiasm as there is in the field right now. And that is not just in the US, it is really globally. So, we are plowing through it, and have not seen business disruption.

171.    On February 27, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 10-K with the SEC ("2012 10-K"), which was signed by, among

others, Hunt and Wood, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

172.    Among other things, the 2012 10-K stated:

> Our business model in China is largely based upon our ability to attract consumers to our stores through our employed sales force and contractual sales promoters, to educate consumers about our products through frequent training meetings, and to promote repeat purchases.
>
> *        *        *
>
> We work diligently to train our sales force in China on how our China business model differs from our global business model.

173.    The statements identified in ¶¶ 168-170, 172 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152. In addition, the SOX certification described in ¶ 171 also was false and materially misleading for the same reasons.

**L.    Company's Announcement of $ 1 Billion Goal for China**

174.    On or about April 19, 2013, Nu Skin hosted its annual incentive trip for approximately 4,000 sales leaders from the Greater China region. In connection with that trip, on April 19, 2013, the Company filed a report on Form 8K reiterating Nu Skin's goal of reaching $1 billion in annual revenue in the Greater China region by 2014 stating in part:

> In connection with its annual incentive trip for Greater China sales leaders, Nu Skin Enterprises (NYSE:NUS) today reiterated its goal of reaching $1 billion in annual revenue in the Greater China region by 2014.

"In 2010, when we set our $1 billion sales goal for the Greater China region, it seemed like an aspirational target," said Truman Hunt, chief executive officer, "<u>However, with momentum building in the region and the positive response we are receiving from customers in this growing market, we now believe the goal is achievable well within the original time frame</u>."

"<u>Furthermore, we continue to work towards our long-term vision of achieving $5 billion in global annual revenue by 2020.</u> We believe that our global business will continue to perform well into the future as we continue to build on our innovative ageLOC product platform, including our new weight management system scheduled to be introduced later this year."

175.   The statements identified in ¶ 174 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152.

**M.   First Quarter 2013 Results**

176.   On May 2, 2013, Nu Skin issued a press release announcing its financial and operating results for the first quarter ended March 31, 2013.  For the quarter, the Company reported net income of $54.3 million, or $0.90 diluted EPS and revenue of $550.1 million, as compared to net income of $47.8 million, or $0.74 diluted EPS and revenue of $462 million for the same period a year ago. In Greater China, first-quarter revenue increased 90 percent to $175.7 million, compared to $92.6 million in the prior-year period.

177.   In connection with the announcement of the results, Hunt made the following statements: "We are pleased with the overall direction of the business, particularly with trends in the North Asia and Greater China regions. . . . <u>Greater China continues to be our fastest-growing region, with each market within the region posting solid quarterly growth</u>."

178.   Based on the stronger than expected growth in China, Wood made the following statements:

> We project second-quarter 2013 revenue to be in the $570 to $580 million range with a negative currency impact of 4 to 5 percent, and earnings per share to be $0.91 to $0.95.  For the full year, we anticipate revenue will be in the $2.51 to $2.54 billion range with earnings per share to be $4.18 to $4.30.

179.     On the afternoon of May 2, 2013, after the release of the Company's financial results for the first quarter ended March 31, 2013 and before the market close, the Company held a conference call with analysts. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's business in China, Hunt made the following statements:

> We also continue to grow at a very strong pace in greater China. During our tour of Asia last week, we were with about 4,000 sales leaders in the greater China region. And I can assure you that these are highly excited and very motivated people who continue to grow the business in this dynamic part of the world.
>
> Despite our growth in China, we're still many times smaller than the leading competitors and, in fact, still not yet even among the top ten companies in our space. So we have a lot of room to continue to run in that market. We continue to be confident in the direction of our business in South Asia-Pacific.

180.     In answering a question as to what was driving strong distributor growth, Wood stated:

> No. There are no particular new qualification requirements, Olivia. It's just a rising tide of business globally that's lifting both the sales leader number, as well as the active number. And, in fact, if you go back and chart the quarterly growth in sales leader since the beginning of 2011, on just the sequential quarterly basis, you will see that there's been a -- a very nice and strong escalating growth rate in that number for a couple of years now. And that's just raising the tide of the business globally. . . .

181.     On May 3, 2013, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended March 31, 2013, which was signed by Wood, and reiterated the Company's previously announced quarterly financial results and financial position. In addition,

- 78 -

the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The Company reported that for the quarter ended March 31, 2013, *Mainland China local-currency revenue grew 141 percent to $124.1 million or 22.5% of Nu Skin's total revenues. The sales leader count in the region improved 91 percent, while the number of actives increased 73 percent compared to the prior year.*

182.     The 10-Q stated in part:

> Strong revenue growth in the Greater China region reflects significant sales force growth and continued interest in our strong product portfolio, including our ageLOC products. In addition, quarterly product expos in the region have significantly increased sales. Preferred customers and Sales Leaders in Mainland China increased 136% and 126%, respectively, compared to the prior-year period.

183.     The Company's stock price increased on the May 2, 2013 and May 3, 2013 statements.  Nu Skin's stock price increased from a market close on May 1, 2013 of $51.73 to close on May 3, 2013 at $54.31 – a two day increase of approximately 5 percent on very high trading volume.

184.     The statements identified in ¶¶ 177, 179, 180, 182 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152. In addition, the SOX certification described in ¶ 181 also was false and materially misleading for the same reasons.

**N.     Second Quarter 2013 Revised Estimates and Results**

185.     On July 9, 2013, *after the market closed*, Nu Skin issued a press release

announcing that it had increased its estimated revenue and earnings per share for the quarter

ended June 30, 2013 and the full year ended December 31, 2013 based in part on better than

expected growth in the Greater China region. The release stated in part:

> Nu Skin Enterprises, Inc. (NYSE: NUS) today announced a
> significant increase to estimated revenue and earnings per share for
> the second quarter of 2013. Revenue is now estimated to be about
> $680 million, with estimated earnings per share of approximately
> $1.20. Foreign currency fluctuations negatively impacted second-
> quarter revenue by approximately 3 percent.   Prior revenue
> guidance was $570 to $580 million, with earnings per share
> guidance of $0.91 to $0.95.  Additionally, the company announced
> that it is increasing its full-year 2013 revenue guidance by $320
> million to $2.83 to $2.86 billion, including a negative 5 percent
> impact from foreign currency fluctuations. The company now
> expects 2013 earnings to be $4.85 to $5.00 per share.
>
> <u>Our second-quarter results reflect the strong momentum of our
> business,"</u> stated Truman Hunt, president and chief executive
> officer. "<u>After a record 2012 that included impressive ageLOC
> product launches in the second quarter, we continue to generate
> healthy gains throughout our global business, particularly in the
> Greater China</u>, North Asia and Americas regions."

186.     On July 10, 2013, on this news and related positive analyst coverage, Nu Skin's

stock price increased almost 20%.

187.     On August 1, 2013, Nu Skin issued a press release announcing its financial and

operating results for the second quarter ended June 30, 2013.  For the quarter, the Company

reported net income of $74.4 million, or $1.22 diluted EPS and revenue of $682.9 million, a 15%

increase over the prior-year period. In Greater China, second-quarter revenue increased 35

percent to $269.1 million, compared to $199.7 million in the prior year, which included

approximately $100 million in product launch revenue. The sales leader count Greater China improved 51 percent, while the number of actives increased 121 percent compared to the prior year.

188.    In discussing the results, Hunt stated in part:

> We are extremely pleased with second-quarter results that reflect the strong momentum of the business. We are particularly pleased with these results given the record regional ageLOC product launches in the prior-year period. Additionally, we generated continued growth of both our consumer and sales leader base, reflected in 32 percent growth in actives and 23 percent growth in sales leaders. <u>Overall, we saw healthy trends throughout the global business, particularly in the Greater China</u>, North Asia and Americas regions.
>
> *      *      *
>
> Given the growth momentum of the business, we are again increasing the sales forecast for the remainder of the year. We expect the upcoming launch of ageLOC TR90 and the strength of the business in several key markets will lead to another record year as annual revenue will approach the $3 billion mark.

