Robert S. Clark (4015)
Daniel E. Barnett (8579)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Tel: (801) 532.7840
Fax: (801) 532.7750
rclark@parrbrown.com

JAMES G. KREISSMAN (*pro hac vice*)
ALEXIS COLL-VERY (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Tel: (650) 251-5000
Fax: (650) 251-5002
jkreissman@stblaw.com
acoll-very@stblaw.com

*Attorneys for Defendants Nu Skin Enterprises, Inc.,*
*M. Truman Hunt, and Ritch N. Wood*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE NU SKIN ENTERPRISES, INC. SECURITIES LITIGATION<br><br>This document relates to ALL ACTIONS. | Master File No. 2:14-cv-00033-DB<br><br>**DEFENDANTS' MOTION TO DISMISS AND SUPPORTING MEMORANDUM**<br><br>Judge Hon. Dee Benson |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF RELIEF SOUGHT AND GROUNDS FOR MOTION ................................. 2

BACKGROUND ................................................................................................ 4

STATEMENT OF FACTS .................................................................................... 14

    I.      Nu Skin's Business and Compensation Model in China Differs from Its Global Model ....................................................................................... 14

          A.      Nature of Nu Skin's Relationship With Its Sales Personnel .................... 15

          B.      Compensation of Nu Skin Sales Personnel .............................................. 16

          C.      Risk of Regulatory Action Based on Sales and Compensation Practices ..................................................................................... 19

    II.     Publication of the Citron Report in August 2012 ................................. 21

    III.    Publication of Substantially Identical Allegations by *People's Daily* in January 2014 ....................................................................................... 23

    IV.    The Response to the *People's Daily* Articles ....................................... 24

    V.     Allegations in the Amended Complaint ............................................... 26

PROCEDURAL HISTORY .................................................................................. 27

LEGAL STANDARD ......................................................................................... 27

ARGUMENT ................................................................................................... 28

    I.      Plaintiffs Fail Adequately to Plead Falsity. ......................................... 28

          A.      Plaintiffs Fail to Allege a False Statement or Omission of Material Fact ........................................................................................... 28

               1.      Nu Skin's Compensation of Its Sales Employees Based on Group Productivity Has Long Been Publicly Disclosed and Was Not Found to Violate Chinese Law. ................................... 30

               2.      Plaintiffs Allege No Specific Facts Showing the Use of Group Productivity in Setting Compensation of Direct Sellers. ..................................................................................... 32

               3.      Plaintiffs Fail to Allege That The Marketing Efforts of Sales Employees Conducted Outside of Fixed Retail Stores Constitute Unlicensed Direct Selling. ..................................... 33

          B.      The Amended Complaint Engages in Impermissible "Puzzle Pleading" ..................................................................................... 35

II.    Plaintiffs Fail to Meet Their Heavy Burden of Pleading Facts Giving Rise
       to a Strong Inference of Scienter. .................................................................. 36

       A.    The "Core Operations" Theory Does Not Support a Finding of
             Scienter ............................................................................................. 39

       B.    Defendants' Stock Sales Do Not Raise a Strong Inference of
             Scienter. ............................................................................................ 42

             1.    Defendants' Trades Were Made Pursuant to Rule 10b5-1
                   Plans. ....................................................................................... 42

             2.    Defendants' Sales Were Routine and Consistent With
                   Historical Trading Patterns. .................................................... 43

       C.    Defendants' Compensation is Irrelevant to the Scienter
             Determination .................................................................................... 47

       D.    Plaintiffs' "Confidential Witnesses" and Purported Nu Skin
             Documents Do Not Support Any Finding of Scienter ........................ 48

III.   The Amended Complaint Fails Adequately to Allege Loss Causation ............... 52

       A.    The *People's Daily* Articles Cannot Constitute Corrective
             Disclosures for Two Independently Sufficient Reasons. ...................... 53

             1.    Repackaging Publicly Available Information Does Not
                   Establish Loss Causation. ........................................................ 53

             2.    Media Allegations That a Risk of Fraudulent Conduct
                   Exists Do Not Constitute a Corrective Disclosure .................... 55

       B.    Announcement of a Government Investigation Cannot Constitute a
             Corrective Disclosure......................................................................... 57

       C.    Nu Skin China's 8-K Was Not a Corrective Disclosure Because It
             Did Not Reveal Any Violation of Chinese Law ................................... 57

IV.    Plaintiffs' Control Person Claim Falls With Their Substantive § 10(b)
       Claim.............................................................................................................. 58

CONCLUSION.......................................................................................................... 59

## TABLE OF AUTHORITIES

### Cases

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2014 WL 2726676 (N.D. Ill. June 16, 2014) ................................ 36-37, 42

*Anderson v. First Sec. Corp.*,
249 F. Supp. 2d 1256 (D. Utah 2002) .............................................................. 37

*Arena Land & Inv. Co., Inc. v. Petty*,
906 F. Supp. 1470 (D. Utah 1994) ................................................................... 29

*Bach v. Amedisys, Inc.*,
10–395–BAJ–CN, 2012 WL 6947008 (W.D. La. Mar. 15, 2013) ............................ 55-57

*Board of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011) .......................................................... 38-39, 41

*Bricklayers of W. Penn. Pension Plan v. Hecla Min. Co.*,
No. 2:12–cv–00042–BLW, 2013 WL 5423875 (D. Id. Sept. 26, 2013) .......................... 40

*City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.*,
388 F. Supp. 2d 932 (S.D. Ind. 2005) .............................................................. 32

*City of Philadelphia v. Fleming Companies, Inc.*,
264 F.3d 1245 (10th Cir. 2001) ................................................................... 37, 48

*Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Bioscis., Inc.*,
No. 07CV1111–IEG–RBB, 2008 WL 2053733 (S.D. Cal. May 13, 2008) ..................... 44

*Constr. Workers Pension Fund v. Navistar Int'l Corp.*,
No. 13 C 2111, 2014 WL 3610877 (N.D. Ill. July 22, 2014) .................................... 36

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................... 27, 52-53

*Durham v. Whitney Info. Network, Inc.*,
06-CV-00687, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) .................................... 57

*Elam v. Neidorff*,
544 F.3d 921 (8th Cir. 2008) ......................................................................... 42

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*,
09-CV-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) ..................................... 42-43

*Grossman v. Novell, Inc.*,
909 F. Supp. 845 (D. Utah 1995) .................................................................... 48

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ............................................................ 28-30

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .............................................................. 49

*Hubbard v. BankAtl. Bancorp, Inc.*,
  503 F. App'x 677 (11th Cir. 2012) ....................................................... 49

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ................................................. 35-36

*In re Almost Family, Inc. Sec. Litig.*,
  No. 3:10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)................................... 57

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV 10–06352, 2013 WL 174119 (C.D. Cal. Jan. 16, 2013)................................... 51

*In re BankAtl. Bancorp, Inc. Sec. Litig.*,
  851 F. Supp. 2d 1299, 1313-14 (S.D. Fla. 2011) ................................................. 49

*In re Cisco Sys. Inc. Sec. Litig.*,
  No. C 11–1568 SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ............................ 50

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)................................................................. 51

*In re Dell, Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)............................................................ 44, 48

*In re FX Energy, Inc. Sec. Litig.*,
  2:07-CV-874 CW, 2009 WL 1812828........................................................... 48-49

*In re Gold Res. Corp. Sec. Litig.*,
  957 F. Supp. 2d 1284 (D. Colo. 2013)................................................... 28, 40, 41

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  No. 09–cv–00200, 2010 WL 5129524 (D. Colo. Dec. 10, 2010)............................ 35-36

*In re Level 3 Commun's, Inc. Secs. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ............................................35, 42-43, 47-48, 59

*In re Maxim Integrated Products, Inc. Sec. Litig.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) ....................................................... 56

*In re NVE Corp. Sec. Litig.*,
  551 F. Supp. 2d 871 (D. Minn. 2007)........................................................... 47

*In re Open Joint Stock Co. "Vimpel-Communc'ns" Sec. Litig.*,
  No. 04 Civ. 9742, 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ..................................... 38

*In re Travelzoo Inc. Sec. Litig.*,
  11 Civ. 5531 GBD, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ............................... 44

*In re Zagg Sec. Litig.*,
  2:12-CV-852, 2014 WL 505152 (D. Utah Feb. 7, 2014) ................................................. 37

*Janbay v. Canadian Solar, Inc.*,
  10 CIV. 4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .......................................... 56

*Kapur v. USANA Health Scis., Inc.*,
  2:07–CV–177, 2008 WL 2901705 (D. Utah July 23, 2008).................... 28, 31, 37, 49-51

*Leventhal v. Tow*,
  48 F. Supp. 2d 104 (D. Conn. 1999).................................................................................. 52

*Local 295/Local 851 IBT Employer Grp. Pension Trust & Welfare Fund v.*
  *Fifth Third Bancorp.*,731 F. Supp. 2d 689 (S.D. Ohio 2010)........................................... 51

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .......................................................................................... 56

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...............................................................................53-55, 57

*Percoco v. Deckers Outdoor Corp.*,
  Civ. No. 12–1001–SLR, 2013 WL 3584370 (D. Del. 2013)........................................... 40

*Prissert v. EMCORE Corp.*,
  894 F. Supp. 2d 1361 (D.N.M. 2012) .............................................................................. 40

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ............................................................................................ 47

*S. Ferry LP, # 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................................ 40

*Slater v. A.G. Edwards & Sons, Inc.*,
  719 F.3d 1190 (10th Cir. 2013) ................................................................................28, 30-31

*Szymborski v. Ormat Techs., Inc.*,
  776 F. Supp. 2d 1191 (D. Nev. 2011)............................................................................... 51

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ....................................................................................44, 54-55

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)..........................................................................40-41

*Weinstein v. McClendon*,
    2014 WL 3057190, --- F.3d ---- (10th Cir. July 8, 2014) ........................................... 27, 37

*Wolfe v. Aspenbio Pharma, Inc.*,
    No. 11–cv–00165, 2012 WL 4040344 (D. Colo. Sept. 13, 2012) .................................... 48

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ............................................................................... 41, 43, 47

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................... 33, 51

**Rules**

17 C.F.R. § 240.10b-5..................................................................................... 2, 27, 42-43

Fed. R. Civ. P. 8 .................................................................................................. 2, 3, 35

Fed. R. Civ. P. 9 ........................................................................................................... 2

Fed. R. Civ. P. 12 ......................................................................................................... 2

**Other Authorities**

15 U.S.C. § 78u-4 ................................................................................................... 2, 27

15 U.S.C. § 78u-5 ....................................................................................................... 35

**INTRODUCTION**

Beginning on January 15, 2014, the *People's Daily*, the official newspaper of the Chinese government, published a series of negative articles about Provo-based direct marketer Nu Skin Enterprises, Inc. ("Nu Skin" or the "Company"), primarily accusing Nu Skin's Chinese business ("Nu Skin China") of operating an illegal pyramid scheme and violating China's strict prohibition on the payment of multi-level compensation (*i.e.*, paying commissions to Nu Skin China sales personnel based not only on their own sales but also on sales made by others in the organization).  Within days of the publication of the first of these articles, the first securities fraud class action lawsuits were brought against Nu Skin and its senior executives.  In those initial complaints, plaintiffs appeared to presume that the Chinese government would find Nu Skin in violation of these laws, subject it to draconian sanctions, and possibly shut down its operations in China.  Plaintiffs thus claimed that Nu Skin was liable for securities fraud because it failed to warn its investors that it was violating these Chinese laws and would suffer such dramatic consequences in the future.

However, things did not turn out the way Plaintiffs' counsel had foreseen.  The Chinese authorities completed their investigation in late March 2014, and did not find Nu Skin liable for violating either the anti-pyramid scheme laws or the multi-level commission laws.  Nu Skin was neither subjected to significant penalties nor required to alter its business model.  Instead, the Chinese authorities fined it approximately $500,000 for violations unrelated to these pyramid and multi-level compensation issues.  Nu Skin's stock rallied dramatically in response.

In light of these developments, one might have expected Plaintiffs to voluntarily dismiss their claims, or at least to modify their approach to this litigation.  They have done

neither.  Instead, Plaintiffs continue to claim that Nu Skin committed securities fraud by failing

to inform investors that it was violating the same Chinese laws that it was <u>not</u> found to have

violated in the recently concluded government investigations.  The Amended Complaint

therefore fails to state a claim and should be dismissed for the reasons set forth below.

### STATEMENT OF RELIEF SOUGHT AND GROUNDS FOR MOTION

Pursuant to Rules <u>12(b)(6)</u>, <u>9(b)</u>, and <u>8</u> of the Federal Rules of Civil Procedure

and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), <u>15 U.S.C. § 78u-4(a)</u>, *et

seq.*, Defendants Nu Skin Enterprises, Inc.; M. Truman Hunt ("Hunt"); and Ritch N. Wood

("Wood" and, collectively, "Defendants") hereby respectfully move for an order dismissing the

Amended Complaint, with prejudice, for failure to state a claim upon which relief may be

granted.  As set forth below, the Amended Complaint fails to state a claim under Section 10(b) of

the Securities Exchange Act of 1934 (the "Exchange Act"), <u>Rule 10b-5</u> promulgated thereunder

("<u>Rule 10b-5</u>"), or Section 20(a) of the Exchange Act, for the following reasons.

First, the Amended Complaint fails to plead an actionable false or misleading

statement.  Given the fact that Chinese regulators recently completed their investigation of Nu

Skin China and did not find it in violation of China's anti-pyramid selling or multi-level

commission laws, Plaintiffs have no valid basis to claim that Nu Skin misled investors by not

informing them that it was violating those same laws.  Moreover, the specific facts about its

compensation model that Plaintiffs accuse Nu Skin of keeping from the market were actually

disclosed in the Company's public filings long before the *People's Daily* articles were published.

Accordingly, the alleged omissions cannot be material as a matter of law.

The Amended Complaint should also be dismissed for failure to satisfy Rule 8 of the Federal Rules of Civil Procedure, because it fails to identify the specific statements alleged to be false or misleading and explain why each statement is actionable.  The Amended Complaint instead quotes large blocks from lengthy Nu Skin public statements and then offers a laundry list of reasons why these groups of statements are false and misleading, leaving the Court to divine which statements are purportedly false and why.  Such "puzzle pleading" is impermissible.

