Jonathan Gardner (*pro hac vice*)
Mark S. Goldman (*pro hac vice*)
Christine M. Fox (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mgoldman@labaton.com
cfox@labaton.com

*Counsel for Lead Plaintiff State-Boston Retirement System
and the Proposed Class*

Heidi G. Goebel, 10343
CHRISTENSEN & JENSEN, P.C.
15 W South Temple
Salt Lake City, UT 84101
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
heidi.goebel@chrisjen.com

*Local Counsel for Lead Plaintiff
and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE NU SKIN ENTERPRISES, INC., SECURITIES LITIGATION | Master File No. 2:14-cv-00033-DB <br><br> **LEAD PLAINTIFF'S OPPOSITION  TO DEFENDANTS' MOTION TO DISMISS** <br><br> Judge Hon. Dee Benson |
| This Document Relates To: ALL ACTIONS | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

I.    INTRODUCTION .......................................................................................................1

      A.    Statement of Facts ...........................................................................................4

            1.    Plaintiff's Allegations of  Nu Skin's MLM Practices in China ..............6

                  (a)    Confidential Witness Accounts and Internal Company Documents............9

                  (b)    Defendants' Frequent Trips to China.........................................11

            2.    Defendants' Circumvention of Chinese Laws and Regulations
                  During the Class Period Results in Exponential Growth in Nu
                  Skin's Sales in China ...............................................................12

            3.    Defendants' Massive Insider Trading and Substantially Increased
                  Compensation.........................................................................13

            4.    The Corrective Disclosures ........................................................13

                  (a)    August 7, 2012 Citron Report ...........................................13

                  (b)    *People's Daily* Articles ..................................................14

                  (c)    Announcement of Investigations by Chinese Government .........15

                  (d)    Nu Skin's January 21, 2014 Letter to its Customers ...............15

            5.    Post-Class Period Events............................................................17

II.   ARGUMENT ............................................................................................................18

      A.    The Standards Applicable to a Motion to Dismiss §10(b) Claims ................18

      B.    Plaintiff Has Plausibly Alleged That Defendants Made Materially False
            and Misleading Statements And Omissions.....................................................18

            1.    Statements and Omissions Alleged to Be False and Misleading ..........18

                  (a)    Confidential Witness Accounts and Internal Documents Support
                         the Falsity of Defendants' Statements and Omissions and
                         Corroborate the Pervasiveness of Downlines and the Payment of
                         Improper Multi-level Compensation in Mainland China.........................20

            2.    Defendants' Puzzle Pleading Argument Must be Rejected ..................22

3.  Nu Skin's Risk Disclosures Failed to Adequately Disclose that the Company Was Already Engaged in Practices that Violated the PRC's Prohibition on the Payment of Multi-Level Compensation.......................24

 (a)  Defendants Had a Duty To Disclose that the Company was Improperly Paying Multi-Level Compensation in the PRC .....................24

 (b)  Any "Truth on the Market" Defense Cannot Insulate Defendants' Statements and Omissions .........................................................26

 (c)  The PSLRA's Safe Harbor Does Not Apply .............................................27

4.  Defendants' Introduction of Facts Not Pled in the Complaint Must Be Rejected ...............................................................................28

C.  The Complaint Adequately Pleads Scienter....................................................29

1.  Courts Examine a Complaint's Scienter Allegations Holistically ........................29

 (a)  Nu Skin's Rapid Expansion of its MLM Business in Mainland China Supports an Inference of Scienter ...................................................31

 (b)  That Hunt and Wood Repeatedly Spoke to the Market about Nu Skin's Business and Growth in China Supports an Inference of Scienter ......................................................................................32

 (c)  Hunt and Wood's Knowledge of the Chinese Regulations (Which Pre-Dated the Class Period) Supports an Inference of Scienter ...............34

 (d)  Hunt and Wood's Frequent Business Trips to China on Nu Skin's Behalf Supports an Inference of Scienter ...................................................35

 (e)  Nu Skin's Corporate Office in Utah Having Access to Sales by All Distributors, Sales Representatives and Direct Sellers in Mainland China Through a Linked Computer System Supports an Inference of Scienter ....................................................................................35

 (f)  Defendants' Affirmative Statements Discrediting the Citron Report Support an Inference of Scienter.............................................................36

 (g)  Confidential Witness Accounts and Internal Company Documents Support an Inference of Scienter.............................................................37

 (h)  The Allegations of Core Operations Support an Inference of Scienter ....................................................................................38

(i)     Allegations of Hunt and Wood's Motive, Including Massive Insider Trading and Substantially Increased Compensation During the Class Period, Support an Inference of Scienter ................................40

        (i)     The Individual Defendants' Class Period Insider Sales Were Inconsistent With Their Prior Trading ............................... 41

        (ii)    Trading Pursuant to 10b5-1 Trading Plans Does Not Negate the Inference of Scienter ...................................................... 41

        (iii)   The Substantial Increase in the Individual Defendants' Compensation During the Class Period Supports an Inference of Scienter ..................................................... 43

D.    The Complaint Adequately Alleges Loss Causation ....................................43

    1.    Defendants Ignore the Standards for Pleading Loss Causation in the Tenth Circuit ..................................................................43

       (a)    The Complaint Alleges a Series of Corrective Disclosures that Demonstrate How the Truth about Nu Skin Was Revealed ....................44

         (i)     August 7, 2012, Citron Report ...................................... 44

         (ii)    January 15-16, 2014 *People's Daily* Articles ............................. 45

         (iii)   January 16, 2014 Announcement of Government Investigations ........................................................... 49

         (iv)   January 21, 2014 Nu Skin Admissions in Form 8-K ................... 50

       (b)    Investors' Losses Were Caused by the Materialization of Risks Previously Concealed by Defendants .......................................51

E.    The Control Person Allegations are Adequately Pled ...................................52

III.  CONCLUSION ..............................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ................................................................18, 19, 43

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ................................................................................51

*Alizadeh v. Tellabs, Inc.*,
   No. 13-cv-537, 2014 WL 2726676 (N.D. Ill. June 16, 2014)................................23

*In re Almost Family, Inc. Sec. Litig.*,
   No. 10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)............................49

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................................................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................18

*Bach v. Amedisys, Inc.*,
   No. 10-cv-395, 2012 WL 6947008 (W.D. La. June 28, 2012),
   *rev'd, Pub. Emps.' Ret. Sys. of Miss. v. Amedisys Inc.*,
   No. 13-cv-30580, 2014 WL 4931411 (5th Cir. Oct. 2, 2014) ..............................48

*In re Bank of Am. Corp. Sec. Derivative & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010)...................................................................27

*In re BankAtl. Bancorp, Inc. Sec. Litig.*,
   851 F. Supp. 2d 1299 (S.D. Fla. 2011), *aff'd sub nom.*
   *Hubbard v. BankAtl. Bancorp, Inc.*, 503 F. App'x 677 (11th Cir. 2012) ..............22

*Better & YRC Investors Grp. v. YRC Worldwide Inc.*,
   No. 11-cv-2072, 2012 WL 4433500 (D. Kan. Sept. 25, 2012).......................37, 43

*In re Biogen Idec, Inc. Sec. Litig.*,
   No. 05-cv-10400, 2008 WL 4810045 (D. Mass. Oct. 25, 2008) ...........................42

*Bd. of Trustees of the City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel Oao*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011)...................................................................40

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)..............................................................................20, 37

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) ...................................................................42

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...................................................................25

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................23

*Corporate Stock Transfer, Inc. v. AE Biofuels, Inc.*,
  663 F. Supp. 2d 1056 (D. Colo. 2009).....................................................19

*In re Daou Sys. Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ...........................................................20, 37

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................51

*Durham v. Whitney Info. Network, Inc.*,
  No. 06-cv-00687, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) ...........49

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ...................................................................41

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. MDL-1446, 2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)...............46

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006) ........................................................43

*FindWhat Investor Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ..........................................................26-27

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).....................................................................27

*Gee v. Pacheco*,
  627 F.3d 1178 (10th Cir. 2010) ...............................................................18

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................49

*George v. China Auto. Sys., Inc.*,
  No. 11-cv-7533(KBF), 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ......42

*In re Gold Res. Corp. Sec. Litig.*,
  957 F. Supp. 2d 1284 (D. Colo. 2013)......................................................28

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ...............................................................25, 26

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .............................................................................38

*In re Intuitive Surgical Sec. Litig.*,
  No. 13-cv-01920, 2014 WL 4145447 (N.D. Cal. Aug. 21, 2014) ...........................23

*Janbay v. Canadian Solar, Inc.*,
  No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)...............................48

*Kapur v. USANA Health Scis., Inc.*,
  No. 07-cv-00177, 2008 WL 2901705 (D. Utah July 23, 2008) ..............................21

*Karacand v. Edwards*,
  53 F. Supp. 2d 1236 (D. Utah 1999).................................................................25

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  No. 09-cv-00200, 2010 WL 5129524 (D. Colo. Dec. 10, 2010),
  *aff'd*, 667 F.3d 1331 (10th Cir. 2012)...............................................................23

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ...................................................................23, 41

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .............................................................................38

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) .....................................................................................36

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ............................................................48

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...............................................................46, 47, 49

*Mishkin v. Zynex, Inc.*,
  No. 09-cv-00780, 2011 WL 1158715 (D. Colo. Mar. 30, 2011).......................20, 37

*Nakkhumpun v. Taylor*,
  No. 12-cv-01038, 2013 WL 5446081 (D. Colo. Sept. 30, 2013).......................44, 47

*Nakkhumpun v. Taylor*,
  No. 12-cv-01038, 2014 WL 321156 (D. Colo. Jan. 19, 2014) ..............................51

*In re Nature's Sunshine Prods. Sec. Litig.*,
  486 F. Supp. 2d 1301 (D. Utah 2007)..................................................................41

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................38

*Nova Leasing, LLC v. Sun River Energy, Inc.*,
    No. 11–cv–00689, 2012 WL 1110397 (D. Colo. Mar. 28, 2012)............................19

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ...............................................29, 30

*Prissert v. EMCORE Corp.*,
    894 F. Supp. 2d 1361 (D.N.M. 2012) ...........................................40

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys Inc.*,
    No. 13-cv-30580, 2014 WL 4931411 (5th Cir. Oct. 2, 2014) ...........................48, 49

*In re Questcor Sec. Litig.*,
    No. 12-cv-01623, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...........................42

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .................................................35, 36

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ..................................................27

*Scott v. ZST Digital Networks, Inc.*,
    No. 11-cv-03531, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ...........................47

*Scott v. ZST Digital Networks, Inc.*,
    896 F. Supp. 2d 877 (C.D. Cal. 2012) .........................................21, 37

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ................................................25

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) .......................................37, 52

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ..........................................45

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................38, 40

*Sutton v. Utah State Sch. For the Deaf & Blind*,
    173 F.3d 1226 (10th Cir. 1999) ................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................... *passim*

*In re Thoratec Corp. Sec. Litig.*,
   No. 04-cv-03168, 2006 WL 1305226 (N.D. Cal. May 11, 2006)............................................27

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   824 F. Supp. 2d 1214 (D.N.M. 2011) ......................................................................20, 21, 43

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................42

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)............................................................................................................27

*Weinstein v. McClendon*,
   757 F.3d 1110 (10th Cir. 2014) ...........................................................................................30

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ......................................................................................44, 51

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1242 (N.D. Okla. 2003).........................................................................23, 26

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003).............................................................................27

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ..............................................................................................40

*In re Zagg Sec. Litig.*,
   No. 12-cv-852, 2014 WL 505152 (D. Utah Feb. 7, 2014)...............................................19, 30

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8(a)(2)..............................................................................................................43

Fed. R. Civ. P. 12(b)(6)..........................................................................................................4, 18

Fed. R. Civ. P. 15 .....................................................................................................................52

Fed. R. Evid. 201 .....................................................................................................................29

**Statutes**

15 U.S.C. § 78u–4(b)(1) ...........................................................................................................19

15 U.S.C. § 78u–5(c)(1)(A) ................................................................................................. 27-28

15 U.S.C. § 78u–5(c)(1)(B) ...........................................................................................28

15 U.S.C. § 78u–5(i)(1) ................................................................................................28

17 C.F.R. § 240.10b5-1(c) ...........................................................................................42

## I.    INTRODUCTION

This is a federal securities class action brought by Lead Plaintiff State-Boston Retirement System ("Plaintiff" or "State-Boston"), a large sophisticated institutional investor, on behalf of a class of persons who purchased or otherwise acquired the securities of Nu Skin Enterprises, Inc. ("Nu Skin" or the "Company") between May 4, 2011 and January 17, 2014, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.[1]

Nu Skin sells personal skin care products and nutritional supplements all over the world. Sales are made almost exclusively on a person to person basis, not in stores.  The Company's growth can be attributed to the ability of current sales representatives to recruit new sales representatives (i.e., their "downlines"), and for these new sales representatives to recruit their own downline of newer sales representatives, and so on.  Sales representatives are compensated with commissions, not only for their own sales, but for sales made by downline sales representatives whom they recruited.  This is known in the industry as "multi-level marketing" (or "MLM") and "multi-level compensation," and collectively, this model is often called a "pyramid scheme" where the people at the top of the pyramid receive virtually all the benefits and the people at the bottom do not fare as well.

