Robert S. Clark (4015)
Daniel E. Barnett (8579)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Tel: (801) 532.7840
Fax: (801) 532.7750
rclark@parrbrown.com

JAMES G. KREISSMAN (*pro hac vice*)
ALEXIS COLL-VERY (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Tel: (650) 251-5000
Fax: (650) 251-5002
jkreissman@stblaw.com
acoll-very@stblaw.com

*Attorneys for Defendants Nu Skin Enterprises, Inc.,*
*M. Truman Hunt, and Ritch N. Wood*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE NU SKIN ENTERPRISES, INC. SECURITIES LITIGATION<br><br>This document relates to ALL ACTIONS. | Master File No. 2:14-cv-00033-DB<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Judge Hon. Dee Benson |

**Table of Contents**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 6

I.      Plaintiffs' Allegations Do Not Adequately Support a Finding of Falsity .......................... 6

        A.      Plaintiffs Fail to Plead Specific Facts Demonstrating Nu Skin's
                 Payment of Downline Commissions ............................................................... 6

        B.      Plaintiffs Do Not Identify Any False Statement Regarding Training .................. 10

        C.      Plaintiffs Allege No False Statement Related to Unlicensed Direct
                 Selling ....................................................................................................... 11

        D.      Plaintiffs Engage in Impermissible Puzzle Pleading .......................................... 13

II.      Plaintiffs Fail to Meet Their Heavy Burden of Pleading Scienter .................................... 14

        A.      Plaintiffs Cannot Plead Scienter Based on the Core Operations Theory .............. 15

        B.      Plaintiffs Fail to Demonstrate that the Timing or Nature of
                 Defendants' Stock Trades Was Suspicious ......................................................... 16

        C.      Executive Compensation Is Irrelevant to the Scienter Analysis .......................... 18

        D.      Plaintiffs' Confidential Witness Statements Cannot Establish Scienter
                 Because Those Statements Are Not Connected to Management and
                 Fail to Establish the Witnesses' Personal Knowledge ......................................... 19

        E.      Plaintiffs' Remaining Scienter Arguments Are Equally Unavailing .................... 20

III.      Plaintiffs' Allegations Fail to Establish Loss Causation .................................................. 23

        A.      The *People's Daily* Articles Merely Repeat Citron's Allegations and
                 Do Not Constitute a Corrective Disclosure ....................................................... 24

        B.      Media Speculation Does Not Constitute a Corrective Disclosure ........................ 25

        C.      The Announcement of a Government Inquiry Is Not a Corrective
                 Disclosure .................................................................................................. 27

        D.      Nu Skin's 8-K Cannot Constitute a Corrective Disclosure Because It
                 Did Not Acknowledge a Violation of Law ....................................................... 29

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

Page

## Cases

*Alizadeh v. Tellabs, Inc.*,
  No. 13-cv-537, 2014 WL 2726676 (N.D. Ill. June 16, 2014) .......................................... 14

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012) .............................................................. 9

*Better v. YRC Worldwide Inc.*,
  No. 11-cv-2072, 2012 WL 4433500 (D. Kan. Sept. 25, 2012) ........................................ 20

*Board of Trustees of City of Ft. Lauderdale General Employees'*
  *Retirement Systems v. Mechel OAO*, 811 F. Supp. 2d 853
  (S.D.N.Y. 2011) ....................................................................................... 15

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
  No. 11 Civ. 4665 PGG, 2014 WL 4832321
  (S.D.N.Y. Sept. 28, 2014) ....................................................................... 19, 21, 26-27

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................... 24

*Durham v. Whitney Info. Network, Inc.*,
  No. 06-cv-00687, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) .................................... 29

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ....................................................................... 17

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ..................................................................... 11

*In re Almost Family, Inc. Sec. Litig.*,
  No. 3:10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ............................... 28-29

*In re Apollo Grp., Inc. Sec. Litig.*,
  No. C 04-2147 PHX, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) ................................. 25

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................. 18

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ......................................................................... 10

*In re Cisco Sys. Inc. Sec. Litig.*,
No. C 11-1568-SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) .............................. 19

*In re Cornerstone Propane Partners, L.P. Securities Litigation*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ........................................................................ 14

*In re Daou Sys., Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ...................................................................................... 10

*In re Elan Corp.*,
No. 02CIV865(RMB)(FM), 2004 WL 1305845
(S.D.N.Y. May 18, 2004) .............................................................................................. 22

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
No. MDL-1446, 2005 WL 3504860 (S.D. Tex. Dec. 22, 2005) ...................................... 26

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) .............................................................................. 18

*In re Focus Enhancements, Inc. Sec. Litig.*,
309 F. Supp. 2d 134 (D. Mass. 2001) .......................................................................... 22

*In re FX Energy, Inc. Sec. Litig.*,
No. 2:07-cv-874-CW, 2009 WL 1812828 (D. Utah June 25, 2009) ........................... 9-10

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013) .......................................................................... 16

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-cv-01920, 2014 WL 4145447 (N.D. Cal. Aug. 21, 2014) ............................... 13

*In re KBC Asset Management N.V.*,
572 F. App'x 356 (6th Cir. July 11, 2014) .................................................................... 24

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ................................................................... 11, 14, 17-18

*In re Level 3 Communications, Inc. Securities Litigation*,
No. 09-cv-00200, 2010 WL 5129524 (D. Colo. Dec. 10, 2010) .................................... 14

*In re Maxim Integrated Products, Inc. Securities Litigation*,
639 F. Supp. 2d 1038 (N.D. Cal. 2009) .................................................................... 25-26

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................................ 27

*In re Nature's Sunshine Products Securities Litigation*,
486 F. Supp. 2d 1301 (D. Utah 2007) ...................................................................... 16-17

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ........................................................... 20

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    824 F. Supp. 2d 1214 (D.N.M. 2011) ........................................................... 9, 18

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 18

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1242 (N.D. Okla. 2003) ......................................................... 13

*In re In re Williams Sec. Litig.-WCG Subclass,*
    *558 F.3d 1130, 1140 (10th Cir. 2009)* ............................................................. 30

*Janbay v. Canadian Solar, Inc.*,
    No. 10 CIV. 4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .............. 25-26

*Kapur v. USANA Health Sciences, Inc.*,
    No. 2:07-cv-00177-DAK, 2008 WL 2901705
    (D. Utah July 23, 2008) ............................................................................... 8, 19

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ......................................................................... 26

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. Aug. 7, 2014) ............................................................. 28

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) .................................................................................. 22

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..........................................................24-25, 27-29

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
    761 F.3d 1109 (10th Cir. 2014) ...................................................................... 21

*Mishkin v. Zynex Inc.*,
    No. 09-cv-00780-REB-KLM, 2011 WL 1158715
    (D. Colo. Mar. 30, 2011) .......................................................................... 10, 20

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ......................................................................27-28

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ......................................................................21-22

*Scott v. ZST Digital Networks, Inc.*,
    No. 11-cv-03531, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) .................................. 25-26

*Slater v. A.G. Edwards & Sons, Inc.*,
    719 F.3d 1190 (10th Cir. 2013) ....................................................................... 12

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .......................................................................... 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................... 15

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)............................................................. 16

*United Food & Commercial Workers Union Local 880 Pension Fund v.*
    *Chesapeake Energy Corp.*, 762 F.3d 1158 (10th Cir. 2014) ........................... 12

*Yates v. Municipal Mortgage & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..................................................................... 15-16

*Zack v. Allied Waste Indus., Inc.*,
    No. CIV04-1640, 2005 WL 3501414 (D. Ariz. Dec. 15, 2005) ......................... 9

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .......................................................................... 9

## Statutes and Rules

Federal Rule of Civil Procedure 8 .................................................................. 1, 3, 14

Private Securities Litigation Reform Act................................................... 3, 9, 12, 15

SEC Rule 10b5-1 ................................................................................... 4, 16-18

Defendants Nu Skin Enterprises, Inc. ("Nu Skin"), M. Truman Hunt, and Ritch N. Wood (collectively, "Defendants") hereby respectfully submit this reply in support of their motion to dismiss (the "Opening Brief" or "Mot.") the Amended Complaint ("Am. Compl.").

