Jonathan Gardner (*pro hac vice*)
Christine M. Fox (*pro hac vice*)
Guillaume Bell (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477
jgardner@labaton.com
cfox@labaton.com
gbuell@labaton.com

Eric K. Jenkins (10783)
**CHRISTENSEN & JENSEN, P.C.**
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
eric.jenkins@chrisjen.com

*Counsel for Lead Plaintiff State-Boston Retirement System
and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE NU SKIN ENTERPRISES, INC., SECURITIES LITIGATION | Master File No. 2:14-cv-00033-JNP-BCW<br><br>Hon. Jill Parrish |
| This Document Relates To:<br>ALL ACTIONS | **LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND SUPPORTING MEMORANDUM OF LAW** |

## TABLE OF CONTENTS

STATEMENT OF RELIEF SOUGHT AND GROUNDS FOR MOTION ...................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................................4

    A.    The Class Claims ...........................................................................................4

    B.    The Stage of the Proceedings........................................................................5

    C.    Overview of the Defenses..............................................................................6

    D.    Settlement Negotiations and the Proposed Settlement ...........................................7

ARGUMENT ..........................................................................................................................8

I.    The Settlement Satisfies the Criteria for Final Approval....................................................8

    A.    The Proposed Settlement was Achieved Only After Arm's-Length Negotiations by Capable and Fully Informed Counsel and Is Not the Result of Collusion........................................................................................9

    B.    The Strengths of Lead Plaintiff's Case and the Risks of Establishing Liability....11

    C.    The Settlement Amount Relative to the Most Realistic Recoverable Damages....15

    D.    The Parties' Judgment that the Settlement Is Fair and Reasonable ......................18

    E.    Class Reaction to Date Supports Approval..........................................................18

II.    The Plan of Allocation Is Fair and Reasonable and Should Be Approved.......................19

III.    The Court Should Affirm Its Certification of the Settlement Class..................................20

CONCLUSION.......................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alvarado Partners L.P., v. Mehta,*
723 F. Supp. 540 (D. Colo. 1989) ............................................................16

*In re Am. Bank Note Holographics, Inc.,*
127 F. Supp. 2d 418 (S.D.N.Y. 2001) .......................................................15

*Anixter v. Home-Stake Prod. Co.,*
77 F.3d 1215 (10th Cir. 1996) ..................................................................16

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.,*
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ..................................................10, 13

*Belote v. Rivet Software, Inc.,*
No. 12-cv-02792-WYD-MJW, 2014 WL 3906205 (D. Colo. Aug. 11, 2014)..................9, 18

*Campbell v. C.R. England, Inc.,*
No. 2:13-cv-00262, 2015 WL 5773709 (D. Utah Sept. 30, 2015) ......................................9, 11

*In re Cendant Corp. Sec. Litig.,*
264 F.3d 201 (3d Cir. 2001)......................................................................15

*City of P'Ship Co. v. Jones Intercable, Inc.,*
213 F.R.D. 576 (D. Colo. 2002) ................................................................20

*In re Crocs, Inc. Sec. Litig.,*
306 F.R.D. 672 (D. Colo. 2014) ........................................................9, 10, 20

*In re Delphi Corp. Sec. Derivative & "ERISA" Litig.,*
248 F.R.D. 483 (E.D. Mich. 2008) ............................................................10

*Glickenhaus & Co. v. Household Int'l, Inc.,*
787 F.3d 408 (7th Cir. 2015) ....................................................................12

*Gottlieb v. Wiles,*
11 F.3d 1004 (10th Cir. 1993) ........................................................... *passim*

*Grady v. De Ville Motor Hotel, Inc.,*
415 F.2d 449 (10th Cir. 1969) ....................................................................8

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) ..................................................................................10

*Jones v. I.Q. Data Int'l, Inc.*,
    No. 1-14-cv-00130-PJK, 2015 WL 5704016 (D.N.M. Sept. 23, 2015) .....................................8

*Jones v. Nuclear Pharmacy, Inc.*,
    741 F.2d 322 (10th Cir. 1984) .............................................................................. *passim*

*In re King Res. Co. Sec. Litig.*
    420 F. Supp. 610 (D. Colo. 1976) ...............................................................................16

*Law v. Nat'l Collegiate Athletic Ass'n*,
    108 F. Supp. 2d 1193 (D. Kan. 2000) ......................................................................19, 20

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006) ..................................................................................20

*Make A Difference Found., Inc. v. Hopkins*,
    No. 10-cv-00408-WJM-MJW, 2012 WL 917283 (D. Colo. Mar. 19, 2012) ..........................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ....................................17

*In re New Mexico Nat. Gas Antitrust Litig.*,
    607 F. Supp. 1491 (D. Colo. 1984) ...................................................................... *passim*

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................17

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .............................................................................12, 16

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
    314 F.3d 1180 (10th Cir. 2002) ....................................................................................8

*Ryskamp v. Looney*,
    No. 10-cv-00842, 2012 WL 3397362 (D. Colo. Aug. 14, 2012) ..........................................19