189.    Wood also commented on the how the growth in China revenues and sales actives was contributing to higher expectations for Nu Skin's overall 2013 results:

> Given the significant growth in our actives, we are raising our annual sales guidance by $90 million to $2.91 to $2.95 billion. We now expect earnings per share to be $5.05 to $5.15 and continue to project a negative 5 percent foreign currency impact to annual revenue.
>
> In the third quarter, we will introduce ageLOC TR90 for a limited time in the Greater China region and much of South Asia in advance of our global convention. With these ageLOC TR90 sales, we anticipate third-quarter revenue to be between $790 and $810 million, with a negative currency impact to revenue of 6 to 7 percent. We anticipate earnings per share to be $1.63 to $1.70 for the quarter.

190.    On the afternoon of August 1, 2013, before the market closed, the Company held

a conference call to discuss Nu Skin's financial results for the second quarter ended June 30,

2013. Participating on that call from Nu Skin were Hunt and Wood. Regarding Nu Skin's

business in China, Hunt made the following statements:

> Turning our attention to a few geographic markets, greater China's
> growth obviously continues to be very strong. Sales in the second
> quarter in mainland China were $198 million. . . .We continue to
> invest to sustain growth in this market and are committed to
> working to ensure our long-term success there. From what we are
> seeing we believe that the market continues to have significant
> upside potential.
>
> *       *       *
>
> In Shanghai we are building a Greater China headquarters, which
> is also quite large in scale. And will enable us to have enough
> infrastructure to continue to grow there for some time. It includes
> manufacturing facilities, warehousing facilities, office facilities, as
> well as a recognition center for China sales leaders. It too will be a
> real showpiece and will attract a lot of our sales leaders from
> around the Greater China region who will be very proud of that.
>
> So we will be into that facility in the December/January timeframe
> and are equally excited to be moving into that one.

191.    In response to a question about capital investments in China, Hunt stated:

> I mean our team is working their tails off, not just at the
> management level but really throughout the entire organization.
> From an infrastructure standpoint, as you know … we are fairly
> rapidly building out our store presence this year and next. The
> supply chain initiatives are important. I mean, we are really
> constrained to some degree in our ability to meet demand there by
> how much product we can put on shelves. And that is an issue. It is
> not a critical issue yet, but as the business continues to ramp we
> obviously need to be able to continue to stay in stock. And with the
> local manufacturing requirements there that requires some capital
> investment.

> So, yes, I mean, this rate of growth is putting some strain on all of those issues. But so far our team is doing a phenomenal job of managing through them.

192.    The Company's stock price increased as result of the August 1, 2013 statements. Nu Skin's stock price increased from a market close on July 31, 2013 of $83.64 to a close on August 2, 2013 at $88.05 – *a two day increase of 5 percent* on high trading volume.

193.    On August 5, 2013, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2013, which was signed by Wood, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. Nu Skin reported that revenues from Mainland China soared from $57.2 million in Q2 2012 to $197.6 million in Q2 2013 – an astounding increase of 244.9% year over year. Without the Mainland China growth, Nu Skin's revenue growth would have been negative on a year-over-year basis.

194.    The 10-Q stated in part:

> Strong revenue growth in the Greater China region reflects significant growth in our Actives and Sales Leaders and continued interest in our product portfolio, including our ageLOC products. Quarterly product expos continued to positively impact sales in the region. Revenue for the second quarter of 2012 included approximately $100 million from the regional limited-time offers of our ageLOC R 2  and ageLOC Galvanic Body Spa  and related products, with most of the sales recorded in Hong Kong in connection with our Greater China regional convention. Actives and Sales Leaders in Mainland China increased 199% and 88%, respectively, compared to the prior-year period. Sales Leaders in Taiwan were down 19% and Actives increased 23%, compared to the prior year.

195.    The statements identified in ¶¶ 185, 188-191, 194 regarding Nu Skin's business in

Mainland China were false and materially misleading for the reasons set forth in ¶ 152. In

addition, the SOX certification described in ¶ 193 also was false and materially misleading for

the same reasons.

### O.    Third Quarter 2013 Results

196.    On October 22, 2013, Nu Skin issued a press release announcing its financial and

operating results for the third quarter ended September 30, 2013.  For the quarter, the Company

reported net income of $110.9 million, or $1.80 diluted EPS and revenue of $927.6 million, a

76% increase over the prior-year period. In Greater China, third-quarter revenue increased 240

percent to $464.6 million, compared to $136.6 million in the prior-year period.

197.    Commenting on the results, Hunt stated in part:

> We are extremely pleased with our third-quarter results. The
> momentum we have established in the first half of the year has
> accelerated as we posted gains throughout the world, with
> particularly impressive results in the Greater China and South
> Asia/Pacific regions, as well as South Korea.

198.    Wood increased the Company's fourth quarter and full year projections based on

better than expected growth in China. Specifically, Wood stated:

> Given the tremendous quarter, as well as our outlook for the
> remainder of the year, we are significantly raising our 2013
> guidance. We project the fourth quarter will be our first billion-
> dollar quarter, with anticipated revenue of $1.02 to $1.05 billion.
> We estimate a negative currency impact of approximately 6
> percent in the fourth quarter, with projected earnings per share of
> $1.85 to $1.90. This forecast includes projected sales of TR90 in
> the fourth quarter of approximately $350 million.

199.    On the afternoon of October 22, 2013, before the market closed, the Company

held a conference call to discuss Nu Skin's financial results for the third quarter ended

September 30, 2013. Participating on that call from Nu Skin were Hunt and Wood. Regarding

Nu Skin's business in China, Hunt made the following statements:

> Geographically, we were politically pleased with the strong growth in the Greater China and South Asia/Pacific regions as well as in South Korea and in the Americas. <u>We remain optimistic about the potential of mainland China, which continues to be a growing market for the direct-selling industry as a whole. We are still a relatively small player in the market, and we think that the market's potential justifies the investment to continue to sustain growth in a market that one really cannot afford to ignore. We've spoken previously about our plans to accelerate the buildout of our business in China and look forward to sharing an update and more details of this plan in November at our analyst day.</u>

*     *     *

> Some of you will remember that about three years ago we put in place an incentive for Greater China to reach $1 billion in sales by the end of 2014, which is our 30th anniversary year. That objective, when we initiated it, seemed quite aspirational at the time, but we will announce this week at our convention that Greater China actually achieved that sales objective for the year earlier in the month of October. So we're really pleased with what is happening there, and that achievement is a tribute to our management team and our sales leaders were working really hard to execute in a high-growth environment.

*     *     *

> I personally look at the size of our competitors, and our benchmark, really, for many years has been the largest direct-selling company out there, the Amway organization. Highly, highly successful in Asia and, really, globally. They do $5 billion in China. They grew and have grown at rates similar to what we are experiencing. And in many markets, including Taiwan and Hong Kong, we were neck-and-neck with them in size.

> <u>So that's one of the reasons why we look at our current business there and think we still have lots of room to run. And, frankly, I think with the growth that we're seeing in the market generally, you're going to see that benchmark even go up quite significantly from where it is today.</u>

- 85 -

200.     In response to a question about sales leader growth in Mainland China (whether

the leaders were Nu Skin employees or independent representatives), Hunt and Wood answered

as follows:

> <u>Truman Hunt</u>: Yes, I'd say it is a division of the two. I am actually
> not sure how many of them would formally be employed right
> now. Do you know, Ritch?
>
> <u>Ritch Wood</u>: <u>Yes, most of the model today is still using the</u>
> <u>employee business model</u>. We are looking to add on, as we
> announced some time ago, I think it's almost a year ago, that we
> would add an additional position that we call an independent
> business owner to that mix. And we're still in the process of
> finalizing that. But probably sometime in 2014 there will be an
> additional opportunity for people who have their own selling
> license to sell products. <u>But, generally, it is mostly the employee</u>
> <u>model today.</u>

201.     Hunt concluded the Q3 2013 conference call by comparing Nu Skin's growth in

Mainland China to Amway's growth rates in China and stated: "So that's one of the reasons why

we look at our current business there and think we still have lots of room to run. And, frankly, I

think with the growth that we're seeing in the market generally, you're going to see that

benchmark even go up quite significantly from where it is today."

202.     The Company's stock price increased substantially on the October 22, 2013

statements.  Nu Skin's stock price increased from a market close on October 21, 2013 of $102.70

to a close on October 23, 2013 at $111.55 – ***a two day increase of 8.6 percent*** on trading volume

almost five times the daily average trading volume.