Next, the Amended Complaint fails to meet its heavy burden of pleading particularized facts that give rise to a strong inference of scienter.  Rather than alleging particularized facts, Plaintiffs attempt to establish scienter through boilerplate allegations that China is an important part of Nu Skin's business and that Nu Skin's senior executives sold stock and were well compensated during the three-year-long proposed class period.  Such pleading has been repeatedly rejected by courts in similar circumstances.  The Amended Complaint also tries to rely on conclusory hearsay statements from low-level confidential witnesses who do not even claim to have communicated with anyone in Nu Skin management, a tactic that courts routinely reject as a basis for pleading scienter.

Finally, the Amended Complaint should be dismissed because it fails to adequately plead loss causation.  To plead loss causation, Plaintiffs must allege an actionable corrective disclosure (*e.g.*, an admission by Nu Skin or a finding by a government body that a prior Nu Skin statement was false or misleading).  No such corrective disclosure occurred here.  Instead, Plaintiffs rely on a repackaging of previously alleged facts, the announcement of a government investigation, and media speculation about potential violations of law.  Established precedent demonstrates that none of these allegations is sufficient to establish loss causation.

## BACKGROUND

Nu Skin is a leading maker of premium-quality anti-aging personal care products and nutritional supplements, which it sells in over 50 countries around the world.  This product suite covers a broad array of health and beauty applications.  For example, Nu Skin's ageLOC products use an innovative scientific approach to address the signs and sources of aging.  Exhibit ("Ex.") A (2011 10-K) at 3.[1]  Similarly, the Company's LifePak product is a nutritional supplement designed to improve overall health and diet.  Id. at 5-6.  Dozens of other Nu Skin products include everything from weight management systems, to supplements that target specific nutritional needs, to highly nutritious meals called "VitaMeal."  Id. at 6.

Nu Skin's Success and Growth

Since its founding in 1984, Nu Skin has enjoyed dramatic growth.  In 2013 alone, Nu Skin reported a record $3.2 billion in revenue, with year-over-year growth of nearly 50%.  Ex. C (2013 10-K) at 1.  Its growth in China has been especially strong in recent years.  Nu Skin saw 67% growth in Mainland China from 2010 to 2011, 74% from 2011 to 2012, and 292% from 2012 to 2013, with revenues increasing from $91.4 million to over $1 billion during that time.  Ex. A (2011 10-K) at 56; Ex. B (2012 10-K) at 50; Ex. C (2013 10-K) at 56.  During the same span, the number of Sales Employees in Mainland China increased from fewer than 2000 employees to roughly 12,000.  Ex. L (2010 10-K) at 21; Ex. A (2011 10-K) at 21; Ex B (2012 10-K) at 17; Ex. C (2013 10-K) at 17.

---

[1]      Nu Skin attaches hereto certain exhibits relied upon and/or referred to in the Amended Complaint.  For convenience, Nu Skin will refer to these documents as "Ex. __" herein.

Contrary to Plaintiffs' suggestion, Nu Skin's growth has not been confined to China. For example, in 2013, Nu Skin experienced 11% growth in North Asia, 48% growth in Greater China (excluding Mainland China), 15% in South Asia/the Pacific, 30% in the Americas, and 7% in Europe, the Middle East, and Africa ("EMEA"). Ex. C (2013 10-K) at 56-58. Nu Skin had also reported significant growth in most of these markets over the past several years. *See* Ex. B (2012 10-K) at 50-51 (2012 growth of 6% in North Asia, 40% in South Asia/the Pacific, 15% in the Americas, and 14% in EMEA); Ex. A (2011 10-K) at 55-57 (2011 growth of 9% in North Asia, 29% in South Asia/the Pacific, and 8% in Europe).

Nu Skin's Global Business and Compensation Model

In most countries, Nu Skin operates through a direct selling model. Pursuant to its global business model, Nu Skin sales personnel—who are independent distributors, not Nu Skin employees—sell Nu Skin products to customers outside of traditional retail stores. In so doing, Nu Skin's distributors may contact friends and relatives, engage in door-to-door sales, or pursue other means of selling Nu Skin's products.

Nu Skin's independent distributors are compensated pursuant to Nu Skin's global compensation plan. Under that plan, distributors earn commissions not only on their own sales, but also on the sales of distributors that they bring into the sales organization and subsequently train and lead. Nu Skin permits this "multi-level" compensation for up to six generations of distributors. Accordingly, a Nu Skin distributor who leads a large sales organization (sometimes referred to as "Sales Leaders") can earn substantial sums. For example, a Sales Leader can earn a 5-20% commission on sales to his or her own network of consumers, 5% on every sale made by the individuals that the Sales Leader has recruited into the organization and trained, an

additional 5% commission on sales made by salespersons recruited by the Sales Leader's recruits, and so on, up to six levels deep into the organization.[2]

Nu Skin's Business and Compensation Model in China Differs from the Global Model

Nu Skin's business and compensation model in China is distinctly different from its global model due to China's unique regulatory requirements.  In 1998, China imposed a ban on direct selling, which was not lifted until 2005.  Thus, Nu Skin did not conduct direct sales in China at that time, but instead operated a limited number of retail stores selling products under a legacy brand.  In 2003, Nu Skin expanded its retail network and began selling Nu Skin-branded products.

In 2005, China passed legislation allowing direct selling, but under limited circumstances and with strict licensing, regulatory, and other requirements.  Among other things, in order to engage in direct selling, Nu Skin must obtain a direct selling license for the geographic territory in question (*e.g.*, province, city, etc.), and each individual that wishes to engage in direct selling must complete an examination administered by Nu Skin and obtain a direct selling card from the Company.  Nu Skin promptly started applying for direct selling

---

[2]     Nu Skin describes its global distributor/Sales Leader compensation model as follows:

Our Sales Leaders can receive "multi-level" compensation under our global sales compensation plan for product sales to their consumer groups as well as the sales made through the network of Sales Leaders they have developed and trained.  Our distributors are not required to recruit or sponsor other distributors, and we do not pay any commissions for recruiting or sponsoring other distributors.  While all of our distributors can sponsor other distributors at any time, our Sales Leaders and those in qualification to become Sales Leaders are the distributors who generally are actively sponsoring other distributors.  Pursuant to our global sales compensation plan, we pay consolidated monthly commissions in a Sales Leader's home country, in local currency, for product sales in the Sales Leader's own consumer group and for product sales in the Sales Leader's organization of Sales Leaders across all geographic markets.  Ex. B (2012 10-K) at 11.

licenses and now possesses such licenses for a significant portion of the country.  Also in 2005,
China formalized an "anti-pyramid" law that, among other things, imposes a ban on paying sales
personnel in China the types of multi-level commissions that Nu Skin pays in most other
countries.

In light of the Chinese regulatory scheme, Nu Skin now operates in China
pursuant to a "hybrid" model that includes both "Direct Sellers" and "Sales Employees."  Direct
Sellers are persons who pass an exam administered by Nu Skin and obtain authorization from Nu
Skin to engage in direct selling in a particular territory.  They are not Nu Skin employees, but
instead are akin to independent contractors.  Nu Skin's Direct Sellers in China can sell Nu Skin's
products anywhere in their authorized territory.  Nu Skin compensates these Direct Sellers
through sales commissions.  However, unlike under its global model, Nu Skin's Direct Sellers in
China only earn commissions on their own personal sales, and not on the sales of any other
individuals.  Nu Skin has relatively few Direct Sellers in China.

The other part of Nu Skin's hybrid model in China is comprised of Sales
Employees—individuals who are employed by Nu Skin and are not Direct Sellers.  Because
these Sales Employees have not met the requirements to become Direct Sellers, they can only
sell Nu Skin products at Nu Skin retail locations.  However, these Sales Employees are free to
engage with potential customers in the field to promote and market Nu Skin's products, solicit
new business, and drive customers to the retail stores located throughout China.  The great
majority of Nu Skin's sales force in China is comprised of Sales Employees.

To comply with China's laws barring multi-level commissions, Nu Skin
compensates its Sales Employees in China in two ways.  First, like Nu Skin's Direct Sellers in

China, its Sales Employees receive sales commissions on personal sales to their customers. In addition, Nu Skin pays a monthly salary to its Sales Employees in China that is adjusted on a quarterly basis. This salary is based on various factors, including their compliance with Company policy and applicable laws and regulations, their individual sales productivity, the effectiveness of their leadership, training, and supervision of other Sales Employees, and their ability to attract and maintain customers and promote the Nu Skin brand. In evaluating the effectiveness of a Sale Employee's ability to lead, train, and supervise a sales team, Nu Skin takes into consideration not only the employee's own sales productivity, but also the sales productivity of the group of salespeople developed and supervised by that Sales Employee, which is a factor commonly used by organizations to evaluate the performance of sales managers in a sales organization.

Nu Skin is far from the only direct selling company doing business in China today. To the contrary, most of the major direct selling organizations in the world (*e.g.*, Amway and Mary Kay) do a substantial amount of business in China, with the revenues of many of these organizations significantly exceeding Nu Skin's China-based revenue. All of these companies are subject to the same direct selling and anti-pyramid regulations. Moreover, while the details vary, a great many of these businesses employ a model similar to Nu Skin's, under which they pay commissions only on direct sales, but also compensate their sales personnel in other ways for developing and supervising other successful sales personnel.

Nu Skin Disclosed the Nature of its Business in China and Warned Investors of Potential Risks

While Nu Skin is proud of its achievements and excited about its future in China, and while it believes that it complies with Chinese laws and regulations, Nu Skin has

nevertheless gone to great pains to educate its investors about its business and compensation

model in China, and to caution investors about the risks and uncertainties inherent in operating

there.  First, in each of Nu Skin's quarterly and annual reports, it explains that its business in

China operates under a model that differs from its global model.  *See, e.g.*, Ex. B (2012 10-K) at

11 ("Because of restrictions on direct selling and multi-level commissions in China, our sales

employees, contractual sales promoters and direct sellers do not participate in our global sales

compensation plan, but are instead compensated according to a separate compensation model

established for that market.").  Nu Skin also tells its investors that, in establishing the salary level

for Sales Employees in China, it uses "the sales productivity of a sales leader and the sales

promoters and employees he/she leads and supervises," as well as various other factors.  Ex. A

(2011 10-K) at 26.

Moreover, while Nu Skin believes its business and compensation models in China

comply with Chinese law, because interpretation of Chinese law is uncertain and subject to

change, Nu Skin has warned its investors in every quarterly and annual disclosure going back for

years that its business in China was subject to significant regulatory risk and that it was possible

the government would find its conduct (or the conduct of individual salespeople) unlawful and

impose serious sanctions.  For example, Nu Skin disclosed in each filing, "The regulatory

environment in China remains complex."  Ex. A (2011 10-K) at 17.  Nu Skin also noted, "Our

operations in China have attracted significant regulatory and media scrutiny since we expanded

our operations there in January 2003."  *Id.*  Nu Skin further explained that these regulations are

"subject to discretionary interpretation," and "[i]nterpretations of what constitutes permissible

activities by regulators can vary from province to province and can change from time to time

because of the lack of clarity in the rules regarding direct selling activities and differences in customs and practices in each location." *Id.*

Furthermore, Nu Skin has consistently explained that, while it "structured [its] business model in China based on . . . [(1) its] interpretation of applicable regulations," (2) "guidance . . . from government officials," (3) its "understanding of the practices of other international direct selling companies operating in China," and (4) its "understanding as to how regulators are enforcing the regulations," the nature of China's political system "gives regulatory agencies at both the local and central levels of government broad discretion to interpret and enforce regulations in a fashion that promotes social order." *Id.* at 26. As a result, Nu Skin noted, "we face a risk that regulators may change the way in which they currently interpret and enforce the direct selling regulations," which could result in significant sanctions, including preventing Nu Skin from continuing to operate its hybrid model in China. *Id.* Nu Skin explained specifically, "If our business practices are found to be in violation of applicable regulations as they may be interpreted or enforced in the future, in particular our use of the sales productivity of a sales leader and the sales promoters and employees he/she leads and supervises in setting his/her quarterly compensation level, then we could be forced to change our business model and/or sanctioned, either of which could significantly harm our business." *Id.*

Finally, Nu Skin has also made it very clear that it had been expanding rapidly in China and, particularly in light of the influx of large numbers of new sales personnel in recent years, there was a substantial risk that the conduct of individual salespeople could be found to violate Chinese law. Ex. A (2011 10-K) at 26-27. For example, Nu Skin noted that "[w]e have experienced rapid growth in China, which could strain our ability to effectively manage our

operations." *Id.* at 27.  The Company also emphasized that "[i]nsufficient management of such growth could result in . . . inappropriate claims or promotions by our sales force[] and governmental inquiries and investigations, all of which could harm our revenue and ability to generate sustained growth and result in unanticipated expenses." *Id.*

Nu Skin added that "[t]he most significant area of risk for such activities relates to improper product claims and claims regarding the business opportunity of being a distributor." Ex. A (2011 10-K) at 23.  Nu Skin further noted that it "experience[s] problems with distributors from time to time," and, because of the dramatic growth in the number of salespeople, Nu Skin disclosed an "increase[d] . . . risk [product] materials could contain problematic product or marketing claims in violation of our policies and applicable regulations," potentially resulting in "fines or other legal action if our distributors violate applicable laws and regulations." *Id.* Moreover, because of distributor uncertainty regarding Nu Skin's China model, Nu Skin warned investors that "confusion can result as to how those working in China should promote the business in China," which can "lead to governmental reviews and investigations of our operations in China," with regulators enjoying "broad latitude to conduct investigations." *Id.* at 26.  Nu Skin concluded, "[w]e anticipate that our business will continue to attract significant governmental scrutiny" as its sales force continues to expand rapidly. *Id.*

The *People's Daily* Allegations

In January 2014, some of the concerns that Nu Skin had been sharing with its investors for years came to fruition.  The *People's Daily*, the Chinese government's official newspaper—which can reflect the policy positions of the government—published a series of articles alleging that Nu Skin China had violated Chinese law by, *inter alia*, operating a pyramid

scheme, paying multi-level commissions to sales personnel, making false and unsupported product claims, and making false claims of celebrity and government endorsements of Nu Skin's products.  The Chinese government announced an investigation into these allegations within hours of their publication.  Nu Skin's stock dropped sharply following these events, suggesting investors were deeply concerned that the Chinese government would impose harsh sanctions.