In almost all countries, some form of MLM is permitted.  One noteworthy exception is the People's Republic of China ("PRC" or "Mainland China").  Nu Skin began selling in Mainland China many years ago.  But the PRC's strict prohibition on MLM and direct selling

---

[1]    "Defendants" include Nu Skin, M. Truman Hunt ("Hunt") and Ritch N. Wood ("Wood"). Hunt and Wood are referred to herein as the "Individual Defendants."

(known well to Defendants) kept Nu Skin's operations from growing at a rate that Mainland China's increasingly large population might warrant.  That is, until 2011.

As detailed in the Consolidated Class Action Complaint ("Complaint"), over the course of two and one half years, Defendants pursued a massive expansion into Mainland China knowing that Nu Skin's form of multi-level compensation violated many of the PRC's regulations on direct selling and pyramid schemes.  During the Class Period, Defendants repeatedly and misleadingly misrepresented how Nu Skin was operating its business in Mainland China in order to create the appearance that the Company's double-digit growth in Mainland China was achieved in compliance with China's laws and regulations when Defendants knew (or at a minimum were reckless in not knowing) that Nu Skin was not in compliance.  Further, Defendants failed to disclose that Nu Skin's internal controls were intentionally (or at least recklessly) inadequate to supervise the training of new sales representatives and when faced with a report halfway through the Class Period essentially exposing Nu Skin's wrongdoing, Defendants steadfastly denied the report.  In reality, Nu Skin was operating the very same MLM system in Mainland China that it was operating around the world – a system specifically prohibited in Mainland China.  Confidential witnesses and internal documents used to train new employees confirm a Nu Skin business that was not complying with China's direct selling and anti-pyramid regulations and contradicted Defendants' representations.  In fact, Defendants were permitting the establishment of downlines in China in direct violation of Chinese law.

The level of detail alleged in the Complaint and the information obtained through confidential witnesses and internal Company documents adequately puts Defendants on notice of the substance of Lead Plaintiff's claims.  Indeed, Defendants had little difficulty in analyzing the Complaint, understanding the falsity and scienter arguments, and addressing those arguments in

their opposition papers.  Further, the Complaint explicitly connects the allegedly false statements and omissions about the Company's growth in China and its purported compliance with Chinese law to the factual allegations demonstrating their falsity and highlighting the true nature of the facts as known (but concealed) by Defendants.  When the Complaint is viewed holistically, as required by Supreme Court precedent, accepting its well pled facts and all inferences therefrom as true, Defendants' scienter has been adequately demonstrated.  The Complaint also demonstrates how Plaintiff's losses were caused by Defendants' misrepresentations, as Nu Skin's stock price declined upon revelation of what was really happening in Mainland China.

No doubt recognizing that Plaintiff adequately alleges violations of the federal securities laws, Defendants improperly reach well beyond the four corners of the Complaint in order to contradict its allegations with their own version of what they purportedly did and said.  As set forth in detail in Lead Plaintiff's accompanying Motion to Strike, Defendants improperly rely upon newspaper articles published after the Class Period to support their claim that Nu Skin has not (yet) been found to be operating a pyramid scheme.  Defendants also identify other companies doing business in China and claim that their compensation structures are similar to that of Nu Skin, apparently arguing that if Nu Skin is circumventing Chinese laws, it is not alone. Trying to turn a settlement with one agency in China into a quasi-governmental finding of lawful operations - which it is not - Defendants repeatedly suggest that Nu Skin has been exonerated by Chinese authorities of operating a pyramid scheme, ignoring the fact - as alleged in the Complaint - that investigations are still open and that there has been no formal acquittal.

Desperate to divert the Court's attention away from the robust allegations of the Complaint, Defendants even resort to attaching a chart misleadingly portraying Lead Plaintiff as a "serial plaintiff, whose claims have been rejected as inadequate on their face by multiple courts

in nearly a half dozen cases. . . "  Defs. Br. at 13.  In reality, State-Boston is exactly the type of institutional investor that the Private Securities Litigation Reform Act of 1995 ("PSLRA") was designed to encourage to become a Lead Plaintiff and who has had strong success in holding public companies responsible for causing investment losses.[2] By relying on these and other untested "facts" found nowhere in the Complaint, Defendants essentially concede that the Complaint adequately states a claim to relief that is cogent and compelling.

The Court's function on a Rule 12(b)(6) motion is not to make factual determinations or "weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (internal quotation and citation omitted).   For the reasons set forth below, Defendants' motion should be denied.

### A.      Statement of Facts

Nu Skin is a global multi-level marketing company that distributes personal skin care products and nutritional supplements directly to consumers in the Americas, Europe, and the

---

[2]      In fact, in five of the cases listed on Exhibit D to Defendants' Motion to Dismiss, in which the court addressed a motion to dismiss, plaintiffs' complaint was upheld at least in part (*NII, BP PLC, MF Global, Bank Atlantic, and Safenet*) and in five cases the court granted the motion to dismiss. Of the five motions to dismiss that were granted – two are currently on appeal (*Netflix* and *Stratte McClure*). A motion to dismiss is currently pending only in the *Barclays* and *Freeport* cases and a motion for summary judgment is being briefed in the *Dole/Murdock* case. Exhibit D also misleadingly captions the last column as "settled/voluntarily dismissed prior to MTD" and lists three cases under this heading. In reality, three cases on the list achieved settlements of between $12 million and $90 million (including *Fitzgerald, MF Global*, and *Safenet*) and the fourth case (*Wildrick*) was dismissed as moot only when the Defendant voluntarily provided the relief requested by State-Boston. In short, out of the 18 cases listed on Exhibit D – only three were lost on a motion to dismiss, while five survived a motion to dismiss and four were resolved favorably for the Class.

Asia Pacific region. ¶¶2, 40.[3] Nu Skin boasts that one of its competitive advantages is its global sales compensation plan under which "a distributor is paid consolidated monthly commissions in the distributor's home country, in local currency, for the distributor's own product sales and for product sales in that distributor's downline distributor network across all geographic markets." ¶43.

In order to continue to grow its sales, the Company must constantly increase the number of its "active" distributors. ¶44.  As one geographic market reaches saturation, the Company must expand to other countries in order to continue signing-up new distributors.  *Id.*  Further, as less successful distributors drop out, they must be replaced by new distributors in new markets. *Id.* If that does not happen, the whole scheme collapses.  *Id.*  As detailed below, the MLM structure utilized by Nu Skin in the rest of the world was not supposed to be employed in Mainland China, where strict rules and laws prohibiting the payment of multi-level compensation were in place.

Prior to the start of the Class Period, growth in Nu Skin's business in some of its larger, more developed markets including Japan and the United States was on the decline.  ¶54. Sales in Mainland China were growing at a slow rate as well. ¶55. To offset the slowdown in growth in Nu Skin's major, more developed markets, Defendants orchestrated a plan to substantially expand Nu Skin's presence in the PRC.  ¶¶4, 57.  The decision to focus the Company's resources on growing business in the PRC was made despite the known stringent regulations in China prohibiting the type of multi-level marketing and multi-level compensation employed by Nu Skin in all of its other markets and despite the limited success Nu Skin had achieved in penetrating the Chinese market to that point as a result of those stringent regulations.  ¶4.

---

[3]  All "¶__" references are to the Complaint. (ECF No. 51).

**1.     Plaintiff's Allegations of  Nu Skin's MLM Practices in China**

China's direct selling and anti-pyramid scheme regulations, enacted at the end of 2005, are extremely restrictive and contain various limitations, including but not limited to: a complete prohibition on multi-level marketing; restrictions on the ability to pay multi-level compensation; and restrictions on how compensation can be calculated for direct sellers.¶¶50, 62.[4] The nature of the legal system in China gives regulatory agencies at both the local and central levels of government the ability to enforce laws regulating direct marketing and prohibiting pyramid schemes.  ¶61.

Beginning in 2007, Nu Skin was permitted to sell its products in Mainland China through both its retail stores and, for those products and sales representatives which and who were properly licensed, through direct selling in the Shanghai and Beijing municipalities.  ¶51. However, there were stringent restrictions on direct selling.  ¶53.  Because of these stringent regulations and the enforcement of those regulations by Chinese authorities, from 2007-2010 Mainland China represented only a small perc

entage of Nu Skin's overall sales.  In fact, from 2008-2009, Nu Skin closed the majority of its retail stores in Mainland China and eliminated close to 1,000 retail sales positions.  *Id.*

In early 2011, faced with slowing growth in its established markets, Defendants embarked on a plan to substantially expand Nu Skin's presence in Mainland China, lured in large part by the size of its population and Nu Skin's lack of market penetration.  ¶55.  By the start of the Class Period, Nu Skin had obtained direct selling licenses in ten provinces and three

---

[4]        Contrary to what Defendants argue in their motion, Defs. Br. at 19, and claim in their SEC filings, China's anti-pyramid and direct selling regulations are quite straightforward. *See* translation of those laws and regulations attached as Exhs. A and B to the Complaint. (Dkt. No. 51). "Defs. Br." refers to Defendants' Motion to Dismiss and Supporting Memorandum. (Dkt. No. 53).

municipalities in Mainland China.  ¶56.  In addition, the Company operated approximately 40 retail stores in the Beijing and Shanghai areas.  *Id.*  However, Nu Skin's retail stores in China were not numerous enough nor did they have nearly the foot traffic the Company needed to substantially expand its business in a meaningful way.  *Id.*

Therefore, Defendants made the critical decision to not only attempt to obtain direct selling licenses in additional cities and provinces to ***create the appearance of a legitimate direct selling business***, but, more importantly, to jump start growth in Nu Skin's business in Mainland China in the only way Defendants knew how – to expand the number of people selling Nu Skin's products in China, luring them in with the Company's MLM strategy, notwithstanding strict Chinese regulations prohibiting it. ¶57.

To that end, Defendants authorized existing Executive Distributors inside and outside the PRC to sign-up a record number of sales representatives in Mainland China as part of their downlines.  ¶58.[5] Newly recruited Chinese citizens were encouraged to become sales representatives and distributors with the promise of reaping millions of yuan[6] in commissions by creating and expanding their own downlines among family and friends in Mainland China.  *Id.* Without the promise of earning commissions on downlines in Mainland China, Nu Skin would have been unable to entice the number of distributors and sales representatives it needed to penetrate the Chinese market and satisfy the demands of the Company's Executive Directors outside China.  *Id.*

---

[5]     In Nu Skin's structure, Executive Distributors are distributors who have achieved a certain level of sales. ¶42. Executive Distributors in the United States were permitted to receive commissions on sales by sales promoters and direct sellers located outside the United States if those sales people were in the Executive Distributor's downlines.¶43.

[6]     Renminbi or RMB is the official currency of the PRC and the "yuan" is the basic unit of the renminbi.

Defendants also actively encouraged Nu Skin's Executive Distributors in Taiwan, Hong Kong, and Southeast Asia to aggressively recruit new sales distributors and direct sellers in Mainland China.  ¶59.  Defendants promised to allow multi-level compensation for its Executive Distributors hailing from outside of Mainland China as well as to all of the sales representatives and direct sellers recruited by those living in Mainland China.  *Id.*

During the Class Period, Defendants repeatedly and misleadingly misrepresented how Nu Skin was operating its business in the PRC in order to create the appearance that the Company's growth in Mainland China was achieved in compliance with China's laws and regulations.  ¶7. For example, Defendants told investors that Nu Skin developed a "hybrid" system of marketing the Company's products in the PRC, creating "teams" that marketed Nu Skin products and shared in commissions and that this "hybrid" system, purportedly in conformity with Chinese law created a tremendous surge in sales.  *Id.*

In reality, Nu Skin was operating the very same MLM system in Mainland China that it was operating everywhere else.  ¶8.  Confidential witnesses and internal documents used to train new employees confirm that Nu Skin was not complying with China's direct selling and anti-pyramid selling regulations.  *Id.*  In fact, quite the opposite - Defendants were permitting the establishment of downlines in China in direct violation of China's rules prohibiting multi-level marketing.  *Id.*  Moreover, Defendants knowingly or recklessly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in compliance with Chinese law.  The training that did exist was lax and inconsistent and scarcely enforced – another violation of China's regulations on direct selling.  *Id.*

(a)     **Confidential Witness Accounts and Internal Company Documents**

Confidential witnesses confirm that during the Class Period, direct sellers, sales representatives, and distributors throughout Mainland China were promised and paid commissions based not only on their own sales but on sales of their downline sales representatives whom they recruited.  ¶¶60, 66-78.  Confidential witnesses also confirm that the Company flouted other provisions of China's direct selling regulations.  *Id.*

For example, the Complaint alleges the following based on information obtained from confidential witnesses:[7]

- CW1, an Independent Distributor at Nu Skin from September 2011 until December 2013 - based in San Francisco - confirmed that during the Class Period, he wanted to expand his downline into China and sat for a multiple-choice examination given by Nu Skin so that he could sponsor distributors in China.  CW1 ultimately decided against expanding his downline into China but is personally aware of the fact that Nu Skin allowed such expansion and that a few of his fellow independent distributors did expand their downlines into China.  CW1 stated that distributors who had downlines in China had a special distributor ID number which indicated that the distributor was allowed to sponsor people in China.  ¶60.