## <u>INTRODUCTION</u>

Defendants moved to dismiss the Amended Complaint on three grounds: (1) failure to allege an actionable false statement and otherwise to comply with the requirements of [Rule 8](), (2) failure to allege facts giving rise to a strong inference of scienter, and (3) failure to allege facts supporting loss causation. Plaintiffs' Opposition ignores both relevant precedent and the Amended Complaint's multiple defects, and otherwise fails to rebut Defendants' arguments.

<u>The Amended Complaint Fails to Allege an Actionable False Statement</u>

The Amended Complaint asserts that Defendants failed to tell their investors that Nu Skin China took group productivity into account in compensating its Sales Employees.[1] In their Opening Brief, Defendants demonstrate that Nu Skin has consistently disclosed this practice. While Plaintiffs no longer dispute this fact, they now contend that Nu Skin's public disclosures are false and misleading for the more specific reason that Nu Skin failed to disclose that it paid "downline" sales commissions (*i.e.*, a percentage of the sales made by an employee's "sales team") to its sales personnel in violation of China's direct selling and anti-pyramid laws.

However, the Amended Complaint fails to allege facts sufficient to plead the payment of downline sales commissions. Plaintiffs rely exclusively on the purported statements

---

[1] As explained in the Opening Brief, Sales Employees are Nu Skin China employees who sell products primarily through retail stores and are compensated by commissions on their personal sales, as well as by a quarterly-adjusted salary. Mot. at 7-8. Direct Sellers, by contrast, hold direct selling licenses, may consummate sales outside of Nu Skin China's stores, and are compensated only by commissions on their personal sales. *Id.* at 7.

of confidential witnesses. These statements are deficient because the witnesses never claim to have paid, received, or witnessed the payment of downline commissions in China and thus lack the requisite first-hand knowledge to validate their statements. Moreover, these witnesses offer no basis for their indirect knowledge of the supposed commission payments, instead stating in conclusory fashion that such commissions "could" be paid. Finally, these witnesses were low-level employees with short employment tenures, and lack visibility into the company's actual practices. Such vague statements by persons with no clear basis for their knowledge are insufficient to establish falsity as a matter of law.

Plaintiffs next assert that they have alleged falsity based on their claim that Nu Skin failed to disclose that its training practices in China are inadequate under Chinese law. This assertion fails for several reasons: (i) Plaintiffs fail to allege that Nu Skin made any public statements regarding the nature or extent of any training that they provided to sales personnel in China; (ii) Plaintiffs fail to allege what training is required under Chinese law; and (iii) Plaintiffs fail to allege that Nu Skin's training fell short of the requisite legal standard.

Finally, Plaintiffs continue to assert that Nu Skin failed to disclose that Nu Skin China sales personnel were engaging in unlicensed direct selling outside of Nu Skin China's traditional retail stores. However, as set forth in the Opening Brief, Nu Skin disclosed the fact that its sales personnel in China promote its products outside of its retail stores, the very practice described by Plaintiffs' confidential witnesses. Plaintiffs fail to respond to the fact that Nu Skin had publicly disclosed the conduct in question, and instead merely reassert their claim that Nu Skin China sales personnel engaged in unlicensed direct selling, without further support. Plaintiffs thus fail to allege falsity with respect to their unlicensed direct selling claim.

The Amended Complaint Engages in Impermissible Puzzle Pleading

The Opening Brief demonstrates that the Amended Complaint engaged in impermissible "puzzle pleading" under Federal Rule of Civil Procedure 8 by presenting a "laundry list" of alleged misstatements, followed by a long list of reasons for falsity. In response, Plaintiffs rely on cases in which the complaints did what the Amended Complaint here did not—provide a specific reason why each company statement was allegedly false.

The Amended Complaint Fails to Allege Facts Giving Rise to a Strong Inference of Scienter

Defendants next move to dismiss the Amended Complaint because it fails to meet the high standard for pleading scienter set out by the PSLRA, *i.e.*, the pleading of specific facts giving rise to a strong inference that Defendants made false or misleading statements either intentionally or with extreme recklessness. While Plaintiffs now offer a host of scienter theories, they are insufficient (taken separately or together) to meet the PSLRA scienter standard.

Plaintiffs first attempt to plead scienter by alleging under the "core operations doctrine" that Nu Skin China was so important to Nu Skin's business that its executives must have known that Nu Skin China was violating Chinese law. In the Opening Brief, Defendants demonstrate that the core operations doctrine is inapplicable here, because controlling precedent establishes that: (i) Nu Skin China's operations did not make up the overwhelming majority of Nu Skin's business; (ii) Nu Skin China's operations took place far away from corporate headquarters; and (iii) the issue in question, compliance with Chinese law, is complex. Plaintiffs simply ignore these authorities and repeat the allegations of the Amended Complaint, which are similar to assertions that have repeatedly been found inadequate in other cases.

Plaintiffs also try to establish scienter based on certain stock sales by Defendants Hunt and Wood made during the lengthy three-year alleged class period. In the Opening Brief, Defendants demonstrate that these sales were consistent with historical practice, were made just before the stock price sharply *increased*, and were almost all made pursuant to preapproved 10b5-1 plans. Plaintiffs largely ignore Defendants' points and focus on the dollar increase in stock sales during the alleged class period, even though Defendants Hunt and Wood sold almost exactly the same percentage of their holdings in the alleged class period as they had sold in the immediately preceding period of the same length. Plaintiffs also ask the Court to defer consideration of this issue until after discovery has been taken relating to the 10b5-1 plans, despite the fact that dozens of courts across the country have declined to do so.[2]

Plaintiffs also cannot establish scienter based on the statements of their confidential witnesses. As Defendants explain in the Opening Brief, and as established precedent holds, Plaintiffs' allegations are deficient because the confidential witnesses lack first-hand knowledge, fail to provide the sources of their purported information, and, critically, fail to allege that they ever communicated with any of the Defendants with respect to the nature of their claims . . . or anything else. Plaintiffs make almost no attempt to respond to this authority.

Finally, Plaintiffs offer a laundry list of additional, boilerplate facts in an effort to establish scienter, including that Nu Skin China's business grew rapidly, that Nu Skin publicly recognized this growth, that Nu Skin executives traveled to China and were aware of Chinese law, that Nu Skin's computer system tracked its sales in China, and, perhaps most brazenly, that

---

[2]     Plaintiffs also try to establish scienter based on the executive compensation received by Defendants Hunt and Wood, a tactic that has been rejected in numerous cases.

Nu Skin demonstrated its culpability by refuting the claims of illegal conduct made by short

seller Citron Research.  Plaintiffs cite no applicable precedent in support of these contentions,

and Defendants believe no such precedent exists.  In sum, despite their efforts to offer numerous

bases for scienter, Plaintiffs fail to plead any facts that give rise to a strong inference of scienter.

The Amended Complaint Fails to Allege Loss Causation

In the Opening Brief, Defendants explain that the Amended Complaint fails to

allege a corrective disclosure that could give rise to loss causation.  In particular, Defendants

explain that a corrective disclosure cannot consist of the mere repackaging of public information,

media speculation, or announcement of government investigations.  Defendants also demonstrate

that the Nu Skin 8-K on which Plaintiffs rely says nothing about any alleged violation of law.  In

response, Plaintiffs point to Tenth Circuit precedent that does not address these issues at all, but

merely sets forth the general loss causation standard, which is not in dispute.  Moreover,

Plaintiffs cannot deny the fact that the clear weight of precedent supports Defendants' argument

that the *People's Daily* allegations, the announcement of government investigations, and the

statements by Nu Skin in its 8-K that some Nu Skin China employees did not follow company

policy do not constitute corrective disclosures and thus fail to plead loss causation.

In sum, the Amended Complaint fails to plead sufficient facts to establish falsity,

scienter or loss causation.  None of these failures are surprising, given that the Chinese

government's investigation did not find Nu Skin violated Chinese anti-pyramid or multi-level

compensation laws.  As such, the Amended Complaint should be dismissed with prejudice.