*Shaw v. Interthinx, Inc.*,
    No. 13-cv-01229-REB-NYW, 2015 WL 1867861 (D. Colo. Apr. 22, 2015) ............................8

*Tennille v. W. Union Co.*,
    809 F.3d 555 (10th Cir. 2015) .....................................................................................16

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)..............................................................................................................8

**RULES**

Fed. R. Civ. P. 23(a) .............................................................................................................21

Fed. R. Civ. P. 23(b)(3)..........................................................................................................21

Fed. R. Civ. P. 23(e) ...............................................................................................................8

Court-appointed Lead Plaintiff State-Boston Retirement System ("State-Boston" or "Lead Plaintiff") moves for final approval of the proposed settlement of the above-captioned action against Defendants Nu Skin Enterprises, Inc. ("Nu Skin"), M. Truman Hunt ("Hunt"), and Ritch N. Wood ("Wood") (collectively, "Defendants" or "Settling Defendants") on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated May 2, 2016 (the "Settlement" or "Stipulation").[1] The Settlement resolves the Settlement Class's claims against all Defendants in exchange for $47,000,000.

## STATEMENT OF RELIEF SOUGHT AND GROUNDS FOR MOTION

Lead Plaintiff and Court-appointed Lead Counsel strongly believe that the Settlement is fair and reasonable and in the best interests of the Settlement Class. This case has been vigorously litigated, as evidenced by the briefing of the motion to dismiss and motion for class certification and by the extensive fact discovery conducted to date. At the time an agreement to settle had been reached, Lead Counsel had reviewed an analyzed approximately 500,000 pages of documents produced by Defendants; and approximately 26,000 pages of documents produced in response to third-party subpoenas. Additionally, Lead Counsel deposed six Nu Skin representatives and deposed Defendants' expert on class certification issues. The Parties also participated in two mediations and subsequent settlement negotiations. Informed by these efforts, Lead Counsel was able to produce a settlement that is an excellent recovery by any measure. The settlement amount exceeds the median for securities class actions nationwide, both in amount and as a percentage of the estimated recovery. For example, it far exceeds the $8.2 million median recovery in the Tenth Circuit between 2006 and

---

[1] The Stipulation was previously filed with the Court. ECF No. 134-1. All terms not defined herein have the same definitions as stated in the Stipulation.

2015.[2]  Additionally, it is greater than the average securities settlement in 2015, which was $37.9 million.  *Id*. at 1.  Moreover, accepting the Settlement now is preferable to the risk of protracted litigation, an uncertain jury verdict, and lengthy appellate practice.

In reaching the determination to settle this action with Defendants, Lead Counsel carefully considered the substantial risks and obstacles to achieving a better result after continued litigation. As discussed herein and in the accompanying Gardner Declaration, Lead Plaintiff faced many disputed factual issues if the case were to proceed, including whether the truth was known to the market before the end of the Class Period and whether Nu Skin was in fact operating an illegal multi-level marketing operation in Mainland China; as well as many disputed legal issues, such as whether loss causation, falsity, and scienter could be proven. Lead Plaintiff also faced a host of evidentiary challenges, including the location of future depositions of Nu Skin personnel (in Hong Kong or Utah), the procedure and location of deposing witnesses who were no longer controlled by Nu Skin such as former sales representatives operating in Mainland China, which had the potential to significantly increase the cost and burden of discovery. These issues created the risk that Lead Plaintiff would not be able to prove its claims or establish significant damages at trial. Defendants

_____

[2] *See* Laarni Bulan, Ellen Ryan, and Laura Simmons, *Securities Class Action Settlements: 2015 Review and Analysis*, at 22 (Cornerstone Research 2016), annexed as Exhibit 2 to the accompanying Declaration of Jonathan Gardner in Support of Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation and Lead Counsel's Motion for an Award of Attorney's Fees and Payment of Expenses ("Gardner Decl.").  All exhibits referenced herein are attached to the Gardner Declaration.  For clarity, citations to exhibits that have internal exhibits will be referenced as "Ex. __-__."  The first numerical reference refers to the designation of the entire exhibit attached to the declaration and the second alphabetical reference refers to the exhibit designation within the exhibit itself.

The Gardner Declaration is an integral part of this submission. The Court is respectfully referred to it for a detailed description of the factual and procedural history of the Action, the claims asserted, Lead Plaintiff's and Lead Counsel's investigation and litigation efforts, the negotiations leading to the Settlement, and the fairness and reasonableness of the Settlement and counsel's request for an award of attorneys' fees and expenses.

have vigorously asserted that the facts developed so far in discovery and the relevant law undercut the allegations and supported their defenses. There was significant uncertainty concerning whether the trier of fact would favor Defendants' arguments and interpretations of the evidence.

Lead Counsel, who have extensive experience in prosecuting securities class actions, have concluded that the Settlement is an excellent result and clearly in the best interest of the Settlement Class. This conclusion is well-informed and is based on a comprehensive analysis of: (i) the evidence produced to date; (ii) the legal and factual issues presented; (iii) the risk, expense, and delay of continuing to litigate through trial; and (iv) Lead Counsel's past experience in litigating complex actions similar to this one. Significantly, the Lead Plaintiff, a sophisticated public pension system with assets under management of more than $5.4 billion, which was appointed by the Court and has been an important part of the litigation and settlement process, supports Lead Counsel's conclusion and believes that the Settlement represents a favorable recovery on behalf of the Settlement Class.  Ex. 1.