203.     On November 6, 2013, the Company filed a quarterly report on Form 10-Q with

the SEC for the period ended September 30, 2013, which was signed by Wood, and reiterated the

Company's previously announced quarterly financial results and financial position.   In addition,

the Form 10-Q contained signed certifications pursuant to SOX by Hunt and Wood, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The Company reported that for the quarter ended September 30, 2013, revenues in Mainland China increased to $345.7 million or approximately 37.2% of Nu Skin's total revenues. The Company also reported that Sales Leaders and Actives in Mainland China increased 328% and 195%, respectively, compared to the prior-year period.

204. The 10-Q included the following statements:

> Although management believes that the Company is in compliance in all material respects with the statutes, laws, rules and regulations of every jurisdiction in which it operates, no assurance can be given that the Company's compliance with applicable statutes, laws, rules and regulations will not be challenged by foreign authorities or that such challenges will not have a material adverse effect on the Company's financial position or results of operations or cash flows.
>
> *     *     *
>
> Significant growth in our revenue, and our Actives and Sales Leaders in the Greater China region was driven by the limited-time offer of ageLOC TR90 during the quarter and continued strong interest in our innovative anti-aging product portfolio and income opportunity.

205. The statements identified in ¶¶ 197, 199 - 201, 204 regarding Nu Skin's business in Mainland China were false and materially for the reasons set forth in ¶ 152. In addition, the SOX certification described in ¶ 203 also was false and materially misleading for the same reasons.

**P.**     **Nu Skin's 2013 Annual Investor Day**

206.     On November 21, 2013, Nu Skin hosted it annual Investor Day in Salt Lake City.

At the meeting, defendant Hunt stated that he expected that Nu Skin's China business would

continue to grow to ultimately account for 50% of the Company revenues. Specifically, Hunt

stated in part:

> [R]ecent news verified that China now accounts for about 50% of the consumption of luxury goods globally, which is actually stunning, isn't it? That was a very third world environment not too many years ago. It's now consuming 50% of the world's growth.
>
> We would expect that -- and if you look at our largest global competitor, the Amway organization, China is 50% of their business. We expect that to be the case with us as well. So, as we stretch towards our $10 billion sales target, it won't be at all surprising if China is 50% or more of that.
>
> *          *          *
>
> You saw by the way the pictures that Dan [Daniel R. Chard President-Global Sales and Operations Chard] showed that showed the increasing size of these success seminars from Greater China. One indication of how strong the business is in Greater China, I would share with you, is that this trip is budgeted to include more than 10,000 sales reps on a trip to Dubai. So, those kinds of incentives are very meaningful for our people.

207.     Hunt also stated that the Company expected to start to transition its model in

China away from an employed sales force to an independent representative sales force who could

distribute products from their own locations beginning in January 2014.

208.     Dan Chard, Nu Skin's President of Global Sales & Operations, also commented

on Nu Skin's business in China, stating, in part:

> So, it takes us to Greater -- to Mainland China. This is now our largest market and our fastest growing market and we believe that it represents a significant opportunity for us to expand and grow

our business. The certain important things about Mainland China that make it unique as a market beyond just the size is government licensing and we're now licensed in over half of the provinces in Mainland China and that's enabled us to do with our direct selling business in most of the major populated cities in Mainland China.

The way we compensate our sales leaders is differential. The way we utilize stores, facilitate both distribution of our products, as well as to build our brand is also different. And we're also required to manufacture our products locally. So, we have a set of a manufacturing facility capacity to help us grow our business.

*      *      *

What's interesting is that the majority of that growth, that 11%, is coming from non-store retail sales, the two biggest segments in those non-store retail sales are internet and direct selling. So, while this growth is being driven by the segment that we compete in.

If you look at where we are from a direct seller standpoint, these are government reported numbers from 2012. And in 2012, we were the 13th largest direct selling company in Mainland China. We fully anticipate that in 2013, when these same numbers were reported, we'll bump up to number five or number six, which is consistent actually with how we compete with some of these larger competitors, particularly Amway around the world.

We're typically in the top five. In the case of Singapore, we are the number 1 direct seller. We tend to do well in markets where Amway does well. So, we're happy with our results. We can see a lot of opportunity ahead of us as we continue to grow. But we like the way the business is developing in Mainland China.

*      *      *

The active base in Greater China is at 120%. So, active base along with participation and the order volume drive that number. Same thing is true in Greater China, the actual orders per participant are down versus where they were last year. So, the majority of the growth that you're seeing is coming through new and active coming in, in growing that base as well as sustaining, improving our participation rate.

*      *      *

China continues to hold great promise. And we're still at a very low penetration rate despite the strong growth, we think we have a lot of rooms to run there. And we anticipate continued global growth as we continue to focus on our awareness and brand favorability as we execute these two-year business cycles and as we refine and expand our -- the rest of our Nu Skin initiative including the Nu Skin EXPO.

209.    The Company's stock price increased on the statements at the conference.  Nu Skin's stock price increased from a market close on November 20, 2013 of $114.74 to a close on November 22, 2013 at $125.39 – *a two day increase of 9 percent* on heavy trading volume.

210.    The statements identified in ¶¶ 206-208 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 152.

## VII.    THE TRUTH IS REVEALED OVER THE COURSE OF ONE WEEK

211.    On January 15, 2014, before the market opened, *People's Daily*, a government-run Beijing-based newspaper, reported that Nu Skin was operating an illegal pyramid scheme in China, selling unlicensed products via direct selling and exaggerating the earnings opportunities for those who get involved.  Further, the article stated that Nu Skin employs unlawful and immoral business practices in violation of PRC law.[30]

212.    As a result of this news, on January 15, 2014, the Company's stock lost 15.5% of its value, declining $21.24 per share to close at $115.23 per share.

---

[30]    A certified translation of the January 15, 2014 *People's Daily* article is attached as Exhibit E.

213.    On January 16, 2014, before the market opened, *People's Daily* published additional information concerning its investigative report of Nu Skin.[31] As part of its investigation, a *People's Daily* reporter recorded a portion of Nu Skin's 2014 Awards Ceremony held in Beijing on January 11, 2014.[32] Attendees included approximately 20,000 Nu Skin team members from all over China. Nu Skin sales representatives informed the *People's Daily* reporter that Nu Skin's bonus system includes level commissions, product retail commissions, and additional bonuses. According to the source, "level commissions" mean that the Company's members engaging in direct sales can obtain commissions from downline sales within six levels. This is in direct contravention of Chinese regulations prohibiting pyramid schemes.

214.    On January 16, 2014, before the market opened, China's State Administration of Industry and Commerce ("SAIC")[33] released a statement stating:

> The SAIC is paying close attention to this matter and has immediately required relevant industry and commerce authorities to conduct an investigation to verify [the claims]. If the situation is verified then industrial and commercial departments will deal with the matter according to laws and regulations.

215.    On January 16, 2014, before the market opened, a second Chinese agency, the Ministry of Commerce ("MOFCOM"), announced that it too would probe Nu Skin. At a

---

[31]    A certified translation of the January 16, 2014 *People's Daily* article is attached as Exhibit F.

[32]    https://www.youtube.com/watch?v=-xhcgpm06EY. A certified translation of the recording is attached as Exhibit G.

[33]    The SAIC is the authority in the PRC responsible for advancing legislation concerning the administration of industry and commerce in the People's Republic.

MOFCOM press conference, Shen Danyang, a spokesman for the MOFCOM, said the ministry

will publicize its investigation results in a timely manner. Further, MOFCOM warned:

> MOFCOM supports and protects the lawful operations of direct
> selling businesses, and supports relevant departments in their
> investigating and penalizing according to The Regulation on the
> Prohibition of Pyramid Selling and The Regulation on Direct
> Selling Administration those organizations, enterprises and
> individuals who are engaged in pyramid selling or illegal direct
> selling.

216.    In response, on January 16, 2014, the Company issued a press release and Report

on Form 8-K disclosing that its business practices were indeed under investigation by Chinese

authorities, stating in relevant part:

> We are aware that Chinese regulators have now initiated
> investigations to review issues raised by recent news reports. The
> government regularly monitors all businesses in this rapidly
> growing marketplace, and as is our practice, we will continue to
> communicate openly with regulators to address any questions they
> may have.