The Chinese Government's Findings

> However, to paraphrase Mark Twain, rumors of Nu Skin's demise were greatly exaggerated.  Although Nu Skin's stock price plummeted, the *People's Daily's* central allegations never resulted in any government sanction, fine, or action.  Following a roughly two-month investigation that involved extensive interviews, document collections, and intense scrutiny of all aspects of Nu Skin China's business, the government did not find that Nu Skin was operating a pyramid scheme, that its compensation practices were unlawful, that it was paying multi-level commissions, that its employees' contacts with customers outside the stores constituted illegal direct selling, or that the overwhelming majority of the other allegations made against Nu Skin China had merit.  Instead, the government issued only a fine of approximately $540,000 against Nu Skin China, and that fine was based on two violations of Chinese regulations that have nothing to do with Plaintiffs' complaint here.[3]

---

[3]     Nu Skin was fined approximately $16,000 for the manner in which it described certain technical aspects related to the science behind its anti-aging products.  Nu Skin was also fined approximately $524,000 based on sales by some of its licensed Direct Sellers of certain Nu Skin products that were licensed for sale in Nu Skin's retail stores, but not licensed for sale by Direct Sellers.  Additionally, the Chinese government imposed approximately $260,000 in fines on six Nu Skin Sales Employees for certain unspecified inappropriate promotional activities.

But Plaintiffs paid the government's actual findings no heed.  Instead, the Amended Complaint continues to tout in vitriolic terms the exact facts that the Chinese government itself has implicitly rejected.  This is not surprising.  Lead Plaintiff State-Boston Retirement System ("State-Boston") is a government pension plan located in Boston, Massachusetts that has commenced approximately twenty securities fraud and other class actions in state and federal courts over the past decade, most alleging causes of action similar to those asserted here.  And, in most of those cases, State-Boston has been represented by Labaton Sucharow LLP, its law firm here.  Ex. D (list of actions drawn from publicly available databases).  This serial plaintiff, whose claims have been rejected as inadequate on their face by multiple courts in nearly a half dozen cases,[4] was apparently undeterred by the Chinese government's own conclusions and thus brings this action, regardless of its lack of merit.

The Aftermath of the *People's Daily* Allegations

Despite the absence of significant government sanctions, Nu Skin's business in China has suffered during 2014.  Once the *People's Daily* made its allegations and the Chinese government began its investigation, thousands of Nu Skin's Sales Employees in China left the Company.  In addition, to show the Chinese government it was a responsible corporate citizen, Nu Skin voluntarily put a temporary hold on hiring new Sales Employees and Direct Sellers, and also temporarily stopped conducting promotional meetings.  As a result, Sales Employees and Direct Sellers who left the Company were not immediately replaced, and Nu Skin's financial

---

[4]     All but three of the eighteen cases set out in Exhibit D hereto were either dismissed on the merits, have a motion to dismiss pending or forthcoming, or were settled or voluntarily dismissed prior to a motion to dismiss.  *See id.*  In one of the three exceptions, State-Boston lost a motion for judgment as a matter of law following trial, and its counsel here was sanctioned for conduct relating to the firm's use of confidential witnesses (*see infra* § II.D n.31).

performance in China suffered accordingly.  While Nu Skin believes its business in China has stabilized, it will take time to dissipate the harm to its business resulting from the actions taken in response to the *People's Daily* allegations.

\*          \*          \*          \*          \*          \*

In sum, Nu Skin has warned its investors for years about the risk and uncertainty inherent in the Chinese regulatory landscape.  When that risk appeared likely to materialize, its stock price declined.  The stock price then recovered significantly when the Chinese authorities did not find that Nu Skin's business model or compensation system violated Chinese law.  The Amended Complaint, however, turns a blind eye to this sequence of events.  Instead, Plaintiffs ask this Court to interpret China's laws and find violations of those laws where China's own regulators did not.  The Court should decline this invitation and dismiss the Amended Complaint with prejudice.

**STATEMENT OF FACTS[5]**

## I.     Nu Skin's Business and Compensation Model In China Differs From Its Global Model

As set forth above, and as Nu Skin has long disclosed, its business and compensation models in China differ significantly from its global model.  The models differ in two principal respects.

---

[5]     Except where otherwise noted, Defendants refer to allegations set out in the Amended Complaint (the "Am. Compl.").

**A.      Nature of Nu Skin's Relationship With Its Sales Personnel**

1.      In most markets, Nu Skin sells its products exclusively through independent distributors who purchase inventory from Nu Skin and sell the product to their customers.  These distributors operate entirely through direct selling.  Ex. A (2011 10-K) at 1.

2.      By contrast, in China, Nu Skin operates under a hybrid model under which it utilizes both Sales Employees[6] and Direct Sellers.  Ex. B (2012 10-K) at 8.[7]  Nu Skin has explained to its investors that its Sales Employees in China do not engage in direct selling:

> [W]e currently are unable to operate under our global direct selling business model in China as a result of regulatory restrictions on direct selling activities in this market.  Consequently, *we have developed a hybrid business model that utilizes retail stores with an employed sales force and contractual sales promoters to sell products through fixed locations, which we supplement with a direct sales opportunity in those locations where we have obtained a direct sales license*.

Ex. A (2011 10-K) at 10 (emphasis added).  In other words, Nu Skin China has made clear that its model is a hybrid one incorporating aspects of direct sales and retail sales.

---

[6]      In addition to its part-time and full-time Sales Employees, Nu Skin also utilizes the services of "contractual sales promoters" and "independent marketers" in China.  All of these individuals are compensated in a similar manner (and a manner different from Nu Skin's Direct Sellers).  Therefore, for purposes of this motion, Defendants will refer to full-time employees, part-time employees, independent marketers, and contractual sales promoters as "Sales Employees," unless otherwise noted.

[7]      As Nu Skin has repeatedly disclosed, it "currently ha[s] very few direct sellers in Mainland China," *see, e.g.*, Ex. C (2013 10-K) at 8, and the Company therefore operates "mostly" through the Sales Employees described above.  Am. Compl. ¶ 200.  For example, the Company disclosed in is 2012 annual report that it had 12,707 Sales Employees, working out of roughly 40 retail stores.  *See* Am. Compl. ¶ 56; Ex. B (2012 10-K) at 8, 17.  Similarly, in 2013, the Company reported it had 11,320 Sales Employees in Mainland China.  Ex. C (2013 10-K) at 17.

3.      While Nu Skin China's Sales Employees cannot sell outside of its retail locations,[8] the Company explains that they can (and are expected to) solicit potential customers outside of retail stores in order to drive traffic to those stores:

> We rely on our sales force to market and sell products at the various retail locations supported by only minimal advertising and traditional promotional efforts.  Our sales force may also refer individuals to join our sales force as sales employees, contractual sales promoters or direct sellers. Our retail model in China is largely based upon our ability to attract customers to our retail stores through our sales force, to educate them about our products through frequent training meetings, and to obtain repeat purchases.

*Id.*

4.      Nu Skin's relatively few Direct Sellers in China are not Sales Employees. Instead, as noted above, their role is similar to that of Nu Skin's independent distributors in other parts of the world; they purchase inventory from Nu Skin and then resell these products directly to their customers.  Ex. C (2013 10-K) at 8.  Moreover, Nu Skin's Direct Sellers are not required to conduct their sale transactions through Nu Skin's retail stores, but instead may consummate sales of Nu Skin's products anywhere in their authorized direct selling territory.  *See id.*

**B.      Compensation of Nu Skin Sales Personnel**

5.      Under Nu Skin's global model, its independent distributors are only paid commissions, not salaries.  As discussed above, these distributors earn commissions both on the sales that they personally make and on the sales of any distributors that they introduce to Nu Skin and bring into their sales organizations.  There is no discretion applied in determining the level of compensation, as the level of compensation is fixed by specific formula and terms.  Ex.

---

[8]      *See, e.g.*, Ex. A (2011 10-K) at 10.

B (2012 10-K) at 11.

6.       In China, however, neither Nu Skin's Direct Sellers nor its Sales

Employees receive commissions on sales made by others.  Instead, Nu Skin pays commissions in

China to both its Direct Sellers and its Sales Employees based only on their personal sales.  Ex.

B (2012 10-K) at 8.  Nu Skin's Direct Sellers in China receive only commissions, and those

commissions are capped at 30% of their sales volume.  Am. Compl. ¶¶ 73, 150.  Nu Skin Sales

Employees in China receive commissions on their personal sales and also receive salaries.  Ex. C

(2013 10-K) at 8.

7.       The salaries of Nu Skin Sales Employees in China are paid monthly, but

are set on a quarterly basis at the discretion of the Company, based on its evaluation of their

performance.  These salaries vary from quarter to quarter and are based on a number of different

objective and subjective performance factors, including sales productivity, leadership, training,

and compliance with the law and Company policy.  *See, e.g.*, Am. Compl. ¶ 144.  As Nu Skin

has repeatedly disclosed, one of the various factors relating to training and leadership that

impacts a Nu Skin employee's salary in China is the performance of the team that the employee

leads and supervises.  *See, e.g.*, *id.*  In other words, an employee's salary can increase or decrease

based in part on the sales performance of the sales organization that he or she develops and

supervises.  This element of Sales Employee compensation (which is not a commission) has been

disclosed to investors dozens of times over the past several years and is a common factor used by

other sales organizations in reviewing performance and setting compensation.  For example, Nu

Skin has stated:

    a.       "our current method of compensating our employed sales representatives and
             contractual sales promoters [in China] includ[es] our use of the sales productivity

-17-

of an individual and the group of individuals whom he or she trains and supervises as one of the factors in establishing salary and compensation." Ex. E (2009 Q1 10-Q) at 23.

b.     in China we "use . . . the sales productivity of a sales leader and the sales promoters and employees he/she leads and supervises in setting his/her quarterly compensation level." Ex. A (2011 10-K) at 26.

c.     In 2012, Defendant Ritch Wood, Nu Skin's Chief Financial Officer, stated at an investor conference that Nu Skin China paid Sales Employees salaries that comprised 40% of the total aggregate sales compensation in China and were based in part on "the productivity of both the employee and his/her sales team." Am. Compl. ¶ 150.[9]

8.     Analysts also understood this portion of Nu Skin's compensation model in China and reported on it.  For example, on August 8, 2012, Canaccord issued an analyst report noting that "Nu Skin utilizes an employed work force in China for the vast majority of its sales reps with a salary that is reset quarterly, commission rates dependent upon individual sales volume, and organizational volume driving salary rates."  Am. Compl. ¶ 145.  Similarly, on August 20, 2012, Canaccord issued a second analyst report reiterating that Nu Skin China "maintains an employed sales force where salaries are paid for group success."  Id. ¶ 151.

9.     The "hybrid model" described above was developed in response to

---

[9]     *Accord* Ex. F (2009 Q2 10-Q) at 26; Ex. G (2009 Q3 10-Q) at 23; Ex. H (2009 10-K) at 29; Ex. I (2010 Q1 10-Q) at 23; Ex. J (2010 Q2 10-Q) at 23; Ex. K (2010 Q3 10-Q) at 22; Ex. L (2010 10-K) at 30; Ex. M (2011 Q1 10-Q) at 21; Ex. N (2011 Q2 10-Q) at 21; Ex. O (2011 Q3 10-Q) at 23; Ex. A (2011 10-K) at 26 ("If our business practices are found to be in violation of applicable regulations as they may be interpreted or enforced in the future, in particular our use of the sales productivity of a sales leader and the sales promoters and employees he/she leads and supervises in setting his/her quarterly compensation level, then we could be forced to change our business model and/or sanctioned, either of which could significantly harm our business."); Ex. P (2012 Q1 10-Q) at 22; Ex. Q (2012 Q2 10-Q) at 24; Ex. R (2012 Q3 10-Q) at 23; Ex. B (2012 10-K) at 21; Ex. S (2013 Q1 10-Q) at 21; Ex. T (2013 Q2 10-Q) at 21; Ex. U (2013 Q3 10-Q) at 23.

regulations on the direct selling industry that were promulgated in China in 2005.  *See, e.g.*, Am.

Compl. ¶ 64.  As explained by the Company:

> Because of restrictions on direct selling and multi-level commissions in
> Mainland China, we have implemented a business model for that market
> that is different from the business model we use in our other markets . . . .
> Our sales employees, contractual sales promoters, direct sellers and
> independent marketers in Mainland China do not participate in our global
> sales compensation plan, but are instead compensated according to a
> separate compensation model established for Mainland China.  Sales
> employees, contractual sales promoters, direct sellers and independent
> marketers all earn commissions on their product sales at established
> commission rates.  Sales employees also receive a salary, which is
> reviewed and adjusted on a quarterly basis.

Ex. C (2013 10-K) at 8.

### C.     Risk of Regulatory Action Based on Sales and Compensation Practices

10.     As noted above, Nu Skin has also long recognized and disclosed to the

public that China's anti-pyramid and direct selling regulations were vague and subject to

uncertainty, and that regulators at both the local and state level had broad discretion in

interpreting these laws.  For example, in 2009, the Company stated that "[t]he direct selling

regulations in China are restrictive and there continues to be some confusion and uncertainty as

to the meaning of the regulations and the specific types of restrictions and requirements imposed

under them," and that "[i]t is also difficult to predict how regulators will interpret and enforce

these regulations."  Ex. E (2009 Q1 10-Q) at 23.

11.     And Nu Skin warned that, in such a regulatory environment, its China

compensation model might invite regulatory scrutiny and enforcement actions.  For example, in

its Q1 2009 10-Q, issued two years before the class period began here, Nu Skin disclosed:

> In particular, our business would be harmed by any determination [by the
> government in China] that our current method of compensating our

> employed sales representatives and contractual sales promoters, including
> our use of the sales productivity of an individual and the group of
> individuals whom he or she trains and supervises as one of the factors in
> establishing salary and compensation, violates the restriction on multi-
> level compensation under the rules.

Ex. E (2009 Q1 10-Q) at 23.  Nu Skin included a substantially similar or identical disclosure in

every 10-Q and 10-K from that time to the present.  *See supra* n.9.

      12.    More generally, Nu Skin has also warned investors that, in light of the

unpredictable regulatory environment in China, there was substantial risk that the Company's

activities, including its fundamental business model, might be challenged by the government.