- CW2, a Nu Skin Sales Manager in Beijing from April 2013 until November 2013 confirmed that Nu Skin's compensation was similar to a pyramid, and everyone was expected to develop his/her own downline.  ¶67.

- CW3, a Sales Representative in the Tianjin province from April 2013 until November 2013, confirmed that neither he nor any Nu Skin sales representatives he knew had a direct selling license.  *Id.* CW3 also did not attend sales training meetings although he attended some marketing meetings to learn about new Nu Skin products.  *Id.*

---

[7]     This is only a selection of each confidential witness account. For the full accounts, *see* ¶¶60, 66-78.

- CW4, a Sales Representative from the Guangzhou province from August 2012 through August 2013 corroborated that Nu Skin sales representatives in China had downlines and that CW4 was part of a downline.  ¶68.

- CW5, a Sales Representative in Nanjing from August 2011 to February 2012, corroborated the existence of downlines in China. CW5 stated "you can say it is like a pyramid scheme."  CW5 stated that a salesman's income depended upon the sales revenue generated by the representatives and others on his team.  CW5 confirmed there were 7 or 8 sales people under him and his income depended on his team's performance.  ¶69.

- CW6, an Analyst at Healthy Business Building Incentive, an outside consultant for Nu Skin in Shanghai from September 2013 to March 2014, confirmed that distributors in Mainland China received a cut of their downlines' revenues as long as the distributors and their downlines meet minimum sales requirements. ¶71.

- CW7, a representative from Sales Support at Nu Skin corporate in Utah also confirmed that Sales Support Reps handling Chinese accounts let him know that there were downlines being set up in China and that in 2012 Nu Skin "definitely had downlines" in China.  The call center set up the downlines for distributors in Mainland China so that people could be signed up as downlines in China the same way that they could be signed up as downlines in the U.S. and Japan.  ¶75.

- CW8, a former Marketing Specialist at Nu Skin from July 2012 to February 2014, who reported to Nu Skin's Vice President of Marketing and Vice President of Global Product Marketing, also confirmed that shortly after he began at Nu Skin in July 2012, the number of distributors based in China increased dramatically and that downlines were created for those distributors.  ¶76.

- CW9, a Nu Skin Independent Distributor from 2010 to the present, confirmed that all of the Chinese downlines reported into sales executives in the U.S. ¶77.  CW9 also reported that Nu Skin's corporate office in Utah can "see every sale that is going on by every distributor" in China because the computer systems were the same. *Id.*

- CW10, a Sales Representative in Shanghai from December 2013 through April 2014 confirmed that as part of Nu Skin's sales team hierarchy, sales representatives had to develop their own downlines in order to earn the title of Sales Representative.  ¶70.

10

Nu Skin sales materials shared with potential recruits in China in early 2013 detail Nu Skin's strategy to encourage its direct sellers and sales representatives in China to create at least six "generations" or layers of recruits underneath them to maximize their compensation.  ¶72.[8] In these documents, Nu Skin calls the downlines of its sales representatives - sales "teams" - and calls its multi-level compensation "team rewards" or "team awards" – but in reality, this was a thinly-veiled disguise for allowing multi-level marketing and multi-level compensation in direct violation of Chinese laws and regulations prohibiting MLM and pyramid schemes.  *Id.*  The Complaint alleges that Defendants knew their "team rewards" system and "payment by team" was in direct contravention of China's prohibition of MLM and pyramid schemes.  There are no special exceptions under Chinese law for the sharing of "team rewards" by sales teams.  *Id.*  The expected surge in sales in Mainland China did not surprise Defendants or anyone back at Nu Skin's headquarters.  Nu Skin was able to monitor sales by all distributors and direct sellers in Mainland China through a linked computer system.  ¶77.

### (b)  Defendants' Frequent Trips to China

Defendants Hunt and Wood participated in meetings with government regulatory representatives in China and understood well the direct selling and anti-pyramid selling regulations and the fact that multi-level compensation was not allowed in any province or city in Mainland China.  ¶79.  For example, on March 31, 2011, one month before the beginning of the Class Period, defendant Hunt met with Wang Chao, China's Vice-Minister of the Ministry of Commerce**.**  ¶80.  According to media reports, Wang cautioned Hunt about Nu Skin's "earnest performance of social responsibilities" and about the Chinese government's direct-selling

---

[8]      *See* "(1) System Analysis of NU SKIN," attached with a certified English translation to the Complaint at Exhibit D; *See also* "The Most Updated Rules for Nu Skin Bonus" (Complaint, Ex. C).

regulations and prohibitions on pyramid-selling.  *Id.*  At that meeting, Hunt and representatives

from Nu Skin China were informed of the rules on market access and industrial management.  *Id.*

Chao also warned Nu Skin that the PRC would thoroughly implement the Administrative

Regulations on Direct-Selling and the Regulations on Prohibiting Pyramid-Selling to ensure the

steady and orderly development of the direct-selling industry.  *Id.*

Moreover, Hunt and Wood frequently traveled to Mainland China for conventions and

sales meetings (detailed in the Complaint) and were acutely aware that their expansion plans for

Nu Skin in Mainland China were proceeding exactly as planned.  ¶81.

### 2.	Defendants' Circumvention of Chinese Laws and Regulations During the Class Period Results in Exponential Growth in Nu Skin's Sales in China

Throughout the Class Period, Defendants touted astounding growth in Mainland China

attributing it to enthusiasm for Nu Skin's anti-aging products and general business momentum

all the while failing to reveal how the exponential growth was really achieved – through

(i) MLM; (ii) the required purchase of products by newly recruited sales representatives; (iii)

vast networks of downlines; and (iv) poorly trained sales representatives who sold products not

authorized for direct sales in Mainland China. ¶¶9, 141.

By the end of 2013, revenues from Mainland China, which were a mere $91.4 million or

6% of Nu Skin's overall revenues in 2010, skyrocketed to over $1 billion in revenue or 32% of

the Company's overall revenue – a growth rate for Mainland China of 292% (year-over-year).

¶245.  During the Class Period, Defendants even boasted that Nu Skin's China business would

continue to grow to ultimately account for 50% or more of the Company's overall revenue.

¶¶206, 246.  In fact, Defendants projected Nu Skin's business in China would contribute at least

$5 billion per year going forward.  ¶¶206, 246.  Based on these stated growth levels, Nu Skin's

stock price nearly tripled from April 2013 to early January 2014.  *See* Defs.' Exh. CC.

### 3.    Defendants' Massive Insider Trading and Substantially Increased Compensation

As they were touting the Company's performance and prospects while withholding the real reasons for the tremendous growth in sales in Mainland China, the Individual Defendants unloaded huge amounts of Nu Skin stock for more than $40 million in proceeds.  ¶¶249-267. Moreover, as detailed below and in the Complaint, the Individual Defendants' stock sales were far out of line with their prior trading practices.  *Id.*  In addition, the Individual Defendants doubled their total compensation from the Company at a time when they knew that the Company's stock price was artificially inflated by the false statements they were making about the reasons for the Company's extraordinary growth in China.  ¶¶268-271.

### 4.    The Corrective Disclosures

#### (a)    August 7, 2012 Citron Report

On August 7, 2012, Citron Research, an online stock commentary website published an analyst report entitled, "The Two Faces of Nu Skin" ("Citron Report").  ¶141.  The Citron Report revealed new information about Nu Skin's operations in China and included seven transcripts of interviews conducted by undercover Citron researchers in Mainland China with Nu Skin retail store employees and/or sales promoters and independent distributors.  ¶¶141-142. Citron reported that Nu Skin's operations in China were based on illegal MLM or pyramid selling schemes which included the payment of multi-level compensation, as well as improperly requiring new distributors to make purchases of Nu Skin products in order to participate in sales commissions or salary.  ¶¶141-142.  The Citron Report warned that investors were exposed to the massive risk that Nu Skin China's operations would come to an abrupt halt as a result of Nu Skin's violation of the PRC's and Hong Kong's anti-pyramid sales laws.  ¶141, According to the report: "The consequences would be devastating.  What would the Company be worth without its

China operation?"  *Id.*  Upon release of the Citron Report, Nu Skin's stock declined $4.50 per

share, or more than 9%, to close at $44.36 per share on August 7, 2012.  ¶143.

Defendants responded to the Citron Report almost immediately, filing a Form 8-K

***completely denying all of Citron's claims*** and continuing to misrepresent the nature of Nu

Skin's business in the PRC.  ¶144.  The Form 8-K, signed by Wood, stated the following:

> ***We are confident that our China operations are in compliance
> with applicable regulations as interpreted and enforced by the
> government of China***.  Nu Skin has an eight-year history of doing
> business in China under these regulations, and the government has
> regularly reviewed our business activities.  In the past year the
> government has issued Nu Skin new direct selling licenses in
> several cities and municipalities.  (emphasis added).

*Id*. Defendants successfully convinced analysts and investors that the Citron Report was not

credible.  Based on these additional misrepresentations denying the disclosures in the Citron

Report, Nu Skin's stock rebounded while investors remained deceived.  ¶148.  For the next year

and a half, Defendants continued to tout the Company's growth in the PRC, which, they claimed,

was achieved while operating in compliance with Chinese law.

**(b)**     ***People's Daily* Articles**

Defendants' scheme fell apart on January 15, 2014, before the U.S. markets opened,

when *People's Daily*, a government-run Beijing-based newspaper, reported that Nu Skin was

operating an illegal pyramid scheme in China, selling unlicensed products via direct selling and

exaggerating the earnings opportunities for those who sold Nu Skin products.  ¶211.  Further, the

article stated that Nu Skin employed unlawful and immoral business practices in violation of

PRC law.  *Id*.[9]

---

[9]     As a result of this news, on January 15, 2014, the Company's stock lost 15.5% of its
value, declining $21.24 per share to close at $115.23 per share. ¶212.

The next day, on January 16, 2014, again before the U.S. markets opened, *People's Daily* published additional information concerning its investigative report of Nu Skin. ¶213. As part of its investigation, a *People's Daily* reporter recorded a portion of Nu Skin's 2014 Awards Ceremony held in Beijing on January 11, 2014 and recorded conversations with a few of the 20,000 Nu Skin sales representatives from China who attended the awards. These Nu Skin sales representatives informed the *People's Daily* reporter that Nu Skin's bonus system paid commissions from downline sales within six levels. ¶213. This is in direct contravention of Chinese regulations prohibiting pyramid schemes. *Id.*

### (c) Announcement of Investigations by Chinese Government

That same day, on January 16, 2014, two Chinese government agencies - China's State Administration of Industry and Commerce ("SAIC") and the Ministry of Commerce ("MOFCOM") announced they were independently conducting investigations of Nu Skin's business in Mainland China to verify the claims in the *People's Daily* articles. ¶¶214-215. In response, on January 16, 2014, the Company issued a press release and Report on Form 8-K disclosing that its business practices were under investigation by Chinese authorities. ¶216.[10]

### (d) Nu Skin's January 21, 2014 Letter to its Customers

On January 21, 2014, Nu Skin filed a Report on Form 8-K releasing a letter to its customers in China (in English and Mandarin) admitting to violations of Mainland China's regulations on direct selling. ¶219. The letter read, in part:

> As part of our initial review, we were disappointed to learn that during our recent rapid growth, there were instances where some

---

[10]     On this news, on January 16, 2014, the Company's stock declined an additional $30.43 per share, or 26.2%, to close at $84.80 per share. ¶217. Shares of Nu Skin fell further on January 17, 2014, to close at $79.47 per share that day, a decline of 6.2%.¶218. Nu Skin's stock currently trades at under $50 per share.

of our sales people failed to adequately follow and enforce our policies and regulations. We sincerely apologize for these unfortunate and unauthorized activities. We are undertaking an internal review of the practices of our employees and sales force, and fully intend to take corrective actions.

\* \* \*

We express our sincere apologies to the public for any impact that this has caused, and we hope that the public and the media will give us an opportunity to improve ourselves in order to reinforce our policies and procedures, enhance a sound supervision system, and enhance our commitment to excellent customer service.

¶219.[11]

Between January 15, 2014 and January 21, 2014, Nu Skin's stock price plummeted over

43%. ¶16. Because of the disclosure of wrongdoing and a severe lack of internal controls to

prevent such wrongdoing and the resulting investigations by multiple agencies of the Chinese

government, ultimately, Nu Skin:

(i)     was fined by one branch of the Chinese government for violations of the regulations on direct selling (¶17)[12];

---

[11]    On this news, shares of Nu Skin fell an additional 2.62% on January 21, 2014 to close at $77.39 per share. ¶220.