<u>**ARGUMENT**</u>

**I.**     **Plaintiffs' Allegations Do Not Adequately Support a Finding of Falsity**

The Opening Brief explains that the Amended Complaint fails to identify a material false or misleading statement or omission. Mot. at 28-30. Plaintiffs respond that the Amended Complaint alleges that Nu Skin made false or misleading statements or omissions by failing to disclose its violations of Chinese law relating to: (1) Nu Skin China's payment of downline sales commissions, (2) Nu Skin China's inadequate training of sales representatives, and (3) unlicensed direct sales by Nu Skin's Sales Employees. Opposition ("Opp.") at 20. To allege falsity, Plaintiffs must therefore allege well-pled facts demonstrating that Nu Skin China violated Chinese law with respect to these issues. They have failed to do so.

**A.**     **Plaintiffs Fail to Plead Specific Facts Demonstrating Nu Skin's Payment of Downline Commissions**

As set forth in the Opening Brief, the Amended Complaint repeatedly makes the conclusory allegation that "Nu Skin was operating the very same MLM system in Mainland China that it was operating everywhere else." *See, e.g.*, Am. Compl. ¶ 8. The only well-pled allegation related to this topic is that one factor in determining a Sales Employee's compensation is the performance of his sales team. *See, e.g.*, *id.* ¶¶ 7, 10, 72, 145, 150; *see also* Mot. at 30-32. Because *Nu Skin has repeatedly disclosed this fact to investors*, this allegation cannot give rise to an actionable false statement. *See, e.g.*, Mot. at 18 (quoting 2011 10-K stating that Nu Skin China "use[s] . . . the sales productivity of a sales leader and the sales promoters and employees he/she leads and supervises in setting his/her quarterly compensation level."); *id.* at 18 n.9.

Plaintiffs concede that Nu Skin made these disclosures, but assert that they have adequately alleged falsity by claiming that Nu Skin Sales Employees and Direct Sellers were

paid downline sales commissions (*i.e.*, a 5% commission on sales made by persons within their sales organization). Opp. at 20.[3] Plaintiffs' downline commission allegations fail because they are based entirely on statements by purported confidential witnesses (CW2, CW3, CW5, CW6, CW7, CW8, and CW10) that are insufficient to establish falsity as a matter of law. *See id.*

As an initial matter, neither CW3 nor CW5 mentions downline commissions. CW3 says nothing about compensation, merely making certain irrelevant statements about licensing and training. Am. Compl. ¶ 67 n.19. Similarly, CW5 is only alleged to have said that "every sales person has a personal account and [that] his 'team's' account was linked to his personal account," *id.* ¶ 78, and that "his income depended on his team's performance." *Id.* ¶ 69. None of these allegations supports Plaintiffs' downline commission theory.

CW7 and CW8 are similarly unhelpful. Each merely reiterates the existence of sales teams in China, without suggesting the payment of downline commissions. *Id.* ¶ 75 (hearsay statement by CW7 that coworkers "let him know" there were downlines); *id.* ¶ 76 (conclusory statement by CW8 that there were downlines).

The final three confidential witnesses in question fail to demonstrate first-hand knowledge of the payment of downline commissions. CW2 and CW10 state only that Sales Employees "could" theoretically obtain a percentage of downline sales, but never state that they

---

[3]      The Amended Complaint uses the term "downline" to refer to a Sales Employee's "sales team" (*i.e.*, other Nu Skin China Sales Employees who report to that employee). *See, e.g.*, Am. Compl. ¶ 71. As discussed above, the performance of a Nu Skin China Sales Employee's sales team is a factor that is considered when setting that Sales Employee's salary. This fact—along with the existence of sales teams in China—has been fully disclosed and is entirely distinct from the alleged payment of downline commissions.

or anyone known to them ever paid or received such a commission. Am. Compl. ¶¶ 67, 70.[4] Finally, while CW6 claims Sales Employees "receive a cut of their downlines' revenues," this witness is an "outside consultant" who, for six months, helped Nu Skin China "determine which distributors qualified for incentive trips and other Nu Skin incentive rewards." *Id.* ¶ 71. CW6 thus lacked any involvement in, or basis for first-hand knowledge of, the alleged payment of downline commissions in China or anywhere else. In sum, no witness claims to have made, received, or witnessed the payment of downline commissions in China. Indeed, the Amended Complaint fails to describe how any witness supposedly learned about even the theoretical possibility of the payment of downline commissions in China.

In the absence of specific facts establishing that these witnesses had a reliable basis for the purported knowledge, their statements are conclusory and speculative and thus cannot establish falsity. *See* Mot. at 48-52 and citations (setting forth case law rejecting confidential witness statements that failed to disclose witnesses' bases for first-hand knowledge); *see also Kapur v. USANA Health Sciences, Inc.*, No. 2:07-cv-00177-DAK, 2008 WL 2901705, at *16 (D. Utah July 23, 2008)* (confidential witness statement that company's products were rarely sold because price was too high and consumers were not interested in buying them insufficient to establish falsity where witness provided no basis to establish first-hand knowledge).[5]

---

[4]    Although not cited by Plaintiffs as corroboration of the payment of downline commissions, CW4 makes a similar statement that employees "could" earn a commission based on downline sales. *Id.* ¶ 68. Plaintiffs' other confidential witnesses (CW1 and CW9) do not discuss compensation at all. *Id.* ¶¶ 60, 77.

[5]    Plaintiffs claim that *Kapur* is distinguishable because the witness statements in *Kapur* were "not based on first-hand knowledge" whereas "[h]ere, information provided by confidential witnesses is based on first-hand knowledge." Opp. at 21 n.18. To the contrary, just as the witnesses in *Kapur* fail to allege facts showing first-hand knowledge,

Indeed, many of the cases cited by Plaintiffs support this fundamental principle. *See, e.g.*, *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1226 n.11 (D.N.M. 2011)* (cited in Opp. at 20) (requiring "detail regarding the basis of the informant's knowledge and the knowledge itself" to meet the PSLRA's pleading standards); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997-98 (9th Cir. 2009)* (cited in Opp. at 21) (rejecting conclusory witness statements that "corporate officers [manipulated] the financial data through separate spreadsheets at the end of each month, and that [key employee] was 'accessing [defendant's] inventory accounts on his own and manipulating the value of the Company's inventory,'" where "[n]one of these confidential witness statements establish[ed] the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions").[6]

Moreover, Plaintiffs fail to distinguish the case law from this District holding that these types of anonymous statements receive a "steep discount." Mot. at 48-49 (quoting *In re FX Energy, Inc. Sec. Litig.*, No. 2:07-cv-874-CW, 2009 WL 1812828, at *10 (D. Utah June 25,

---

none of the witnesses here is alleged to have personally paid, received, or observed the payment of downline commissions. Indeed, because the Amended Complaint provides no grounds to conclude that these witnesses had any basis for their statements, Plaintiffs' confidential witnesses may even lack indirect knowledge. *See, e.g.*, Am. Compl. ¶¶ 67-68, 70-71.

[6] *Accord, e.g.*, *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1033, 1037-38 (N.D. Cal. 2012)* (rejecting falsity allegation where "Plaintiffs fail to adequately allege that the confidential witnesses were in a position to have the knowledge they profess," when witnesses stated without explanation that defendant pharmaceutical company "supplied uncoated . . . pills" that were "distinctly bitter" and did not match placebos in alleged double-blind study); *Zack v. Allied Waste Indus., Inc.*, No. CIV04-1640, 2005 WL 3501414, at *7 (D. Ariz. Dec. 15, 2005)* (rejecting falsity claim based on alleged improper changes to company forecasts at direction of management, where plaintiffs "failed to plead with particularity . . . the source of confidential witnesses' knowledge").

[2009)).[7]  Similarly, Plaintiffs ignore Defendants' case law discounting the use of internal

company documents that lack any sender, recipient, or authentication information.  *See* Mot. at

52.  Finally, Plaintiffs fail to rebut the myriad other facts rendering their confidential witnesses

unreliable, including that these individuals worked at Nu Skin China for brief periods; were low-

level salespeople or consultants with no alleged involvement in the setting or payment of

compensation in China; and lacked any knowledge of broader Nu Skin China policies or

practices regarding compensation.  *See id.* at 51-52.[8]

        In sum, Plaintiffs' remaining compensation-based falsity argument is that Nu Skin

China paid downline sales commissions.  Given the Amended Complaint's failure to include any

specific allegations from credible witnesses with first-hand knowledge of the payment of such

commissions, Plaintiffs have failed to adequately allege falsity with respect to this issue.