On May 24, 2016, the Court preliminarily approved the Settlement, approved the retention of A.B. Data, Ltd. as Claims Administrator, and directed A.B. Data to cause the mailing of the settlement notice (the "Notice") to all identified Class Members (ECF No. 135). To date, more than 178,618 copies of the Notice have been mailed. Ex. 3 ¶9. The Court also ordered Lead Counsel to publish the Summary Notice in the *Investor's Business Daily* and transmit it over *PR Newswire,* which was done on June 20th and 22nd. ECF No. 135; Ex. 3 ¶10. Additionally, the Notice and Proof of Claim were posted on the dedicated settlement website and the website of Lead Counsel. *Id.* ¶12; Gardner Decl. ¶67.  To date, there have been no objections to any aspect of the Settlement and only one request for exclusion (representing 7 shares).  Ex. 3 ¶13.

For the reasons discussed herein and in the Gardner Declaration, Lead Plaintiff and its counsel respectfully submit that the proposed Settlement is fair, reasonable and adequate to the Settlement Class and merits the Court's approval.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Class Claims

This Action was brought and settled on behalf of all persons or entities who purchased or otherwise acquired the publicly traded common stock of Nu Skin, including put and call options on such publicly traded Common Stock, between May 4, 2011 and January 17, 2014, inclusive (the "Class Period"), and were damaged thereby (the "Settlement Class"). *See* ECF No. 135 ¶2.

The Complaint alleges that Defendants made materially false and misleading statements concerning how Nu Skin—a multi-level marketing ("MLM") company that distributes personal skincare products and nutritional supplements—was operating its business in Mainland China. Specifically, the Complaint alleges that Defendants had created the appearance that the Company's growth in Mainland China was achieved in compliance with Mainland China's strict laws and regulations precluding MLM activities, when Defendants allegedly knew this to be false. The Complaint also alleges that Defendants failed to disclose that Nu Skin's internal controls were intentionally (or at least recklessly) inadequate to supervise the training of new sales representatives to comply with Mainland China's direct sales regulations.  Further, the Complaint alleges that Nu Skin was operating the same MLM system in Mainland China as it was operating around the world, which was specifically prohibited in Mainland China. Gardner Decl. ¶14-20. The truth was allegedly revealed in a series of partial disclosures in August 2012 and January 2014.  These revelations

4

caused a decline in the price of Nu Skin common stock, damaging Class Members that had purchased Nu Skin common stock and call options and/or wrote put options. Gardner Decl. ¶¶21-24.

###    B.       The Stage of the Proceedings

After the Court denied Defendants' motion to dismiss, thereby lifting  the automatic discovery stay under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Parties commenced discovery.  Among other things, Lead Counsel: (i) propounded three sets of document requests and one set of requests for admission on Defendants; (ii) responded to Defendants' document requests, interrogatories, and requests for admission; (iii) served document subpoenas on third parties; (iv) engaged in numerous meet and confer discussions with Defendants and third-parties on the scope of discovery; (v) reviewed approximately 500,000 pages of documents produced by Defendants; (vi) reviewed approximately 26,000 pages of documents produced in response to third-party subpoenas; (vii) took six depositions of Nu Skin representatives; (viii) deposed Defendants' expert on class certification issues; (ix) defended a deposition of Lead Plaintiff; and (x) retained an expert to analyze loss causation issues and estimate potential class-wide damages. *See generally*, Gardner Decl. ¶¶19-58. The extent of discovery, Lead Counsel's detailed review thereof, and the analyses of Lead Plaintiff's experts allowed Lead Plaintiff and its counsel to make an extensive and well-informed liability and damages assessment before settling the Action. *Id.*

Lead Plaintiff moved to certify the class on June 26, 2015 (ECF No. 90), and Defendants filed their opposition on August 25, 2015 (ECF No. 99). After the class certification motion was briefed and oral argument was held, the Court ordered supplemental briefing at Defendants' request. The motion was fully briefed and under submission when the Parties stipulated to its withdrawal on the grounds that the Parties had reached an agreement to settle this Action. ECF No. 125.