217.    On this news, on January 16, 2014, the Company's stock declined an additional

$30.43 per share, or 26.2%, to close at $84.80 per share.

218.    Shares of Nu Skin fell further on January 17, 2014, to close at $79.47 per share

that day, a decline of 6.2%.

219.    On January 21, 2014, before the market opened, Nu Skin filed a Report on Form

8-K releasing a letter to its customers in China (in English and Chinese / Mandarin) admitting to

violations by Nu Skin employees of Mainland China's regulations on direct selling.

The letter read, in relevant part:

> Dear consumers and everyone who cares about Nu Skin China,
>
> *       *       *

As part of our initial review, we were disappointed to learn *that during our recent rapid growth, there were instances where some of our sales people failed to adequately follow and enforce our policies and regulations. We sincerely apologize for these unfortunate and unauthorized activities*. We are undertaking an internal review of the practices of our employees and sales force, and fully intend to take corrective actions.

We will also provide additional training to reinforce our existing policies which, among other things, prohibit:

    1) inaccurately attributing endorsements to public figures or media reports;

    2) exaggerated product claims; and

    3) improper descriptions of Nu Skin's distinct business model in China that confuse it with Nu Skin's business model in other markets.

We express our sincere apologies to the public for any impact that this has caused, and we hope that the public and the media will give us an opportunity to improve ourselves in order to reinforce our policies and procedures, enhance a sound supervision system, and enhance our commitment to excellent customer service.

Effective immediately, we have voluntarily decided to take the following measures in China in order to cooperate with the relevant authorities, demonstrate our commitment to our policies, and enhance the long term stability of our operations:

    1) reinforce training and education for sales persons on relevant laws and regulations;

    2) to focus additional resources on training and education, we will temporarily suspend all business promotional meetings, and at the same time temporarily suspend accepting applications for any new sales people and direct sellers; and

    3) to strengthen our commitment to consumers, we will extend our current direct selling product refund policy to cover both our direct selling and non-direct selling products sold through our company's retail channel.

We will continue to undertake our responsibilities to the public, actively communicate with the relevant government authorities, and report to them on the implementation of the above-mentioned measures.   At the same time, in order to cooperate with the verification by the relevant government departments, if any individual or any behavior has been found to be in violation of regulations, the Company will take actions in accordance with the Company's policies. . . .

220.    On this news, shares of Nu Skin fell an additional 2.62% on January 21, 2014 to close at $77.39 per share.

## VIII.   POST-CLASS PERIOD REVELATIONS

221.    As detailed in the Company's January 21, 2014 letter, in response to the government investigations, Nu Skin announced it would immediately take the following measures: (1) temporarily suspending business promotional meetings in China; (2) temporarily suspending acceptance of applications for any new sales representatives in China; and (3) extending Nu Skin's product refund and return policies in China. Not surprisingly, the adverse publicity and the suspension of business promotional meetings and acceptance of applications has had a significant negative impact on the number of Sales Leaders and actives distributors in Mainland China and on Nu Skin's revenue in the short term.

222.    In the wake of the *People's Daily* series of articles, other media sources in China have reported that Nu Skin direct sellers had been encouraged during the Class Period to establish downlines among family and friends in order to qualify for group bonus schemes in clear violation of the rules against MLM and pyramid selling. *See* Liang Fei, "Shady Sales,"

*Global Times*, Jan. 21, 2014.[34] *See also* "Disclosure of the new distribution modes of Nu Skin: Uncovering the dream of becoming rich with a monthly income for an RMB 500,000 property" *21st Century Network*, Jan. 17, 2014.[35]

223.    This article in the *21st Century Network*, concluded, based upon discussions with Nu Skin sales representatives and direct sellers, a review of Nu Skin training videos and certain internal documents obtained from Nu Skin sales representative, and discussions with that a local law enforcement official in China, that Nu Skin operated a pyramid scheme because it: 1) required the payment of an entry fee to become a direct seller; 2) direct sellers and distributors were encouraged to recruit a "sales team" of downlines; and 3) the Company used a capital chain mode. (Ex. G). The article also confirmed that Nu Skin-sponsored training videos encouraged the establishment of downlines and the payment of multi-level compensation in Mainland China. *Id.*

224.    The *Global Times* article also reported that a "monthly procurement" or product purchase requirement was a requirement to be part of a sales team in China. *See* Liang Fei, "Shady Sales," *Global Times*, Jan. 21, 2014. (Ex. H).

225.    On the news of the investigations in China, analysts that covered Nu Skin significantly reduced their forecasts for the Company for 2014. For example, on February 4, 2014, Scott Van Winkle at Canaccord Genuity issued a research report on Nu Skin with a "Hold" rating based on a complete lack of clarity for Nu Skin's business in Mainland China in 2014. Van Winkle's report stated in part:

---

[34]     http://www.globaltimes.cn/content/838684.shtml. A copy of this article which was published in English is attached as Exhibit H.

[35]     http://finance.sina.com.cn/chanjing/gsnews/20140117/160817991941.shtml. A certified translation of this article is attached as Exhibit I.

Our HOLD rating reflects a new level of risk in China that we expect to impact the growth trajectory in the near term. <u>At roughly one-third of our 2013 revenue forecast, China is large enough to significantly impact the financial results and valuation</u>. . . . Per our January 21 note titled "Factoring in a China impact," we proactively reduced our F2014 mainland China revenue forecast by 35% (immediate 25% reduction to near-term revenue run rate, with sequential revenue growth beginning to return in Q3/14) and thus believe we are positioned appropriately in the interim given the current information available.

226.   Rommel Dionisio at Wedbush Securities also projected lower revenues from China if Nu Skin was forced to adjust its sales model. In a February 4, 2014 report, Dionisio stated in part: "Should the company add an extra layer of scrutiny and internal regulation for its China distributors, this could potentially slow growth somewhat near term, so we hesitate to boost 2014 estimates, despite the stronger-than-expected momentum in Q4."

227.   On March 3, 2014, Scott Van Winkle of Canaccord Genuity issued another Research Report on Nu Skin maintaining his "HOLD" rating and ***again*** reducing his 2014 forecast for the Company. Van Winkle stated in part:

[T]he key takeaway from the Q4 report wasn't expected to be the Q4 results, but rather a forward look at business trends given the ongoing internal and government review of the business in this region. <u>While we had significantly reduced our forecasts in January given the China status, Q1 guidance was incrementally soft (~20% below consensus EPS) and there was no update to the full year F2014 outlook. Clearly F2014 forecasts need to be reduced given the Q1 guidance and continued operating limitations in mainland China. The driver of the Q1 softness is of course China, although more modest growth in remaining geographies appears to be compounding the China deceleration</u>. . . . <u>With no update to the full year outlook given the continued China uncertainty, it's only prudent to assume a more pronounced China deceleration given the Q1 outlook and increasingly difficult compares moving through the year.</u>

228.    On March 18, 2014, the Company filed its annual report for the year ended

December 31, 2013 on Form 10-K with the SEC ("2013 10-K"), which was signed by, among

others, Hunt and Wood.  The Company reported that for the year ended December 31, 2013,

revenues from Mainland China exceeded $1 billion and represented 31.6% of Nu Skin's total

revenues (***growth of 292 percent year-over-year!***).

229.    In its 2013 10-K the Company also disclosed the following:

> [I]t is likely that we will be fined and could potentially face some
> other form of sanctions from these regulators. These other
> sanctions could include a formal suspension of our ability to recruit
> new sales people and direct sellers, a temporary suspension of our
> ability to sell products in various markets or, in the most extreme
> cases, loss of existing licenses to operate in various jurisdictions in
> Mainland China. Furthermore, the negative publicity stemming
> from the allegations made in the media, these governmental
> investigations and any potential sanctions could harm our business
> and operations.

230.    On March 24, 2014, Nu Skin announced it had settled certain investigations, the

regulatory investigation being conducted by the SAIC in Shanghai, where the Company's

business in China is headquartered, and the SAIC in Beijing, where the Company maintains a

branch office by agreeing to change certain of Nu Skin's sales practices and paying a fine. The

fine was for violations of Mainland China's Regulations on Direct Selling Administration for the

sale of certain products by Nu Skin's direct sellers that were not registered for the direct selling

channel.[36] Nu Skin also was found to have violated China's regulations for product claims that

were deemed to lack sufficient documentary support.