For example, its Q1 2009 10-Q stated that "[o]ur operations in China are subject to significant

regulatory scrutiny, and we have experienced challenges in the past, including interruption of

sales activities at certain stores and fines being paid in some cases."  Ex. E (2009 Q1 10-Q) at 23.

The disclosure went on to explain that, "[e]ven though we have now obtained a direct selling

license, government regulators continue to scrutinize our activities and the activities of our

employed sales representatives, contractual sales promoters and direct sellers to monitor our

compliance with applicable regulations as we integrate direct selling into our business model."

*Id.*

      13.    The 10-Q concluded:

> "Any determination that our operations or activities, or the activities of our
> employed sales representatives, contractual sales promoters or direct
> sellers, are not in compliance with applicable regulations, could result in
> the imposition of substantial fines, extended interruptions of business,
> termination of necessary licenses and permits, including our direct selling
> licenses, or restrictions on our ability to open new stores or obtain
> approvals for service centers or expand into new locations, all of which
> could harm our business . . . . The direct selling regulations in China are
> restrictive and there continues to be some confusion and uncertainty as to
> the meaning of the regulations and the specific types of restrictions and

requirements imposed under them.  It is also difficult to predict how regulators will interpret and enforce these regulations."

*Id.* Each 10-Q and 10-K since then has included substantially similar or identical cautionary language.[10]

14.     Nu Skin's disclosures have also noted that Nu Skin China had been the subject of investigations and regulatory scrutiny in the past, had paid fines on multiple instances in prior years, and could face "more significant sanctions," Ex. A (2011 10-K) at 26, including potentially being "forced to change our business model," *id.*, or "extended interruptions of business, termination of necessary licenses and permits, including our direct selling licenses, or restrictions on our ability to open new stores or obtain approvals for service centers or expand into new locations, all of which could harm our business."  Ex. I (2010 Q1 10-Q) at 23.

**II.     Publication of the Citron Report in August 2012**

15.     On August 7, 2012, and in a supplemental report published on August 16, 2012, well-known short-seller Citron Research published a report (the "Citron Report") that was substantially identical in material respects to the *People's Daily* articles and to the allegations set out in the Amended Complaint.  Plaintiffs do not dispute this fact and, indeed, refer to the Citron Report as a "partial corrective disclosure."  Am. Compl. ¶¶ 141-42, 149, 286(a).

16.     The Citron Report made the same allegations as those subsequently made in the *People's Daily* articles which lie at the crux of this litigation.  For example, Citron alleged

---

[10]     *Accord* Ex. F (2009 Q2 10-Q) at 26; Ex. G (2009 Q3 10-Q) at 23; Ex. H (2009 10-K) at 28-29; Ex. I (2010 Q1 10-Q) at 23; Ex. J (2010 Q2 10-Q) at 23; Ex. K (2010 Q3 10-Q) at 22; Ex. L (2010 10-K) at 29-30; Ex. M (2011 Q1 10-Q) at 21; Ex. N (2011 Q2 10-Q) at 21; Ex. O (2011 Q3 10-Q) at 23; Ex. A (2011 10-K) at 26; Ex. P (2012 Q1 10-Q) at 22; Ex. Q (2012 Q2 10-Q) at 24; Ex. R (2012 Q3 10-Q) at 23-24; Ex. B (2012 10-K) at 21; Ex. S (2013 Q1 10-Q) at 21; Ex. T (2013 Q2 10-Q) at 21; Ex. U (2013 Q3 10-Q) at 23.

that Nu Skin China had "support[ed] the creation of a multi-level pyramid compensation scheme," and "is in fact operating as an MLM" (Ex. V (August 7, 2012 report) at 3), and "is composed of many pyramids," featuring employees with as many as "2,000 full-time downlines" and providing that "every new distributor has 6 uplines who will help train the new distributors," with "every one of your uplines . . . mak[ing a] 5% commission from your sales." Ex. W (August 16, 2012 report) at 2. The Citron Report also cited undercover witnesses and documents purportedly demonstrating these pyramid selling and MLM activities. Ex. V (August 7, 2012 report) at 4-5. Citron additionally alleged, just as Plaintiffs do here, that Nu Skin China needed to use a sophisticated computer system in order to calculate compensation in China based on downline performance. *Id.* at 6.

17. Similarly, just like Plaintiffs here, Citron alleged violations of the PRC's direct selling laws, contending that Nu Skin China had "violate[d] laws regulating direct selling," Ex. V (August 7, 2012 Citron Report) at 3, and engaged in "a blatant violation of direct selling principles." *Id.* at 4; *see* Am. Compl. ¶¶ 141-42.

18. Finally, Citron made miscellaneous allegations that Nu Skin China had "promise[d] unlimited riches for . . . new recruit[s] to join the pyramid" (Ex. V (August 7, 2012 Citron Report) at 5), engaged in "[b]rainwashing and chanting slogans" (*id.* at 8), and "requir[ed] purchases in order to participate in sales commissions or salary" (*id.* at 3), as well as making claims regarding its ageLOC product based on "pseudo-scien[ce]" and falsely claiming endorsements from a major scientist. Ex. W (August 16, 2012 Citron Report) at 3, 5, 11-14, 17. Citron concluded by noting the likelihood of severe government sanctions due to this alleged misconduct. (Ex. V (August 7, 2012 Citron Report) at 10.)

19.     Following the issuance of the Citron Report, Nu Skin reiterated the fact that Nu Skin China relied on group productivity as one of the various factors it considers in establishing the salaries of its Sales Employees, Am. Compl. ¶ 144 (quoting August 7, 2012 8-K), and analysts then discussed whether Nu Skin China's practices violated the law.  For example, Andrew Left of Citron appeared on television and debated a Deutsche Bank analyst, with Left asserting, "'If you look at my diagrams on my website, you can see reps drawing out pyramids when recruiting,'" adding that "'they most definitely run an MLM in China,'" including "'get[ting] paid for recruiting sellers down the pyramid, which constitutes an MLM scheme.'"  *Id.* ¶ 147.

## III.     Publication of Substantially Identical Allegations by *People's Daily* in January 2014

20.     Approximately 18 months after publication of the Citron Report, the *People's Daily* made substantially identical allegations in two articles published on January 15 and 16, 2014.  The state-controlled newspaper reported that Nu Skin China was "suspected of" operating a pyramid scheme and providing multi-level compensation, Am. Compl., Ex. E at 12, and engaging in direct selling of products that were not licensed for direct selling.  *Id.* at 8; *see also id.*, Ex. F at 9.  More specifically, the *People's Daily* asserted: (i) Nu Skin China's "personnel is in pyramid or ladder-shaped structure" (Am. Compl., Ex. E at 12); (ii) "[a]ccording to national relevant laws, such bonus system and personnel composition are suspected of pyramid schemes" (*id.*); (iii) salespeople "may gain commissions at 5% of the sales of their 'subordinate'" (*id.*, Ex. F at 9); and (iv) Nu Skin China required new salespeople "to purchase Nu Skin products for 500" RMB as part of a pyramid scheme.  *Id.* at 10.

21. The paper also reported that Nu Skin salespersons promoted Nu Skin as a "get rich quick" scheme—join Nu Skin if "you want to earn 1 million yuan in half a year" (Am. Compl., Ex. E at 9)—and that the Company "was suspected of mind control, so called 'brainwashing.'" *Id.* at 12.

22. The Company's closing stock price on January 14, 2014 was $136.47. Following publication of the first *People's Daily* article on January 15, the Company's stock price fell 15.5% to $115.23. Am. Compl. ¶ 286(b), (e).

## IV.    The Response to the *People's Daily* Articles

23. On January 16, the Chinese government announced an investigation into the accusations made by the *People's Daily*. *Id.* ¶¶ 214-15. Following that announcement, Nu Skin's stock fell another 26.4%, to $84.80. *Id.* ¶ 286(c).

24. On January 21, 2014, Nu Skin filed an 8-K acknowledging instances in which some of its salespeople failed adequately to follow and enforce Nu Skin's policies and regulations (not Chinese laws or regulations) and announcing additional training of its employees. *Id.* ¶ 219. Nu Skin also stated it was voluntarily suspending business promotional meetings and its acceptance of new Direct Sellers and Sales Employees until the government's investigation was complete. *Id.* ¶¶ 219, 221. Nu Skin's announcement did not acknowledge Company wrongdoing—to the contrary, it emphasized Nu Skin China's intention to improve the education of its salespeople regarding how to accurately describe the Company's fully compliant China business model. *Id.* ¶ 219. Nu Skin's stock fell just 2.62% following the issuance of the 8-K. *Id.* ¶ 220.

25.     On March 24, 2014, Nu Skin announced the conclusion of all material investigations in China.  *Id.* ¶¶ 230-34.[11]  Similarly, the Chinese government announced the results of the investigation on its website.  *See id.* ¶¶ 230-33.[12]  The investigations resulted in a fine of about $540,000, based on findings that: (1) certain products licensed only for sale in the Company's retail locations had been sold by some of the Company's Direct Sellers, and (2) Nu Skin China lacked adequate scientific support for certain product claims.  *See, e.g.,* Am. Compl. ¶¶ 230, 287-89.   At the same time, six Beijing Sales Employees were fined $241,000, collectively, for improper promotional activities.  Am. Compl. ¶ 231.  Nu Skin also agreed to improve the education and supervision of its Direct Sellers and Sales Employees and to close certain promotional workshops being run by certain Sales Employees in Beijing.  Am. Compl. ¶ 232.

26.     The Chinese government investigation was most notable for what it did **_not_** conclude.  It did not find that Nu Skin was a pyramid scheme, engaged in unlawful MLM activities, violated the direct selling regulations because its Sales Employees engaged in promotional activities outside the stores, or needed to change its business or compensation model.  *Id.* ¶¶ 230-32.  Not surprisingly, the government's decision was greeted as "very good news," and Nu Skin's stock rebounded nearly 20% upon the announcement that the Chinese

---

[11]     The Amended Complaint vaguely alleges the existence of "***at least one investigation by Chinese authorities***" of Nu Skin as of June 2014, Am. Compl. ¶¶ 17, 234 (emphasis in original), but does not even suggest that this investigation is connected to Plaintiffs' allegations here in any way.

[12]     *Accord, e.g.,* Ex. X (http://www.nytimes.com/2014/03/25/business/china-fines-nu-skin-over-sales-tactics-and-product-claims.html?_r=0).

government's investigations were concluded in this manner.  *Id.* ¶ 289 (citing analyst report);

Ex. Y (http://buzz.money.cnn. com/2014/03/24/nu-skin-china-herbalife/).

## V.     Allegations in the Amended Complaint

27.     Notwithstanding the fact that the government did not adopt the *People's Daily's* fundamental allegations, which echoed the allegations made by Citron, the Amended Complaint largely repackages them here.  The Amended Complaint asserts that Nu Skin made false statements and omissions regarding its financial performance in China and its China business model and operations, Am. Compl. ¶¶ 83-210, because it failed to disclose that it was violating China's anti-pyramid and direct selling laws, in three principal ways.

28.     First, the Amended Complaint asserts that Nu Skin paid "***sales representatives*** [*i.e.*, Sales Employees] in Mainland China on the basis not only of their own sales but also of the sales productivity of the sales people [they] recruited."  *Id.* ¶ 65 (emphasis added).  The complaint cites various purported confidential witnesses and two alleged Company documents in support of this allegation.  *See id.* ¶¶ 65-78.

29.     Second and relatedly, Plaintiffs allege that Nu Skin China's ***Direct Sellers*** were compensated based in part on "sales productivity" of their sales team, even though there is an absolute bar on compensating Direct Sellers in China for anything other than their personal sales.  *Id.* ¶¶ 65-66.  Plaintiffs again rely on the same smattering of confidential witnesses and two documents to support this claim.  *See id.* ¶¶ 65-78.

30.     Third, Plaintiffs allege that, because Nu Skin China Sales Employees did not possess direct selling licenses, their practice of promoting and marketing Nu Skin products with potential customers outside of Nu Skin's retail stores violated Chinese direct selling

regulations, even though the products in question were actually purchased at Nu Skin's retail

stores.  *See, e.g.*, *id.* ¶ 78.

## PROCEDURAL HISTORY

On April 7, 2014, the plaintiffs filed a stipulated motion to consolidate the cases,

appoint a lead plaintiff, and appoint lead counsel.  On June 30, 2014, pursuant to a stipulated

briefing schedule—and months after the Chinese government issued its findings—Plaintiffs filed

the Amended Complaint.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a

securities fraud complaint must plead six elements: (1) a material false or misleading statement;

(2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on

the statement; (5) economic loss; and (6) a causal connection between the material

misrepresentation or omission and the loss, commonly referred to as "loss causation."  *See Dura*

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

In addition, the PSLRA requires plaintiffs to "specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1);

*Weinstein v. McClendon*, 2014 WL 3057190, --- F.3d ----, at *2 (10th Cir. July 8, 2014) (same).

A complaint must also "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *Weinstein*, 2014

WL 3057190, --- F.3d ----, at *3.

**ARGUMENT**

**I.     Plaintiffs Fail Adequately to Plead Falsity.**

   **A.     Plaintiffs Fail to Allege a False Statement or Omission of Material Fact.**

   The Amended Complaint should be dismissed first and foremost because

Plaintiffs have not alleged an actionable misstatement or omission.  To plead falsity, Plaintiffs

must allege both a false statement or omission of fact and that the statement or omission was

material.  *See, e.g., In re Gold Res. Corp. Sec. Litig., 957 F. Supp. 2d 1284, 1292 (D. Colo.

2013).*  But it is hornbook law that "[m]ateriality . . . depends on the information that already

exists in the market" and that, "unless the statement significantly altered the total mix of

information available, it will not be considered material.'"  *Slater v. A.G. Edwards & Sons, Inc.,

719 F.3d 1190, 1197 (10th Cir. 2013)* (quoting *Grossman v. Novell, Inc., 120 F.3d 1112, 1119

(10th Cir. 1997))*; *see Kapur v. USANA Health Scis., Inc., 2:07–CV–177, 2008 WL 2901705, at

*9 (D. Utah July 23, 2008).*

   The Amended Complaint alleges that (i) Nu Skin's quarterly and annual earnings

releases and related documents containing statements about Nu Skin's growth and financial

performance in China;[13] and (ii) certain Nu Skin statements about the nature of its business and

compensation model in China[14] were false and/or misleading, because Nu Skin failed to disclose

---

[13]     *See* Am. Compl. ¶¶ 83-90, 93-96, 98-100, 102-05, 107-08, 110-18, 120-28, 130-36, 139, 153, 155-60, 162-63, 165, 167-70, 174, 176-82, 185, 187-91, 193-94, 196-201, 203-04, 206, 208.