[12]    Based upon information and belief, at least one investigation by Chinese authorities regarding Nu Skin's business was ongoing as of June 2014. ¶¶17, 234. While offering a panoply of new "facts" in their motion to dismiss, Defendants do not offer up a single new fact to dispute this allegation. Defs. Br. at 25 n.11. Further, Nu Skin's Report on Form 10-Q for the quarter ended March 31, 2014 (filed on May 8, 2014 and referred to at ¶238) reported that the Chinese government continues to investigate the Company. In that report, the Company disclosed:

Our operations in Mainland China are subject to significant government scrutiny, and we could be subject to fines or other penalties. …..*The government in Mainland China recently announced that it would inspect the direct selling industry over the next several months, which has and will increase regulatory scrutiny of the industry and our business*. (emphasis added).

*(continued ... )*

(ii) was forced to retrain its sales representatives in China (*Id.*);

(iii) was required to shutter certain "working studios" improperly used by the Company's sales representatives in China to recruit new distributors and direct sellers (*Id.*);

(iv) suspended all business promotional meetings until at least May 1, 2014 (which the Company called a "voluntary" suspension taken in connection with multiple government investigations) and then when corporate-sponsored promotional meetings resumed they were only allowed to be conducted inside of Nu Skin's offices (¶221);

(v) suspended all recruitment of new sales representatives in Mainland China until May 1, 2014 (*Id.*); and

(vi) extended Nu Skin's product refund and return policies in China.  (*Id.*).[13]

### 5. Post-Class Period Events

In the wake of the *People's Daily* series of articles, other media sources in China have reported that Nu Skin direct sellers had been encouraged during the Class Period to establish downlines among family and friends in order to qualify for group bonus schemes in clear violation of the rules against MLM and pyramid selling.  ¶¶222-224.  Analysts who covered Nu Skin continue to significantly reduce their forecasts for the Company for 2014 and 2015.  ¶¶225-227.

On May 6, 2014, in connection with the release of the Company's first quarter 2014 financial results, the Company reported overall growth well below Wall Street estimates and

---

*( ... continued)*

*Id.*, at p. 25. Despite submitting every Nu Skin quarterly and annual report filed with the SEC during the Class Period (and at least seven SEC filings that predate the Class Period), Defendants do not submit as an exhibit Nu Skin's 10-Q for the quarter ended March 31, 2014 even though it is cited in the Complaint.

[13] Based on Nu Skin's Class Period actions, Plaintiff alleges that Nu Skin was forced to curtail its business in Mainland China post-Class Period which ultimately led to, among other things, decreased sales in China, a massive drop in Sales Leaders in China and ballooning inventory. ¶¶221-240.

reported that the number of Sales Leaders in Mainland China had decreased significantly during the first quarter of 2014, from approximately 49,000 as of December 31, 2013 to approximately 24,000 as of March 31, 2014.  ¶¶235-238.  In sum, as detailed in the Complaint, Defendants' conduct in China during the Class Period continues to negatively affect Nu Skin's revenues and growth rate.  Nu Skin's stock currently trades below $50 per share, down from a Class Period high of more than $138 per share.

## II.    ARGUMENT

### A.    The Standards Applicable to a Motion to Dismiss §10(b) Claims

When analyzing a complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations are taken as true and construed in the light most favorable to the non-moving party.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *See also Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

### B.    Plaintiff Has Plausibly Alleged That Defendants Made Materially False and Misleading Statements And Omissions

#### 1.    Statements and Omissions Alleged to Be False and Misleading

To state a valid Rule 10b–5 claim, a plaintiff must first plead that the defendant made an untrue or misleading statement of material fact or failed to state a material fact necessary to make a statement not misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099-1100 (10th Cir. 2003).  A plaintiff must "specify each statement alleged to have been misleading [and] the ...

reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1). *See Adams,* 340 F.3d at 1095; *In re Zagg Sec. Litig.*, No. 12-cv-852, 2014 WL 505152, at *4 (D. Utah Feb. 7, 2014). "A common-sense, case-by-case approach will edify any determination of whether the facts alleged are sufficient under this standard, requiring courts to determine whether, taken as a whole, the facts alleged support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Corporate Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d 1056, 1066 (D. Colo. 2009) (internal quotations and citation omitted); *Nova Leasing, LLC v. Sun River Energy, Inc.,* No. 11–cv–00689, 2012 WL 1110397, at *8 (D. Colo. Mar. 28, 2012).

Here, the Complaint identifies the specific false and misleading statements – which are prominently displayed by the use of underlining or a specific mention of the false portion of the statement (such as "SOX certification only").[14] The Complaint then explicitly connects the allegedly false (underlined) statements to the factual allegations demonstrating their falsity. Where appropriate, the Complaint groups the false statements together by fiscal quarter (with the only exception being certain investor conferences and the Citron Report) and highlights the true nature of the facts as known, but undisclosed, by Defendants.[15] Plaintiff also alleges that Defendants made omissions during the Class Period and that Defendants failed to disclose information when they had a duty to do so.[16]

---

[14] ¶¶83-86, 88 (SOX cert only), 89, 93-96, 98 (SOX cert only), 99, 103-104, 107 (SOX cert only), 108, 111, 113-115, 117 (SOX cert only), 118, 121-123, 127 (SOX cert only), 128, 131, 133-136, 138 (SOX cert only), 139, 144, 150, 153, 157-159, 162 (SOX cert only), 163, 165, 168-170, 171 (SOX cert only), 172, 174, 177-179, 180, 181 (SOX cert only), 182, 185, 188-191, 193 (SOX cert only), 197, 199-201, 203 (SOX cert only), 206-208.

[15] ¶¶92, 101, 109, 119, 129, 140, 152, 154, 164, 166, 173, 175, 184, 195, 205, 210.

[16] *Id.*

        (a)     **Confidential Witness Accounts and Internal Documents Support the Falsity of Defendants' Statements and Omissions and Corroborate the Pervasiveness of Downlines and the Payment of Improper Multi-level Compensation in Mainland China**

A court should give weight to statements of a confidential witness where those statements are supported by detail "regarding the basis of the informant's knowledge and the knowledge itself." *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1226 n.11 (D.N.M. 2011). This is especially true where confidential witnesses corroborate each other. *See In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir. 2002). Here, the Complaint identifies the confidential witnesses, specifies each witness's affiliation with Nu Skin, title, position, geographic area of employment, length of employment, and job responsibilities, all of which establish the basis of these witnesses' knowledge. *See, e.g.*, ¶¶60, 66-71, 75-78.

The first-hand corroborated accounts by confidential witnesses support Plaintiff's allegations that (1) direct sellers, sales representatives and distributors in China were paid downline commissions based on their sales as well as sales of their recruited sales representatives below them, in direct violation of Chinese rules prohibiting multi-level marketing (¶¶67, 70, 71, 75, 76, 78); (2) new sales representatives and direct sellers were receiving little, if any, training in violation of Chinese regulations on direct selling (¶67); and (3) Nu Skin sales representatives were making unlicensed, direct sales of products outside of Nu Skin's brick and mortar stores in China. ¶¶67, 68, 77.

Accordingly, "the allegations based on the statements of the CWs are entitled to significant weight because the complaint describes the bases of the CWs' knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex, Inc.*, No. 09-cv-00780, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011).

Defendants make several meritless arguments attempting to discredit the information provided

by the confidential witnesses.  Defendants make these arguments in their "Scienter" section.

Defs. Br. at 48-52. However, the pervasiveness of the MLM activities and payment of multi-

level compensation discussed at length by the confidential witnesses supports both falsity and

scienter and will be addressed here.  *See, e.g., Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d

981, 1000 (9th Cir. 2009) (allegations of falsity may be indicative of scienter); *Scott v. ZST*

*Digital Networks, Inc.,* 896 F. Supp. 2d 877, 892 (C.D. Cal. 2012) (same).[17]

Defendants argue that confidential witnesses are generally unreliable and courts should

apply a "steep discount" to unnamed sources.  Defs. Br. at 48-49.  This is not the standard,

particularly, where, as here, the confidential witnesses are only cited for the detailed information

provided based on their own, personal experience.  *See In re Thornburg Mortg.,* 824 F. Supp. 2d

at 1226 n.11.[18]

---

[17]     Defendants rely on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) for the proposition that the confidential witnesses were not positioned to know the information alleged. Defs. Br. at 33 n.18.  But in *Zucco*, unlike here, some of the witnesses were not employed at the defendant company during the time period in question and only had secondhand information about the accounting practices that were alleged to be fraudulent. *Id.* at 995-96. Moreover, in *Zucco* one of the witnesses was a human resources employee, who had no knowledge of the workings of the finance or corporate departments at the defendant company. This is in stark contrast to the confidential witnesses in the Complaint, who were sellers of Nu Skin products employed during relevant periods and aware of the Company's practices and the manner in which they were compensated.

[18]     Defendants' reliance on *Kapur v. USANA Health Sciences, Inc.,*No. 07-cv-00177, 2008 WL 2901705 (D. Utah July 23, 2008) is misplaced. Defs. Br. at 49-50. In *Kapur*, the court refused to credit information provided by confidential witnesses because it was not based on first-hand knowledge, but rather was overheard during a discussion among "other employees." The court also did not give weight to internal documents cited by confidential witnesses because the contents of those internal reports was not provided or described.  Here, all of the information provided by confidential witnesses is based on first-hand knowledge and several of the internal documents relied upon by Plaintiff are attached to the Complaint.

Defendants also argue that the confidential witnesses lack reliability because none of them is alleged to be a Direct Seller and none reference Direct Seller compensation.  Defs. Br. at 31 n.16, 32-33. However, none of the confidential witnesses had to be a Direct Seller to establish the Company's violations.  Payment to any employee or direct seller in Mainland China of multi-level compensation violates the PRC regulations. ¶62.  The majority of the confidential witnesses corroborate that they were employees during the Class Period and they were paid multi-level compensation or that they were part of and created downlines in the PRC (many of which were unprofitable for the witnesses and which led to their short tenure).  ¶¶60, 66-71, 74-78.  While certain PRC restrictions concerning training relate only to Direct Sellers (*see* ¶62), the ban on multi-level compensation in the PRC is not restricted to Direct Sellers.  ¶62.[19]

## 2.    Defendants' Puzzle Pleading Argument Must be Rejected

Defendants' argument that the Complaint amounts to impermissible "puzzle" pleading must fail.  Defs. Br. at 35.  The Complaint is carefully organized; alleges each specific material misstatement and related omission, including date and circumstances of its making and the speaker or signatory thereof; and after each group of misstatements, provides the reasons why those specific statements were materially false and/or misleading by omission when made.

---

[19]     Defendants' suggestion that the Court's sanction in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, 851 F. Supp. 2d 1299, 1313-14 (S.D. Fla. 2011), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 503 F. App'x 677 (11th Cir. 2012) is somehow applicable to the facts of this case or to the credibility of the confidential witnesses in this case should be rejected outright. In *Bancorp*, after full discovery, the court discredited one allegation of only one of the six confidential witnesses based on the fact that the witness did not work in the division where the alleged misconduct occurred, which the court found to undercut her credibility. *Id.* at 1313-14. Here, the majority of the confidential witnesses sold Nu Skin products in China and were paid or promised improper multi-level compensation and were aware of the Company's practices related to such sales. The confidential witnesses who were not sales representatives or distributors in China have downlines in China or worked at corporate headquarters in connection with sales support for the creation of downlines.

Courts have repeatedly found this style of pleading permissible.  *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003); *In re Intuitive Surgical Sec. Litig.,* No. 13-cv-01920, 2014 WL 4145447, at *5 (N.D. Cal. Aug. 21, 2014); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005).  In *Intuitive Surgical*, faced with the same argument as Defendants make here, the Court stated:

> [T]he breadth of the CAC alone does not create the type of "puzzle-like" complaint that warrants dismissal.  *See In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1081 (N.D.Cal.2005) (finding that puzzle-pleadings "abuse the principles of Rule 8 not because they are not short" but because they are not plain).  Plaintiff here has precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading. . . Plaintiff's CAC fulfills the purpose of Rule 8 by putting Defendants on notice of the true substance of the claims against them.  *See Splash*, 160 F. Supp. 2d at 1074.