## B.  Plaintiffs Do Not Identify Any False Statement Regarding Training

        Plaintiffs claim to have pled falsity by alleging that "new sales representatives and

direct sellers were receiving little, if any, training in violation of Chinese regulations on direct

---

[7]    Instead, Plaintiffs' precedent merely holds that witnesses with *specific personal involvement* in wrongful activity can establish a basis for personal knowledge.  *See, e.g.*, *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1017 (9th Cir. 2005) (witness had personal knowledge when he was asked to go to company warehouse, plug in and turn on a computer, and bill for work he did not perform, and was later told to "forget it ever happened.");  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30-31 (1st Cir. 2002) (witnesses had personal knowledge when they personally (1) entered suspicious returns into database, (2) engaged in "channel stuffing" with five specific distributors, and (3) had "direct knowledge" of improper shipments to two specific customers);  *Mishkin v. Zynex Inc.*, No. 09-cv-00780-REB-KLM, 2011 WL 1158715, at *6 (D. Colo. Mar. 30, 2011) (witnesses personally submitted allegedly fraudulent invoices).

[8]    Plaintiffs do not assert that any of their confidential witnesses was a Direct Seller and have therefore failed to allege any specific facts suggesting that Direct Sellers received downline commissions or other forms of compensation based on the sales of others.

selling." Opp. at 20. This theory assumes that Nu Skin China (1) was required to conduct certain training under the direct selling regulations; (2) failed to provide such training; and (3) falsely stated that it was providing such training. Plaintiffs fail to allege any of these facts.

First, the Amended Complaint does not claim that Chinese direct selling regulations require a particular level or type of training. *See, e.g.*, Am. Compl. ¶ 20 n.11 (claiming only that Chinese regulations require a direct selling company to "organiz[e] the vocational training and examination of the door-to-door salesmen it recruits"). Second, Plaintiffs do not allege that Nu Skin China failed to train its Direct Sellers (the relevant regulation relates only to Direct Sellers, not Sales Employees) or that Nu Skin's training otherwise failed to comply with Chinese law. Indeed, to the contrary, the Amended Complaint alleges that Nu Skin China *provided* training. *See, e.g.*, *id.* ¶ 67 (remote training sessions); *id.* ¶ 68 (training conducted by upstream personnel); *id.* ¶ 69 (same). Finally, Plaintiffs do not identify any Nu Skin statement specifying a particular level or quality of training. *See, e.g.*, *id.* ¶ 118 (citing Nu Skin's statement that it "work[s] diligently to train our salesforce"). Accordingly, Plaintiffs fail to allege any basis for a false or misleading Nu Skin statement regarding training.[9]

## C. Plaintiffs Allege No False Statement Related to Unlicensed Direct Selling

Plaintiffs' third and final alleged basis for falsity is the purported unlicensed direct selling by Nu Skin China Sales Employees outside of the company's retail stores. The Opening Brief demonstrates that Nu Skin has long publicly disclosed the fact that its Sales

---

[9]     Moreover, vague statements about the strength of Nu Skin China's training are puffery that cannot give rise to a securities fraud claim. *See, e.g.*, *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339-40 (10th Cir. 2012); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119-20 (10th Cir. 1997).

Employees engage in marketing and promotional activities outside its retail stores, an activity that is not prohibited by any provision of law. *See* Mot. at 33-34. Plaintiffs fail to address this argument, instead merely stating in a conclusory sentence that "Nu Skin sales representatives were making unlicensed, direct sales of products outside of Nu Skin's brick and mortar stores in China." Opp. at 20.[10] Accordingly, as set forth in the Opening Brief, the Amended Complaint's boilerplate unlicensed direct selling allegations cannot allege falsity as a matter of law.[11]

---

[10]  Plaintiffs cite ¶¶ 67, 68, and 77 of the Amended Complaint to support their unlicensed direct selling allegations. Opp. at 20. In Paragraph 67, CW2 allegedly states that he "engaged in direct selling outside Nu Skin's store in Beijing." However, as the rest of the paragraph explains, CW2 merely stated that he interacted with customers outside of Nu Skin stores, while the sales transactions took place within the stores—exactly how Nu Skin itself describes its sales process. *See* Mot. at 34. Plaintiffs next rely on Paragraph 68, which alleges that CW4 stated "the Company did not make it clear which products were licensed for sale by direct sellers and which could only be sold through the physical stores." Even if true, this assertion does not show that unlicensed direct selling occurred. Finally, Paragraph 77 claims that CW9 alleged Nu Skin could monitor sales in China through a computer system. This allegation also does not show unlicensed direct selling.

[11]  Plaintiffs also devote pages of their Opposition to attacking arguments that Defendants have not made. Plaintiffs first contend that Defendants are not entitled to rely on certain risk factor disclosures in their SEC filings warning investors that the Chinese government could, in the future, find Nu Skin's compensation structure to violate Chinese law. Opp. at 24. However, Defendants only include those disclosures in the Background section of the Opening Brief and do not base their argument upon them. Plaintiffs then attack a "truth-on-the-market" defense that Defendants do not assert. *See id.* at 26-27. Instead, Defendants offer the uncontroversial legal principle that the disclosure of previously disclosed facts is not material, relying on precedent distinct from the truth-on-the-market defense. *See* Mot. at 30-31; *see also United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 762 F.3d 1158, 1167 (10th Cir. 2014) (reiterating that "[u]ndisclosed information is material only if its disclosure would have 'significantly altered the total mix of information available' to a reasonable investor") (quoting *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013)). Finally, Plaintiffs challenge the applicability of the PSLRA's safe-harbor provision for forward-looking statements. Opp. at 27-28. Once again, the Opening Brief does not rely on the safe harbor with respect to any of the asserted bases for falsity in Plaintiffs' Opposition.

**D. Plaintiffs Engage in Impermissible Puzzle Pleading**

Defendants' Opening Brief shows how the Amended Complaint engages in improper "puzzle pleading" by listing dozens of different statements, and then offering a laundry list of purported reasons why that group of statements is false or misleading, without explaining why each specific statement is allegedly false or misleading. Mot. at 36. Plaintiffs deny that the Amended Complaint is deficient in this manner, and cite precedent which they claim supports the appropriateness of their pleading technique. However, an examination of the precedent relied on by Plaintiffs only further demonstrates the inadequacy of the Amended Complaint.

As an initial matter, Plaintiffs cite to multiple cases in which the complaint at issue specifically explained why each alleged misrepresentation was false or misleading. *See* Opp. at 23. For example, rather than taking Plaintiffs' "laundry list" approach, the plaintiffs in *Intuitive Surgical* followed each allegedly false or misleading disclosure with a paragraph specifically explaining why the statement was false. *See In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920, 2014 WL 4145447, at *5 (N.D. Cal. Aug. 21, 2014) (noting plaintiffs "precisely detailed" each statement and reason for falsity and had "avoid[ed] lengthy quotations in favor of highlighting problematic portions of statements");[12] *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003) (misstatements followed by specific reasons for falsity).[13]

By contrast, Plaintiffs here list dozens of lengthy quotes, from numerous Nu Skin disclosures, followed by long and disparate lists of reasons for falsity. *See, e.g.*, Am. Compl.

---

[12]     *See also* 2013 WL 6387059 (Amended Class Action Compl.) ¶¶ 182-255 (setting forth allegedly false statements, followed by specific basis for falsity).

[13]     *See also, e.g.*, 2002 WL 32835268 (Consolidated Amended Compl.) ¶¶ 312-19, 325-29, 348-54 (same).