### C.      Overview of the Defenses

In their motion to dismiss and during settlement discussions, Defendants asserted a number of credible defenses to the class's claims regarding failure to plead falsity, scienter, and loss causation. With respect to falsity, Defendants contended that Lead Plaintiff failed to plead any false or misleading statements because, *inter alia*: (i) Nu Skin previously disclosed the very practices that Lead Plaintiff accuses it of concealing and these facts are publicly known, and have not found to be in violation of Chinese law; (ii) Lead Plaintiff alleged no specific facts showing the use of group productivity in setting compensation of direct sellers; and (iii) Lead Plaintiff failed to allege that the marketing efforts of sales employees conducted outside of fixed retail stores constituted unlicensed direct selling.  Additionally, Defendants contended that Lead Plaintiff failed to adequately allege scienter because: (i) no facts were alleged showing that the Company's senior management knew its activities were illegal; (ii) the core operations theory did not support a finding of scienter; (iii) Hunt and Wood's stock sales were made pursuant to 10b5-1 plans and trades made pursuant to such plans do not provide strong evidence of scienter and even had those trades not been preapproved, the trades were routine and consistent with historical trading patterns; and (iv) Lead Plaintiff's confidential witnesses and two purported Company documents were unreliable and irrelevant to Lead Plaintiff's allegations. Lastly, Defendants argued that Lead Plaintiff failed to adequately allege loss causation because: (a) the *People's Daily* articles did not contain new information and merely repeated the August 2012 Citron Report and are therefore not corrective disclosures; (b) the announcement of a government investigation cannot constitute a corrective disclosure and therefore Lead Plaintiff cannot rely on the January 16, 2014 announcement of Chinese government investigations as a basis for pleading loss causation; and (c) Nu Skin's January 21, 2014 8-K is not

evidence of loss causation because that disclosure does not admit that Nu Skin violated any regulations on direct selling. Defendants also argued that Lead Plaintiff failed to establish control-person liability under Section 20(a). See ECF No. 53; Gardner Decl. ¶¶25-26.

### D.   Settlement Negotiations and the Proposed Settlement

The $47 million Settlement resulted from numerous discussions between the Parties and two mediation sessions. Representatives from State-Boston and counsel for Nu Skin's insurance carriers participated in both mediation sessions. On October 13, 2015, the Parties attended a full-day mediation session before mediator Bruce Friedman of JAMS. Gardner Decl. ¶59. On February 8, 2016, the Parties participated in a second full-day mediation session, this time presided over by mediator Judge Layn R. Phillips, a former federal judge. *Id*. ¶60. Following the second mediation session, the Parties continued to engage in productive settlement discussions with the assistance of Judge Phillips. On February 17, 2016, Judge Phillips made a mediator's proposal to settle the Action for $47 million. The Parties ultimately accepted the mediator's proposal and executed a settlement term sheet on February 22, 2016. *Id.* Thereafter, the Parties negotiated and finalized the terms of the Settlement and executed the Stipulation on May 2, 2016. *Id.* ¶¶60-61.

The Settlement creates a Settlement Fund in the amount of $47 million for the benefit of the Settlement Class. *See* Stipulation at ¶¶1.34, 2.3. In exchange for Defendants' payment, the Settlement Class agrees to release all Released Claims against the Released Defendant Parties, as detailed more fully in the Stipulation. *See* Stipulation at ¶¶1.28, 1.29. The terms of the Settlement are also set forth in the Notice, which was distributed to Class Members. *See* Ex. 3-A.

## ARGUMENT

### I.     The Settlement Satisfies the Criteria for Final Approval

The settlement of disputed claims is favored as a matter of public policy, *see*, *e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969), particularly in the context of class-action litigation. *See, e.g., Jones v. I.Q. Data Int'l, Inc.*, No. 1-14-cv-00130-PJK, 2015 WL 5704016, at *1 (D.N.M. Sept. 23, 2015) ("We are mindful of the strong judicial policy in favor of settlement, particularly in the class action context.")[3]. For these reasons, in evaluating the fairness of the settlement, courts should neither decide the merits of the case, nor substitute their judgment for that of the parties who negotiated the settlement. *Shaw v. Interthinx, Inc.*, No. 13-cv-01229-REB-NYW, 2015 WL 1867861, at *2 (D. Colo. Apr. 22, 2015).

Approval of a proposed settlement is within the sound discretion of the Court. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002); *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). A class action settlement is entitled to final approval under Fed. R. Civ. P. 23(e) where it is "fair, reasonable and adequate." *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993); *Jones*, 741 F.2d at 324 ("the trial court must approve a settlement if it is fair, reasonable and adequate"). In both *Gottlieb* and *Jones*, the Tenth Circuit identified four factors that a district court should consider in assessing whether a proposed class action settlement is fair, reasonable and adequate:

    (i)      whether the proposed settlement was fairly and honestly negotiated;

    (ii)     whether serious questions of law and fact exist, placing the ultimate outcome of the

---

[3] Unless otherwise noted, all internal quotations and citations are omitted and all emphasis is added.

litigation in doubt;

(iii)  whether the value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(iv)  the judgment of the parties that the settlement is fair and reasonable.

*Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324. *See also Campbell v. C.R. England, Inc.*, No. 2:13-cv-00262, 2015 WL 5773709, at *5 (D. Utah Sept. 30, 2015); *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 690 (D. Colo. 2014). Additional relevant factors may include: (i) the risk of establishing damages at trial; (ii) the extent of discovery and the current posture of the case; (iii) the range of possible settlement; and (iv) the reaction of class members to the proposed settlement. *In re New Mexico Nat. Gas Antitrust Litig.*, 607 F. Supp. 1491, 1504 (D. Colo. 1984); *Belote v. Rivet Software, Inc.*, No. 12-cv-02792-WYD-MJW, 2014 WL 3906205, at *2 (D. Colo. Aug. 11, 2014) (citing *New Mexico*).