---

[36]    Nu Skin sells approximately 104 kinds of products in its retail stores.  According to
information from MOFCOM, the Company is only allowed to sell 84 kinds of products through

*(continued . . . )*

231.    According to the SAIC in Beijing, six Nu Skin sales employees also were found to have conducted promotional activities in violation of Mainland China's Regulations on Direct Selling Administration which violation was punishable by confiscation of the illegal sales and a monetary penalty.

232.    In addition to monetary fines and the confiscation of all of the related illegal sales revenue by the SAIC, Nu Skin was required to enhance the education and supervision its sales representatives in Mainland China.  Nu Skin was also required to close certain Nu Skin "working studios" in the Beijing area which were in engaging in activities in contravention of China's direct selling regulations.

233.    The SAIC also announced that it would look to increase regulation of the direct sales sector in China. "For the next step, SAIC will work with other departments to increase the level of regulation of the direct sales market and sternly investigate and prosecute any illegal behavior in the direct sales sector," the SAIC statement said.

234.    To date, Nu Skin has not announced the results of the investigation by MOFCOM into Nu Skin's compliance with local regulations, although in connection with the announcement of the SAIC fines, Nu Skin announced on March 24, 2014, it was not aware of any other "material enforcement investigations currently pending in China."  **However, based upon information and belief, at least one investigation by Chinese authorities regarding Nu Skin's business is ongoing as of June 2014**.

---

( . . . continued)
the direct sales channel. *See* Liang Fei, "Shady Sales," *Global Times*, Jan. 21, 2014 (Ex. H). *See also People's Daily*, Jan. 15, 2014, Ex. H (pg.1).

235.    On May 6, 2014, Nu Skin issued a press release announcing its financial and operating results for the first quarter ended March 31, 2014. In the press release, the Company did not provide guidance for Mainland China for the second quarter or the rest of 2014, citing a lack of visibility. Wood stated: "Because we are only a few days into the recommencement of promotional activities in China, it is difficult to forecast how the business will perform. Ideally, we would have more time to monitor the direction of the business in China before providing updated guidance. That said, our current estimate of second-quarter revenue would be around $700 million with earnings per share of approximately $1.25."

236.    According to analysts, Nu Skin's estimates for the second-quarter ended June 30, 2014 were below consensus estimates of $789 million and an EPS of $1.43. Moreover, analysts noted that Nu Skin's overall growth in the first quarter came in ***well below*** Street estimates. [Deutsche Bank Report, May 6, 2014].

237.    During the conference call on May 6, 2014 that followed the release of the Company's earnings, the Company also announced much higher than expected distributor attrition in Mainland China, with roughly 50% of China's sales leaders leaving the business between December 31, 2013 and March 31, 2014. [Canaccord Genuity Report, May 7, 2014]. Further, the Company announced that it was projecting the growth rate in the second quarter in Greater China to slow to 20% (year-over-year) - down from a Class Period high of triple-digit growth.[37] According to a May 7, 2014 Research Report from John Faucher at JP Morgan Chase

---

[37]     Again, the Company failed to provide specific guidance for Mainland China's revenues in the second quarter.

that followed the Company's earnings call, "Management's forecast implies that sales excluding Greater China would be down ~6% [year-over-year] in Q2."

238.    On May 8, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2014, which was signed by Wood and which acknowledged the attrition in sales leaders and the ongoing uncertainty facing the Company's business in Mainland China. In the 10-Q, the Company reported the following:

> Adverse media reports and government investigations, and our voluntary suspension of business promotional meetings and applications for new sales representatives in Mainland China had a significant negative impact on our revenue and number of Sales Leaders and Actives in this region during the first quarter, with Sales Leaders and Actives declining 49% and 38% sequentially.
>
> \*      \*      \*
>
> In January of 2014 we announced that in light of various government investigations in Mainland China we were temporarily suspending all business promotional meetings as well as applications for new sales representatives in that market.  This suspension was not lifted until May 1, 2014.  Largely as a result of this suspension, our Sales Leaders in Mainland China decreased significantly during the first quarter, from approximately 49,000 as of December 31, 2013 to approximately 24,000 as of March 31, 2014.  It is unclear what long term impact this suspension and negative publicity associated with these matters will have on our operations in Mainland China and other markets. Our business is highly dependent on the continual recruitment of new individuals attracted to our earnings opportunity in Mainland China and elsewhere and on momentum in our sales and expansion created by recruiting.  We have not previously undertaken such a lengthy suspension of applications for new sales representatives and it is uncertain how difficult it will be for us to regain this momentum. Any significant or prolonged difficulties in re-engaging our sales force could adversely affect our sales and results of operations.

239.    On May 16, 2014, the Company filed a Report on Form 8-K with the SEC attaching a letter to its shareholders. In that letter, signed by Hunt and Steven J. Lund, Nu Skin's

Chairman of the Board, the Company reiterated that the investigation in China and the

Company's remedial actions "had, and will have, a negative impact on 2014 results."

240.    Based on the Chinese investigations and settlement, Nu Skin was required to

make changes to its sales practices and policies in Mainland China to make them compliant with

the direct selling regulations. These changes and increased scrutiny of direct sales by the Chinese

government is already significantly affecting, and will continue to negatively affect, the pace of

Nu Skin's growth in China.  If Nu Skin does not change its sales and marketing techniques and

multi-level compensation in China, under the relevant regulations, the SAIC can shut down Nu

Skin's operations in China and the MOFCOM can revoke Nu Skin's direct-selling licenses. In

addition, according to the regulations, organizers of pyramid schemes may face criminal

punishment.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

241.    During the Class Period, Defendants had both the motive and opportunity to

commit fraud. They also had actual knowledge of the misleading nature of the statements they

made or acted with reckless disregard for the true information known to them at the time for the

reasons discussed above.  In so doing, Defendants committed acts, and practiced and participated

in a course of business that operated as a fraud or deceit on purchasers of Nu Skin's securities

during the Class Period.

242.    As set forth herein, Defendants orchestrated and approved of the rapid expansion

of Nu Skin's business in Mainland China using Nu Skin's traditional MLM practices without

much change to the parameters of Nu Skin's compensation plan despite strict regulations

prohibiting MLM in Mainland China. The Individual Defendants knew that Nu Skin was

implementing its MLM model in China and knew that failure to reveal this fact likely would mislead investors.

243.    Defendants actively encouraged Nu Skin's existing distributors to sign-up a record number of sales promoters and direct sellers in China by following the Company's tried-and-true method of MLM by having direct sellers in China create and expand downlines among family and friends in Mainland China. Further, Defendants allowed Nu Skin corporate to pay commissions on downline sales in China.

244.    Statements by confidential witnesses corroborate the conclusion that Nu Skin authorized the use of MLM and multi-level compensation in violation of Chinese laws.  It was only through these improper activities that Nu Skin was able to achieve triple-digit growth in Mainland China during the Class Period. *See supra, ¶¶* 60, 67-71, 75-78.

## A.    Growth in China Was Extremely Important to the Company's Success

245.    Nu Skin became increasingly dependent on Mainland China for a disproportionate share of its gross revenues and all of its growth.  In 2010, revenues from Mainland China were $91.4 million or 6% of Nu Skin's overall revenue.  By the end of 2013, those numbers skyrocketed *– to over $1 billion in revenue or  32% of the Company's overall revenue – a growth rate for Mainland China of 292% (year-over-year)*.

246.    The Chinese market was of critical importance to Nu Skin's growth during the Class Period as growth in Nu Skin's other important regions such as the U.S. and Japan was faltering. At the start of the Class Period, Wood commented that Nu Skin was fortunate that emerging markets such as China have "more than made up" for declines in Japan and the U.S. ¶ 87. During the Class Period, the Defendants even boasted that Nu Skin's China business would

continue to grow to ultimately account for 50% or more of the Company's overall revenue. ¶ 206. *In fact, Defendants projected Nu Skin's business in China would contribute at least $5 billion per year up from $91.4 million in 2010*. ¶ 206.