[14]     *See id.* ¶¶ 89, 99, 108, 118, 126, 128, 139, 144-45, 147, 150-51, 153, 159, 165, 169, 172, 200 (describing Nu Skin's hybrid model in China and explaining how its Sales Employees and Direct Sellers are compensated).

that it was violating various Chinese laws and regulations.[15]

Thus, Plaintiffs must allege **_facts_** demonstrating that Nu Skin violated Chinese law.  Plaintiffs cannot rely on mere boilerplate allegations that Nu Skin China was a "pyramid scheme" or engaged in illegal multi-level marketing, *see, e.g.*, Am. Compl. ¶¶ 5-9, 57-59, 64-65, 82, 92, 152, because such allegations lack the requisite particularity to be actionable under the law of this Circuit.  *See, e.g., Grossman*, 120 F.3d at 1124 ("Mere conclusory allegations of falsity are insufficient."); *Arena Land & Inv. Co., Inc. v. Petty*, 906 F. Supp. 1470, 1482 (D. Utah 1994), *aff'd*, 69 F.3d 547 (10th Cir. 1995) (rejecting "conclusory allegations" of fraudulent scheme).

Instead, the Court may examine only non-conclusory, factual allegations of alleged illegal behavior that have been pleaded with specificity.  Although the Amended Complaint is far from a model of clarity, it appears that Plaintiffs' factual allegations related to the alleged violations of Chinese law are as follows:

1.  Nu Skin violated Chinese law by compensating its Sales Employees in China not only for their personal sales, but also based on the sales of others within their individual sales organizations, *see, e.g.*, Am. Compl. ¶ 65;

2.  Nu Skin violated Chinese law by compensating its Direct Sellers in China based not only on their personal sales, but also on the sales of others, *see, e.g., id.*; and

---

[15]   The Amended Complaint also includes what appear to be Plaintiffs' general critiques of the direct selling and multi-level marketing industries.  *See* Am. Compl. ¶¶ 40-45.  These gratuitous remarks are not linked to any statement by any defendant and thus cannot give rise to an action for securities fraud.

3.     Nu Skin Sales Employees violated Chinese direct selling regulations because they solicited the purchase of Nu Skin products outside of Nu Skin retail stores without direct selling licenses.  *See, e.g.*, *id.* ¶ 78.

When examined in turn, none of these allegations is sufficient to plead falsity.

### 1.     Nu Skin's Compensation of Its Sales Employees Based on Group Productivity Has Long Been Publicly Disclosed and Was Not Found to Violate Chinese Law.

Plaintiffs' first substantive basis for claiming falsity is that Nu Skin China violated Chinese law with respect to the compensation of its Sales Employees, by creating "sales 'teams,'" Am. Compl. ¶ 10, paying "compensation based on group or team sales volume," *id.* ¶ 73, and employing a system in which "one's income depended upon the sales revenue generated by the representatives and others on his team."  *Id.* ¶ 69.  These allegations fail for two principal reasons.  First, as discussed above, Nu Skin has repeatedly disclosed the very practices that Plaintiffs accuse it of concealing.  Second, these facts are publicly known, and Chinese regulators have not found them to violate Chinese law.

Previous public disclosures render any subsequent statements regarding, or omissions of, that information immaterial as a matter of law.  *See, e.g.*, *Slater*, 719 F.3d at 1197; *Grossman*, 120 F.3d at 1119.  For example, in *Slater*, plaintiff alleged, *inter alia*, that a company had failed to disclose its exposure to the deterioration of mortgage-backed loans in a stock offering document.  *See* 719 F.3d at 1199-1200.  The Tenth Circuit rejected the argument, finding no material omission because the company's prior 10-Qs, issued prior to the stock offering, informed investors that defendant held billions of dollars of such assets.  *Id.* at 1200-01.  The court also made clear that the prior disclosures need not be identical to the alleged

omissions, but rather that "the only information that was needed . . . was that [defendant] actually had direct exposure to that market; more detailed information was not necessary or required." *Id.* at 1201.

Here, Nu Skin has disclosed for years that the salaries of its Sales Employees are based on various factors relating to their duties, including, among others, ***"the sales productivity of an individual and the group of individuals whom he or she trains and supervises."*** Statement of Facts ¶ 7 (emphasis added). As set forth in detail above, Nu Skin disclosed its use of group productivity in setting salaries for Sales Employees in China in every quarterly and annual report during the purported class period, in public statements rebutting the Citron Report, and in other statements to investors and analysts. *See id.* Defendant Wood also made a number of public statements regarding the matter. *Id.* Moreover, Nu Skin affirmatively disclosed the risk of future enforcement based specifically on this element of its compensation model in China. *Id.* ("our business would be harmed by any determination that our current method of compensating our employed sales representatives . . . including our use of the sales productivity of an individual and the group of individuals whom he or she trains and supervises . . . violates the restriction on multi-level compensation"). Because Plaintiffs cannot allege falsity where the allegedly omitted facts were disclosed, claims based on this omission theory should be dismissed. *See Slater*, 719 F.3d at 1197; *Kapur*, 2008 WL 2901705, at *9.[16]

---

[16]     To the extent that Plaintiffs contend Nu Skin China compensated Sales Employees not only based on group productivity, but through a direct 5% commission on downline sales, those allegations rest entirely on the conclusory, hearsay statements of a handful of confidential witnesses who never even allege that they themselves provided or received downline commissions. Because such allegations lack sufficient indicia of reliability, they are not actionable. *See infra* § II.D.

Furthermore, as set forth above, following a months-long investigation into numerous aspects of Nu Skin's business in China, including its compensation practices, the Chinese government issued detailed findings that included no finding of pyramid selling, the payment of multi-level commissions, or any other illegal compensation practices.  Statement of Facts ¶¶ 25-26.  Nu Skin cannot be held liable for failing to disclose the illegality of its compensation practices when those practices have been publicly disclosed by Nu Skin, were further brought to the attention of investors and Chinese regulators by short sellers, market analysts, and the *People's Daily*, were investigated, and were never found to be illegal.[17]

### 2.   Plaintiffs Allege No Specific Facts Showing the Use of Group Productivity in Setting Compensation of Direct Sellers.

Plaintiffs next contend that Nu Skin China compensated its Direct Sellers based on group productivity.  Nu Skin agrees that it cannot compensate its Direct Sellers in China in this manner.  However, Plaintiffs have not pled falsity for this allegation for the simple reason that Plaintiffs fail to allege any specific facts that support this claim, relying instead on boilerplate assertions.  *See, e.g.*, Am. Compl. ¶ 59 ("Notwithstanding China's rules against paying multi-level compensation, Defendants promised to not only allow multi-level compensation to its Executive Distributors hailing from outside of Mainland China but to all of the direct sellers recruited by those living in Mainland China.").

Plaintiffs' confidential witnesses do not support a claim that Nu Skin paid its Direct Sellers based on group productivity.  First, none of the confidential witnesses is alleged to

---

[17]    If Plaintiffs are suggesting that the existence of an investigation requires the court to ***infer*** illegal conduct, the subsequent termination of those investigations without findings supporting Plaintiffs' allegations "effectively negat[es]" any such inference.  *See, e.g., City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.*, 388 F. Supp. 2d 932, 941-42 (S.D. Ind. 2005).

have been a Direct Seller.  Second, none of Plaintiffs' confidential witnesses ever specifically

references Direct Seller compensation or claims that Direct Sellers are paid based on group

productivity.  Finally, none of the confidential witnesses claims to be in a position to know how

Direct Sellers (as opposed to its Sales Employees) were compensated in China.[18]

Similarly, the documents cited in the Amended Complaint do not support falsity.

The only document cited that addresses this issue clearly states that "Direct Sellers will not get

paid in any form on the sales volume of other Direct Sellers and Sales Employees."  *Id.* ¶ 73

(emphasis in original).  The other two documents referenced by Plaintiffs make no statement

about compensation to Direct Sellers by Nu Skin China.  *See id.*, Exs. C-D.[19]

### 3. Plaintiffs Fail to Allege That The Marketing Efforts of Sales Employees Conducted Outside of Fixed Retail Stores Constitute Unlicensed Direct Selling.

Finally, Plaintiffs assert that Nu Skin's public statements were false and

misleading because Nu Skin violated Chinese law by allowing its many thousands of Sales

Employees (who admittedly do not have direct selling licenses) to market Nu Skin's products to

customers outside of Nu Skin's fixed retail stores and then "take their customers to the retail

---

[18]    *See* Am. Compl. ¶¶ 60, 67-78 (citing two U.S. "Independent Distributors," a "Sales Manager" (*i.e.*, a Sales Employee), multiple "Sales Representatives," an "Analyst," a "Sales Support Representative," and a "Marketing Specialist," none of whom had any involvement in direct selling or overseeing the compensation of Direct Sellers, and none of whom discusses compensation of Direct Sellers).  As discussed below, statements from confidential witnesses who had no involvement in, or knowledge of, compensation of Direct Sellers in China are entitled to minimal weight, at best.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) (declining to credit witnesses who "were simply not positioned to know the information alleged").

[19]    Moreover, Plaintiffs are again asking this Court to do that which Chinese regulators have not: find that Nu Skin's compensation of its Direct Sellers violates China's anti-pyramid regulations.  *See* Statement of Facts ¶¶ 25-26.

stores to complete the sales transaction."  Am. Compl. ¶ 78.  But Nu Skin has never claimed that its China Sales Employees limit their marketing efforts to its retail stores.  To the contrary, Nu Skin has consistently disclosed that its Sales Employees in China sell products "through"—not "at"—"fixed locations."  *Id.* ¶ 64 (citing 2011 10-K); Statement of Facts ¶ 3.  Nu Skin has even touted the fact that marketing by its Sales Employees comprises a major part of its business strategy in China:

> We rely on our sales force to market and sell products at the various retail locations supported by only minimal advertising and traditional promotional efforts . . . . ***Our retail model in China is largely based upon our ability to attract customers to our retail stores through our sales force*** [and] to educate them about our products through frequent training meetings . . . .

Statement of Facts ¶ 3 (quoting Ex. A, 2011 10-K at 10) (emphasis added).  Given the fact that Nu Skin's business is based primarily on face-to-face interactions with customers, investors unquestionably understood that Sales Employees speak with customers in the field, attract them to retail stores, and complete transactions inside those stores.[20]  Moreover, the government did not find this practice to violate Chinese law during its recent in-depth investigation.[21]

---

[20]    Indeed, Plaintiffs' own allegations show that it would be absurd to suggest all of Nu Skin China's tens of thousands of Sales Employees operated solely within retail stores at all times.  As explained above, Nu Skin China had roughly 12,000 Sales Employees for just 40 stores, an average of three hundred employee for every store.  *See* Statement of Facts ¶ 2 n.7.  In combination with Nu Skin's disclosures that its Sales Employees interacted with customers in the field, but that sales transactions occurred in retail stores, these figures alone render Plaintiffs' suggestion that Nu Skin did not disclose that its Sales Employees in China promoted and marketed its products outside of its retail locations utterly implausible.

[21]    Finally, Plaintiffs appear to contend that Nu Skin's statements that it believed it was complying with applicable Chinese laws were false and misleading.  *See, e.g.*, Am. Compl. ¶ 99.  However, these statements were forward-looking expressions of ***belief*** about how China's government would interpret the applicable regulations, accompanied by meaningful cautionary language.  *See, e.g.*, *id.* ("Although management believes that the Company is in compliance . . . no assurance can be given that the Company's compliance with applicable statutes, laws, rules

**B.      The Amended Complaint Engages in Impermissible "Puzzle Pleading."**

Even if Plaintiffs had adequately pled a false statement or omission of material

fact, however, the Amended Complaint should still be dismissed for impermissible "puzzle

pleading."  Federal Rule of Civil Procedure 8(a) requires a complaint to contain "a short and

plain statement of the claim showing that the pleader is entitled to relief."  As courts in this

circuit have noted, "excerpt[ing] long passages including numerous statements" and then setting

forth a series of reasons why these statements are false, without sufficiently identifying the

aspects of the statements alleged to be false and/or misleading or the reasons that each such

statement is allegedly actionable, constitutes impermissible puzzle pleading.  *In re Level 3*

*Commc'ns, Inc. Sec. Litig.*, No. 09–cv–00200, 2010 WL 5129524, at \*9 (D. Colo. Dec. 10,

2010), *aff'd*, *In re Level 3 Commc'ns, Inc. Secs. Litig.*, 667 F.3d 1331 (10th Cir. 2012)).[22]

---

and regulations will not be challenged by foreign authorities . . . .").  These statements are
protected by the PSLRA safe harbor and cannot form the basis for liability.  *See* § 78u–
5(c)(1)(A)–(B).  Moreover, in light of the recently completed Chinese investigation, these
statements have not been shown to be materially false.

[22]      For example, in *Level 3 Commc'ns*, plaintiffs included a series of long block quotes—
with portions bolded and italicized for emphasis—followed by paragraphs setting forth multiple
reasons why the group of statements cited were allegedly false and/or misleading.  *See, e.g.*, Ex.
Z (No. 1:09–cv–00200, Dkt. No. 100 (Amended Complaint)) ¶¶ 54-70 (false statements
regarding company's integration of an acquisition); *id.* ¶¶ 71-77 (false statements relating to
progression of merger and expertise in relevant field).  While certain alleged bases for falsity
clearly corresponded to certain statements, the court nonetheless found that this "puzzle
pleading" was an improper means of pleading a claim, holding that this approach "leaves the
court to the task of teasing out which specific statements are at issue" overall.  *Level 3*, 2010 WL
5129524, at \*9.  Similarly, in *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857-58 (N.D.
Tex. 2005), a consolidated case involving the firm serving as Lead Counsel in this action (as well
as other plaintiffs and counsel), plaintiffs again excerpted a series of long block quotes, with
portions emphasized, and with each set of statements again followed by bullet points containing
a half dozen reasons for falsity.  *See, e.g.*, Ex. AA (Case No. 5:03-cv-289, Dkt. No. 30
(Complaint)) ¶¶ 77-86.  Even though it was apparent that plaintiffs in that case—as here—
contended that the statements were misleading because the company's performance was based

The Amended Complaint here presents a classic case of puzzle pleading.  Over roughly sixty pages, Plaintiffs list literally dozens of different statements and omissions that they then link to a laundry list of alleged reasons for falsity in only the vaguest of terms.[23]  Because Plaintiffs' approach leaves it to this Court, and Defendants, to speculate as to which of the various rationales for alleged falsity are applicable to which statements, Plaintiffs' amended claims should be dismissed as impermissible puzzle pleading.  *See, e.g.*, *Level 3*, 2010 WL 5129524, at *9, *12; *Alamosa*, 382 F. Supp. 2d at 857-58.