2014 WL 4145447, at *5.

The Complaint's allegations are sufficiently particularized to provide Defendants with fair notice.  Indeed, Defendants' arguments demonstrate that they are not "puzzled" by the Complaint's pleading because Defendants are able to identify the false statements and attempt to refute them through the own version of the facts.  Nothing more is required.[20]

---

[20]     Defendants' cited cases are inapposite.  In *In re Level 3 Communications, Inc. Securities. Litigation*, No. 09-cv-00200, 2010 WL 5129524, at * 9 (D. Colo. Dec. 10, 2010), *aff'd,* 667 F.3d 1331, 1344-45 (10th Cir. 2012), the district court complained of difficulty "teasing out which specific statements are at issue" and then matching those misrepresentations with the corresponding adverse facts. *Id.* at *9. Despite the district court's disfavor with plaintiffs' method of pleading in *Level 3*, it was nonetheless able to match the alleged false statements with the alleged adverse facts and determine that no claim for relief had been stated under the PSLRA. *Id.* Similarly, in *Alizadeh v. Tellabs, Inc.*, No. 13-cv-537, 2014 WL 2726676, at *5 (N.D. Ill. June 16, 2014), the court found it difficult to connect the specific false or misleading statements to the factual allegations demonstrating that they were false.  Here, in contrast, the "connector" paragraphs are the last paragraph in each applicable section and these paragraphs either state the reasons why the statements are false and misleading or refer back to an earlier paragraph where the adverse facts were listed.

**3.      Nu Skin's Risk Disclosures Failed to Adequately Disclose that the Company Was Already Engaged in Practices that Violated the PRC's Prohibition on the Payment of Multi-Level Compensation**

Defendants next argue that their false and misleading statements are immunized by risk disclosures in the Nu Skin's SEC filings which supposedly warned that the Chinese government could, in the future, find Nu Skin's compensation structure in violation of the restrictions on multi-level compensation in the PRC.  Defs. Br. at 19-21, 30.  Defendants also argue that Nu Skin disclosed the information Plaintiff alleges was not disclosed - that the Company paid its employees and direct sellers in Mainland China multi-level compensation in violation of the PRC regulations.  Defs. Br. at 30.

Defendants' reliance on "risk disclosures" in Nu Skin's SEC filings should be rejected for the following reasons: 1) by affirmatively and repeatedly speaking about Nu Skin's compliance with the PRC regulations, Defendants had a duty to disclose the full truth about the Company's payment of multi-level compensation in the PRC; 2) to the extent Defendants are advancing a "truth on the market" defense – such a fact-intensive defense is not appropriate on a motion to dismiss and, in any event, Defendants fail to adequately disclose the truth; and 3) any such risk warnings are insufficient to invoke the PSLRA's safe harbor.

**(a)      Defendants Had a Duty To Disclose that the Company was Improperly Paying Multi-Level Compensation in the PRC**

During the Class Period, Defendants made unequivocal statements about the Company's compliance with the PRC regulations.  One example is: "We are confident that our China operations are in compliance with applicable regulations as interpreted and enforced by the government of China."  ¶144.  *See also* ¶¶99, 150.  To avoid being misleading, Defendants' statements concerning Nu Skin's compliance with the PRC regulations triggered a duty to disclose that the Company was improperly paying multi-level compensation at the time.  *See*

*Grossman v. Novell, Inc.,* 120 F.3d 1112, 1125 (10th Cir. 1997) ("if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement.");

*Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243-44 (D. Utah 1999) (duty to disclose what was "needed so that what was revealed would not be so incomplete as to mislead.") (internal quotations and citation omitted).[21]

Further, Nu Skin's "risk disclosures" during the Class Period were neither accurate nor complete. The cautionary language in Nu Skin's SEC filings consisted only of general warnings about the risks inherent to Nu Skin's direct selling model as implemented in China and was not "specifically tailored" to risks from Nu Skin's active payment of downline commissions to its sales representatives, distributors and direct sellers. Defendants' failure to disclose they were actively paying such multi-level commissions during the Class Period – a violation of Article 7(1) of the PRC's Regulation on Prohibition of Pyramid Selling (¶62) - rendered their statements about compliance with applicable regulations materially misleading, which was not cured by any general cautionary or risk-disclosing language. *See Merchant Capital*, 483 F.3d at 768-69.

Moreover, the disclosure that in the PRC Nu Skin uses the sales productivity of individuals whom a sales representative trains and supervises in establishing an employee's salary, (Defs. Br. at 31), was not an accurate description of how the Company's sales representatives, distributors, and direct sellers were compensated during the Class Period. Confidential witnesses and internal documents confirm that direct sellers, sales representatives,

---

[21]    *See also SEC v. Merchant Capital, LL*C, 483 F.3d 747, 770–71 (11th Cir. 2007) (holding that a duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 673 (6th Cir. 2005) (person or corporation has a duty to disclose it, if it renders a prior disclosure objectively inaccurate, incomplete, or misleading).

and distributors in Mainland China were paid downline **commissions** based on a set percentage of the sales of the sales representatives below them who they recruited (up to six levels down). ¶¶60-78.  Defendants had a duty to disclose that these downline commissions, strategically called "team rewards" or "team awards" by Nu Skin, were prohibited by the Chinese regulations prohibiting multi-level compensation. ¶¶71-72.[22]

There can be little doubt that Nu Skin's payment of downline, multi-level compensation in violation of the PRC regulations is exactly the type of information "a reasonable investor would consider ... important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119.  *See also In re Williams Sec. Litig.*, 339 F. Supp. 2d at 1263.  Indeed, the materiality of this information is readily established by the steep decline in Nu Skin's stock price upon its revelation to the market.  ¶¶143, 146, 212, 217, 218, 220.

### (b)     Any "Truth on the Market" Defense Cannot Insulate Defendants' Statements and Omissions

Defendants further argue that the so-called "truth-on-the-market" defense invalidates Plaintiff's claims because all information material to investors was publicly available.  Defs. Br. at 30.  In essence, Defendants assert that their misrepresentations are immaterial because the information that Nu Skin was paying multi-level compensation in violation of the PRC regulations was already known to the market.  Defendants' argument here also fails.

Misrepresenting reality as a mere risk is deceptive: "to warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat Investor Grp. v.*

---

[22]     For the first time in their motion (and not in any of the SEC filings attached to the motion), Defendants claim that the portion of its employees' compensation in China based on sales of an employee's team members is "not a commission." Defs. Br. at 187. This unsupported statement should not be accepted by the Court.

*FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) (internal quotations and citation omitted); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1233 (N.D. Okla. 2003) ("WCG Subclass") (same).

The disclosure of the mere possibility that the Chinese government "could" in the future find Nu Skin's compensation structure in the PRC in violation of the rules against multi-level compensation fails to disclose that the Company's structure for the payment of commissions to downline sales employees and distributors was, ***at the time Nu Skin's risk disclosures were issued, specifically prohibited by the PRC regulations.*** Defs. Br. at 20-21. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (holding that to cure a misstatement, the purportedly true statement must "discredit the other one so obviously that the risk of real deception drops to nil").

Moreover, the so-called "truth-on-the-market" defense is intensely factual and not appropriate for consideration on a motion to dismiss. *See e.g., Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000); *In re Bank of Am. Corp. Sec. Derivative & ERISA Litig.,* 757 F. Supp. 2d 260, 300–02 (S.D.N.Y. 2010); *In re Thoratec Corp. Sec. Litig.,* No. 04-cv-03168, 2006 WL 1305226, at *10 (N.D. Cal. May 11, 2006).

### (c)   The PSLRA's Safe Harbor Does Not Apply

Defendants also argue that the complained of statements qualify for protection under the PSLRA's safe-harbor provision for forward-looking statements. Defs. Br. at 34 n.21. *See* 15

U.S.C. § 78u–5(c)(1)(A).[23] However, Defendants' statements about Nu Skin's compliance with the PRC regulations concern then-existing conditions and cannot be construed as protected forward looking statements.[24] *See In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1294 (D. Colo. 2013) ("The distinction must be made between statements of future projections and statements of current or historical fact, as the latter are not protected by the safe harbor."). Further, as discussed above, the risk disclosures Defendants point to in their SEC filings are woefully inadequate given Defendants' knowledge at the time.

### 4.    Defendants' Introduction of Facts Not Pled in the Complaint Must Be Rejected

As set forth in more detail in Lead Plaintiff's Motion to Strike, filed concurrently herewith, Defendants attempt to turn the motion to dismiss process on its head.  Rather than respond to the allegations of the Complaint, Defendants choose instead to advance a counter-narrative of their version of the facts taken entirely from disputed sources outside the four corners of the Complaint.  Defs. Br. at 15-26. However, Defendants do not formally request that the Court take judicial notice of any facts or contentions comprising their version of the facts – in

---

[23]    The Safe Harbor provides that a defendant shall not be liable for a forward-looking statement if it "is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A). As defined in the statute, a "forward-looking statement" is a projection of financial items, a description of management's plans and objectives for future operations or economic performance, or the stated assumptions underlying these projections. 15 U.S.C. § 78u–5(i)(1). The Safe Harbor does not apply to the extent a statement was made by a person or entity having actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(c)(1)(B).

[24]    Defendants incredibly argue that their statements during the Class Period that Nu Skin's business practices in China were in compliance with the law were forward looking statements. (Defs. Br. at 34 n.21).

essence conceding that **none** of the self-serving facts or information they rely upon to contradict the allegations of the Complaint are appropriate for judicial notice pursuant to Fed. R. Evid. 201.

Defendants' attempt to establish a competing universe of facts and inferences that are inconsistent with or contradict the well-pled allegations of the Complaint, without permitting Plaintiff the opportunity to examine or challenge such contentions through the crucible of discovery is completely improper. Defendants' tactic should be rejected and their contradictory competing factual contentions and exhibits stricken or disregarded.

## C.      The Complaint Adequately Pleads Scienter

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs,* 551 U.S. at 324. (internal quotations and citation omitted). Indeed, "[f]aced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate" for a court to "make a determination as to which inference will ultimately prevail" because that would "invade the traditional role of the factfinder." *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1188 (10th Cir. 2003).

### 1.      Courts Examine a Complaint's Scienter Allegations Holistically

The Supreme Court set forth a three-step process for reviewing allegations of scienter on a motion to dismiss under the PSLRA. *Tellabs,* 551 U.S. at 322-23. First, the facts alleged in the complaint must be taken as true. *Id.* at 322. Second, those facts must be considered holistically, rather than in isolation, to determine whether scienter has been properly pled, as the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. *See also id.* at 326 ("assess all the allegations holistically"). Third, in determining whether pleaded facts give rise to a "strong" inference of scienter, courts can take

into account plausible, nonculpable opposing inferences that arise from the allegations of the Complaint. *Id.* at 317, 323. To qualify as strong, an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. The inference of scienter need not be irrefutable; it must only be strong in light of other explanations. *Id.*; *Pirraglia*, 339 F.3d at 1188.

Proof of recklessness is sufficient to establish scienter. *See Weinstein v. McClendon*, 757 F.3d 1110, 1114 (10th Cir. 2014). "[A] defendant acts recklessly when his or her conduct amounts to an extreme departure from the standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger." *In re Zagg Sec. Litig.*, 2014 WL 505152, at *5 (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001)).

The Complaint is replete with facts, that when considered holistically, give rise to a strong and compelling inference that Defendants acted with knowledge, or at a minimum, acted recklessly with a motive to deceive, including allegations regarding:

- Nu Skin's otherwise unexplainable rapid expansion of its MLM business in Mainland China (i.e., the sheer magnitude of the fraud);

- Hunt and Wood repeatedly spoke to the market about Nu Skin's business and growth in China;

- Hunt and Wood's knowledge of the Chinese law which pre-dates the Class Period;

- Hunt and Wood's frequent business trips to China on Nu Skin's behalf;

- Nu Skin's corporate office in Utah had access to sales by all distributors, sales representatives and direct sellers in Mainland China through a linked computer system;

- Defendants' affirmative statements discrediting the Citron Report;

- confidential witness accounts and internal Company documents;

- the importance of China's growth to the Company's future, rendering it a core operation of the Company during the Class Period; and

- Hunt and Wood's motive to deceive including massive insider trading and substantially increased compensation during the Class Period.

A reasonable person would deem the inference of scienter as to Hunt and Wood cogent and "at least as compelling as any opposing inference one could draw from the facts alleged."

*Tellabs,* 551 U.S. at 324.

### (a) Nu Skin's Rapid Expansion of its MLM Business in Mainland China Supports an Inference of Scienter

Prior to the start of the Class Period, growth in Nu Skin's business in Japan and the United States was on the decline. ¶¶55-57. To offset the slowdown in growth in these markets, the Company focused on growing its business in the PRC despite the stringent regulations in China prohibiting the very type of MLM and multi-level compensation employed by Nu Skin in all of its other markets and despite the limited success Nu Skin had achieved in penetrating the Chinese market as a result of those stringent regulations prior to the Class Period. ¶4.