¶ 92.  Numerous decisions in this Circuit and elsewhere (including some involving complaints authored by Plaintiffs' counsel themselves) have found this exact format to violate Rule 8.  *See* Mot. at 35 n.22.[14]

## II.      Plaintiffs Fail to Meet Their Heavy Burden of Pleading Scienter

The Opening Brief demonstrates that the Amended Complaint should be dismissed because Plaintiffs have failed to plead specific facts giving rise to a strong inference of scienter.  In particular, Defendants explain that: (1) Plaintiffs cannot rely on the "core operations" doctrine to establish scienter because that doctrine is inapplicable here; (2) Plaintiffs cannot plead scienter based on the stock sales of Defendants Hunt and Wood because they have failed to allege facts showing that those sales were suspicious in any way; (3) Plaintiffs cannot

---

[14]      Plaintiffs' own cases are largely in accord, and Plaintiffs fail to distinguish Defendants' authorities.  Plaintiffs note that in *In re Level 3 Communications, Inc. Securities Litigation*, No. 09-cv-00200, 2010 WL 5129524, at *9 (D. Colo. Dec. 10, 2010), *aff'd*, 667 F.3d 1331, 1344-45 (10th Cir. 2012), and *In re Cornerstone Propane Partners, L.P. Securities Litigation*, 355 F. Supp. 2d 1069, 1080-81 (N.D. Cal. 2005), the courts reached the merits of motions to dismiss, despite concerns about the puzzle pleading nature of the complaints in question.  *See* Opp. at 23 and n.20.  However, both courts dismissed the complaints on substantive grounds after first noting the complaint's impermissible structure.  Indeed, the court in *Level 3* was prepared to dismiss the complaint without prejudice based on its structure, but for its other inadequacies which led to a dismissal with prejudice.  2010 WL 5129524, at *7 ("The 'hydra-like complaint' in this case should, at a minimum, be dismissed without prejudice.").  Additionally, in *Cornerstone*, the court explicitly noted that, given the puzzle pleading nature of the complaint, the clear majority view in the Ninth Circuit was that dismissal was required.  355 F. Supp. 2d at 1080-81 (citing cases).  Finally, Plaintiffs try to distinguish *Alizadeh v. Tellabs, Inc.*, No. 13-cv-537, 2014 WL 2726676, at *5 (N.D. Ill. June 16, 2014), cited in the Opening Brief, claiming that here, "the 'connector' paragraphs . . . in each applicable section . . . either state the reasons why the statements are false and misleading or refer back to an earlier paragraph where the adverse facts were listed."  Opp. at 23 n.20.  However, the *Alizadeh* complaint used virtually indistinguishable language from the Amended Complaint.  *See, e.g.*, 2013 WL 7159515 (Amended Complaint) ¶ 135 (arguing alleged misstatements "were materially false and/or misleading when made for the reasons stated in ¶ 16(a)-(j)" and listing various reasons).

establish scienter by looking to the executive compensation paid to Defendants; and (4) Plaintiffs cannot rely on purported confidential witness statements to establish scienter both because those statements are unreliable and, even if credited, do not demonstrate knowledge of the alleged misstatements or omissions by Nu Skin's officers or directors.  Plaintiffs fail to address many of these arguments and offer ineffective responses to the rest.  Instead, Plaintiffs devote most of their scienter argument to offering additional bases for scienter that are equally unavailing.[15]

### A.    Plaintiffs Cannot Plead Scienter Based on the Core Operations Theory

The Opening Brief makes clear that the "core operations theory" is typically given limited weight in the scienter analysis, and that it is inapplicable here because (i) Nu Skin China represented a relatively small portion of Nu Skin's business during the relevant period, rather than the requisite overwhelming majority of its operations; (ii) Nu Skin China's operations took place thousands of miles away from corporate headquarters; and (iii) the allegations in question relate to Nu Skin China's compliance with complex and uncertain foreign law.  Mot. at 39-41.

Plaintiffs fail to respond to these arguments.[16]  Instead, Plaintiffs simply repeat their allegation that Nu Skin China comprised, at most, about 30% of Nu Skin's global revenue

---

[15]    Plaintiffs accurately state that scienter is viewed "holistically."  Opp. at 29 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)).  However, even viewed holistically, Plaintiffs' scienter arguments are each so lacking in merit that they do not collectively approach the elevated scienter pleading standard of the PSLRA.

[16]    Plaintiffs attempt to distinguish Defendants' precedent in a single footnote.  Opp. at 40 n.32.  Plaintiffs claim that *Board of Trustees of City of Ft. Lauderdale General Employees' Retirement Systems v. Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011), only found that allegations of core operations were insufficient, *standing alone*, to establish scienter.  In fact, the *Mechel* court considered the core operations theory in combination with numerous other factors and still rejected it.  *Id.* at 871-83.  Plaintiffs also assert that *Yates v. Municipal Mortgage & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014), is distinguishable because the conduct at issue there "concerned only a small

during the relevant period, and was projected to eventually comprise 50% of revenue.  Opp. at

38-39.  Because courts uniformly find these facts insufficient to show scienter, Plaintiffs' core

operations theory fails.  *See e.g.*, *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1300-

01 (D. Colo. 2013); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 342-44 (S.D.N.Y. 2011).

> **B.** **Plaintiffs Fail to Demonstrate that the Timing or Nature of Defendants' Stock Trades Was Suspicious**

In their Opening Brief, Defendants demonstrate that stock sales made by

Defendants Hunt and Wood during the class period were (1) wholly consistent with pre-class

sales on a percentage basis; (2) almost all made just before the stock price doubled or tripled; and

(3) in all but one case made pursuant to preapproved 10b5-1 plans.  Defendants then explained

that clear precedent establishes that these stock trades do not give rise to an inference of scienter.

*See* Mot. at 42-47.  Plaintiffs do not dispute these facts, and their legal arguments either rely on

easily distinguishable case law or are inconsistent with the black-letter law of this Circuit.

First, while ignoring the fact that Defendants sold a similar percentage of their

holdings in the immediately precedent control period as they did in the alleged class period,

Plaintiffs cite *In re Nature's Sunshine Products Securities Litigation*, 486 F. Supp. 2d 1301, 1311

(D. Utah 2007), for the proposition that Hunt's and Wood's sales were inconsistent with

historical practice simply because the dollar value of the class period sales was higher than that

of their pre-class sales.  Opp. at 41.  *Nature's Sunshine*, however, does not stand for this

---

percentage of the Company's shareholder equity and only one of the defendants' funds."
Opp. at 40 n.32.  However, Defendants cited *Yates* for the proposition that complex
issues affecting one business unit (such as interpretation of foreign law) are by definition
"not especially obvious" and thus the core operations doctrine should not apply.  *See*
Mot. at 41.

proposition.  Instead, that case found class period sales by a company's CEO to be suspicious when that CEO had *never previously sold a single share of stock* during the many years he served in his position.  *See* 486 F. Supp. 2d at 1311.  Here, where the two individual defendants each traded virtually the same percentage of their holdings in the control and alleged class periods, *Nature's Sunshine* is clearly inapplicable.[17]

Plaintiffs also assert that the timing of Hunt's and Wood's trades was "sufficiently suspicious to overwhelm any inference that they were made in good faith," Opp. at 41-42, without providing any factual basis for this claim.  Moreover, Plaintiffs never address Defendants' detailed showing that most of the class period sales in question occurred when the stock was much closer to its low than to its peak.  Mot. at 44-47.  Plaintiffs also ignore Defendants' numerous authorities holding that a pattern of selling of this type negates any inference of scienter.  *Id.* at 47.  Plaintiffs further fail to respond to the extensive precedent cited by Defendants holding that a modest number of trades, made at varying times over a years-long class period, cannot give rise to a strong inference of scienter.  *See id.* at 43-44 and citations.

Finally, Plaintiffs attempt to avoid the black-letter law cited by Defendants holding that trades made pursuant to Rule 10b5-1 plans do not give rise to a strong inference of scienter.  Mot. at 42-43.  Plaintiffs first argue that "[s]ales pursuant to a trading plan should occur with a prescribed, regular pattern or be made at regular intervals, for example, 500 shares a month on the 10th day of the month."  Opp. at 42.  This novel proposition has no basis in the text

---

[17]    Plaintiffs also attempt to distinguish *Level 3*, 667 F.3d at 1346, and *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008), by arguing that defendants there maintained a substantial percentage of their holdings.  Opp. at 41 n.34.  But the same is true here.  Hunt kept nearly half of his stock—even after the stock price roughly tripled—while Wood kept stock worth several millions of dollars by the end of the class period.  *See* Mot., Ex. BB.

of Rule 10b5-1, Plaintiffs cite no other authority for it, and Defendants are aware of none.