### A.   The Proposed Settlement was Achieved Only After Arm's-Length Negotiations by Capable and Fully Informed Counsel and Is Not the Result of Collusion

Where a settlement results from arms-length negotiations between experienced counsel, the Court may presume that the settlement is reasonable. *Campbell*, 2015 WL 5773709, at *5 ("Arm's length bargaining between represented parties weighs in favor of finding a settlement reasonable.") (internal quotation omitted). Additionally, protracted, difficult settlement negotiations signify the absence of collusion. *See id.* ("[T]here is no evidence to suggest that the settlement here is the product of collusion. Rather, the evidence shows that . . . the settlement is a result of a fair and difficult negotiation.") The Settlement here is the product of such arm's-length, informed, non-collusive negotiations, which occurred between the Parties over a span of almost half a year and with the assistance and guidance of experienced mediators Bruce Friedman and Judge Phillips.

*See* Gardner Decl. ¶¶59-62. Throughout the settlement negotiations, the Parties were represented by counsel with extensive experience in securities litigation. Lead Counsel has many years of experience in litigating securities fraud class actions and negotiating class action settlements that have been approved by courts throughout the country. *See e.g., In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Funds and reaching proposed settlements of more than $1 billion); *In re Gen. Motors Corp. Sec. and Derivative Litig.*, MDL No. 1749 (E.D. Mich.) (achieving a settlement of $303 million); *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-1500 (N.D. Ala.) (representing New Mexico Funds and achieving settlements valued at approximately $670 million); Ex. 4-D.

The use of experienced mediators Bruce Friedman and Judge Phillips, and the fact that the settlement amount was independently proposed by Judge Phillips, further demonstrate the absence of collusion. *See Crocs*, 306 F.R.D. at 690-92; *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("Parties colluding in a settlement would hardly need the services of a neutral third party to broker their deal."); *cf.*, *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding procedural fairness of settlement that was mediated by Judge Phillips and describing Judge Phillips as "an experienced and well-regarded mediator of complex securities cases"); *see also In re Delphi Corp. Sec. Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) (speaking of Judge Phillips, "the Court and the parties have had the added benefit of the insight and considerable talents of a former federal judge who is one of the most prominent and highly skilled mediators of complex actions").

Moreover, Lead Counsel's investigation had provided a thorough understanding of the strengths and weaknesses of the case at the time of the settlement discussions. Lead Counsel fully

briefed a motion to dismiss and a motion for class certification, including supplemental briefing on class certification. Gardner Decl. ¶¶25-42. Before formal discovery began, Lead Counsel conducted a rigorous investigation, locating more than 100 potential witnesses and interviewing 45 of them, using in-house investigators as well as an investigation firm with offices in Mainland China. *Id*. ¶19. During fact discovery, Lead Counsel reviewed and analyzed: (i) approximately 500,000 pages of documents produced by Defendants; and (ii) approximately 26,000 pages of documents produced in response to third-party subpoenas. Additionally, Lead Counsel took six depositions of Nu Skin representatives and deposed Defendants' expert on class certification issues, including loss causation, damages, and the length of the class period. *Id.* ¶¶43-58. Lead Counsel's investigation amply prepared Lead Counsel to negotiate with the Defendants.

In short, the Parties settled only after extensive investigation and analysis by Lead Counsel, substantial document and deposition discovery, significant consultation with experts, class certification related discovery, full briefing of Lead Plaintiff's class certification motion, two full-day mediation sessions, and additional mediation efforts facilitated by Judge Phillips. *See New Mexico*, 607 F. Supp. at 1504 (citing the extent of discovery and current posture of the case as an additional factor to be considered at final approval). There is absolutely no evidence indicating that the Settlement is anything but the product of informed, fair, and honest negotiations among experienced counsel.

**B.      The Strengths of Lead Plaintiff's Case and the Risks of Establishing Liability**

The second *Gottlieb/Jones* factor is whether there were "serious questions of law and fact . . . placing the ultimate outcome of litigation in doubt." *Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324; *see also* Campbell, 2015 WL 5773709, at *5. Although Lead Counsel believes that this is a

strong case, it nevertheless recognizes that certain risks and uncertainties exist, and are also well aware that numerous other securities class actions have been prosecuted in the belief that they were meritorious, only to lose at summary judgment, at trial, or on appeal.[4] The risks and uncertainties faced by Lead Plaintiff are discussed below and outlined in the Gardner Declaration.

### 1. Motions Could Be Decided Against Lead Plaintiff

Prior to the Settlement being reached, Lead Plaintiff's motion for class certification was pending before this Court.  Although Defendants have not opposed certifying a class in some form, they have argued that the class period should be much shorter than that sought by Lead Plaintiff. Gardner Decl. ¶¶37, 80-83. If the Court credited this argument, it would dramatically reduce class-wide damages. Even if the Court granted Lead Plaintiff's motion for class certification, Lead Plaintiff would still undoubtedly have to oppose a motion for summary judgment. The following sections illustrate the risks of these motions being decided against Lead Plaintiff, a factor that weighs in favor of settlement.