247.    Moreover, the Individual Defendants were especially knowledgeable about and intensely focused on the business model deployed in China given that they repeatedly spoke to the market about Nu Skin's business in China, made frequent business trips to China on Nu Skin's behalf, were aware of the MLM regulations and prohibitions in China, and knew that Nu Skin's worldwide business model, upon which its Chinese model was based and which it effectively replicated, was a MLM scheme that at least one court in the past has determined was a pyramid scheme. *See Arata v. Nu Skin Int'l, Inc.,* 5 F.3d 534 (9th Cir. 1993).

248.    Given the exponentially growing size of Nu Skin's Chinese market, its critical importance to the growth of Nu Skin's overall business, and its potential to become the Company's revenue life-blood, the illegal practices implemented by Defendants for deployment in China could not have occurred without the Individual Defendants' knowledge and approval.

**B.      The Individual Defendants' Insider Selling During the Class Period Was Extremely Large and Inconsistent with their Prior Trading History**

249.    The Individual Defendants also possessed the motive to commit fraud. During the Class Period, the Individual Defendants reaped more than $40 million in insider trading proceeds and, through acts committed in furtherance of the fraud, doubled their total compensation from the Company.

250.    During the Class Period, the Individual Defendants also engaged in stock sales that were suspiciously-timed and out of line with their prior trading practices.  Indeed, the

Individual Defendants' Class Period stock sales amount to in excess of **$40 million** compared to pre-Class Period stock sales of **$15.6 million** – an increase of more than 150%.

251.    To evaluate the Individual Defendants' selling activity, Plaintiffs used the publicly-available trading data that is required to be reported to the SEC on Form 4s.  Plaintiffs analyzed the trading by the Individual Defendants that occurred during the Class Period (989 days) and during the period immediately preceding the Class Period (also 989 days) beginning August 17, 2008 and ending May 3, 2011 (the "Control Period").  The Individual Defendants' Form 4s filed during the Class Period and Control Period are hereby incorporated herein by reference.

252.    To analyze the Individual Defendants' sales, Plaintiffs calculated the total sales by each of the Individual Defendants, together with the cash proceeds from such sales, during the Control Period and Class Period.  Those totals were then compared, to identify whether the Individual Defendants' sales during the Class Period were consistent with their sales during the Control Period.  These analyses reveal that Individual Defendants' Class Period sales were extremely large.

253.    The Individual Defendants' Class Period stock sales were not only large in absolute terms, but also inconsistent with the Individual Defendants' own prior selling activity during the Control Period.

**Individual Defendants' Class Period Insider Selling**

| | Disposition | Date | Number of Shares | Price per Share | Proceeds |
|---|---|---|---|---|---|
| M Truman Hunt | Sale | July 15, 2011 | 40,278 | $40.00 | $1,611,120.00 |
| M Truman Hunt | Sale | July 18, 2011 | 29,400 | $40.12 | $1,179,528.00 |
| M Truman Hunt | Sale | July 19, 2011 | 280,322 | $40.24 | $11,280,157.28 |
| M Truman Hunt | Sale | February 13, 2013 | 50,000 | $42.00 | $2,100,000.00 |
| | | **Hunt Totals - Class Period** | **400,000** | | **$16,170,805.28** |
| Ritch Wood | Sale | May 4, 2011 | 81,250 | $34.75 | $2,823,437.50 |
| Ritch Wood | Sale | May 31, 2011 | 40,000 | $38.75 | $1,550,000.00 |
| Ritch Wood | Sale | November 7, 2011 | 67,500 | $50.77 | $3,426,975.00 |
| Ritch Wood | Sale | February 28, 2012 | 22,500 | $54.75 | $1,231,875.00 |
| Ritch Wood | Sale | March 1, 2012 | 22,500 | $57.52 | $1,294,200.00 |
| Ritch Wood | Sale | March 13, 2012 | 17,500 | $59.75 | $1,045,625.00 |
| Ritch Wood | Sale | December 2, 2013 | 105,000 | $125.39 | $13,165,950.00 |
| | | **Wood Totals - Class Period** | **356,250** | | **$24,538,062.50** |
| | | **Class Period Totals: Hunt and Wood** | **756,250** | | **$40,708,867.78** |

**Individual Defendants' Pre-Class Period Insider Selling - During the 'Control Period'**

| | Disposition | Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|---|
| M Truman Hunt | Sale | March 2, 2010 | 500 | $28.45 | $14,225.00 |
| M Truman Hunt | Sale | March 8, 2010 | 104,500 | $29.27 | $3,058,715.00 |
| M Truman Hunt | Sale | April 14, 2010 | 250,000 | $30.68 | $7,670,000.00 |
| | | **Hunt Totals - Control Period** | **355,000** | | **$10,742,940** |
| Ritch Wood | Sale | November 10, 2009 | 11,682 | $26.50 | $309,573.00 |
| Ritch Wood | Sale | November 10, 2009 | 11,682 | $26.50 | $309,573.00 |
| Ritch Wood | Sale | March 8, 2010 | 43,125 | $29.75 | $1,282,968.75 |
| Ritch Wood | Sale | April 22, 2010 | 10,874 | $32.75 | $356,123.50 |
| Ritch Wood | Sale | April 29, 2011 | 81,250 | $32.00 | $2,600,000.00 |
| | | **Wood Totals - Control Period** | **158,613** | | **$4,858,235.25** |
| | | **Pre-Class Period Totals: Hunt and Wood** | **513,613** | | **$15,601,178.25** |

- 105 -

254.    Hunt's sales during the Class Period totaled $**16,170,805.28.**  During the Control Period, Hunt's sales totaled **$10,742,940**.  Thus, Hunt's sales during the Class Period are out of line with prior selling activity.

255.    Wood's sales during the Class Period totaled $**24,538,062.50.**  During the Control Period, Wood's sales total **$4,858,235.25**.  Thus, Wood's sales during the Class Period are vastly out of line with prior selling activity. Wood's trading increased dramatically relative to Control Period, ***increasing more than 500%***.

256.    The stock sales by the Individual Defendants were not only large in absolute terms during the Class Period, but also very large when compared to the Individual Defendants' own prior selling activity.

**C.    The Individual Defendants' Trades During the Class Period Made Pursuant to 10b-5-1 Plans Are Not Insulated from Scrutiny**

257.    In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.

258.    The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans"). *Id*. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential defense to accusations of insider trading ***only*** if it is entered into by an insider "***before becoming aware***" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

259.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith."  Thomas J. Griffith, Corporate Counsel's Guide to Insider Trading and

Reporting § 12:26 (2013).  Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

260.    While a large percentage of the Individual Defendants' stock sales were made pursuant to 10b5-1 plans, in each case the circumstances of those sales are sufficiently suspicious to overwhelm any inference that they were made in good faith.

261.    Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, for example, 500 shares a month on the 10th day of the month.  Such was not the case here.  In this circumstance, even trades according to a 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

262.    Furthermore, the Individual Defendants sold irregular amounts of shares at irregular intervals under these "plans."

263.    10b5-1 plans are under heavy scrutiny from the SEC in light of a recent *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 plans were still trading at opportune times and reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

264.    With regard to such trading plans, a December 13, 2012 *Wall Street Journal* article entitled "SEC Draws Fire Over Executive Trading Plans," notes "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior."

According to one source cited in the article, "[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading."

265.    Indeed, according to a report issued by Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits – or avoided significant losses – by trading company stock in the days just before their companies issued market-moving news."

266.    The report recommends that clients avoid multiple trading plans, as well as frequent modifications, and suggests clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (*e.g.*, 1,000 shares a month on the 15th day of the month)."

267.    Further, though the Individual Defendants filed reports on SEC Form 4's disclosing their trades and indicating that certain of them were made pursuant to 10b5-1 plans, no further information is available on the plans.  Without discovery, investors cannot understand the details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.

**D.    In Addition to the Massive Proceeds from Insider Selling, the Individual Defendants' Total Compensation from Nu Skin Also Increased Dramatically During the Class Period Based on Defendants' Fraud**

268.    The Individual Defendants' compensation structure at Nu Skin emphasizes incentive-based payoffs.  Total compensation consists of six components, 1) base salary, 2) bonus, 3) stock awards; 4) options awards; 5) non-equity incentive based compensation (cash

awards to the named executive officers made pursuant to the Company's Amended and Restated 2010 Omnibus Incentive); and 6) other compensation.[38]

269.     During the Class Period, the Individual Defendants' total compensation from Nu Skin rose dramatically.  Hunt's total compensation from 2011 to 2013 nearly doubled from $5 million to almost $10 million. Wood's total compensation from 2011 to 2013 more than doubled rising from $1.56 million in 2011 to $4.14 million in 2013.