## II.     Plaintiffs Fail to Meet Their Heavy Burden of Pleading Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs' Amended Complaint also fails for the separate reason that they have failed to plead facts giving rise to a strong inference of scienter.  As this Court recently held:

> With regard to the element of scienter, the PSLRA requires that plaintiffs alleging securities fraud must "state with particularity facts giving rise to a ***strong inference*** that

---

on illegal conduct, the court dismissed, finding that, "[h]owever easy the puzzle, assembling puzzles is not the duty of the Court . . . . The Court will not waste its resources attempting to construe which statements are actionable and why each is actionable." *In re Alamosa*, 382 F. Supp. 2d at 857-58; *accord, e.g.*, *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at *5 (N.D. Ill. June 16, 2014) (dismissing puzzle pleading complaint "because it requires the Court and the defendant to piece together exactly which statements Plaintiffs are challenging and what allegations contradict those statements"); *Constr. Workers Pension Fund v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5-*6 (N.D. Ill. July 22, 2014) (dismissing complaint where "[m]any of the Consolidated Amended Complaint's paragraphs include block quotes, with liberal use of bold and italics, leaving Defendants and the Court to speculate which statements or parts of statements [plaintiff] alleges are inaccurate . . . . [A]fter quoting [the relevant statements] at length, [plaintiff] merely sets out . . . that these statements were false and misleading for a laundry list of reasons . . . .").

[23]    *See, e.g.*, Am. Compl. ¶ 92 ("The statements identified in ¶¶ 83-86, 88 . . . 89 regarding Nu Skin's business growth in Mainland China were false and materially misleading because the following facts were known by Defendants but concealed from the investing public . . . ."); *id.* ¶ 101 ("The statements identified in ¶¶ 93-96, 99 regarding Nu Skin's business in Mainland China were false and materially misleading for the reasons set forth in ¶ 92.").

the defendants acted with the required state of mind" . . . . A complaint will survive[] only if a reasonable person would deem the inference of scienter cogent and ***at least as compelling as any opposing inference one could draw from the facts alleged***.'" *Tellabs*, 551 U.S. at 324 . . . .

The requisite "scienter" for a § 10(b) claim is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319. Proof of recklessness is sufficient to establish a § 10(b) claim. In this context, a defendant acts recklessly when his or her conduct amounts to an extreme departure from the standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger. *City of Philadelphia v. Fleming Companies, Inc.* 264 F.3d 1245, 1260 (10th Cir. 2001). In the context of a claim based on non-disclosure of material facts, a plaintiff must show that the defendant 1) ***knew of the material fact***; and 2) ***knew that failure to reveal the fact likely would mislead investors***. *Id.* at 1261.

*In re Zagg Sec. Litig.*, 2:12-CV-852, 2014 WL 505152, at *5 (D. Utah Feb. 7, 2014) (emphasis added) (citations omitted) (Benson, J.). "The pleading rule for scienter is 'stringent,'" Kapur, 2008 WL 2901705, at *11 (citations omitted), and scienter allegations based merely on motive and opportunity—such as those on which Plaintiffs rely almost exclusively here—"are typically not sufficient in themselves to establish a strong inference of scienter." *See id.* (quoting Fleming, 264 F.3d at 1262).

Because the standard for pleading scienter is so high, conclusory and boilerplate scienter allegations cannot suffice. *See, e.g.*, Weinstein, 2014 WL 3057190, --- F.3d ----, at *3 (rejecting pleading with "little . . . to support the conclusory allegation that these allegedly misleading omissions and statements were motivated by the intent to defraud or by a reckless disregard"); *Anderson v. First Sec. Corp.*, 249 F. Supp. 2d 1256, 1266(D. Utah 2002) (dismissing where "Plaintiffs' scienter allegations [we]re conclusory and ha[d] no supporting facts that any corporate officer directed the decision . . . or knew anything about it").

Here, Plaintiffs seek to hold Defendants accountable for alleged violations of law that the Chinese government, following its investigation, failed to substantiate. Indeed, Plaintiffs never allege scienter based on purported management awareness of the *actual* conduct that the Chinese government found in violation of its regulations (*i.e.*, lack of adequate scientific support for certain product claims and direct sale of certain products only authorized for sale in retail stores). On this basis alone, the Amended Complaint fails.

Additionally, the nature of the allegations in question (*i.e.*, failure to disclose a violation of foreign law) strongly militates against a finding of scienter. For example, in *Board of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 870 (S.D.N.Y. 2011), plaintiffs alleged that defendant's disclosures were misleading because the company failed to disclose that its results were enhanced by its violation of Russia's anti-monopoly laws. Plaintiffs did not allege facts showing that the company's senior management knew its activities were illegal, *id.*, and defendant had disclosed in its public filings that the relevant anti-monopoly provisions were "'vague in certain parts and subject to varying interpretations.'" *See id.* at 876. The court held that plaintiff failed to plead scienter, given that "the far more compelling inference is that Defendants simply failed to anticipate [the relevant agency's] evolving interpretation of a facially vague statute of recent vintage with limited judicial and regulatory precedent or guidance." *Id.* at 882.[24] Here, where Nu Skin's public

---

[24]   *Accord, e.g.*, *In re Open Joint Co. "Vimpel-Communc'ns" Sec. Litig.*, No. 04 Civ. 9742, 2006 WL 647981, at *7-*8 (S.D.N.Y. Mar. 14, 2006) (rejecting scienter claim based on finding of tax evasion by Russian government, where "Russian tax laws present[ed] an uncertain terrain," and defendant had disclosed that "'Russia's federal and local tax laws and regulations are subject to frequent change, varying interpretations and inconsistent enforcement'" and that "'uncertainty related to Russian tax laws exposes [the Company] to significant fines and penalties and to enforcement measures'") (quotation marks and alterations in original).

disclosures similarly warned investors of the fluid and unpredictable regulatory environment, and where, unlike in *Mechel,* Nu Skin has not been found to have committed the violations Plaintiffs claim should have been disclosed, any inference of scienter is clearly outweighed by the far more likely inference that Nu Skin and its management did not believe the company to be operating in violation of Chinese anti-pyramid and multi-level compensation laws.

Moreover, the Amended Complaint lacks any specific facts suggesting that Nu Skin's management (including the individual defendants) was aware of or involved in any form of alleged misconduct.  Plaintiffs have failed to come forward with any documents or other communications with management regarding these issues, or with any other facts suggesting management knowledge of the alleged illegal activity.  Instead, Plaintiffs assert four bases for scienter: (1) the Company's China operations are a core aspect of its business; (2) stock sales made by individual defendants Hunt and Wood during the class period; (3) Hunt and Wood's overall compensation; and (4) statements and documents provided by confidential witnesses.  Each of these allegations is clearly inadequate under well-established case law in this Circuit.[25]

A.      The "Core Operations" Theory Does Not Support a Finding of Scienter.

Plaintiffs first allege that, "[g]iven the exponentially growing size of Nu Skin's Chinese market, its critical importance to the growth of Nu Skin's overall business, and its potential to become the Company's revenue life-blood, the illegal practices implemented by Defendants for deployment in China could not have occurred without the Individual Defendants'

---

[25]      Plaintiffs also cite meetings that Hunt and Wood participated in with senior Chinese government officials and their knowledge of applicable Chinese laws.  Am. Compl. ¶¶ 79-82. However, at most, these allegations show only that Hunt and Wood were aware of the existence of the relevant laws—not that they were aware of the alleged violation of those laws.

knowledge and approval."  Am. Compl. ¶ 248.  This request that the Court simply assume the existence of scienter fails as a matter of law.

First, courts routinely hold that the "core operations" theory provides minimal support for a finding of scienter.  *See, e.g.*, *Bricklayers of W. Penn. Pension Plan v. Hecla Min. Co.*, No. 2:12–cv–00042–BLW, 2013 WL 5423875, at *4 (D. Id. Sept. 26, 2013) (noting this theory "rarely succeeds" absent other evidence of scienter); *Percoco v. Deckers Outdoor Corp.*, Civ. No. 12–1001–SLR, 2013 WL 3584370, at *5 (D. Del. 2013) ("Only in rare instances can core operations alone allow inferences of scienter . . . .").  Indeed, it is only in the "'rare circumstance'" where "the nature of the relevant facts  . . . is 'of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter'" that courts find the theory at all persuasive.  *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1364, 1372-73 (D.N.M. 2012) (quoting *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008)).

For example, in *In re Gold Resource*, plaintiffs alleged that defendants made material misstatements about the company's growth and production in its Mexican operations.  *See*, 957 F. Supp. 2d at 1287-88, 1299-1300.  In that case, the company employed just seven U.S. employees and more than three hundred in Mexico.  *Id.* at 1287.  Plaintiffs proffered as evidence of scienter the fact that "the errors were related to core operations."  *Id.* at 1300.  The court rejected that argument, noting the mere fact that defendant was a "small-sized company" could not constitute independent evidence of scienter, particularly where "'the relevant personnel are separated by nearly 2,000 miles and international borders.'"  *Id.* at 1301.  The court concluded that plaintiffs could not just rely on the proportion of defendant's business located in the relevant area to presume scienter.  *Id.* at 1301-02; *accord, e.g.*, *Tyler v. Liz Claiborne, Inc.*,

814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (noting that "the operation in question [must] constitute nearly all of a company's business").

Here, the alleged legal violations occurred at one Nu Skin subsidiary located across the globe that comprised roughly 12% of Nu Skin's total revenue in 2012 and 32% in 2013.  *See* Ex. B (2012 10-K) at 7; Ex. C (2013 10-K) at 48.  Given that Nu Skin generated more than $2 billion in revenue in 2012 and over $3 billion in 2013, *see* Ex. B (2012 10-K) at 6; Ex. C (2013 10-K) at 1, with business units throughout the world that each generate hundreds of millions of dollars in revenue, Nu Skin China falls far short of comprising "nearly all of [Nu Skin's] business."  *Tyler*, 814 F. Supp. 2d at 343; *see* *In re Gold*, 957 F. Supp. 2d at 1300-01.

Moreover, even if China constituted an overwhelming percentage of Nu Skin's business during the class period (which it did not), the failure to predict how a regulator will interpret uncertain and complex foreign laws cannot support a finding of scienter under a core operations theory.  *See, e.g.,* *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014) (rejecting core operations theory where errors were "not especially obvious" and concerned complex accounting issue facing just one portion of one of defendant's funds).  *Mechel,* discussed *supra*, provides another analogous example.  In that case, the court held that, even if it considered the relevant business unit to be a core operation, that did not mean that plaintiff could plead scienter based on the mere fact that this business unit was ultimately found to be violating Russian anti-monopoly law.  Indeed, the *Mechel* court held that to interpret the core operations doctrine to imply scienter whenever any issue arose in a core business would impose "no cognizable limit" on the doctrine, which would "eviscerate the cogent and compelling inference of scienter required by *Tellabs*."  *Id.* at 873.

**B.      Defendants' Stock Sales Do Not Raise a Strong Inference of Scienter.**

The second basis for scienter proffered by Plaintiffs is that Hunt and Wood sold $40 million of stock, in trades alleged to be "suspiciously-timed and out of line with their prior trading practices," and that, "[w]hile a large percentage . . . were made pursuant to 10b5-1 plans," the circumstances were "sufficiently suspicious to overwhelm any inference that they were made in good faith."  Am. Compl. ¶¶ 249-50, 260.  None of these facts supports an inference of scienter.

**1.      Defendants' Trades Were Made Pursuant to Rule 10b5-1 Plans.**

First, it cannot be disputed here that 10 of the 11 trades relied on by Plaintiffs were made pursuant to Rule 10b5-1 plans.  Ex. BB (Form 4s summary).[26]  It is well established in this and other circuits that trades made pursuant to 10b-5 plans generally do not provide strong evidence of scienter.  *See, e.g.*, *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious."); *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, 09-CV-5641, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) ("Defendants' stock sales were made pursuant to a 10b–5 trading plan, adopted before the sale, which negates an inference of scienter").

For example, in *Level 3*, plaintiffs asserted as a basis for scienter that "certain defendants engaged in sales of their personal holdings of Level 3 stock and that these defendants had not traded any Level 3 shares in the prior two years."  667 F. 3d at 1346.  Despite this

---

[26]      The single non-10b5-1 plan sale during the class period was Hunt's sale of 50,000 shares (7% of his overall holdings during the class period) on February 13, 2013 at $42/share.  *See id.* As set forth in detail below, Nu Skin's stock price increased by approximately 350% following this sale and prior to the end of the purported class period.

marked change in trading habits, the Tenth Circuit rejected plaintiffs' contention, noting that "the sales were made pursuant to 'automatic transactions' set up prior to the class period to pay withholding taxes that became due" and that Defendants retained substantial holdings after the sales. *Id.*  The court concluded that "[t]hese considerations rebut any inference of scienter we might otherwise draw regarding these sales." *Id.* at 1346-47.[27]

Here, it is undisputed that all but one of the trades at issue were preapproved, and Plaintiffs proffer **no** facts calling into question the timing, mechanism, or structure of Defendants' Rule 10b5-1 trading patterns.  Plaintiffs' suggestion that automatic trades outside the control of the individual defendants, over a period of three years, were somehow inherently "suspicious" is simply inconsistent with the law of this circuit. *Level 3*, 667 F. 3d at 1346.

### 2.   Defendants' Sales Were Routine and Consistent With Historical Trading Patterns.

Even if these trades had not been preapproved, however, Plaintiffs' own allegations show that there is nothing suspicious about Defendants' sales during the class period. The trades occurred over an inordinately long period of time, were consistent with historical trading patterns, and largely occurred well before the stock peaked.