In early 2011, Defendants began encouraging Nu Skin's existing sales distributors around the world, including its Chinese-speaking distributors in Hong Kong, Taiwan, and Southeast Asia, to recruit sales promoters and distributors in Mainland China in much the same way they recruited distributors around the rest of the world. ¶5. This included signing up sales distributors in Mainland China, paying them commissions and requiring the new recruits to sell specified minimum monthly sales levels of Nu Skin products while promising to reward them handsomely for recruiting additional new downline sales distributors from whom they could share commissions. *Id.*

31

Defendants' rapid-fire growth scheme worked. Throughout the Class Period, Nu Skin posted astounding double and triple digit growth in Mainland China. *See e.g.,* ¶245. *See also* Defendants' Exhibits A (pg. 56), B (pg. 50), C (pg. 56).

| Year | Revenues from Mainland China | Year-over-year growth in revenues from Mainland China |
|------|------------------------------|-------------------------------------------------------|
| 2010 | $91.4 million | -- |
| 2011 | $152.5 million | 67% |
| 2012 | $256.8 million | 74% |
| 2013 | $1.005 billion | 292% |

This explosion in reported revenues in the PRC was only possible through MLM, vast networks of downlines, and poorly trained sales representatives who sold products not authorized for direct sales in Mainland China.  ¶9.[25]  In light of the Company's past violations of PRC multi-level marketing restrictions (¶52), at the very least, this rapid growth should have raised a red flag for Defendants.

      **(b)**     **That Hunt and Wood Repeatedly Spoke to the Market about Nu Skin's Business and Growth in China Supports an Inference of Scienter**

During the Class Period, the Individual Defendants participated in quarterly and annual earnings conference calls.[26] During these calls, Wood and Hunt spoke at length about and answered questions about Nu's Skin's business in China. *Id.* For example, during the Class Period, Hunt and Wood made the following statements about Nu Skin's business in China:

---

[25]     Defendants also knowingly or recklessly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in a way that complied with Chinese law. ¶¶8, 92(c), 152(c). The training that did exist was lax and inconsistent and not at all enforced – another violation of China's regulations on direct selling.  ¶¶8, 62, 67-70, 92(c), 152(c). This too supports an inference of scienter.

[26]     ¶¶84-87, 94-96, 103-105, 114-115, 122-123, 133-136, 157-159, 169-170, 179-180, 190-191, 199-201.

▪Hunt: "[M]ainland China continued to grow at a rate of about 50%, year-over-year." ¶94.

▪Wood: "As we continue to grow, China will just become more and more profitable." ¶95.

▪Hunt: "First, nearly 70% revenue growth in Mainland China is making China a much more relevant factor in our overall results. Our business there is obviously trending very strongly. . . . So we continue to believe that China is enjoying very healthy momentum and has a real likelihood to becoming our largest market within a fairly short period of time." ¶103.

▪Hunt: "And they are just -- they happen to be sitting on the biggest direct selling opportunity in the history of the world. There just aren't any other markets like it, with direct selling being as robust as it within the Chinese communities globally and . . . It just happens to be a phenomenal market in terms of size and scale." *Id*.

▪Wood: "it's highly likely that China surpasses Korea next year as the second largest business in our world, and by 2015, could likely be the largest market in the Nu Skin world." ¶134.

▪Hunt: "We are confident in the long-term growth potential of Mainland China and believe we have the knowledge and resources to capitalize on the opportunity." ¶165.

▪Hunt: "Sales in the second quarter in mainland China were $198 million. . . .We continue to invest to sustain growth in this market and are committed to working to ensure our long-term success there. From what we are seeing we believe that the market continues to have significant upside potential." ¶190.

In addition, Hunt and Wood signed Nu Skin's SEC filings during the Class Period which reported on, among other things, the Company's business and the growth in sales in Mainland China.[27]

---

[27]     ¶¶30, 31, 88, 98, 107, 117, 127, 138, 144, 162, 171, 181, 193, 203.

> **(c)** **Hunt and Wood's Knowledge of the Chinese Regulations (Which Pre-Dated the Class Period) Supports an Inference of Scienter**

Nu Skin has been operating in China since the early 1990s. ¶46. From 2003 to 2005, Nu Skin sold product in Mainland China only through retail outlets. ¶49. In 2006, shortly after the PRC implemented regulations concerning direct selling and anti-pyramid-selling, Nu Skin began its direct selling operations. ¶51. Shortly before the beginning of the Class Period, Defendant Hunt and representatives from Nu Skin China met with high level Chinese government officials who reiterated that the Chinese government would thoroughly implement the Administrative Regulations on Direct-Selling and the Regulations on Prohibiting Pyramid-Selling. ¶80. Thus, Hunt and Wood were familiar with the Chinese regulations well before the Class Period.

During the Class Period, Defendants discussed Nu Skin's compliance with the Chinese regulations governing direct selling and anti-pyramid selling. *See e.g.,* ¶¶7, 99, 118, 144, 150, 151, 165, 204.  Through these statements, Defendants demonstrated their knowledge of the PRC regulations.  For example, when the Citron Report was released raising concerns that Nu Skin was operating a pyramid scheme in China, Defendants affirmatively and unequivocally denied all of Citron's claims and continued to misrepresent the nature of Nu Skin's business in the PRC. ¶¶144, 145, 150, 151. In a Report on Form 8-K, signed by Defendant Wood, Nu Skin stated the following with respect to its compliance with the laws in the PRC:

> We are confident that our China operations are in compliance with applicable regulations as interpreted and enforced by the government of China. ***Nu Skin has an eight-year history of doing business in China under these regulations,*** and the government has regularly reviewed our business activities. In the past year the government has issued Nu Skin new direct selling licenses in several cities and municipalities. (emphasis added).

¶144.  Indeed, Defendants successfully convinced analysts and investors that the Citron Report was not credible. ¶145.

On August 16, 2012, Defendant Wood presented at the Canaccord Genuity 32nd Annual Growth Conference in Boston. ¶150. According to an analyst report following Wood's presentation: "Nu Skin CFO Ritch Wood spent much of the presentation detailing Nu Skin's Chinese operations. In sum, *Nu Skin has been operating in mainland China for roughly 10 years*, first as a retailer then subsequently as a direct seller. The company notes being fully regulatory compliant, and has safeguards in place similar to those in all of its other global markets." ¶151 (emphasis added). For the next year and a half, Defendants continued to tout the Company's growth in the PRC, which, they claimed, was achieved while operating in compliance with Chinese law. ¶13.[28]

**(d)   Hunt and Wood's Frequent Business Trips to China on Nu Skin's Behalf Supports an Inference of Scienter**

Hunt and Wood traveled frequently to Mainland China for conventions and sales meetings and were acutely aware of Nu Skin's operations in Mainland China. ¶¶79-81. The Individual Defendants also participated in meetings with government regulatory representatives in China including one meeting shortly before the beginning of the Class Period where defendant Hunt met with Wang Chao, China's Vice-Minister of Ministry of Commerce. ¶80.

**(e)   Nu Skin's Corporate Office in Utah Having Access to Sales by All Distributors, Sales Representatives and Direct Sellers in Mainland China Through a Linked Computer System Supports an Inference of Scienter**

Nu Skin's corporate office in Utah had access to sales by all distributors, sales representatives and direct sellers in Mainland China through a linked computer system. ¶77.

---

[28]   *See Reese v. Malone*, 747 F.3d 557, 580 (9th Cir. 2014) (court found that magnitude of the violation, public attention on the Company, and contemporaneous documents demonstrating management's awareness of the company's non-compliance, made it "absurd" to suggest that management was not aware of BP's significant, existing compliance issues that rendered their statements misleading).

According to CW9, a Nu Skin Independent Distributor since 2010, Nu Skin's corporate office in Utah can "see every sale that is going on by every distributor" in China through Nu Skin's computer systems. ¶77.[29] CW7, a former Sales Support Representative at Nu Skin who assisted distributors in Nu Skin's call center in Provo, Utah, corroborated that call center representatives in Utah set up downlines for sales representatives and distributors in Mainland China in the same way that they set up downlines for representatives and distributors in the U.S. and Japan. ¶75.

### (f) Defendants' Affirmative Statements Discrediting the Citron Report Support an Inference of Scienter

Defendants' vehement denials of the information disclosed in the Citron Report (¶¶144, 150, 151) and affirmative statements to the contrary also support a strong inference of scienter. Allegations that defendants took affirmative steps to discredit specific, objective public allegations regarding the Company weigh in favor of a finding of scienter. S*ee Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1324 & n.15 (2011)* (describing the misleading press release as the "[m]ost significant[ ]" fact in favor of a finding of scienter).[30] Moreover, Defendants tacitly admit they knew the truth by arguing that the truth was already in the market by reason of a public disclosure. Defs. Br. at 30-31.

---

[29]    Even though based in the U.S., CW9 was familiar with Nu Skin's operations in China because in 2011 he took a trip to China in an attempt to recruit Nu Skin sales representatives for his downline. ¶77. CW9 no longer actively recruits for Nu Skin, but at the height of his relationship with Nu Skin, CW9 had more than 250 people in his downline. CW9 also stated that all of the Chinese downlines reported to sales executives in the U.S. ¶77.

[30]    *See also Reese*, 747 F.3d at 572 (court found that defendant "bridge[d] the [scienter] gap" by making a detailed factual statement contradicting important data to which defendant had access, creating a strong inference that the defendant knowingly misled the public) (alteration in original).

(g)     **Confidential Witness Accounts and Internal Company Documents Support an Inference of Scienter**

The Complaint's numerous first-hand accounts, provided by confidential witnesses who worked in various positions at different geographical locations at the Company, support both a finding of falsity *(see discussion infra)* and scienter. Courts in this Circuit have found that allegations from confidential witnesses can support a finding of scienter. *See, e.g., Better & YRC Investors Grp. v. YRC Worldwide In*c., No. 11-cv-2072, 2012 WL 4433500, at *10-11 (D. Kan. Sept. 25, 2012) (court considered confidential witness accounts which corroborated defendants' knowledge or reckless disregard of concealed facts); *In re SemGroup Energy Partners, L.P. Sec. Litig.*, 729 F. Supp. 2d 1276, 1290 n.1 (N.D. Okla. 2010); *Mishkin*, 2011 WL 1158715, at *6.

Indeed, an allegation of "falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners*, 552 F.3d at 1000 (internal quotations omitted); s*ee also Scott*, 896 F. Supp. 2d at 892.

Here, multiple witnesses' ***consistent*** accounts strengthen the inference of scienter. *See In re Daou Sys. Inc.*, 411 F.3d at 1015; *In re Cabletron Sys., Inc.*, 311 F.3d at 29. For example, CW2, a former Nu Skin Sales Manager in Beijing, CW4, a former Sales Representative from Guangzhou, CW5, a former Sales Representative in Nanjing, and CW10, a former Sales Representative in Shanghai all based in Mainland China – corroborate the existence of downlines in China.  ¶¶67-70.  Moreover, the confidential witnesses based in the U.S. corroborated the accounts of the witnesses based in China.  ¶¶60, 75, 76. Thus, the corroborative confidential

witness accounts along with internal Company documents also support a strong inference of scienter.

**(h)      The Allegations of Core Operations Support an Inference of Scienter**

Following *Tellabs*, Courts have upheld a strong inference of scienter where the fraud involved a company's core operations—as is the case here. The Second, Third, Seventh, and Ninth Circuits have recognized that allegations of fraud arising from a company's core operations can support an inference of scienter.  As the Seventh Circuit reasoned in *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* ("Tellabs II"), it would be "exceedingly unlikely" for a CEO to be unaware of problems affecting the company's major products. 513 F.3d 702, 711 (7th Cir. 2008).[31]

As set forth above, during the Class Period, Nu Skin became increasingly dependent on Mainland China for a disproportionate share of its gross revenues and all of its growth.  In 2010, revenues from Mainland China were $91.4 million representing 6% of Nu Skin's overall revenue.  By the end of 2013, those numbers skyrocketed – to over $1 billion in revenue representing 32% of the Company's overall revenue – a growth rate for Mainland China of 292% (year-over-year). ¶245.

---

[31]      In *South Ferry LP v. Killinger*, the Ninth Circuit concluded that "[a]llegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." 542 F.3d 776, 784-85 (9th Cir. 2008). The Third Circuit in *Institutional Investors Group v. Avaya, Inc.*, referring to the "core business inference," 564 F.3d 242, 268 (3d Cir. 2009), specifically recognized that the "perceived importance of margins supports an inference that [Avaya's CFO] was paying close attention to these numbers." *Id.* at 271. *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (allegations of a company's core operations, "can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently. That view finds support in decisions by this court and district courts within this circuit.").

The Chinese market was of critical importance to Nu Skin's growth during the Class Period as growth in Nu Skin's other important regions such as the U.S. and Japan was faltering. ¶¶54, 55, 246. Defendants repeatedly touted the growing market in Mainland China as the driving force behind the Company's current and future growth.  For example:

- At the start of the Class Period, Wood commented that Nu Skin was fortunate that emerging markets such as China have "more than made up" for declines in Japan and the U.S. ¶¶87, 246.

- At the start of the Class Period, Hunt highlighted the "encouraging trends" Nu Skin was seeing in "emerging markets" such as Mainland China: "we believe that these emerging markets could easily represent half of our business or more by 2015." ¶84. Defendant Wood echoed the sentiment: "I would expect greater China . . . to become a more and more key player to our overall business." ¶85.

- Hunt: "I would point out how quickly emerging markets are becoming a larger component of our revenue mix. The greater China region obviously knocked the cover off the ball with 150% growth in the second quarter." ¶133.