Plaintiffs also argue that discovery is required regarding Hunt and Wood's 10b5-1 plans. *Id.* However, *every* motion to dismiss is decided before discovery, and courts regularly grant such motions involving 10b5-1 plans without allowing discovery into those plans. *See, e.g.*, *Level 3, 667 F.3d at 1346-47* (dismissing complaint and relying, in part, on fact that insider sales were made pursuant to 10b5-1 plans, without ordering discovery into plans); *see also* Mot. at 42-43.[18]

### C. Executive Compensation Is Irrelevant to the Scienter Analysis

In their Opening Brief, Defendants demonstrate that Plaintiffs could not establish scienter based on the salaries, bonuses, and incentive-based stock options received by Defendants Hunt and Wood because courts have repeatedly held that such facts are virtually irrelevant to a scienter determination. Mot. at 47-48. Plaintiffs tacitly concede this point, admitting that this factor is "not an independent basis to support scienter." *See* Opp. at 43.[19]

---

[18] Plaintiffs' authority is distinguishable. Plaintiffs first cite cases in which the 10b5-1 plans were either *all* entered into during the class period or at times designed to maximize profits, or did not cover significant trading activity. *See* Opp. at 42 n.36 and cases cited. By contrast, here, it is undisputed that virtually all of the trades at issue were both preapproved and made shortly before the sharp spike in the stock price. Similarly, Plaintiffs' remaining cases, *id.* at 42 n.37, are either distinguishable or actually support Defendants' position. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (defendants sold virtually 100% of their stock at times designed to maximize profits); *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) (no mention of 10b5-1 plans); *see also* *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722-23 (W.D. Tex. 2010) (reiterating that preapproved trades over lengthy class periods are entitled to reduced weight in scienter inquiry).

[19] Plaintiffs' lone citation, *Thornburg*, 824 F. Supp. 2d at 1243, reaffirms that "[d]irectors and officers, like all people, tend to act in their own economic self-interest" and that "[a]lleging such motives, therefore, does not significantly advance the ball in proving a strong inference of scienter, though a court should not completely ignore such allegations." *Id.*

**D.    Plaintiffs' Confidential Witness Statements Cannot Establish Scienter Because Those Statements Are Not Connected to Management and Fail to Establish the Witnesses' Personal Knowledge**

As discussed above and in the Opening Brief, controlling case law establishes that the statements of confidential witnesses cannot give rise to a strong inference of scienter if (i) those statements do not demonstrate that company management was aware that the company had made a material misrepresentation or omission or (ii) the confidential witnesses do not allege facts demonstrating that they were speaking based on first-hand knowledge.  *See* Mot. at 48-52. Plaintiffs fail to address most of this precedent.

First, Plaintiffs entirely fail to address Defendants' controlling authority holding that confidential witness statements must be linked to management to be relevant to the scienter inquiry.  *See* Mot. at 50-51.  For this reason alone, the confidential witness statements cannot establish scienter.  *See, e.g.*, *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568-SBA, 2013 WL 1402788, at *11 (N.D. Cal. Mar. 29, 2013) (rejecting scienter where "there [we]re no facts alleging that any of the confidential witnesses had direct contact with either [defendant CEO or CFO]"); *see also* *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 PGG, 2014 WL 4832321, at *22, *32 (S.D.N.Y. Sept. 28, 2014) (rejecting scienter where "the confidential witness's account does not demonstrate with particularity that [defendant executive] was aware of" alleged evidence of improprieties and "Plaintiffs d[id] not allege . . . that these employees' concerns were brought to [executives'] attention at any point during the Class Period"); *Kapur*, 2008 WL 2901705, at *17 (declining to find scienter where plaintiffs failed to plead that documents shared with management informed them of alleged pyramid scheme).

Moreover, even absent this fatal flaw, Plaintiffs' allegations would still fail because the Amended Complaint does not allege facts demonstrating that any of the confidential witnesses possessed first-hand knowledge of the matters discussed. *See supra* § I.A. Rather than attempt to distinguish Defendants' cases, Plaintiffs instead cite a series of decisions where the complaints alleged facts showing that the confidential witnesses actually possessed first-hand knowledge. *See* Opp. at 37.[20] In the absence of such well-pled facts establishing personal knowledge, Plaintiffs cannot establish scienter based on confidential witness statements.

### E. Plaintiffs' Remaining Scienter Arguments Are Equally Unavailing

In addition to the Amended Complaint's principal scienter arguments, Plaintiffs now offer a litany of additional purported bases for scienter. However, each of these arguments also fails as a matter of law. Plaintiffs first point to Nu Skin China's growth during the class period, as well as Hunt and Wood's public statements regarding that growth, and make the unsupported and conclusory assertion that Nu Skin China could only have achieved such growth by violating Chinese law. Opp. at 31-33. Plaintiffs cite no authority for the novel proposition that growth in a business unit gives rise to a strong inference that the unit is operating in an

---

[20]     The cases cited by Plaintiffs stand in stark contrast to the allegations of the Amended Complaint. *See, e.g.*, *Better v. YRC Worldwide Inc.*, No. 11-cv-2072, 2012 WL 4433500, at *11 (D. Kan. Sept. 25, 2012) (defendant executives alleged to have had first-hand knowledge of company's financial and other difficulties through specific written reports, meetings, and email); *Mishkin*, 2011 WL 1158715, at *6 (CWs stated that they were personally directed by the company's CEO to overbill insurance companies); *In re SemGroup Energy Partners, L.P., Sec. Litig.*, 729 F. Supp. 2d 1276, 1290 n.1 (N.D. Okla. 2010) (multiple named and confidential witnesses attested that they personally engaged in improper speculative trading activities at the direction of defendant and personally observed those activities, respectively).

illegal manner, because no such precedent exists.  Indeed, were Plaintiffs correct, the scienter

requirement would be eviscerated in any case involving a growing business unit.

Plaintiffs next rely on Hunt and Wood's purported knowledge of Chinese direct

selling laws and their frequent business trips to China.  Opp. at 34-35.  Again, Plaintiffs fail to

cite a single case for the proposition that awareness of a country's laws or travel to that country

gives rise to a strong inference that the persons in question were aware of a violation of those

laws.[21]  To the contrary, courts repeatedly find such activities insufficient to establish scienter.

*See* Mot. at 38-39 (listing cases); *accord, e.g.*, *Avon*, 2014 WL 4832321, at *20 (rejecting

scienter allegation that CEO "was aware of [alleged] bribery because 'Avon's most senior

executives . . . traveled to China several times for meetings with Avon executives'" and

frequently met with Chinese officials); *see also* *MHC Mut. Conversion Fund, L.P. v. Sandler*

*O'Neill & Partners, L.P.*, 761 F.3d 1109, 1121-22 (10th Cir. 2014) (attendance at meetings

discussing relevant market insufficient to establish scienter).

Plaintiffs also claim that scienter can be established based on the allegedly "linked

computer system" in Utah, through which Nu Skin employees could "'see every sale that is

going on by every distributor' in China."  Opp. at 35-36 (quoting statement by CW9 in Am.

Compl. ¶ 77).  This allegation fails because it is wholly unrelated to any supposed wrongdoing.

The allegation that a computer system can see every sale occurring in China indicates nothing

about whether anyone in China is receiving downline commissions, whether the system would

---

[21]     Plaintiffs' lone citation, *Reese v. Malone*, 747 F.3d 557, 580 (9th Cir. 2014), has nothing
to do with travel or knowledge of relevant law.  *See* Opp. at 35 n.28.  Instead, that case
found scienter had been adequately alleged when corporate executives made statements
about an oil spill that were contradicted by specific internal company documents that
were allegedly in their possession.  *See* *Reese*, 747 F.3d at 572, 579-80.

detect the commission payments if they were made, whether any report generated by the system would include this type of information, and whether any output from this system was ever shared with Nu Skin management.  Thus, the allegation cannot establish scienter.  *See, e.g.*, *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 161 (D. Mass. 2001) ("[T]he existence of a sophisticated internal reporting system for sales is, without more, insufficient to establish scienter without a specific allegation of the factual content of a report.").