### 2. Defendants Have Maintained That They Believed They Were in Compliance with Applicable Chinese Regulations

Defendants have argued that Lead Plaintiff could not prove that Nu Skin violated Mainland China's rules prohibiting MLM. Gardner Decl. ¶¶70-72. Indeed, Defendants asserted that a government investigation determined that only a handful of rogue Nu Skin salespeople had improperly engaged in unauthorized promotional activities and, thus, the Chinese government did

---

[4] Many plaintiffs have won at trial, only to lose on appeal. *See*, *e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing jury verdict awarding investors $2.46 billion on loss causation and damages grounds and remanding for a new trial on these issues); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant).  *See also* Gardner Decl. ¶¶107-113.

not require Nu Skin to change its business practices, and imposed only a modest fine upon Nu Skin. Additionally, Defendants argued that Nu Skin did not pay its sales employees in Mainland China downline commissions and, instead, its compensation system operated as the Company had disclosed to investors—monthly commissions based on sales and monthly salaries adjusted quarterly, based in part, on group productivity. Further, when Defendants obtained the Chinese government's approval of their compensation model in China, it had expert witnesses prepared to say that the Company was in compliance with China's laws regarding MLM. While Lead Plaintiff believes it could amass sufficient evidence to prove that Defendants made materially false and misleading statements and omissions regarding these issues, there was a risk that the Court could find a failure to prove an actionable misrepresentation. *Id.*

Resolution of whether Chinese law prohibited Nu Skin's compensation model would depend in part on the Parties' competing expert opinions. Any battle of the experts is inherently unpredictable, and there is the risk that Defendants may successfully mount a *Daubert* challenge to exclude one or more of Lead Plaintiff's experts. *In re Bear Stearns*, 909 F. Supp. 2d at 267 ("When the success of a party's case turns on winning a so-called 'battle of experts,' victory is by no means assured.").

### 3.     The Risk that Lead Plaintiff Would Be Unable to Establish Scienter

Defendants also contended that even if Lead Plaintiff were able to prove an actionable misrepresentation, Lead Plaintiff could not prove scienter, *i.e.*, that Defendants knew or believed the Company to be out of compliance with Mainland China's regulations. Defendants would likely argue that, even if Lead Plaintiff could establish that certain Nu Skin employees somehow knew that the Company had violated China's anti-MLM regulations and that Nu Skin's statements about

compensation were thus false or misleading, Lead Plaintiff would be unable to establish that senior management or the individuals who made or approved the alleged misrepresentations knew them to be false.  A defendant's state of mind in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence. Defendants would likely also vigorously argue that Lead Plaintiff's argument that the rapid growth of Nu Skin's business unit and the importance of the business unit to Nu Skin's broader operations support scienter are insufficient as a matter of law to establish Defendants' scienter. Gardner Decl. ¶¶74-77. There was a risk that Defendants' argument may resonate with the Court or a jury, and that the Court could find a failure to establish scienter.

### 4.    Defendants' Loss Causation and Damages Defenses

Defendants' loss causation defenses also presented substantial hurdles to the class's claims. Defendants have argued that the *People's Daily* articles published in January 2014 were not corrective disclosures because they failed to disclose any new information and, instead, only repeated information previously disclosed in the Citron Research Report in August 2012. Additionally, Defendants argued that (i) the Company's announcement of a government investigation could not constitute a corrective disclosure, and (ii) the Company's admission that certain employees had failed to comply with Nu Skin's policies did not amount to a disclosure of Nu Skin's alleged failure to comply with Chinese regulations. Gardner Decl. ¶¶79-81. While Lead Plaintiff has arguments to the contrary, overcoming Defendants' loss causation defenses was not a foregone conclusion.

With respect to damages, Defendants asserted that damages should be limited to the pre-Citron Report period given that the Citron Report, according to Defendants, disclosed all of the

material allegations relied upon by Lead Plaintiff. Alternatively, they argued that the Class Period should end after the first *People's Daily* article, published before trading began on January 15, 2014. Should a jury find Defendants' arguments persuasive, the amount of the class's damages would have been substantially reduced to either approximately $45 million or $300 million. *Id*. at ¶82. *See New Mexico*, 607 F. Supp. at 1504 (citing the risk of establishing damages at trial as an additional factor to be considered at final approval).

Further, Defendants may argue that the confounding (i.e., non-fraud-related) information was disclosed during each of the January corrective disclosures and thus it is Lead Plaintiff's burden to disaggregate the confounding information. *Id*. ¶84. This had the potential to further reduce damages or prevent recovery altogether if Lead Plaintiff's experts could not successfully disaggregate the fraud-related disclosures from the non-fraud-related confounding information. Indeed, since loss causation and damages are expert-intensive issues, there exists a significant risk that Lead Plaintiff would not be able carry its burden of proof. *See In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("[E]stablishing damages at trial would lead to a 'battle of experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001) (noting that it is "virtually impossible to predict with any certainty which [expert] testimony would be credited, and ultimately, which damages would be found to have been caused by actionable" conduct).