270.     The Individual Defendants' compensation for 2011 - 2013 is set forth below:[39]

| Name | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|------|------|-----------|-----------|------------------|-------------------|-------------------------------------------|---------------------------|-----------|
| **Truman Hunt** | 2013 | 1,000,000 | 42,966 | 2,914,313 | 3,596,000 | 2,000,000 | 141,557 | $9,694,835 |
| | 2012 | 988,333 | 42,167 | 3,934,500 | 685,000 | 2,000,000 | 129,965 | $7,779,965 |
| | 2011 | 919,391 | 41,250 | 2,312,063 | 510,835 | 1,092,546 | 139,604 | $5,015,689 |
| **Ritch Wood** | 2013 | 505,000 | 22,550 | 388,575 | 2,528,063 | 612,000 | 92,426 | $4,148,614 |
| | 2012 | 473,333 | 20,500 | 524,600 | 604,600 | 576,000 | 74,383 | $2,273,417 |
| | 2011 | 435,000 | 18,833 | 308,275 | 432,109 | 310,142 | 81,477 | $1,585,836 |

271.     The Individual Defendants knew that disclosing the true nature of Nu Skin's MLM business in China would have led to serious regulatory problems, distributor attrition, lost sales and reduced stock prices immediately, thus impairing their incentive compensation component where they made most of their money.  Instead, the longer they withheld the adverse

---

[38]     According to Nu Skin's Proxy dated May 16, 2014, "other compensation" includes but is not limited to: 1) Company contributions to Deferred Compensation Plan; 2) tax payments; 3) Term Insurance Premiums paid by Company; 4) Company Contributions to 401(k) Retirement Savings Plan; 5) Perquisites; and 6) Other Personal Benefits.

[39]     This information also comes from Nu Skin's Proxy dated May 16, 2014.

information, sales and stock prices would remain high, thereby providing them with additional years of high level compensation.  This evidence provides additional support for a strong inference of scienter.

## X.     CLASS ACTION ALLEGATIONS

272.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Nu Skin securities including options during the Class Period (the "Class") and who were damaged when the truth about Nu Skin's business was disclosed.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

273.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nu Skin had an average of 60 million shares of common stock outstanding that traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nu Skin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

274.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

275.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

276.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements and omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nu Skin;

(c)    whether the Individual Defendants caused Nu Skin to issue false and misleading financial statements and omissions during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements and omissions;

(e)    whether the prices of Nu Skin securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

277.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

278.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

279.   Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Nu Skin's failure to comply with China's regulations on direct selling and laws prohibiting pyramid schemes, which compliance would drastically affect the growth rate of the Company's business in China.

280.   Alternatively, Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine, because at all relevant times, the market for Nu Skin's securities was an efficient market and the price of Nu Skin's securities was impacted by the misrepresentations and omissions for the following reasons, among others:

(a)   Nu Skin's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Nu Skin filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NYSE;

(c)   Nu Skin regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Nu Skin was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including but not limited to 1) John Faucher at JP Morgan Securities LLC; 2) Bill Schmitz, Jr. at Deutsche Bank; 3) Frank Camma at Sidoti & Co., LLC; 4) Mark Astrachan at Stifel Nicolaus; 5) Scott Van Winkle at Canaccord Genuity; 6) Tim Ramey at D.A. Davidson & Co.; 7) Olivia Tong at Bank of America Merrill Lynch; 8) Anand Vankawala at Avondale Partners; 9) Per Ostlund at Jefferies & Co.; and 10) Rommel Dionisio at Wedbush Securities) at major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e) Nu Skin's stock price was positively impacted by disclosures of improved results and increased guidance, attributable at least in part to sales in Mainland China, and declined when Defendants conceded that Nu Skin had not complied with Chinese laws prohibiting unlicensed direct selling and other illegal marketing schemes.

281.    As a result of the foregoing, the market for Nu Skin's securities promptly digested current information regarding Nu Skin from all publicly available sources and reflected such information in Nu Skin's stock price.  Under these circumstances, all purchasers of Nu Skin's securities during the Class Period suffered similar injury through their purchase of Nu Skin's securities at artificially inflated prices and a presumption of reliance applies.

## XII.   NO SAFE HARBOR

282.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding Nu Skin's business and practices.

283.   To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

284.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nu Skin who knew that those statements were false when made.

**XIII. LOSS CAUSATION/ECONOMIC LOSS**

285.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

286.     The truth about Nu Skin's business was disclosed in a series of corrective disclosures beginning on August 7, 2012 with the publication of the August 7th Citron Report and concluding with the Report on 8-K issued by the Company before the market opened on January 21, 2014, in which Defendants acknowledged that Nu Skin violated Mainland China's regulations on direct selling on numerous occasions.

(a)     The August 7th Citron Report was a partial corrective disclosure as it included new information about Nu Skin's operations in China and included seven transcripts of interviews of conversations conducted by undercover Citron researchers in Mainland China with Nu Skin retail store employees and/or sales promoters and independent distributors. Citron concluded that Nu Skin's operations in China are based on multi-level marketing or pyramid selling schemes. The interviews and the documents created by the Nu Skin employees and independent distributors (and contained in the August 7th Citron Report) demonstrate how Nu Skin downlines worked in China and had not been previously disclosed or known to the market. Based on the proprietary interviews and notes, the August 7th Citron Report was more than just an opinion piece based on publically available information. It was a partial disclosure of Nu Skin's violations of Chinese law which the Defendants attempted to discredit almost immediately. On the news of the August 7th Citron Report, Nu Skin's stock declined $4.50 per share, or more than 9%, to close at $44.36 per share on August 7, 2012. However, the Company's stock price remained artificially inflated after the August 7th Citron Report because

of Defendants' false and misleading statements reiterating Nu Skin's compliance with direct selling regulations in China, including Defendants' statements in the Company's report on Form 8-K filed ***after the market closed*** on August 7, 2012. On August 8, 2012, Nu Skin's stock price decreased an additional 5.4% on heavy trading volume falling from $44.36 per share to close at $41.96 per share. Analysts who covered Nu Skin including Bill Schmitz, Jr. of Deutsche Bank and Scott Van Winkle of Canaccord Genuity sided with the Company, downplaying the August 7th Citron Report in their comments to the market. On their reports and on the August 9, 2012 CNBC debate, the price of Nu Skin's stock rebounded by 6.24% on August 9, 2012;

(b)       On January 15, 2014, *People's Daily*, a government-run Beijing-based newspaper, reported that Nu Skin operates an illegal pyramid scheme in China and engages in business practices in violation of PRC law.[40] On that day, trading in Nu Skin stock was halted four times. On January 15, 2014, Nu Skin's stock closed at $115.23 per share, a decline of approximately 15.5% in one day;

(c)       On January 16, 2014, *People's Daily* published additional new information concerning its investigative report of Nu Skin including video recordings of internal Nu Skin meetings at which downline sales and multi-level compensation were discussed. Also on January 16, 2014, China's SAIC and MOFCOM announced separate investigations of Nu Skin into the information uncovered by the *People's Daily* reports. Given that the *People's Daily* is a government-run newspaper, in essence a mouthpiece for the PRC, the announcement of the

---

[40]       The *People's Daily* is an official newspaper of the government of China with a worldwide with a circulation of 3 to 4 million. In addition to its main Chinese-language edition, it has editions in many foreign languages including English. *People's Daily* also maintains a multilingual internet presence. The newspaper provides information on the policies and viewpoints of the Chinese government.

investigation by the Chinese government after an expose conducted and published with the government's approval, provided the investing public with the information as early as mid-January 2014 that a negative finding by the SAIC was a likely occurrence. And the market reacted accordingly. On January 16, 2014, on the above-described news, Nui Skin's stock declined an additional $30.43 per share, or 26.4%, to close at $84.80 per share;

(d)     On January 21, 2014, before the market opened, Nu Skin filed a Report on Form 8-K releasing a letter to its customers in China (in English and Chinese / Mandarin) admitting to violations by Nu Skin China employees of Mainland China's regulations on direct selling.  By the time the market opened on January 21, 2014, the information about Nu Skin's business in China was revealed to investors; and

(e)     Nu Skin's share price fell after the truth became known with respect to the very misrepresentations and omissions alleged herein. Between January 15, 2014 and January 21, 2014, Nu Skin's stock price plummeted over 43% - falling from a market close on January 14, 2014 of $136.47 per share to a market close on January 21, 2014 of $77.39 on unusually high volume during those four trading days.