Courts have repeatedly noted that multi-year class periods such as the purported class period in this case, involving a small number of trades that are made in line with historical practices, do not support a finding of scienter. *See Yates*, 744 F.3d at 891 (noting that plaintiffs'

---

[27]    Similarly, in *Yates*, plaintiffs alleged defendants sold substantially more shares during the class period than the control period.  744 F.3d at 891.  In declining to find scienter on this basis, the court noted that "[t]he fact that [defendants] traded . . . under non-discretionary Rule 10b5–1 plans further weakens any inference of fraudulent purpose." *Id.*  Indeed, even though one defendant had created his plan after the start of the class period, allegations showing nothing more than prearranged trades still "mitigate[d] any inference of improper motive." *Id.*

"inordinately long [class] period of 44 months . . . makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company."); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (rejecting claim that even large stock sales made in "exceedingly long" 46-month period were suspicious); *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008) (sales of "large number of shares" not probative of scienter where period four years long, with trading consistent over time).

As Plaintiffs concede, Defendants collectively made fewer than a dozen trades during the three-year class period (four by Defendant Hunt and seven by Defendant Wood).  Am. Compl. ¶ 253.  Moreover, all of these trades were consistent with Defendants' trading history. Indeed, viewed as a percentage of Defendants' holdings, Hunt and Wood actually sold *fewer* shares during the class period than during the three-year control period proposed by Plaintiffs themselves.  *Id.* ¶ 251; *see* Ex. BB (Form 4s summary) (Hunt sold 57.70% of his shares owned during class period, compared to 63.82% of his shares during control period, while Wood sold 89.11% of his shares owned during class period, compared to 92.21% during control period). The consistency of Hunt's and Wood's trading patterns strongly undercuts any inference—let alone a strong inference—of scienter.  *See, e.g.*, *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Bioscis., Inc.*, No. 07CV1111, 2008 WL 2053733, at *7 (S.D. Cal. May 13, 2008) (rejecting scienter allegation where each individual defendant "sold less . . . stock during the class period than in" either of the preceding two years); *In re Travelzoo Inc. Sec. Litig.*, 11 Civ. 5531 GBD, 2013 WL 1287342, at *10 and n.9 (S.D.N.Y. Mar. 29, 2013) (sale of even 95% of holdings not suspicious, where defendant sold 50% of holdings before class period).

Finally, the sales in question occurred at times that were far from suspicious.  Nu

Skin's share price **more than tripled** during the class period.  However, all but one of the individual defendants' sales occurred at times when Nu Skin's share price was at the low end of its range during the class period, and far closer in price to the prevailing price during the control period than during the class period.  For example, Hunt's sales ranged from $40-$42 per share, with the last sale occurring in February 2013, before the stock price subsequently peaked at **$140** in early 2014.  Ex. BB (Form 4s summary); Ex. CC (stock price chart).  Similarly, except for one trade, Wood's sales topped out at $59.75, less than half of the stock's high, and, even after a lone trade by Wood at $125.39 in December 2013, he still retained nearly **37,000** shares, worth many millions of dollars.  *See id.*

The below chart summarizes Hunt and Wood's trades in comparison to the stock price movement before and during the class period:

| Date | Event | Shares Sold | Stock Price |
|---|---|---|---|
| November 10, 2009[28] | Wood Trade | 11,682 | **$26.50** |
| March 2, 2010 | Hunt Trade | 500 | **$28.45** |
| March 8, 2010 | Wood Trade | 43,125 | **$29.75** |
| March 8, 2010 | Hunt Trade | 104,500 | **$29.27** |
| April 14, 2010 | Hunt Trade | 250,000 | **$30.68** |
| April 22, 2010 | Wood Trade | 10,874 | **$32.75** |
| April 29, 2011 | Wood Trade | 81,250 | **$32.00** |
| May 3, 2011 | End of Control Period | N/A | **$32.96** |
| | | | |
| May 4, 2011 | Wood Trade/Beginning of Class Period | 81,250 | **$34.75** |
| May 31, 2011 | Wood Trade | 40,000 | **$38.75** |
| July 15, 2011 | Hunt Trade | 40,278 | **$40.00** |
| July 18, 2011 | Hunt Trade | 29,400 | **$40.12** |
| July 19, 2011 | Hunt Trade | 280,322 | **$40.24** |
| Nov. 7, 2011 | Wood Trade | 67,500 | **$50.77** |
| Feb. 28, 2012 | Wood Trade | 22,500 | **$54.75** |
| March 1, 2012 | Wood Trade | 22,500 | **$57.52** |
| March 13, 2012 | Wood Trade | 17,500 | **$59.75** |
| Feb. 13, 2013 | Hunt Trade | 50,000 | **$42.00** |
| Dec. 2, 2013 | Wood Trade | 105,000 | **$125.39** |
| Jan. 13, 2014 | Stock Price Peak During Class Period (Intra-Day) | **N/A** | **$140.50** |

Defendants also attach hereto as Exhibit CC a graph similarly depicting the fact that the vast majority of the trades at issue occurred near the start of the class period, and at a time when the stock price was much closer to the control period than it was to its ultimate peak in early 2014.

It defies credulity to suggest that Hunt and Wood traded on insider knowledge when they sold shares over several years, largely prior to the subsequent dramatic increase in share price, and in a manner not significantly different from their trading history.  *See, e.g.*, *In re FX Energy, Inc. Sec. Litig.*, 2:07-CV-874, 2009 WL 1812828, at *10 (D. Utah June 25, 2009)

---

[28]     The Amended Complaint appears to list this trade twice.  Am. Compl. ¶ 253.

(rejecting scienter where "there [wa]s no allegation that the sales were . . . calculated to maximize the personal benefit from undisclosed inside information"); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 889 (D. Minn. 2007) (no scienter where defendant "sold long before the stock price peaked; and he sold his stock for less than half of the peak price"), *aff'd*, 527 F.3d 749 (8th Cir. 2008); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders sold "at share prices between $52 7/8 and $56 1/4," before the stock rose to $73).[29]

### C.   Defendants' Compensation is Irrelevant to the Scienter Determination.

Plaintiffs' third scienter allegation is that "[t]he Individual Defendants' compensation structure at Nu Skin emphasizes incentive-based payoffs," including a base salary, bonus, stock awards, options awards, cash awards, and other compensation, and that "[t]he Individual Defendants knew that disclosing the true nature of Nu Skin's MLM business in China would have led to serious regulatory problems, distributor attrition, lost sales and reduced stock prices immediately, thus impairing their incentive compensation component where they made most of their money."  Am. Compl. ¶¶ 268, 271.

Courts in this Circuit and across the country have repeatedly rejected the suggestion that management compensation can give rise to a strong inference of scienter, holding that these types of incentives are always present.  For example, in *Level 3*, plaintiff argued that incentive-based stock options supported a finding of scienter.  The Tenth Circuit rebuffed that contention, finding that "[t]his type of incentive-based compensation . . . is common among executives at publicly traded companies and does not ordinarily indicate scienter."  667 F.3d at

---

[29]     Plaintiffs also allege no suspicious trading by management or directors *other* than Hunt and Wood, further undercutting any suggestion of scienter.  *See Yates*, 744 F.3d at 890.

1346.  Similarly, in *City of Philadelphia*, plaintiffs attempted to show scienter by, *inter alia*,

alleging a motive "to 'protect and enhance their executive positions and the substantial

compensation and prestige they obtained thereby;' and . . . to enhance the value of their own . . .

stock." 264 F.3d at 1256.  The Tenth Circuit again declined to adopt that argument, finding that

"motives . . . that Defendants desired to protect their own positions with the company and the

value of their own . . . stock [] are also insufficient, as again they are motives shared by all

company executives." *Id.* at 1269.[30]

        Here, as in each of these cases, Plaintiffs allege nothing more than that Hunt and

Wood received substantial salaries, bonuses, and stock- and cash-based compensation during the

class period.  These facts fail to give rise to an inference of scienter as a matter of law.

    **D.**    **Plaintiffs' "Confidential Witnesses" and Purported Nu Skin Documents Do Not Support Any Finding of Scienter.**

        Finally, Plaintiffs' use of confidential witness statements and two purported (but

not authenticated) Company documents fail to give rise an inference of scienter, both because the

sources are unreliable and because the information in them is irrelevant to Plaintiffs' allegations.

        At the outset, it is important to note that courts in this Circuit are generally

suspicious of confidential witnesses.  For example, in *FX Energy*, plaintiffs alleged that

optimistic predictions made by an energy company concerning two of its drilling projects were

---

[30]    Numerous courts are in accord.  *See, e.g., Grossman v. Novell,* 909 F. Supp. 845, 851 (D. Utah 1995) ("[Plaintiff's] argument that the individual defendants wanted to keep their jobs and maintain their stature in the community is legally insufficient to establish motive to commit fraud.  Those desires are nearly universal in our society."); *Wolfe v. Aspenbio Pharma, Inc.,* No. 11–cv–00165, 2012 WL 4040344, at *9 n.20 (D. Colo. Sept. 13, 2012) ("The allegedly 'very high' salaries of the other individual defendants are not sufficient to support the required inference of scienter."); *In re Dell,* 591 F. Supp. 2d at 897-98 (salary, short-term bonuses, and long-term bonuses merited little weight in scienter analysis and were not "surprising or suspicious").

false, because defendants omitted evidence that the data was unreliable and other information contradicting these optimistic assessments.  2009 WL 1812828, at *1-*4.  One of plaintiffs' bases for pleading scienter was a confidential witness, "who allegedly informed Defendants that [the wells in question] were bad prospects."  Id. at *10.  Judge Waddoups first noted that this witness might "'have axes to grind' . . . be 'lying[,]' or maybe '[doesn't] even exist.'"  Id. at 10 (quoting Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007)).  The court then explained that it was "reasonable to apply a steep 'discount' to Plaintiffs' unnamed source," particularly where "the complaint d[id] not make clear to whom the witness spoke, when the conversations occurred, or what was said in response to the witness."  Id. [31]

Courts in this and other Circuits give scant weight to confidential witness statements where (i) the complaint fails to demonstrate the personal knowledge of those witnesses; (ii) the statements are conclusory or rely on hearsay or speculation; and/or (iii) the statements were not demonstrably made to Company management.  For example, in Kapur, defendant, a multi-level marketing company, was accused of operating a pyramid scheme.  2008 WL 2901705, at *1-*2.  Plaintiffs relied on confidential witnesses who made statements about the company's product quality and its sales and recruiting tactics.  Id. at *2-*3.  The complaint described each witness by title and role, including a "senior-level finance manager" who claimed

---

[31]     These concerns about confidential witnesses' reliability are more than hypothetical.  See In re BankAtl. Bancorp, Inc. Sec. Litig., 851 F. Supp. 2d 1299, 1313-14 (S.D. Fla. 2011), aff'd sub nom. Hubbard v. BankAtl. Bancorp, Inc., 503 F. App'x 677 (11th Cir. 2012)  (sanctioning lead counsel in this case under Rule 11 for failing to make a reasonable inquiry into one specific confidential witness statement that the court ultimately determined lacked sufficient evidentiary support, which "a reasonable inquiry by counsel would have revealed").  During discovery in that case, other confidential witnesses relied on by the same firm also contradicted statements attributed to them in the pleadings.  See generally id. at 1310-12.

certain documents were regularly sent to and discussed with senior management.  *Id.* at *3.
Judge Kimball refused to rely on these confidential witnesses to show either falsity or scienter.
For example, the court refused to credit a confidential witness statement that he or she had ***heard***
from other employees that consumers were not happy with the products, finding that "sole
reliance on a conclusory statement, notably based on hearsay, of a confidential witness is
insufficient to satisfy the PSLRA particularity requirement."  *Id.* at *16.  Further, even the
confidential witness statement indicating that management regularly received and discussed
certain reports fell short, absent evidence that these reports actually revealed the alleged pyramid
scheme.  *Id.* at *17.

Here, as in those decisions, the statements of Plaintiffs' confidential witnesses do
not meet the heightened pleading burden under the PSLRA.  First, all ten of Plaintiffs'
confidential witnesses are low-level employees, not members of management.  Plaintiffs do not
allege that any of the confidential witnesses ever spoke with or provided documents to
management, or had any personal knowledge whatsoever of corporate policy or practice within
Nu Skin China.  Am. Compl. ¶¶ 67-78.  For this reason alone, even crediting everything these
witnesses said as true, their statements have no probative value in showing ***management's*** state
of mind and are therefore irrelevant to the Court's scienter inquiry.  *See, e.g.*, *In re Cisco Sys.
Inc. Sec. Litig.*, No. C 11–1568 SBA, 2013 WL 1402788, at *11 (N.D. Cal. Mar. 29, 2013)
("Plaintiffs rely on confidential witness statements to show . . . that Defendants were aware that
Cisco was facing a litany of issues . . . . Yet, there are no facts alleging that any of the
confidential witnesses had direct contact with either [defendant CEO or CFO] . . . .
Consequently, the statements of the confidential witnesses are insufficient to establish a strong

inference of scienter."); *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10–06352, 2013 WL 174119, *18 (C.D. Cal. Jan. 16, 2013) (rejecting confidential witness statements where plaintiffs did "not link the [alleged conduct] to those higher up in the company"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims, however, is that they do not allege with specificity that any of the confidential witnesses relied upon in the Complaint presented information to the individual defendants.").[32]

The confidential witness allegations also rely entirely on conclusory or hearsay assertions that fail to establish their own first-hand knowledge. For example, while several confidential witnesses allege that Nu Skin China sales personnel received commissions based on the sales of others, no confidential witness actually alleges that he or she ever paid or received such a commission. *See* Am. Compl. ¶¶ 67-71. Moreover, most of these statements come from low-level employees who worked for Nu Skin for very brief time periods (*i.e.*, four months to a year), with no facts showing any of these witnesses had personal knowledge of broader policies or practices across Nu Skin China. The allegations therefore lack sufficient indicia of reliability, a separate and independent reason that they do not support a finding of scienter. *See, e.g.*, *Kapur*, 2008 WL 2901705, at *16 ("sole reliance on a conclusory statement, notably based on hearsay, of a confidential witness is insufficient to satisfy the PSLRA particularity requirement"); *Zucco*, 552 F. 3d at 996 (rejecting statements from witnesses who were "simply

---

[32]     *Accord, e.g.*, *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1201 (D. Nev. 2011) (statements by confidential witnesses who were not alleged to have had contact with management did not raise strong inference of scienter); *Local 295/Local 851 IBT Employer Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 721 (S.D. Ohio 2010) (finding that confidential witness statement fails to establish scienter where "there are no facts alleged from which it can be inferred that the confidential witness had sufficient contact with any of the Defendants to impute their knowledge of misconduct to the Defendants").

not positioned to know the information alleged," "report[ed] only unreliable hearsay," or "allege[d] conclusory assertions of scienter").[33]

Finally, the two documents upon which Plaintiffs rely lack any: (i) authenticating information; (ii) indicia that they were ever shared with Nu Skin management; (iii) indicia that they are official Nu Skin documents or reflect Company policy; (iv) author or recipient information; or (v) specific allegations regarding what they are or how they were used, other than the naked assertion that they were "shared with potential recruits in China in early 2013." Am. Compl. ¶¶ 72 and n.22. Such vague and unauthenticated documents cannot support a finding of scienter. *See, e.g.*, *Leventhal v. Tow*, 48 F. Supp. 2d 104, 113 (D. Conn. 1999) (rejecting reliance on internal memoranda that, *inter alia*, failed to establish any authors and recipients).