- Wood stated that Nu Skin expected its emerging markets to account for 40 percent of its projected 2015 revenue, "with tremendous opportunity in Mainland China and Southeast Asia." ¶150.

- Hunt boasted that Nu Skin's China business would continue to grow to ultimately account for 50% or more of the Company's overall revenue. ¶¶206, 246. ("So, as we stretch towards our $10 billion sales target, it won't be at all surprising if China is 50% or more of that." ¶206.);

- Dan Chard, Nu Skin's President of Global Sales & Operations: "So, it takes us to Greater -- to Mainland China. This is now our largest market and our fastest growing market and we believe that it represents a significant opportunity for us to expand and grow our business." ¶208.

Analysts who covered Nu Skin echoed the Company's statements regarding Mainland China being a core market for Nu Skin. *See, e.g.* ¶100 ("However, NUS's emerging markets business is on a strong trajectory, especially in China. . ."). Given the exponentially growing size of Nu

Skin's Chinese market, its critical importance to the growth of Nu Skin's overall business, and its potential to become the Company's revenue life-blood, the illegal practices implemented by Defendants for deployment in China could not have occurred without the Individual Defendants' knowledge and approval. ¶248.

Even cases relied on by Defendants concede that: "'[a]llegations that rely on the core-operations inference *are among the allegations that may be considered in the complete PSLRA analysis'*, in accordance with the holistic approach outlined in Tellabs." *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1372-73 (D.N.M. 2012) (Defs. Br. at 40) (emphasis added).[32]

> **(i)** **Allegations of Hunt and Wood's Motive, Including Massive Insider Trading and Substantially Increased Compensation During the Class Period, Support an Inference of Scienter**

Plaintiff analyzed the trading by the Individual Defendants that occurred during the Class Period (989 days) and during the period immediately preceding the Class Period beginning August 17, 2008 and ending May 3, 2011 - also 989 days (the "Control Period"). The massive insider trading by Hunt and Wood during the Class Period, compared to much smaller pre-Class Period insider sales, together with allegations of increased compensation, further supports a

---

[32]    The Court in *Board of Trustees of the City of Ft. Lauderdale General Employees' Retirement Systems v. Mechel Oao*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011) (Defs. Br. at 38) held that the allegations of core operations, *by themselves*, *in that case,* were not independently sufficient to raise a strong inference of scienter. Although Plaintiff does not rely on the allegations of core operations alone to support a strong inference of scienter, here the pervasive nature of the improper conduct in China and the astronomical growth in revenue in China during the Class Period "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry LP,* 542 F.3d at 786. Further, *Yates v. Mun. Mortg. & Equity, LLC,* 744 F.3d 874, 889 (4th Cir. 2014) (Defs. Br. at 41) is also distinguishable. In that case, the alleged accounting error concerned only a small percentage of the Company's shareholder equity and only one of the defendants' funds. Here, Mainland China was Nu Skin's growth engine – its main driver of revenue growth – with 2013 revenues from Mainland China surpassing 30% of Nu Skin's total revenues - and projections that it could reach $ 5 billion by 2015.

strong inference of scienter. *See Tellabs,* 551 U.S. at 325 (acknowledging that motive can be a relevant consideration in the scienter analysis).

**(i)    The Individual Defendants' Class Period Insider Sales Were Inconsistent With Their Prior Trading**

The Individual Defendants' Class Period stock sales exceed $40 million compared to Control Period stock sales of $15.6 million – ***an increase of more than 150%.***  ¶250.[33]  Hunt's sales during the Class Period totaled $16.17 million versus $10.74 million during the Control Period.  ¶254. Wood's sales during the Class Period totaled $24.53 million versus $4.85 million during the Control Period – an increase of more than 500%. ¶255. Class Period insider sales which are inconsistent with prior trading practices support an inference of scienter. *See In re Nature's Sunshine Prods. Sec. Litig.,* 486 F. Supp. 2d 1301, 1311 (D. Utah 2007) (a strong inference of scienter may be shown from insider trades at times and in quantities that were suspicious in light of the insider's total stock holdings).[34]

**(ii)    Trading Pursuant to 10b5-1 Trading Plans Does Not Negate the Inference of Scienter**

While a large percentage of Defendant Hunt and Wood's stock sales appear to have been made pursuant to 10b5-1 trading plans, in each case the circumstances of those sales are

---

[33]    The Complaint also details Hunt and Wood's stock and option awards during the Class Period. ¶270.

[34]    *In re Level 3 Commc'ns, Inc. Sec. Litig.,* 667 F.3d at 1346 (Defs. Br. at 42) is distinguishable because in that case the individual defendants held (as opposed to sold) a substantial percentage of their Level 3 holdings. Here, the Individual Defendants sold much more stock than they retained. According to Defendants' Form 4 summaries, Defendants sold between 60-90% of their Nu Skin holdings during the Class Period. *See* Defs. Ex. BB.  *Elam v. Neidorff,* 544 F.3d 921, 928 (8th Cir. 2008) is distinguishable because in that case, the "stock sales at issue represent only a small portion of each seller's overall holdings" (5.3% and 2.4%), *id.* at 928, much less than the 60% and 90%, sold by Hunt and Wood, respectively. Defs. Ex. BB.

sufficiently suspicious to overwhelm any inference that they were made in good faith.[35]  Sales pursuant to a trading plan should occur with a prescribed, regular pattern or be made at regular intervals, for example, 500 shares a month on the 10th day of the month. Such was not the case here. The Individual Defendants sold irregular amounts of shares at irregular intervals under their 10b5-1 plans. ¶262. For example, neither Hunt nor Wood sold on a monthly or bi-monthly basis or sold a set number of shares with any particular frequency. ¶253.

Further, although Hunt and Wood filed reports on SEC Form 4's disclosing their trades and indicating that certain of them were made pursuant to 10b5-1 plans, **no further information is available on the 10b5-1 plans, either in the Individual Defendant's Form 4's or in Defendants' motion to dismiss, such as when the plans were adopted and if they were amended during the Class Period**.[36] Without discovery, investors cannot understand the details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.[37]

---

[35]     The SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans") only if the plan is entered into by an insider "[b]efore becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. 17 C.F.R. § 240.10b5-1(c).

[36]     Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where they were adopted or amended during the class period. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007); *George v. China Auto. Sys., Inc.*, No. 11-cv-7533(KBF), 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012); *In re Biogen Idec, Inc. Sec. Litig.*, No. 05-cv-10400, 2008 WL 4810045, at *14 (D. Mass. Oct. 25, 2008); *see also In re Questcor Sec. Litig.*, No. 12-cv-01623, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (10b5-1 trading plan created near the beginning of the class period did not negate the suspicious nature of the defendant's stock sales).

[37]     Further, whether Defendants' trading plans were legitimately adopted or were put in place after learning of material, nonpublic information cannot be resolved on a motion to dismiss. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("The Court finds that, although evidence of the nondiscretionary nature of Defendants'

*(continued ... )*

42

(iii) **The Substantial Increase in the Individual Defendants' Compensation During the Class Period Supports an Inference of Scienter**

During the Class Period, the Individual Defendants' total compensation from Nu Skin rose dramatically. Hunt's total compensation from 2011 to 2013 nearly doubled from $5 million to almost $10 million. ¶¶269-270. Wood's total compensation from 2011 to 2013 *more than doubled* rising from $1.56 million in 2011 to $4.14 million in 2013. *Id.* While not an independent basis to support scienter, together with all of the other indicia of scienter explained above, the Court should consider the Individual Defendants' desire to increase their compensation as additional evidence of Defendants' motive. *See In re Thornburg Mortg., 824 F. Supp. 2d at 1243* (court should consider allegations of motive).[38]

**D.   The Complaint Adequately Alleges Loss Causation**

**1.   Defendants Ignore the Standards for Pleading Loss Causation in the Tenth Circuit**

Loss causation is subject only to the notice pleading requirements of Fed. R. Civ. P. 8(a)(2). *See e.g., YRC Worldwide Inc., 2012 WL 4433500, at *9.* To adequately plead loss

---

*( ... continued)*

sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010)* ("the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion."); *In re EVCI Colls. Holding Corp. Sec. Litig., 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006)* (same).

[38]   In this Circuit, the scienter of "senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *See Adams, 340 F.3d at 1106-07* (*citing Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 100–01 (2d Cir. 2001)* (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b–5)).

causation in the Tenth Circuit, a plaintiff must "identify a 'causal connection' between the loss and the misrepresentation." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136-37 (10th Cir. 2009).

Although "[l]oss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops," this is not "the only or even the preferred method of showing loss causation." *Id.* at 1137. For instance, a plaintiff can plead loss causation by alleging "a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure." *Id.* at 1138. For any loss causation theory, the key inquiry is whether a plaintiff has shown "some mechanism for how the truth was revealed." *Id.* Although a corrective disclosure must somehow "relate back" to the misrepresentation, a "disclosure need not precisely mirror the earlier misrepresentation" to be corrective. *Id.* at 1140; *see also Nakkhumpun v. Taylor*, No. 12-cv-01038, 2013 WL 5446081, at *14 (D. Colo. Sept. 30, 2013).

Remarkably, Defendants fail to pay even lip service to Tenth Circuit standards for pleading loss causation. While Defendants' loss causation section relies heavily on Eleventh Circuit authority, it does not cite any decisions within this Circuit. This is because the decisions in this Circuit establish pleading standards that are not favorable to Defendants' arguments.

### (a) The Complaint Alleges a Series of Corrective Disclosures that Demonstrate How the Truth about Nu Skin Was Revealed

The Complaint alleges that the truth about Defendants' misrepresentations gradually leaked into the market in a series of corrective disclosures, each of which is addressed below.

### (i) August 7, 2012, Citron Report

The Complaint alleges that the Citron Report was a partial corrective disclosure. ¶¶13, 141-143, 286. Defendants' sole argument regarding the Citron Report is to baldly assert that media allegations of fraudulent conduct cannot constitute a corrective disclosure. Defs. Br. at

55. Defendants are wrong. There is no rule that a short-seller report cannot support loss causation, especially where it reveals new, nonpublic information and is accompanied by a stock drop. *See, e.g.*, *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012). Moreover, subsequent revelations confirm the corrective nature of the Citron Report disclosures.

Defendants cannot dispute that the Citron Report revealed new, nonpublic information about Nu Skin - namely, specific facts uncovered during an in-depth investigation including taped and transcribed conversations with Nu Skin sales representatives and direct sellers in Mainland China.  ¶¶141-142.  This specific information partially revealed the risk that the Company's Chinese operations were based on illegal multi-level marketing or pyramid selling. Defendants also cannot seriously dispute that disclosures in the Citron Report related back to Defendants' alleged misrepresentations and that Nu Skin's stock price dropped 14.12% on August 7-8, 2012, following the Citron Report's publication.  ¶286(a).

The revelations in the Citron Report were partially counteracted by public statements made by both Nu Skin and analysts disputing the Citron Report, including a television appearance by a Deutsche Bank analyst during which he defended the Company.  ¶¶144-147.  As a result, Nu Skin's stock partially—but not fully—rebounded, with its price rising 6.24% on August 9, 2012 and the market continued to be misled by Defendants.  ¶148.

### (ii)     January 15-16, 2014 *People's Daily* Articles

Before the market opened on January 15, 2014, the Chinese government-run newspaper *People's Daily* reported that, based on its own investigation, Nu Skin was operating an illegal pyramid scheme China, causing the Company's stock to lose 15.5% of its value on that day. ¶¶211-12.  Before the market opened on January 16, 2014, *People's Daily* published additional details about its investigation, further bolstering its conclusion that Nu Skin was operating an illegal pyramid scheme, which, along with the announcement of government investigations

45

discussed below, caused the Company's stock price to fall an additional 26.2% on that day. ¶¶213, 217.

The publication of a news article can constitute a corrective disclosure, *e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)*. As Defendants' own cited authority holds, a third-party source can support loss causation if it discloses new information. *See Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (Defs. Br. at 53-54).  Defendants do not dispute that the *People's Daily* articles reveal information related to their alleged misrepresentations and were accompanied by stock drops. Instead, Defendants contest these corrective disclosures on the basis that the articles: (i) merely "repackaged" facts in the Citron Report (Defs. Br. at 53-55); and (ii) report only "suspected" unlawful conduct (Defs. Br. at 55-57).  These arguments are misplaced.

Even a cursory review of the two *People's Daily* articles shows that, contrary to Defendants' assertions, both articles revealed new information about Nu Skin's practices in Mainland China based on the *People's Daily's* own independent investigation – which included new interviews with Nu Skin Sales Representatives and distributors.  ¶¶211, 213.[39]  Not only did the *People's Daily* articles report on employee interviews and Nu Skin sales and promotional conferences that occurred less than one week before the articles' publication, the articles also reported on readers' submissions to the paper, Nu Skin training videos in which Nu Skin distributors were interviewed, and interviews of legal experts.  *See* Complaint at Exs. E & F. The nonpublic, independently-obtained information in the *People's Daily* articles (which had not been previously disclosed) make them readily distinguishable from the public information held

---

[39]    Translations of the *People's Daily* articles are attached to the Complaint as Exhibits E and F.  (ECF No. 51).