        Finally, Plaintiffs assert that "Defendants' vehement denials of the information disclosed in the Citron Report . . . and affirmative statements to the contrary also support a strong inference of scienter."  Opp. at 36.  As an initial matter, this argument—that only a guilty party would deny its guilt—has a surreal ring to it.[22]  Moreover, Plaintiffs' argument would turn a defendant's *denial* of unsubstantiated allegations into evidence of scienter in every case, an approach rejected by courts.  *See, e.g.*, *In re Elan Corp.*, No. 02CIV865(RMB)(FM), 2004 WL 1305845, at *28 (S.D.N.Y. May 18, 2004) ("if a denial of wrongdoing could serve as the factual predicate for a showing of scienter . . . this element of a securities law claim would become a mere formality").  Additionally, the cases relied on by Plaintiffs for this proposition, *see* Opp. at 36 and n.30, are readily distinguishable because, unlike here, they each involve demonstrably *false* denials of fraud allegations.  *See* *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 and n.15 (2011) (defendant issued press release indicating that internal study supported product safety claims, when no such study existed); *Reese*, 747 F.3d at 572 (defendant's public statements contradicted by internal data in her possession).  Here, by contrast, Nu Skin

---

[22]    *See, e.g.*, Franz Kafka, *The Trial* 146 (David Wyllie trans., Tribeca Books 2011) (1925) (When the defendant, K., states "But I'm not guilty . . . there's been a mistake," the response is "but that is how the guilty speak.").

responded to Citron by stating that it had not engaged in pyramid selling or MLM activities—statements ultimately corroborated by the lack of such finding by the Chinese government following the conclusion of its detailed investigation. Am. Compl. ¶¶ 230-33.[23]

## III.    Plaintiffs' Allegations Fail to Establish Loss Causation

Plaintiffs are required to plead a cognizable basis for loss causation. As set forth in the Opening Brief, each of Plaintiffs' alleged bases for loss causation fails:

- The *People's Daily* articles cannot give rise to loss causation both because they merely repackage previously disclosed public information and because they consist only of media speculation, not statements of fact.

- The announcement of the Chinese government's investigation into potential wrongdoing by Nu Skin China cannot constitute a corrective disclosure and thus cannot give rise to loss causation.

- Nu-Skin's report on Form 8-K stating that certain Nu Skin China employees failed in certain instances to comply with company policy could not constitute a corrective disclosure, because it did not admit to a violation of law and thus did not demonstrate that any prior company statement was false or misleading.

*See* Mot. at 52-58. Plaintiffs claim that in making this argument, Defendants ignore controlling Tenth Circuit precedent. Opp. at 43-44. However, the legal standard Plaintiffs cite is precisely the legal standard set out in Defendants' brief. *Compare, e.g.*, *id.* (there must be a "causal connection" between the alleged misstatement and the stock price decline) *with* Mot. at 53 ("Plaintiffs must allege a specific 'causal connection between the material misrepresentation and

---

[23]    Plaintiffs continue to claim that a Chinese government investigation of Nu Skin's business was ongoing as of June 2014, adding that "Defendants do not offer up a single new fact to dispute this allegation." Opp. at 16 n.12. However, as the Amended Complaint confirms, the government concluded its investigation in March 2014, assessing minor fines for two violations unrelated to pyramid selling or MLM allegations. *See* Am. Compl. ¶¶ 230-34. Plaintiffs offer no facts suggesting an ongoing investigation related to matters raised by the Amended Complaint, and Defendants are aware of none.

the loss.'") (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  Moreover, the

cases relied on by Plaintiffs say nothing about how to *apply* the loss causation standard under the

facts of this case.  Indeed, as set forth below, Plaintiffs' Opposition further demonstrates that the

majority of courts have adopted Defendants' position on these issues.

> **A.      The *People's Daily* Articles Merely Repeat Citron's Allegations and Do Not Constitute a Corrective Disclosure**

Defendants' Opening Brief demonstrates that the January 2014 *People's Daily*

articles merely repeated the same allegations made by Citron Research in 2012, including setting

forth a detailed chart showing a virtual one-to-one correlation between the allegations.  Mot. at

54-55.  Plaintiffs do not dispute these facts.  Instead, Plaintiffs contend that the *People's Daily*

articles "revealed new information about Nu Skin's practices in Mainland China based on the

*People's Daily's* own independent investigation—which included new interviews with Nu Skin

Sales Representatives and distributors."  Opp. at 46.

However, alleging the same *facts* based on slightly different witness accounts or

documents does not convert the *People's Daily* articles into a corrective disclosure.  For

example, in *In re KBC Asset Management N.V.*, 572 F. App'x 356, 360-62 (6th Cir. July 11,

2014), the Sixth Circuit rejected the argument that a plaintiff had pled loss causation based on a

stock price decline that followed the release of emails and affidavits in which the defendant

admitted to certain litigation misconduct that it had previously denied.  In so ruling, the court

relied on the fact that the supposed corrective disclosures were "old news," because the conduct

had previously been disclosed through the release of different documents and certain court

rulings.  *See id.*; *see also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (failing to find

loss causation arising from influential investor's report, which, even though it included

previously undisclosed "expert analysis of the source material," asserted same basic facts as prior publications); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186-88 (4th Cir. 2007) (former executive's negative characterization of previously disclosed transaction not a corrective disclosure) (cited in Mot. at 54-55 and never addressed by Plaintiffs).[24]

## B.    Media Speculation Does Not Constitute a Corrective Disclosure

Defendants' Opening Brief cites numerous cases holding that media reports of suspected or possible illegality cannot constitute corrective disclosures, because "the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud." *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012); Mot. at 55-57.[25]

---

[24]    Plaintiffs' limited attempt to distinguish Defendants' case law likewise fails. Plaintiffs argue that in *In re Maxim Integrated Products, Inc. Securities Litigation*, 639 F. Supp. 2d 1038 (N.D. Cal. 2009), the alleged corrective disclosure that was rejected was based solely upon a statistical analysis of existing public information, whereas the *People's Daily* articles were based on "previously undisclosed facts." Opp. at 48 and n.40. However, as set forth above, the *People's Daily's* reliance on new interviews does not change the fact that the *People's Daily's* allegations and alleged information are cumulative and repetitive of the Citron Report. *See* Mot. at 56 (quoting *Maxim*, 639 F. Supp. 2d at 1045-46). Similarly, the lone case that Plaintiffs cite on this point reflects the discredited view that loss causation may be alleged simply by citing a disclosure that was followed by a stock price decline, regardless of whether the information disclosed was already known in the market. *See* Opp. at 47 (quoting *Scott v. ZST Digital Networks, Inc.*, No. 11-cv-03531, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012)). While *Scott* devotes only a paragraph to this topic, the cases cited in the Opening Brief reflect the far more thoughtful analysis that comprises the clear majority view on this issue. *See* Mot. at 53-54; *see also Maxim*, 639 F. Supp. 2d at 1048 ("[A] disclosure that 'does not reveal anything new to the market is, by definition, not corrective.'") (quoting *In re Apollo Grp., Inc. Sec. Litig.*, No. C 04-2147 PHX, 2008 WL 3072731, at *2 (D. Ariz. Aug. 4, 2008)).

[25]    Plaintiffs attempt to distinguish *Janbay* on the ground that it involved an "alleged corrective disclosure [that] was speculative," Opp. at 48 n.40, but this is precisely why Defendants cite it. The *People's Daily* offered exactly the same sort of speculation of possible illegality. *See, e.g.*, Mot. at 56 ("The reporter discovers in the investigation that

Plaintiffs largely ignore this case law. Instead, Plaintiffs state the unremarkable proposition that, in some instances, short-seller, newspaper, or analyst reports of misconduct can be sufficient to plead loss causation. *See, e.g.*, Opp. at 45 ("There is no rule that a short-seller report cannot support loss causation, especially where it reveals new, nonpublic information and is accompanied by a stock drop."). Plaintiffs' cases are thus consistent with Defendants' position that media reports must offer more than mere speculation to constitute corrective disclosures,[26] and Plaintiffs never respond to Defendants' precedent showing that the *People's Daily* articles do not meet the loss causation standard because they allege nothing more than "suspected" misconduct. Mot. at 56-57 (quoting *People's Daily*).[27]

---

some parts of Nu Skin's business model and hierarchical structure are *suspected of* violation of national laws.") (quoting Am. Compl., Ex. F at 9) (emphasis added).