### C. The Settlement Amount Relative to the Most Realistic Recoverable Damages

The third *Gottlieb*/*Jones* factor is whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation. *Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324. In evaluating this factor, it is important to keep in mind, as many courts have

noted, that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush.'" *Alvarado Partners L.P., v. Mehta,* 723 F. Supp. 540, 547 (D. Colo. 1989) (citing *West Vir. v. Chas. Pfizer & Co*, 314 F. Supp. 710, 740, 743 (S.D.N.Y. 1970); *see also Tennille v. W. Union Co.*, 809 F.3d 555, 558-59 (10th Cir. 2015); *In re King Res. Co. Sec. Litig.* 420 F. Supp. 610, 625 (D. Colo. 1976).

In considering whether to enter into the Settlement, Lead Plaintiff weighed the value of an immediate guaranteed settlement against the challenges and significant proceedings that remained ahead, such as: (i) additional fact depositions, which, with respect to Nu Skin China witnesses, Defendants have asserted should be taken in Hong Kong at great expense to class members; (ii) additional expert reports, depositions, and *Daubert* motions contesting the qualifications and opinions of each expert; (iii) summary judgment briefing; (iv) trial preparation, including numerous *in limine* motions;  (v) trial; and (vi) appeals. While Lead Plaintiff strongly believed it would ultimately prevail in the litigation, it was also cognizant of the fact that success is never guaranteed. *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion); *Robbins*, 116 F.3d  at 1448-49. (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant).

On the other hand, the guaranteed Settlement of $47 million represents a very meaningful recovery of the damages allegedly suffered by the class. Indeed, the Settlement exceeds both the average and median settlement amounts in recent securities class actions nationwide. As reported by Cornerstone Research, in 2015 the average securities class action settlement was $37.9 million and

the median settlement was $6.1 million. *See* Ex. 2 at 1.

As a percentage of estimated best-case recoverable damages, the Settlement also compares favorably to other class action settlements. *See New Mexico*, 607 F. Supp. at 1504 (citing the range of possible settlement as an additional factor to be considered at final approval). Lead Plaintiff's consulting damages expert has estimated that the class's best-case aggregate damages were approximately $790 million, assuming that Lead Plaintiff was successful in establishing that 100% of the price declines in reaction to all four alleged corrective disclosures were attributable to the alleged fraud. Under this assumption, the $47 million Settlement would be approximately 6% of the class's best-case total estimated losses. The Settlement recovers approximately 16% of Defendants' best-case scenario of damages to the shareholders, assuming of course that liability were proven. Gardner Decl. ¶¶7-8.

This recovery falls well within the range of approval, and courts have generally approved settlements in cases since the PSLRA that recover a comparable or smaller percentage of maximum damages.  *See, e.g., In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (finding that a recovery representing 6.25% of damages was "at the higher end of the range of reasonableness of recovery in class actions securities litigations").  According to Cornerstone Research, between 2006 and 2015, the median percentage of investor losses recovered in securities class-action settlements ranged between 1.8% and 2.9%. *See* Ex. 2 at 8.

### D.     The Parties' Judgment that the Settlement Is Fair and Reasonable

The final *Gottlieb/Jones* factor – the judgment of the parties that the settlement is fair and reasonable – also weighs in favor of approving the Settlement. *Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324. Lead Plaintiff fully supports the Settlement (Ex. 1), and Lead Counsel believes that the Settlement provides an excellent recovery to the Settlement Class. Lead Counsel's opinion is based upon extensive knowledge of the facts of the case and the legal issues facing the class, as well as an analysis of the strengths and weaknesses of the case. After such an analysis, Lead Counsel concluded that the Settlement is fair, just, and adequate to Lead Plaintiff and the Settlement Class.

As evidenced by the extensive briefing of the motion to dismiss and the motion for class certification, as well as the review of more than 500,000 pages of documents and the six depositions conducted, Lead Counsel is extremely well versed in the facts and legal issues to be tried in this case. Given Lead Counsel's extensive experience and success in prosecuting securities class actions, Ex. 4-D, its judgment is entitled to substantial weight. *See, e.g., Belote* v. *Rivet Software, Inc.* No. 12-2792, 2014 WL 3906205,  at *4 ( D. Colo. Aug. 11, 2014) ("[c]ounsels' judgment as to the fairness of the agreement is entitled to considerable weight.") (citing *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 695 (D. Colo. 2006)).

### E.     Class Reaction to Date Supports Approval

As mentioned above, to date, more than 178,000 copies of the Notice have been mailed to potential Settlement Class Members and Summary Notice has been published in *Investor's Business Daily* and transmitted over the internet. Ex. 3 ¶9. To date, there have been no objections and only one request for exclusion (representing just 7 shares).  *Id*. ¶13; *see New Mexico*, 607 F. Supp. at 1504 (citing the reaction of class members as an additional factor to be considered at final approval).