287.    On March 24, 2014, Nu Skin announced the AIC investigations in Shanghai and Beijing resulted in fines for Nu Skin and its employees for violating Mainland China's Regulations on Direct Selling Administration. In addition to monetary fines and the confiscation and destruction of Nu Skin products involved in the listed violations, Nu Skin was asked to retrain and better supervise its sales representatives in Mainland China and to close certain Nu Skin "working studios" which were in contravention of China's direct selling regulations.

288.    Because Nu Skin had already admitted to the violations on January 21, 2014, and

announced in its Report on Form 10K for the year ended December 31, 2013 (filed on March 18,

2014) that it was likely Nu Skin "will be fined and could potentially face some other form of

sanctions from these regulators….includ[ing] a formal suspension of our ability to recruit new

sales people and direct sellers, a temporary suspension of our ability to sell products in various

markets or, in the most extreme cases, loss of existing licenses to operate in various jurisdictions

in Mainland China," the announcement of the SAIC fines on March 24, 2014 did not result in

any further negative effect on Nu Skin's stock price.

289.    This was confirmed by analyst reports, some of which noted that the fines were a

"most likely outcome," already incorporated into the price of the stock. According to a March

24, 2014 analyst report by John Faucher at J.P. Morgan Chase & Co:

> Nu Skin issued an update on their regulatory situation in China and
> announced an agreement with the Administration of Industry and
> Commerce (AIC). Nu Skin announced two fines totaling $540,000.
> The company also highlighted that they are "not aware of any
> other material enforcement investigations currently pending in
> China". We view this as very good news and would expect the
> stock to respond very positively today.
>
> ▪ Result in line with our expectations. ***Since the company issued a
> letter in late January admitting to issues with their Mainland
> China business, we had viewed a fine as the most likely outcome***.
> The scope of the penalties is a little narrower than we had
> expected, with the biggest issue being selling products that were
> unregistered for direct sales (although registered for sale in Nu
> Skin stores).

290.    Further, most analysts reduced their expectations for Nu Skin sales in China at

least in the short term. Scott Van Winkle from Canaccord Genuity, one of Nu Skin's most ardent

supporters issued two successive downward revisions to Canaccord's estimates for the

contribution of sales in Mainland China to Nu Skin's results for the full year 2014 since the announcement of the government inquiry in mid-January 2014.

## COUNT I

### Violation of Section 10(b) Of
### The Exchange Act And Rule 10b-5(b)
### Promulgated Thereunder Brought Against All Defendants

291.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

292.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Nu Skin's business, operations, management and the intrinsic value of Nu Skin's securities; and (ii) cause Plaintiffs and other members of the Class to purchase securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

293.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Nu Skin's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

294.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Nu Skin's compliance with Mainland China's direct selling regulations during the Class Period, as specified herein.

295.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nu Skin's compliance with China's regulations on direct selling which affected growth in Nu Skin's fastest growing market, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Nu Skin ad its growth rate and future prospects in China in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Nu Skin's securities during the Class Period.

296.   Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and

(iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

297.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true nature of Nu Skin's multi-level marketing business in China from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by Defendants' misstatements of the Company's core China business throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

298.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Nu Skin's securities was artificially inflated during the Class Period.  In ignorance of the fact that market price of Nu Skin's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Nu Skin's

securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

299.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Nu Skin's business in China, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Nu Skin securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

300.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

301.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**Violation Of Section 20(a) Of The Exchange Act**
**Brought Against the Individual Defendants**

302.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

303.    The Individual Defendants acted as controlling persons of Nu Skin within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding Nu Skin's business prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

304.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

305.     As set forth above, Nu Skin violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of Nu Skin, the primary violator.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under

Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class

representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by

reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-

judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated this 30th day of June, 2014.

LABATON SUCHAROW LLP


/s/ Jonathan Gardner
Jonathan Gardner
Mark S. Goldman
Christine M. Fox
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
            mgoldman@labaton.com
            cfox@labaton.com

Heidi G. Goebel, 10343
CHRISTENSEN & JENSEN, P.C.
15 W South Temple
Salt Lake City, UT 84101
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
Email: heidi.goebel@chrisjen.com

*Counsel for Lead Plaintiff State-Boston Retirement
System and the Proposed Class*

Lionel Z. Glancy
Joshua L. Crowell
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com
          jcrowell@glancylaw.com

Stephen R. Basser
BARRACK RODOS & BACINE
600 W Broadway Suite 900
San Diego, CA 92101
Telephone (619) 230-0800
Facsimile: (619 230–1874
Email: sbasser@barrack.com

Jeffrey W. Golan
Julie B. Palley
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963–0838
Email: jgolan@barrack.com
          jpalley@barrack.com

Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Fl.
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com

Nadeem Faruqi
Juan E. Monteverde
FARUQI & FARUQI, LLP
369 Lexington Avenue
New York, New York 10463
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
E-mail: nfaruqi@faruqilaw.com
            jmonteverde@faruqilaw.com

Guri Ademi
ADEMI & O'REILLY, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
E-mail: gademi@ademilaw.com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on this 30th day of June, 2014, I electronically filed this Consolidated Class

Action Complaint, using the Court's CM/ECF system, which will be sent electronically to the

registered participants as identified on the attached Electronic Mail Notice List.


/s/ Jonathan Gardner
Jonathan Gardner

**Mailing Information for a Case 2:14-cv-00033-DB**

**I.     Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Nelson T. Abbott**
  nelson@abbottlawfirm.com,nicole@abbottlawfirm.com
- **Rachel A. Avan**
  ravan@labaton.com
- **Daniel E. Barnett**
  dbarnett@parrbrown.com,calendar@parrbrown.com
- **Stephen R. Basser**
  sbasser@barrack.com
- **Robert S. Clark**
  rclark@parrbrown.com,calendar@parrbrown.com,achandler@parrbrown.com
- **Alexis S. Coll-Very**
  acoll-very@stblaw.com,janie.franklin@stblaw.com,lee.brand@stblaw.com
- **Andrew G. Deiss**
  adeiss@deisslaw.com
- **Christine M. Fox**
  cfox@labaton.com,fmalonzo@labaton.com,electroniccasefiling@labaton.com
- **Jonathan Gardner**
  jgardner@labaton.com,ElectronicCaseFiling@labaton.com,fmalonzo@labaton.com,ckeller@labaton.com
- **Heidi G. Goebel**
  heidi.goebel@chrisjen.com,goebel_heidi@hotmail.com,karen.harwood@chrisjen.com
- **Jeffrey W. Golan**
  jgolan@barrack.com,rbranch@barrack.com
- **Mark S. Goldman**
  mgoldman@labaton.com,fmalonzo@labaton.com,electroniccasefiling@labaton.com
- **Jon V. Harper**
  jharper@aklawfirm.com,abeal@aklawfirm.com
- **Mark F James**
  mjames@hjdlaw.com
- **Thomas R Karrenberg**
  tkarrenberg@aklawfirm.com,aolson@aklawfirm.com
- **Christopher J. Keller**
  ckeller@labaton.com
- **James G. Kreissman**
  jkreissman@stblaw.com,lee.brand@stblaw.com
- **Angelina Nguyen**
  anguyen@labaton.com,fmalonzo@labaton.com,electroniccasefiling@labaton.com

- **Julie B. Palley**
  jpalley@barrack.com,rbranch@barrack.com
- **Jonathan C. Sanders**
  jsanders@stblaw.com,janie.franklin@stblaw.com,lee.brand@stblaw.com
- **David W. Scofield**
  dws@psplawyers.com,ka@psplawyers.com,hj@psplawyers.com
- **Michael W. Stocker**
  mstocker@labaton.com

## II.    Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

▪(No manual recipients)