In sum, Plaintiffs' confidential witness and documentary "evidence" of scienter is unreliable and unconnected to Nu Skin management in Provo, Utah—halfway around the world from China. This evidence does not support a strong inference of scienter.

## III. The Amended Complaint Fails Adequately to Allege Loss Causation.

Finally, the Amended Complaint fails to plead facts demonstrating loss causation—*i.e.*, that the alleged misrepresentations or omissions caused the alleged loss. *Dura,*

---

[33] Other aspects of the statements are similarly deficient. *See* Am. Compl. ¶ 60 ("Independent Distributor" in San Francisco "is personally aware of the fact that a few of his fellow independent distributors did expand their downlines into China," but fails to explain basis for awareness, which is likely hearsay); *id.* ¶ 67 (bald statement that "Nu Skin's compensation was similar to a pyramid," with no explanation of its basis); *id.* ¶ 67 n.19 (assertion by salesperson that no one he knew had direct selling licenses, with no explanation of who those individuals were and no claim that any of them were held out as Direct Sellers rather than Sales Employees); *id.* ¶¶ 68-71 (general statements about Nu Skin China's compensation system, with no facts showing personal knowledge); *id.* ¶ 75 (confidential witness stating that fellow employees "let him know that there were downlines being set up in China" with no additional details); *id.* ¶¶ 76-77 (conclusory or hearsay statements about creation of downlines in China).

544 U.S. at 342.  In pleading loss causation, Plaintiffs must allege a specific "causal connection

between the material misrepresentation and the loss."  *Id.*  Plaintiffs must do more than simply

allege that the stock price was previously inflated as a result of a misrepresentation, because the

securities laws are not meant to "provide investors with broad insurance against market losses."

*Id.* at 345.

        Here, Plaintiffs point to three disclosures occurring between January 15-21, 2014

as the bases for loss causation: (1) the *People's Daily* articles on January 15-16, Am. Compl.

¶ 286(b)-(c); (2) the announcement of Chinese government investigations of Nu Skin on January

16," *id.* ¶ 286(c); and (3) Nu Skin's January 21 8-K filing.  *Id.* ¶ 286(d).  Each of these

allegations fails under well-established law.

### A.    The *People's Daily* Articles Cannot Constitute Corrective Disclosures for Two Independently Sufficient Reasons.

#### 1.    Repackaging Publicly Available Information Does Not Establish Loss Causation.

        It is well-settled that publicly known information that has been repackaged in a

negative media or short-seller report cannot constitute an actionable corrective disclosure.  For

example, in *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), influential investor David Einhorn

made a negative presentation about a company, leading to a stock drop of "20% on unusually

high volume."  *Id.* at 1193.  The court rejected the notion that this presentation constituted a

corrective disclosure and dismissed the case for lack of loss causation.  *Id.* at 1200.  The Court

explained that a restatement of publicly known facts could not constitute loss causation:

> [The] material portions of the Einhorn Presentation were gleaned entirely
> from public filings and other publicly available information . . . . Because
> a corrective disclosure obviously must disclose *new* information, the fact
> that the sources used in the Einhorn Presentation were already public is

fatal . . . . [T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure . . . . [T]he decline in the value of [the company's] shares in the wake of the Einhorn Presentation was not due to the fact that the presentation was revelatory of any fraud, but was instead due to changed investor expectations after an investor who wielded great clout in the industry voiced a negative opinion about the Company.

*Id.* at 1198-00 (emphasis in original); *accord, e.g.*, *Hunter*, 477 F.3d at 186-87 (lawsuit by

former CEO could not support loss causation claim where "complaint disclose[d] nothing new,"

and decline likely occurred because allegations were repackaged by influential figure).

Here, Nu Skin's stock price fell in January 2014 because an influential

newspaper, which Plaintiffs describe as the "mouthpiece for the PRC," made the allegations, not

because the articles contained new, previously undisclosed information.  Indeed, as shown

below, the *People's Daily* articles merely repeat the 2012 Citron Report in all relevant respects

(Statement of Facts ¶¶ 16-21):

| **Substantive Allegation** | **Citron Allegations** | ***People's Daily* Allegations** |
|---|---|---|
| Operation of a Pyramid Scheme | "What Nu Skin Actually Does: Pyramid Selling"; Nu Skin China "support[ed] the creation of a multi-level pyramid compensation scheme." | Nu Skin China's "personnel is in pyramid or ladder-shaped structure . . . . According to national relevant laws, [Nu Skin China's] bonus system and personnel composition are suspected of pyramid schemes." |
| MLM Activities | Nu Skin China "is in fact operating as an MLM," and "every new distributor has 6 uplines who help train the new distributors," with "every one of your uplines . . . mak[ing a] 5% commission from your sales." | "'Superiors' may gain commissions at 5% of the sales of their 'subordinate'; the main source of the senior direct distributor's income is the commissions on his 'subordinate's' sales." |

| Product Buy-In | Nu Skin China "requir[ed] purchases in order to participate in sales commissions or salary." | Nu Skin China required new recruits "to purchase Nu Skin products of 500 Yuan" in order to become a salesperson. |
|---|---|---|
| False Product Claims | Nu Skin China made claims regarding its ageLOC product based on "pseudo-scien[ce]" and falsely claimed endorsements from a major scientist. | Nu Skin China made claims about its ageLOC product that were "totally made up" and falsely claiming endorsements from two major scientists. |
| Unrealistic Promises of Wealth to New Recruits | Nu Skin China "promise[d] unlimited riches for . . . new recruit[s] to join the pyramid." | Nu Skin China asked a reporter if "you want to earn one million Yuan in half a year." |
| "Brainwashing" | Nu Skin China "engaged in "[b]rainwashing and chanting slogans." | Nu Skin China implement[ed] "mind control, so called 'brainwashing.'" |

As demonstrated above, the *People's Daily*'s simple repackaging of facts or allegations already disclosed by Citron (or facts disclosed by Nu Skin itself) cannot be a corrective disclosure.  *See Meyer*, 710 F.3d at 1198-00; *Hunter*, 477 F.3d at 186-87.  Plaintiffs therefore cannot plead loss causation based on Paragraph 286(b) of the Amended Complaint.

### 2.   Media Allegations That a Risk of Fraudulent Conduct Exists Do Not Constitute a Corrective Disclosure.

Plaintiffs' claim also fails because media reports suggesting a company may be engaging in misconduct are not corrective disclosures.  For example, in *Bach v. Amedisys, Inc.,* 10–395–BAJ–CN, 2012 WL 6947008 (W.D. La. Mar. 15, 2013), the court held that neither a Citron Research report nor a *Wall Street Journal* article, each of which suggested that the defendant had manipulated data in order to inflate Medicare billings, could constitute a corrective disclosure.  *Id.* at *4, *9-*10.  The court found the Citron Research report contained "no new disclosure of fraud or improper behavior . . . but only an opinion that the possibility of

fraud exists and the issue should be investigated further." _Id._ at *9.  The court then concluded

that, "[t]o allow a securities fraud action to proceed on the basis of media speculation of fraud,

such as is alleged to have been presented by the Citron[] report[,] would require the Court to

expand securities law to insure investors against media allegations of possible risks." _Id._ at *10.

The court similarly held that the _Wall Street Journal_ article, which also included certain

additional allegations, could not constitute a corrective disclosure.  _Id._

          Other courts have similarly found that even a growing chorus of media and

analyst reports speculating about misconduct does not constitute a corrective disclosure.  _See,_

_e.g._, _In re Maxim Integrated Products, Inc. Sec. Litig._, 639 F. Supp. 2d 1038, 1045-46 (N.D. Cal.

2009) (finding articles regarding possible backdating insufficient and noting that "plaintiff must

identify disclosures revealing more than a '"risk" or "potential" for widespread fraudulent

conduct'") (quoting _Metzler Inv. GMBH v. Corinthian Colleges, Inc._,  540 F.3d 1049, 1063–64

(9th Cir. 2008)); _Janbay v. Canadian Solar, Inc._, 10 CIV. 4430, 2012 WL 1080306, at *16

(S.D.N.Y. Mar. 30, 2012)  ("[T]he raising of questions and speculation by analysts and

commentators does not reveal any 'truth' about an alleged fraud . . . .").

          Here, the _People's Daily_ articles did not reveal **_facts_** proving widespread

misconduct at Nu Skin China, but rather **_suspected_** misconduct based on scattered witness

statements and documents.  Am. Compl., Ex. E at 12 ("According to national relevant laws, such

bonus system and personnel composition are **_suspected_** of pyramid schemes."); _id._, Ex. F at 9

("The reporter discovers in the investigation that some parts of Nu Skin's business model and

hierarchical structure are **_suspected_** of violation of national laws."); _id._ at 10 (Nu Skin China

"**_suspected_** of 'brainwashing'") (all emphasis added).  And the investigation prompted by those

articles failed to substantiate those suspicions in all relevant respects.  Because these speculative

allegations thus identify nothing more than a "risk" that the Chinese government would find

widespread illegality, these allegations cannot support the loss causation claimed in Paragraph

286(b) of the Amended Complaint.  *Bach*, 2012 WL 6947008, at *9-*10.

### B.   Announcement of a Government Investigation Cannot Constitute a Corrective Disclosure.

Plaintiffs similarly cannot rely on the January 16 announcement of Chinese

government investigations to establish loss causation.  Well-established case law holds that

disclosure of a government inquiry cannot be a corrective disclosure.  *See, e.g., Durham v.

Whitney Info. Network, Inc.*, 06-CV-00687, 2009 WL 3783375, at *20-*21 (M.D. Fla. Nov. 10,

2009) (announcement of SEC investigation not a corrective disclosure); *In re Almost Family,

Inc. Sec. Litig.*, No. 3:10-cv-00520, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012)

("Numerous federal district courts have held that a disclosure of an investigation, absent an

actual revelation of fraud, is not a corrective disclosure.").  While "stock prices may fall upon the

announcement of an SEC investigation . . . that is because the investigation can be seen to

portend an added risk of future corrective action," not because "the investigations, in and of

themselves, reveal to the market that a company's previous statements were false or fraudulent."

*Meyer*, 710 F.3d at 1201.  Accordingly, Plaintiffs cannot rely on the January 16 announcement of

Chinese government investigations as a basis for pleading loss causation.

### C.   Nu Skin China's 8-K Was Not a Corrective Disclosure Because It Did Not Reveal Any Violation of Chinese Law.

Finally, Plaintiffs cannot rely on Nu Skin's January 21 8-K as evidence of loss

causation, because, contrary to Plaintiffs' claim, that disclosure does ___**not**___ admit that Nu Skin

violated China's regulations on direct selling.  *See* Am. Compl. ¶ 219.[34]  Instead, Nu Skin's 8-K

merely stated, "during our recent rapid growth, there were instances where some of our sales

people failed to adequately follow and enforce ***our policies and regulations***."  *See id.* (emphasis

added).  Because Plaintiffs' claims here depend on a finding that Nu Skin violated Chinese law,

not the Company's policies and regulations, the 8-K was not a corrective disclosure and cannot

establish loss causation.  Moreover, Nu Skin's stock price fell just 2.6% following issuance of

the 8-K, Am. Compl. ¶ 220, further undercutting any notion of loss causation based on that

release.

* * *

In sum, loss causation requires a corrective disclosure.  Here, where Nu Skin has

not admitted to violating either China's anti-pyramid or its multi-level commission laws, and

where the Chinese government has investigated Nu Skin and has found no such violations, there

can be no such disclosure.  Plaintiffs' attempt to rely on media speculation, the announcement of

an investigation, and the Company's statements about compliance with its own policies (not

compliance with law) cannot substitute for an actual corrective disclosure.  Accordingly, the

Amended Complaint should be dismissed for failure to allege loss causation.

## IV.    Plaintiffs' Control Person Claim Falls With Their Substantive § 10(b) Claim.

For the reasons set out above, Plaintiffs' claim under § 10(b) of the Securities Act

fails as a matter of law.  "Because plaintiff[s'] complaint does not allege a primary violation of

---

[34]    As set out above, while Nu Skin's 8-K announced voluntary measures such as
temporarily suspending sales meetings in response to the investigation, those measures were not
based on any finding or acknowledgement of wrongdoing by the Company and may not be used
to infer illegal conduct.

the securities laws, [their] Section 20(a) claim also fails." *Level 3*, 667 F.3d at 1347.

## CONCLUSION

For the reasons set forth above, Defendants respectfully submit that the Amended

Complaint should be dismissed with prejudice.

Dated this 29th day of August, 2014.

**PARR BROWN GEE & LOVELESS**

/s/ Roberts S. Clark
Robert S. Clark
Daniel E. Barnett

**SIMPSON THACHER & BARTLETT LLP**

James G. Kreissman (*pro hac vice*)
Alexis Coll-Very (*pro hac vice*)

*Attorneys for Defendants Nu Skin
Enterprises, Inc., M. Truman Hunt, and
Ritch N. Wood*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be filed via the Court's CM/ECF system, which

caused the foregoing to be served on all counsel of record by electronic mail.


/s/ Daniel E. Barnett