46

to be insufficient in *Meyer*.  *See* 710 F.3d at 1198 (rejecting the corrective nature of a slide show presentation stating that the information therein was "obtained from publicly available sources") (internal quotations omitted).

That the *People's Daily* investigation unearthed facts similar to those disclosed by the Citron Report does not render such facts stale or repackaged.  The *People's Daily* articles were published almost a year-and-a-half after the Citron Report and were based on the *People's Daily's* own independent investigation and included information not even in existence at the time of the Citron Report. ¶¶211, 213.

In *Scott v. ZST Digital Networks, Inc.*, No. 11-cv-03531, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012), the court rejected the same argument made by Defendants, holding that:

> [The] citation to a previous article containing allegations of wrongful behavior at the [c]ompany cannot overcome the Plaintiff's pleading of loss causation.  Plaintiff alleges that [the company's] stock price fell precipitously" on the date the second article was published, and accordingly the plaintiff had given the defendants "more than 'some indication' as to the causal mechanism which is alleged to connect the purported revelation and the drop in the Company's share price.

*Id.* at *11.

Defendants further argue to be corrective, the articles must have "***prov[en]*** widespread misconduct" and "substantiate[d] [the newspaper's] suspicions in all relevant respects."  Defs. Br. at 56-57 (emphasis added).  Such an extreme pleading requirement for loss causation is wholly inconsistent with the case law in the Tenth Circuit.  *See Nakkhumpun*, 2013 WL 5446081, at *14 (holding that "a court cannot be too exacting in [its] demands for a connection between the initial misrepresentation and subsequent revelation") (internal quotations omitted) (alteration in original). Defendants' proposed standard would require either an admission of fraud or a definitive finding of fraud. This is not the law.

Moreover, Defendants' cited cases (Defs. Br. at 55-56) do not support such a pleading requirement and are otherwise distinguishable. In *Bach v. Amedisys, Inc.*, No. 10-cv-395, 2012 WL 6947008 (W.D. La. June 28, 2012), *rev'd*, *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys Inc.*, No. 13-cv-30580, 2014 WL 4931411 (5th Cir. Oct. 2, 2014) (Defs. Br. at 55-57), one alleged corrective disclosure was a Citron report which acknowledged that "it is not yet concluding that Amedisys is committing fraud" and more scrutiny is needed, while the other was an article containing a statistical analysis of public information.  *Bach,* 2012 WL 6947008, at *9-10. Notably, the Fifth Circuit recently reversed *Bach*, holding that a series of partial disclosures, *including a Citron report*, article, and government investigations, coupled with a later change in the company's practices in response to the investigations, "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation."  *Pub. Emps.' Ret. Sys. of Miss.,* 2014 WL 4931411, at *8.

Unlike in Defendants' cited cases, the *People's Daily* articles were based not on public information or speculation or opinion, but on previously undisclosed facts and specific instances of illegal conduct unearthed during an investigation.[40]  Further distinguishing Defendants' cited cases is the context in which the articles were published—Nu Skin's prior violations of China's multi-level marketing restrictions (¶52) and the Citron Report.  Given this context, and the announcement of the government investigations discussed below, it is evident that Plaintiff has

---

[40]     In *In re Maxim Integrated Products, Inc. Securities Litigation*, 639 F. Supp. 2d 1038 (N.D. Cal. 2009) (Defs. Br. at 56), the alleged corrective disclosure was based on a statistical analysis of public information.  *Bach,* 2012 WL 6947008, at *8; *In re Maxim,* 639 F. Supp. 2d at 1046-47.  Lastly, in *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) (Defs. Br. at 56), the alleged corrective disclosure was speculative based on no new undisclosed facts and did not correspond with a drop in the company's stock price.  *Id.* at *16.

adequately pled that the *People's Daily* articles partially revealed the truth about Nu Skin's misrepresentations.

### (iii)   January 16, 2014 Announcement of Government Investigations

Before the market opened on January 16, 2014, two Chinese government agencies announced that they were commencing investigations into Nu Skin's marketing and sales practices.  ¶¶214-16.  On that day, Nu Skin's stock price fell 26.2%.  ¶217.  Defendants do not dispute that these disclosures revealed new information, related back to their alleged misrepresentations, and were accompanied by a stock drop.  Instead, Defendants rely on the supposedly "[w]ell-established" rule that the announcement of a government investigation alone cannot constitute a corrective disclosure.  Defs. Br. at 57.  In reality, this rule is not well-established—it has not yet been addressed in this Circuit—and has been expressly rejected by several courts.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 385, 387-88 (E.D.N.Y. 2013) (examining cases, including two cases that Defendants cite, and rejecting the argument that the announcement of an investigation is insufficient).

Regardless, even Defendants' own out-of-Circuit cases (Defs. Br. at 57) hold that the announcement of a government investigation may constitute a partial corrective disclosure when it is coupled with confirmation of misconduct.  *See Meyer*, 710 F.3d at 1201 n.13 (holding that an investigation is sufficient when "coupled with a later finding of fraud or wrongdoing"); *see also Durham v. Whitney Info. Network, Inc.*, No. 06-cv-00687, 2009 WL 3783375, at *21 (M.D. Fla. Nov. 10, 2009).[41]

---

[41]     Defendants' cited case, *In re Almost Family, Inc. Securities Litigation*, No. 10-cv-00520, 2012 WL 443461, at *13 n.9 (W.D. Ky. Feb. 10, 2012) (Defs. Br. at 57), is distinguishable because there the company was later exonerated by a Senate report. *See also Pub. Emps.' Ret. Sys. of Miss.*, 2014 WL 4931411, at *7-8 (distinguishing *Almost Family* and holding that "[t]he
*(continued ... )*

Here, the Complaint alleges numerous previous and subsequent disclosures confirming that Nu Skin had been engaged in an illegal pyramid scheme in China and disclosing the significant negative impact this revelation would have on the Company's business prospects. ¶¶221-40.  Specifically, in the months after Nu Skin's acknowledgement of wrongdoing on January 21, 2014:

- Nu Skin disclosed that it had settled certain government investigations, would reform its sales practices, and would pay a fine, primarily for improper direct sales and promotional activities in violation of Mainland China's Regulations on Direct Selling Administration (¶¶230-31);

- Nu Skin was required to disgorge its illegal sales revenue, strengthen the education and supervision of its sales personnel, and close certain "working studios" (¶232); and

- A Chinese governmental agency announced that it would look into increasing its regulation and scrutiny of the direct sales sector (¶233).

These subsequent disclosures are entirely consistent with the conclusions in the *People's Daily* articles that prompted the investigations in the first place. Also – once Defendants stopped their misconduct, sales growth in Mainland China decreased substantially. ¶¶18, 221, 237-240.

### (iv)   January 21, 2014 Nu Skin Admissions in Form 8-K

Before the market opened on January 21, 2014, Nu Skin filed, on Form 8-K, a letter to its customers acknowledging that: "during our recent rapid growth, there were instances where some of our sales people failed to adequately follow and enforce our policies and regulations" such as making "improper descriptions of Nu Skin's distinct business model in China that confuse it with Nu Skin's business model in other markets."  ¶219.  Given that this admission

---

*( ... continued)*
district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud").

came just days after the publication of the two *People's Daily* articles about Nu Skin's multi-level marketing activities, prompting the commencement of two government investigations, it is apparent that these statements relate to the subject of these articles and investigations.[42]

Defendants make the hyper-technical argument that Nu Skin's admission was not to violating China's regulations on direct selling but to violating its own policies and regulations. Defs. Br. at 57-58.  First, presumably it is Nu Skin's policy to comply with government regulations.  Second, Defendants are essentially insisting upon a mirror-image rule, which the Tenth Circuit has expressly rejected.  *See In re Williams Sec. Litig.*, 558 F.3d at 1140 (a "disclosure need not precisely mirror the earlier misrepresentation"). Despite Defendants' hope to the contrary, this is not the law. Nu Skin's argument illustrates why: "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

> **(b)    Investors' Losses Were Caused by the Materialization of Risks Previously Concealed by Defendants**

Under the "materialization of the concealed risk" theory of loss causation, a plaintiff must allege that: (i) "the risk that caused the loss was within the zone of risk concealed by the misrepresentation"; and (ii) the security "lost value because the concealed risk materialized." *Nakkhumpun v. Taylor*, No. 12-cv-01038, 2014 WL 321156, at *3 (D. Colo. Jan. 19, 2014).

---

[42]    Defendants also argue without support that this disclosure is not corrective because the stock price only dropped 2.6% on January 21.  Defs. Br. at 58.  Contrary to Defendants' contention, the negative price reaction is consistent with the leakage theory alleged in the Complaint.  This is sufficient on a motion to dismiss.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (plaintiff need only provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (internal quotations and citation omitted).

Here, Defendants' misrepresentations concealed the risk that Nu Skin's illegal marketing and sales practices would result in government investigations, monetary penalties, disruption of business, and lost revenue.  These risks materialized during each of the specific corrective disclosures dates alleged. ¶¶285-290. These facts establish loss causation under the materialization of the concealed risk theory.  *See In re SemGroup Energy Partners,* 729 F. Supp. 2d at 1301.

> ### E.   The Control Person Allegations are Adequately Pled

Defendants contest Plaintiff's Section 20(a) claims only on the basis that the underlying Section 10(b) claim should be dismissed.  Defs. Br. at 58-59.  Because those arguments fail, the Court should sustain Plaintiff's claims under Section 20(a) of the Exchange Act.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.[43]

Dated: October 28, 2014

Respectfully submitted,

LABATON SUCHAROW LLP

/s/ Jonathan Gardner
Jonathan Gardner (*pro hac vice*)
Mark S. Goldman (*pro hac vice*)
Christine M. Fox (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mgoldman@labaton.com
cfox@labaton.com

*Counsel for Lead Plaintiff State-Boston
Retirement System and the Proposed Class*

---

[43]   In the event that all or any portion of the Complaint is dismissed, Plaintiff respectfully seeks leave to amend under Fed. R. Civ. P. 15.

Heidi G. Goebel, 10343
CHRISTENSEN & JENSEN, P.C.
15 W South Temple
Salt Lake City, UT 84101
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
heidi.goebel@chrisjen.com

*Local Counsel for Lead Plaintiff*
*and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that on this 28th day of October, 2014, I electronically filed this Lead Plaintiff's Opposition to Defendants' Motion to Dismiss using the Court's CM/ECF system, which will be sent electronically to the registered participants as identified on the attached Electronic Mail Notice List.


<u>/s/ Jonathan Gardner</u>
Jonathan Gardner

**Mailing Information for a Case 2:14-cv-00033-DB**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Nelson T. Abbott**
  nelson@abbottlawfirm.com,nicole@abbottlawfirm.com
- **Rachel A. Avan**
  ravan@labaton.com
- **Daniel E. Barnett**
  dbarnett@parrbrown.com,calendar@parrbrown.com
- **Stephen R. Basser**
  sbasser@barrack.com
- **Robert S. Clark**
  rclark@parrbrown.com,calendar@parrbrown.com,achandler@parrbrown.com
- **Alexis S. Coll-Very**
  acoll-very@stblaw.com,janie.franklin@stblaw.com,lee.brand@stblaw.com
- **Andrew G. Deiss**
  adeiss@deisslaw.com,stacey@deisslaw.com
- **Christine M. Fox**
  cfox@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com
- **Jonathan Gardner**
  jgardner@labaton.com,ElectronicCaseFiling@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,ckeller@labaton.com
- **Heidi G. Goebel**
  heidi.goebel@chrisjen.com,goebel_heidi@hotmail.com,karen.harwood@chrisjen.com
- **Jeffrey W. Golan**
  jgolan@barrack.com,rbranch@barrack.com
- **Mark S. Goldman**
  mgoldman@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com
- **Jon V. Harper**
  jharper@aklawfirm.com,abeal@aklawfirm.com
- **Mark F James**
  mjames@hjdlaw.com
- **Thomas R Karrenberg**
  tkarrenberg@aklawfirm.com,aolson@aklawfirm.com
- **Christopher J. Keller**
  ckeller@labaton.com
- **James G. Kreissman**
  jkreissman@stblaw.com,lee.brand@stblaw.com
- **Angelina Nguyen**
  anguyen@labaton.com,fmalonzo@labaton.com,electroniccasefiling@labaton.com

- **Julie B. Palley**
  jpalley@barrack.com,rbranch@barrack.com
- **Jonathan C. Sanders**
  jsanders@stblaw.com,janie.franklin@stblaw.com,lee.brand@stblaw.com
- **David W. Scofield**
  dws@psplawyers.com,ka@psplawyers.com,hj@psplawyers.com
- **Michael W. Stocker**
  mstocker@labaton.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

☐  (No manual recipients)