[26] *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2005 WL 3504860, at *16, *19 (S.D. Tex. Dec. 22, 2005) (noting in passing that "the market may learn of possible fraud [from] a number of sources," including "newspapers and journals," but finding loss causation based on Enron's conceded massive financial fraud); *see also Scott*, 2012 WL 538279, at *11 (finding short-seller report sufficient to allege loss causation where it revealed *actual* wrongdoing—filing of conflicting sets of financial statements in China and U.S.).

[27] Plaintiffs characterize Defendants' position as requiring a corrective disclosure to contain "pro[of]" of misconduct. Opp. at 47. To the contrary, as set forth in the Opening Brief, a corrective disclosure must merely plead facts that are based on more than speculation or conjecture. Mot. at 55-57; *see, e.g.*, *Maxim*, 639 F. Supp. 2d at 1045 ("[C]orrective statements . . . must identify disclosures revealing more than a 'risk' or 'potential' for widespread fraudulent conduct."); *see also Janbay*, 2012 WL 1080306, at *16 (corrective disclosure must "reveal [the] 'truth' about an alleged fraud," not merely "'[s]peculation and conjecture'" or "'even a well-educated guess'") (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 477 (4th Cir. 2011)). In this case, the *People's Daily* offered only a suspicion of misconduct, which the Chinese government itself ultimately failed to substantiate. In addition, even if the *People's Daily* had actually alleged illegality, the anonymous and conclusory witness statements and documents it cited are insufficient to constitute a corrective disclosure. *Cf., e.g.*, *Avon*, 2014 WL 4832321, at *23 (noting in connection with scienter that "news articles . . . must indicate particularized facts about a

Finally, while Plaintiffs correctly note that one of Defendants' authorities was reversed during the pendency of this motion, even that reversal reiterates that "[s]peculation of wrongdoing [by Citron] cannot by itself arise to a corrective disclosure." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). Indeed, *Amedisys* only found loss causation to have been pled in light of, *inter alia*, the fact that government investigations confirmed that defendant's practices were abusive and/or fraudulent and the fact that defendant settled a related DOJ claim for $150 million (a fact not before the district court). *Id.* at 325 n.6.

## C. The Announcement of a Government Inquiry Is Not a Corrective Disclosure

The Opening Brief demonstrates that numerous courts reject the notion that loss causation can be based on the announcement of a government investigation. *See* Mot. at 57. Such announcements do not trigger loss causation because, while "stock prices may fall upon the announcement of an . . . investigation . . . that is because the investigation can be seen to portend an added *risk* of future corrective action," not because it "reveal[s] to the market that a company's previous statements were false or fraudulent." *Meyer*, 710 F.3d at 1201.

In response, Plaintiffs assert that the Tenth Circuit has not ruled definitively on this issue and further note that not all district courts are in agreement with Defendants' authority. Opp. at 49. However, Plaintiffs fail to cite to any cases within this Circuit that reach a contrary ruling, *see id.*, and all of the circuit courts that have examined this question adopt Defendants'

---

defendant's conduct in order to support [the] claims" and rejecting article's reliance on anonymous source, where article's "vague description of the source provide[d] no basis for the Court to evaluate its reliability"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

position, including a very recent Ninth Circuit decision reaffirming this principle.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. Aug. 7, 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market.  Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal. . . . Accordingly, we hold that the announcement of an investigation, without more, is insufficient to establish loss causation.") (citing *Meyer*, 710 F.3d at 1201); *see also Amedisys*, 769 F. 3d at 323 ("We agree with the district court that generally, commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure.") (citing *Meyer* and *Loos*).  Moreover, Plaintiffs never rebut Defendants' showing that "[n]umerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."  Mot. at 57 (quoting *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-cv-00520, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012)).  Defendants respectfully submit that the Court should follow *Meyer* and progeny and decline to find loss causation based on the mere unsubstantiated possibility of wrongdoing.

Plaintiffs also argue that "a government investigation may constitute a partial corrective disclosure when it is coupled with *confirmation of misconduct*."  Opp. at 49 (emphasis added).  Plaintiffs then claim that "the Complaint alleges numerous previous and subsequent disclosures *confirming* that Nu Skin had been engaged in an illegal pyramid scheme in China and disclosing the significant negative impact this revelation would have on the Company's business prospects," including Nu Skin's settlement of the investigation and payment of a fine; disgorgement of sales revenue; agreement to improve its training practices; and agreement to close certain workshops, as well as the announcement by "[a] Chinese governmental agency . . .

that it would look into increasing its regulation and scrutiny of the direct sales sector." *Id.* at 50 (emphasis added). This contention misstates the allegations of the Amended Complaint, which shows that *none of the government's findings had anything to do with pyramid selling or MLM activities*. Am. Compl. ¶¶ 230-33. Rather, Nu Skin paid modest fines for two alleged violations, relating to (1) technical product claims and (2) sales by Direct Sellers of products that were only licensed for sale in retail stores, neither of which forms a basis for Plaintiffs' claims here. *See generally id.* ¶¶ 61-78 (detailing alleged violations); Mot. at 25-26. Thus, this case is directly in line with decisions that reject loss causation following the favorable termination of an investigation or findings of minor, unrelated violations.[28]

### D. Nu Skin's 8-K Cannot Constitute a Corrective Disclosure Because It Did Not Acknowledge a Violation of Law

Finally, as explained in the Opening Brief, Nu Skin's January 21, 2014 8-K was not a corrective disclosure because it addressed isolated violations of company policy, not violations of Chinese law. *See* Mot. at 57-58. Plaintiffs respond that "presumably it is Nu Skin's policy to comply with government regulations," and that "Defendants are essentially insisting upon a mirror-image rule [*i.e.*, a rule that the corrective disclosure must precisely mirror the alleged misstatement], which the Tenth Circuit has expressly rejected." Opp. at 50-51.

---

[28]     *See, e.g.*, *Meyer*, 710 F.3d at 1201 n.13 (where "no later finding of wrongdoing . . . an . . . investigation, standing alone, is insufficient to qualify as a corrective disclosure"); *Almost Family*, 2012 WL 443461, at *13 n.9 (announcement of investigation insufficient where a U.S. Senate report did not find evidence of fraud); *Durham v. Whitney Info. Network, Inc.*, No. 06-cv-00687, 2009 WL 3783375, at *21 (M.D. Fla. Nov. 10, 2009) (no corrective disclosure where "the result of the Special Committee investigation was that the Company restated its financial statements with respect to . . . items unrelated to" the alleged misconduct").

Plaintiffs' arguments fail as a matter of law and logic. First, while it is Nu Skin's policy to comply with the law, that does not mean that any violation of company policy *is also a violation of law*. Second, while a corrective disclosure need not precisely mirror an alleged violation, it must at least relate to the purported misconduct, as Plaintiffs' precedent makes clear. See *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure . . . must at least relate back to the misrepresentation and not to some other negative information about the company."). Here, Nu Skin's 8-K never even mentioned pyramid selling, the payment of downline commissions, or any other activity relevant to Plaintiffs' allegations, and thus it cannot trigger loss causation. *See* Mot. at 57-58 and citations.

## CONCLUSION

For the reasons set forth above and in Defendants' Opening Brief, Defendants respectfully submit that the Amended Complaint should be dismissed with prejudice.

Dated this 1st day of December, 2014.

**PARR BROWN GEE & LOVELESS**

 /s/ Robert S. Clark
Robert S. Clark
Daniel E. Barnett

**SIMPSON THACHER & BARTLETT LLP**

James G. Kreissman (*pro hac vice*)
Alexis Coll-Very (*pro hac vice*)

*Attorneys for Defendants Nu Skin Enterprises, Inc., M. Truman Hunt, and Ritch N. Wood*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December, 2014, I caused the foregoing to be filed electronically through the Court's CM/ECF System, which caused service via electronic mail on all counsel of record.

DATED this 1st day of December, 2014.

PARR BROWN GEE & LOVELESS

/s/ Daniel E. Barnett
DANIEL E. BARNETT
COUNSEL FOR DEFENDANTS