While not dispositive, if only a small number of objections are received, it is indicative of the adequacy of the settlement. *Ryskamp v. Looney*, No. 10-cv-00842, 2012 WL 3397362, at *4 (D. Colo. Aug. 14, 2012) (giving significant weight to the fact only two objections were received); *Make A Difference Found., Inc. v. Hopkins*, No. 10-cv-00408-WJM-MJW, 2012 WL 917283, at *3 (D. Colo. Mar. 19, 2012) (finding that only three objections to the settlement representing 47,000 class members "weigh[ed] heavily in favor of approval of the derivative litigation settlement").

The deadline for submitting objections and requesting exclusion is September 14, 2016.  As provided in the Preliminary Approval Order, Lead Counsel will file reply papers on or before September 28 , 2016, which will address any objections or requests for exclusion received after this submission.  ECF No. 135.

## II.     The Plan of Allocation Is Fair and Reasonable and Should Be Approved

Lead Plaintiff has proposed a plan to allocate the net proceeds of the Settlement among Settlement Class Members, which was reported in the Notice mailed to Class Members. Ex. 3 -A at 8-11. The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Settlement Class Members who suffered economic losses as a result of the Defendants' allegedly false and misleading statements. The $47 million in cash, less attorneys' fees and expenses, notice and administration expenses, and any tax expenses payable from the Settlement Fund (the "Net Settlement Fund"), will be distributed to Authorized Claimants in accordance with the Plan of Allocation.

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *Law v. Nat'l Collegiate Athletic Ass'n*, 108 F. Supp. 2d

19

1193, 1196 (D. Kan. 2000) (internal quotation omitted); *see also Crocs*, 306 F.R.D. at 692 (applying standard). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Lucas*, 234 F.R.D. at 695 (quoting *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001)). Generally, "a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *Crocs*, 306 F.R.D. at 692.

The proposed Plan of Allocation is fair, and reimburses class members based on the type and extent of their injuries. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based upon each Authorized Claimant's Recognized Loss. Gardner Decl. ¶¶91-95; Notice at 8. The formula for calculating each Claimant's Recognized Loss takes into account: (i) alleged artificial inflation (or deflation in the case of put options) in the respective prices of the Nu Skin securities at the time of purchase or acquisition and at the time of sale; (ii) the portion of each price drop that may be attributable to the alleged fraud; (iii) the type of security or securities purchased by the Claimant; (iv) when the Claimant purchased the Nu Skin securities; and (v) whether the Claimant sold the Nu Skin securities during the Class Period, and if so, when. *Id.* This distribution methodology was prepared by Lead Plaintiff's damages expert, and is eminently fair and reasonable.

## III.    The Court Should Affirm Its Certification of the Settlement Class

Courts within the Tenth Circuit have long articulated a strong policy favoring class actions in securities fraud actions. *City of P'Ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 580-81 (D. Colo. 2002) (citing *In re Intelcom Grp, Inc., Sec. Litig.*, 169 F.R.D. 142, 144 (D. Colo. 1996) ("[S]ecurities claims are particularly well suited for class action status because they allow for the

policies behind the securities laws to be enforced in circumstances where there are numerous investors with small individual claims that would otherwise effectively be barred from litigation.")).

In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiff requested that the Court certify the Settlement Class for settlement purposes so that notice of the proposed Settlement, the final approval hearing, and the rights of class members to request exclusion, object, or submit proofs of claim could be issued.  In its Preliminary Approval Order, (ECF No. 135), this Court certified the Settlement Class.  Nothing has changed to alter the propriety of the Court's certification and, for all the reasons stated in the Lead Plaintiff's Unopposed Motion Preliminarily Approving Class Action Settlement (ECF No. 133), and Lead Plaintiff's briefing in connection with the motion for class certification (ECF Nos. 90, 107, 124), incorporated herein by reference, Lead Plaintiff now requests that the Court reiterate its prior certification (i) of the Settlement Class for purposes of carrying out the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3); and (ii) of Lead Plaintiff as Class Representative, as well as its appointment of Lead Counsel as Class Counsel for the Settlement Class.

## CONCLUSION

For the reasons stated herein and the Gardner Declaration, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and Plan of Allocation. Proposed orders will be filed after the deadlines for seeking exclusion and objecting have passed.

Dated: August 31, 2016       **LABATON SUCHAROW LLP**

By:  */s/ Jonathan Gardner*
      Jonathan Gardner (*pro hac vice*)
      Christine M. Fox (*pro hac vice*)

Guillaume Buell (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
jgardner@labaton.com
cfox@labaton.com
gbuell@labaton.com

**CHRISTENSEN & JENSEN, P.C.**
Eric K. Jenkins (10783)
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
Telephone:  (801) 323-5000
Facsimile:   (801) 355-3472
eric.jenkins@chrisjen.com

*Counsel for Lead Plaintiff and the Class*

## **CERTIFICATE OF SERVICE**

I certify that on this 31st day of August 2016, I electronically filed Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Supporting Memorandum of Law using the Court's CM/ECF system, which will be sent electronically to all counsel of record.

/s/ JONATHAN GARDNER
Jonathan Gardner